# 17-2654-cv

## United States Court of Appeals
### for the
## Second Circuit

COALITION FOR COMPETITIVE ELECTRICITY, DYNEGY INC.,
EASTERN GENERATION, LLC, ELECTRIC POWER SUPPLY
ASSOCIATION, NRG ENERGY, INC., ROSETON GENERATING LLC,
SELKIRK COGEN PARTNERS, L.P.,

*Plaintiffs-Appellants,*

– v. –

AUDREY ZIBELMAN, in her official capacity as Chair of the New York Public
Service Commission, PATRICIA L. ACAMPORA, in her official capacity
as Commissioner of the New York Public Service Commission,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

DONALD B. VERRILLI, JR.
MUNGER, TOLLES & OLSON LLP
1155 F Street, NW, 7th Floor
Washington, DC 20004
(202) 220-1100
– and –
HENRY WEISSMANN
FRED A. ROWLEY, JR.
MARK R. YOHALEM
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Suite 5000
Los Angeles, California 90071
(213) 683-9100

JONATHAN D. SCHILLER
DAVID A. BARRETT
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300
– and –
STUART H. SINGER
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
(954) 356-0011

*Attorneys for Plaintiffs-Appellants*

GREGG C. SAYRE, in his official capacity as Commissioner of the New York Public Service Commission, DIANE X. BURMAN, in her official capacity as Commissioner of the New York Public Service Commission,

*Defendants-Appellees,*

EXELON CORP., R.E. GINNA NUCLEAR POWER PLANT LLC, CONSTELLATION ENERGY NUCLEAR GROUP, LLC, NINE MILE POINT NUCLEAR STATION LLC,

*Intervenor-Defendants-Appellees.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned counsel for Plaintiffs-Appellants certifies as follows:

- Plaintiff Coalition for Competitive Electricity is not a public company and has no publicly held parents, subsidiaries, or affiliates.

- Plaintiff Dynegy Inc. ("Dynegy") is a publicly held company. Dynegy does not have a parent company, there are no publicly held companies that have a 10% or greater ownership interest in Dynegy, and Dynegy has no publicly held subsidiaries or affiliates.

- Plaintiff Eastern Generation, LLC is not a public company and has no publicly held parents, subsidiaries or affiliates.

- Plaintiff Electric Power Supply Association is not a public company and has no publicly held parents, subsidiaries or affiliates.

- Plaintiff NRG Energy, Inc. ("NRG") has publicly traded shares. No publicly held company has a 10% or greater ownership interest in NRG. NRG Yield, Inc., ("NYLD") is a publicly traded affiliate of NRG. NRG has no other parents, subsidiaries, or affiliates that are publicly traded.

- Plaintiff Rensselaer LLC is not a public company and has no publicly held parents, subsidiaries or affiliates.

- Plaintiff Roseton Generating LLC is not a public company and has no publicly held parents, subsidiaries or affiliates.

- Plaintiff Selkirk Cogen Partners, L.P. has four corporate parents. Two parent companies—Atlantic Power Corporation and Osaka Gas Co. Ltd.—are public companies, and the other two are private. Selkirk Cogen Partners L.P. has no public affiliates or subsidiaries.

i

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................1

STATEMENT OF THE CASE........................................................2

    A.    Facts........................................................4

        1.    The Federal Regulatory Scheme................................................4

        2.    The ZEC Program's Manipulation of Wholesale Markets........6

        3.    New York's Targeted Subsidies for the Exelon Plants ............10

    B.    Procedural History........................................................12

SUMMARY OF ARGUMENT ........................................................14

ARGUMENT ........................................................18

I.    STANDARD OF REVIEW........................................................18

II.    THE DISTRICT COURT HAS EQUITY JURISDICTION OVER PLAINTIFFS' PREEMPTION CLAIMS. ........................................................19

    A.    Because the FPA Is Judicially Administrable, the *Armstrong* Exception to Equity Jurisdiction Does Not Apply.............................20

    B.    The FPA Confirms, Rather than Implicitly Forecloses, a Private Equitable Remedy. ........................................................23

III.    THE ZEC PROGRAM IS PREEMPTED BY THE FEDERAL POWER ACT. ........................................................29

    A.    The ZEC Program Is Preempted Because It Intrudes upon an Exclusively Federal Field of Law by Ensuring that Certain Favored Nuclear Generators Receive Payments in Connection with Their Wholesale Electricity Sales Over and Above the Rates that FERC Has Determined Are Just and Reasonable. .............29

ii

## TABLE OF CONTENTS
### (continued)

Page

      1.     The ZEC Program Is Functionally Indistinguishable from the Program that Was Found Preempted in *Hughes*. ................ 31

      2.     Preemption of the ZEC Program Leaves New York with Ample Authority to Achieve Legitimate Policy Objectives Within Its Protected Sphere of Authority Under the FPA. ......................................................................... 40

  B.     The ZEC Program Conflicts with Federal Law that Requires Wholesale Rates to Be Determined in Approved Auction Markets. ..................................................................................... 44

IV.    THE ZEC PROGRAM VIOLATES THE COMMERCE CLAUSE. ........... 49

  A.     Plaintiffs State a Claim for a Commerce Clause Violation. ............... 50

      1.     The ZEC Subsidy Is a *Per Se* Violation of the Commerce Clause. ...................................................................... 51

      2.     The ZEC Subsidy Inflicts Harms on Interstate Commerce that Outweigh Any Putative Local Interests. ............................ 53

  B.     Plaintiffs' Allegations Fall Within the "Zone of Interests" Protected by the Commerce Clause ..................................................... 54

  C.     New York Adopted the ZEC Program as a Regulator, Not a Market Participant. .............................................................................. 56

CONCLUSION .................................................................................................... 58

CERTIFICATE OF COMPLIANCE ................................................................... 60

# <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

**FEDERAL CASES**

*AEP Tex. N. Co. v. Tex. Indus. Energy Consumers*,
  473 F.3d 581 (5th Cir. 2006) ...............................................................24

*Allco Finance Limited. v. Klee*,
  861 F.3d 82 (2d Cir. 2017) ..................................................... 37, passim

*Allco Finance Limited v. Klee*,
  3:15-cv-608 (CSH), 2016 WL 4414774 (D. Conn. Aug. 18, 2016)..................57

*Alliance for Clean Coal v. Miller*,
  44 F.3d 591 (7th Cir. 1995) .................................................................52

*Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*,
  812 F.2d 898 (4th Cir. 1987) ...............................................................24

*Ark. Power & Light Co. v. Mo. Pub. Serv. Comm'n*,
  829 F.2d 1444 (8th Cir. 1987) .............................................................24

*Armstrong v. Exceptional Child Center, Inc.*,
  135 S.Ct. 1378 (2015).............................................................. 1, passim

*Bacchus Imps., Ltd. v. Dias*,
  468 U.S. 263 (1984)...........................................................................50

*Barry v. Lyon*,
  No. 13-CV-13185, 2015 WL 12838828 (E.D. Mich. Jun. 5, 2015)..................23

*Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs*,
  27 F.3d 1499 (10th Cir. 1994) .............................................................36

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
  476 U.S. 573 (1986)...........................................................................50

*C & A Carbone, Inc. v. Town of Clarkstown, New York*,
  511 U.S. 383 (1994)...............................................................51, 52, 58

*Cal. Indep. Sys. Operator Corp. v. FERC*,
  372 F.3d 395 (D.C. Cir. 2004).............................................................43

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
520 U.S. 564 (1997).................................................................50

*Carcieri v. Salazar*,
555 U.S. 379 (2009).................................................................28

*Chicago & N. W. Transp. Co. v. Kalo Brick & Tile Co.*,
450 U.S. 311 (1981).................................................................36

*Clarke v. Securities Industry Ass'n*
479 U.S. 388 (1987).................................................................54

*Cortec Indus.. Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991) .......................................................18

*Duncan v. Walker*,
533 U.S. 167 (2001).................................................................25

*Electric Power Supply Ass'n v. Star*,
No. 17 CV 1164, 2017 WL 3008289 (N.D. Ill. Jul. 14, 2017)...........14

*FERC v. Elec. Power Supply Ass'n (EPSA)*,
136 S.Ct. 760 (2016).................................................21, 30, 35, 39

*First Jersey Secs., Inc. v. Bergen*,
605 F.2d 690 (3d Cir. 1979) .....................................................25

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
841 F.3d 133 (2d Cir. 2016) ............................................ 13, passim

*Hughes v. Alexandria Scrap Corp.*,
426 U.S. 794 (1976).................................................................56

*Hughes v. Talen Energy Marketing, LLC*,
136 S.Ct. 1288 (2016).......................................................... 3, passim

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977).................................................................50

*Int'l Paper Co. v. Ouellette*,
479 U.S. 481 (1987).................................................................44

v

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Iowa Mut. Ins. Co. v. LaPlante*,
    480 U.S. 9 (1987)...................................................24

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
    559 U.S. 573 (2010)...................................................24

*Miss. Power & Light Co. v. Miss. ex rel. Moore*,
    487 U.S. 354 (1988)...................................................35

*N.J. Bd. of Public Utils. v. FERC*,
    744 F.3d 74 (3d Cir. 2014) ...........................................4, 5

*N.J. Realty Title Ins. Co. v. Div. of Tax Appeals*,
    338 U.S. 665 (1950)...................................................36

*Northern Natural. Gas Co. v. State Corp. Comm'n of Kan.*,
    372 U.S. 84 (1963)...................................................30, 35, 36, 37

*Nantahala Power & Light Co. v. Thornburg*,
    476 U.S. 953 (1986)...................................................35

*Nat'l Meat Assoc. v. Harris*,
    565 U.S. 452 (2012)...................................................35

*New Energy Co. of Ind. v. Limbach*,
    486 U.S. 269 (1988)...................................................50, 57

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
    491 U.S. 350 (1989)...................................................24

*Niagara Mohawk Power Corp. v. Hudson River-Black River
    Regulating Dist.*,
    673 F.3d 84 (2d Cir. 2012) ...........................................24

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016) ...........................................18

*Oneok, Inc. v, Learjet, Inc.*,
    135 S.Ct. 1591 (2015)...................................................44

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*PPL Energy Plus, LLC v. Solomon*,
766 F.3d 241 (3d Cir. 2014) ...............................................................24

*PPL EnergyPlus, LLC v. Nazarian*,
753 F.3d 467 (4th Cir. 2014) ...............................................................47

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970)................................................................................51

*Planned Parenthood Se., Inc. v. Bentley*,
141 F. Supp. 3d 1207, 1216 (M.D. Ala. 2015)..................................23

*Pub. Serv. Co. v. Patch*,
167 F.3d 15 (1st Cir. 1998).................................................................24

*Retail Indus. Leaders Ass'n v. Fielder*,
475 F.3d 180 (4th Cir. 2007) ..............................................................36

*Rochester Gas & Electric Corp. v. PSC*,
754 F.2d 99 (2d Cir. 1985) ..........................................................39, 40

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007) ...............................................................18

*S.D. Mining Ass'n v. Lawrence Cty.*,
155 F.3d 1005 (8th Cir. 1998) ...........................................................36

*Sayles Hydro Assocs. v. Maughan*,
985 F.2d 451 (9th Cir. 1993) ..............................................................24

*Selevan v. New York Thruway Auth.*,
584 F.3d 82 (2d Cir. 2009) .........................................................55, 56

*Town of Southold v. Town of E. Hampton*,
477 F.3d 38 (2d Cir. 2007) ................................................................53

*Turkmen v. Hasty*,
789 F.3d 218 (2d Cir. 2015) ...............................................................18

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
261 F.3d 245 (2d Cir. 2001) ...........................................................50

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
438 F.3d 150 (2d Cir. 2006) ...........................................................55

*United Haulers Ass'n v. Oneida-Herkimer Waste Mgmt. Auth.*,
550 U.S. 330 (2007)........................................................................58

*Vango Media, Inc. v. City of New York*,
34 F.3d 68 (2d Cir. 1994) ...............................................................45

*Verizon Md., Inc. v. Pub. Svc. Comm'n of Md.*,
535 U.S. 635 (2002)...................................................................19, 28

*Virginia Office of Protection and Advocacy v. Stewart*,
563 U.S. 247 (2011)...................................................................22, 23

*W. Lynn Creamery v. Healy*,
512 U.S. 186 (1994)...................................................................50, 52

*Wos v. E.M.A.*,
568 U.S. 627 (2013).......................................................................35

*Ziglar v. Abbasi*,
137 S.Ct. 1843 (2017).....................................................................18

**STATE CASES**

*Hudson River Sloop Clearwater, Inc. v. New York State Public Service Commission*
(Sup. Ct., Albany Co. Index No. 07242-16) (filed Nov. 30, 2016)....................12

**REGULATORY CASES**

*AmerGen Energy Co.*,
91 FERC ¶ 62,049 (2000) ..................................................................9

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Central Hudson Gas & Electric Co. et al.*, 83 FERC P 61,352 (1998),
    86 FERC P 61,062 (1999), 88 FERC P 61,138 (1999) .........................................5

*N.Y. Pub. Svc. Comm'n v. NYISO*,
    153 FERC ¶ 61,022 (2015)..................................................................45

*NYISO and N.Y. Transm. Owners.*,
    126 FERC ¶ 61,046 (2009)..................................................................45

*NYISO, Inc.*,
    158 FERC ¶ 61,028 (2017)..................................................................45

*Pac. Gas & Elec. Co.*,
    123 FERC ¶ 61,067 (2008)..................................................................48

*Promoting Wholesale Competition Through Open Access Non-*
    *Discriminatory Transmission Servs. by Pub. Utils.*, FERC Order
    No. 888, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996).........................................5

*WSPP*,
    139 FERC ¶ 61,061 (2012)...........................................................42, 43, 44, 49

**FEDERAL STATUTES**

16 U.S.C. § 824 ...............................................................................1

16 U.S.C. § 824(a) .........................................................................29

16 U.S.C. § 824(b)(1)......................................................................4

16 U.S.C. § 824a-3(h)(2)(B) ...........................................................27

16 U.S.C. § 824d(a) ............................................................... 4, passim

16 U.S.C. § 824d(e) .......................................................................32

16 U.S.C. § 824e(a)......................................................................4, 21

16 U.S.C. § 825m(a) ......................................................................25

16 U.S.C. § 825p...................................................................15, 23, 25

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 .........................................................................1, 19, 28

42 U.S.C. § 1983 ...................................................................................1

42 U.S.C. § 16451 ................................................................................9

49 U.S.C. § 47533(3) ...........................................................................26

## FEDERAL RULES

Rule 12(b)(6) .................................................................................1, 12, 18

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1983. This Court has jurisdiction under 28 U.S.C. § 1291. Following entry of a Memorandum Opinion and Order granting Defendants' Rule 12(b)(6) motions on July 25, 2017, SPA-1,[1] District Court ECF Docket no. ("ECF") 159, the District Court entered final judgment on July 27, 2017. SPA-48, ECF 160. Plaintiffs-Appellants timely filed a Notice of Appeal on August 24, 2017. A-318, ECF 161.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The New York Public Service Commission ("PSC") adopted a so-called Zero Emissions Credit ("ZEC") program in August 2016. The ZEC program subsidizes sales of electricity produced by three nuclear power plants in upstate New York. These sales occur in interstate wholesale electricity markets, which are under the exclusive jurisdiction of the Federal Energy Regulatory Commission ("FERC"), pursuant to the Federal Power Act ("FPA"), 16 U.S.C. §§ 824, *et seq.* The issues on appeal are:

1. Whether *Armstrong v. Exceptional Child Center, Inc.*, 135 S.Ct. 1378 (2015), which interpreted the Medicaid Act, precludes private suits in

---

[1] Citations in the form "A-___" are to the Joint Appendix, and "SPA-___" to the Special Appendix. Unless otherwise indicated, in quotations throughout this brief, all emphases are added and all internal citations are omitted.

1

equity to enforce FPA preemption claims, overruling decades of precedent allowing such private enforcement.

2.     Whether Plaintiffs' complaint states a claim that the ZEC program is subject to field or conflict preemption because it mandates that certain favored producers receive payments in connection with their wholesale electricity sales that exceed the FERC-approved auction clearing price and distort the wholesale electricity market.

3.     Whether the complaint states a claim that the ZEC program violates the dormant Commerce Clause by discriminating in favor of subsidized in-state nuclear plants or by unduly burdening interstate commerce.

## STATEMENT OF THE CASE

Plaintiffs filed this action in the Southern District of New York (Valerie E. Caproni, J.) to enjoin the Defendant state officials from enforcing the ZEC portion of an order (the "ZEC Order") entered by the PSC.  A-80 (State of N.Y., Pub. Svc. Comm'n, Order Adopting a Clean Energy Std. (Aug. 1, 2016)).

The ZEC program uses subsidies tethered to wholesale market prices to prop up three failing New York nuclear power plants, all of which are owned by affiliates of Defendant-Intervenor Exelon Corporation.  A-61, ECF 1 (Complaint ("Compl.") ¶¶ 55-58).  These plants sell electricity, in competition with Plaintiffs' power plants, in wholesale auctions conducted under FERC supervision.  A-51, 65 (Compl. ¶¶ 34, 64-65).  The Exelon plants—known as FitzPatrick, Ginna and Nine Mile Point—were not able to compete successfully in those wholesale markets; they were operating at a loss and would have gone out of business without the

2

additional support payments mandated by the state. A-60 (Compl. ¶¶ 52-58). To keep these plants operating, the ZEC program provides subsidies, over and above the FERC-approved auction rates, for the electricity they sell into wholesale auctions. A-40, 62 (Compl. ¶ 3, 58). New York consumers of electricity foot the bill for these subsidies, which are projected to reach $7 billion over the next dozen years.

Plaintiffs allege that the ZEC program is unconstitutional because it is preempted by the FPA and violates the Commerce Clause. A-71 (Compl. ¶¶ 76-101). In providing ZEC subsidies tied to participation in wholesale markets, the PSC has usurped FERC's exclusive authority under the FPA to set just and reasonable rates that power producers receive in connection with sales of electricity into wholesale auctions. For preemption purposes, the New York ZEC program is identical in substance to a state program that the Supreme Court unanimously invalidated in *Hughes v. Talen Energy Marketing, LLC*, 136 S.Ct. 1288 (2016). The program invades FERC's exclusive jurisdiction because it replaces the FERC-determined just and reasonable auction prices for wholesale electricity with a different rate determined by the state. ZEC subsidies also distort wholesale auction outcomes in conflict with FERC's policy of using auctions to set wholesale electricity prices. Finally, the ZEC program favors three in-state nuclear

3

plants at the expense of out-of-state generators who compete in the same FERC

auction markets, thereby violating the dormant Commerce Clause.

### A.  Facts

#### 1.  The Federal Regulatory Scheme

The FPA gives FERC broad and exclusive authority over "the sale of

electric energy at wholesale in interstate commerce," 16 U.S.C. § 824(b)(1),

including regulation of any charges "in connection with" wholesale rates and any

"rules and regulations affecting or pertaining to such rates or changes," 16 U.S.C.

§§ 824d(a), 824e(a).  FERC has "exclusive jurisdiction over 'rates and charges ...

received ... for or in connection with' interstate wholesale sales," *Hughes*, 136

S.Ct. at 1297 (quoting 16 U.S.C. § 824d(a)), and has exclusive authority to ensure

that wholesale electricity rates are not "unjust, unreasonable, unduly discriminatory

or preferential," *id*. at § 824e(a).

FERC has determined that the just and reasonable rates for wholesale energy

and capacity should be set by competitive energy markets and auctions, rather than

traditional cost-of-service ratemaking, in states like New York that have elected to

participate in competitive wholesale electricity markets since 1999.  *See* A-48

(Compl. ¶ 27); *N.J. Bd. of Public Utils. v. FERC*, 744 F.3d 74, 81 (3d Cir. 2014).

In New York, the wholesale auctions are managed by the New York Independent

System Operator ("NYISO"), under rules and procedures FERC has approved.  *See*

4

*Central Hudson Gas & Electric Co. et al.*, 83 FERC P 61,352 (1998), 86 FERC P 61,062 (1999), order on reh'g, 88 FERC P 61,138 (1999); A-48 (Compl. ¶¶ 27-28); *N.J. Bd*, 744 F.3d at 82

NYISO operates two main types of wholesale auctions: energy and capacity. A-49 (Compl. ¶ 29). Both auctions employ "stacking" of bids from lowest to highest until the requisite quantity is covered. A-50, 54 (Compl. ¶¶ 33, 39-40). The price of the highest-stacked bid sets the "market clearing price," which all bidders at or below that price receive. *Id.* The clearing price is by definition the FERC-approved "just and reasonable" rate. *Hughes*, 136 S.Ct. at 1297.

In "energy" auctions, generators bid the lowest price they will accept to sell a specified quantity of electrical output on a spot or short-term basis. A-49 (Compl. ¶¶ 30-34). In "capacity" auctions, generators bid, and NYISO purchases, options to call upon the generator to produce a specified amount of energy if and when needed in the future, which insures the long-term reliability of the electric system. A-52 (Compl. ¶ 35-40).

FERC adopted the supply/demand-based auction process "to bring more efficient, lower cost power to the Nation's electricity consumers" by aligning incentives. *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. by Pub. Utils.*, FERC Order No. 888, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996). "A high clearing price in the capacity

auction encourages new generators to enter the market, increasing supply and thereby lowering the clearing price in same-day and next-day auctions three years' hence; a low clearing price discourages new entry and encourages retirement of existing high-cost generators." *Hughes*, 136 S.Ct. at 1293. Over time, the FERC-approved market design is self-correcting and leads to efficient economic equilibrium. A-55 (Compl. ¶ 40).

### 2. The ZEC Program's Manipulation of Wholesale Markets

New York's ZEC program disrupts FERC's market-based approach to setting wholesale rates. To keep Exelon's three favored plants in operation, the ZEC program provides a subsidy payment for each megawatt of electricity these plants sell into the wholesale auction, over and above the FERC-approved auction price. The program thus countermands the outcome of the FERC-regulated auction process, which sets rates too low to allow those plants to operate profitably. In so doing, the ZEC program artificially inflates supply, which depresses the auction clearing price to the disadvantage of more efficient wholesale market participants, including Plaintiffs.

The ZEC subsidy for these plants is expressly tethered to wholesale prices resulting from the NYISO auctions. A-69 (Compl. ¶¶ 70-71). The ZEC price

6

formula starts with a Base Subsidy Amount,[2] which is set at $17.48 per megawatt hour ("MWh") for the first two years of the program, increasing to $21.38 by 2021. A-266 (ZEC Order App. E, p. 13).  From 2023-2029, the Base Subsidy Amount increases even further, though the precise amount depends on the future mix of renewable and conventional generation resources.  A-259 (*id*. at App. E, p. 6).  To establish the ZEC subsidy amount, the Base Subsidy Amount is adjusted biennially by reference to forecast wholesale market prices in two specified areas of the state. A-215 (ZEC Order 131).[3]  The ZEC Order sets a baseline wholesale price index of $39/MWh, which approximates the sum of recent forecasts of energy and capacity prices in the specified NYISO markets for the first two years of the ZEC program. A-222 (*id.* at 138-139).  As prices in the wholesale markets rise above $39/MWh in future years, the ZEC subsidy is reduced dollar for dollar.  *Id*.; *see also* A-258 (App. E at 5-8).  If prices decline after having risen above the $39/MWh benchmark, the ZEC subsidy is increased dollar for dollar, up to the Base Subsidy

---

[2] The PSC refers to this amount as the "Social Cost of Carbon," adjusted for revenue anticipated from the Regional Greenhouse Gas Initiative.  But because Plaintiffs dispute the derivation of these amounts and allege they are simply a dollar amount designed to keep the Exelon plants in business, Plaintiffs refer to it instead as the Base Subsidy Amount.

[3] Specifically, the Base Subsidy Amount is reduced by the amount by which the "Zone A [western New York] Forecast Energy Price and [rest of state] Forecast Capacity Price combined exceeds $39/MWh."  No subsidized plant is in Zone A. A-215 (ZEC Order 131).

Amount. The effect of these calculations is that the three subsidized Exelon plants are guaranteed two revenue streams for the electricity they sell into wholesale auctions: (1) the amounts they earn in the wholesale markets, plus (2) the Base Subsidy Amount; but (2) is reduced as (1) increases. New York has effectively decreed that until FERC's prices increase to, and remain at, a level deemed sufficient by the state, the plants receiving ZECs will be paid for wholesale electricity sales at a rate substantially higher than the FERC-approved market price.

The ZEC Order requires "load serving entities" (LSEs)—the local utilities that purchase power at wholesale and sell it at retail to end-use consumers—to make ZEC subsidy payments to the favored nuclear power plants in addition to paying the FERC-approved auction rates for wholesale power. LSEs are authorized to pass the cost of the subsidy on to consumers. The LSEs make the ZEC payments through a state entity, the New York State Energy Research and Development Authority ("NYSERDA"), which acts solely as a middleman. A-68 (Compl. ¶¶ 69-73).

While the ZEC Order does not expressly mandate that the plants receiving ZEC subsidies bid into the NYISO auctions, it presupposes that they will do so, and in fact the subsidized generators must do so, both by virtue of legal obligation and as a practical economic reality. A-51, 65 (Compl. ¶¶ 34, 64). The whole

8

purpose of the ZEC program is to shore up the three plants' economic performance by guaranteeing them more than the wholesale price for each megawatt of electricity they sell at wholesale in the NYISO auctions. A-39, 61 (Compl. ¶¶ 2-3, 55-58).

Unlike plants whose output can be adjusted quickly in response to fluctuations in demand, nuclear generators (including FitzPatrick, Ginna and Nine Mile Point) run continuously at maximum output. A-51 (Compl. ¶ 34). Because they cannot store their production or sell it elsewhere, the subsidized nuclear generators typically bid into energy auctions as "price takers," selling their entire output at the market clearing price. *Id.* Furthermore, as Exempt Wholesale Generators ("EWGs") under the Public Utility Holding Company Act, 42 U.S.C. §§ 16451, *et seq.*, FitzPatrick, Ginna, and Nine Mile Point are legally obligated to sell their electricity only at wholesale. *AmerGen Energy Co.*, 91 FERC ¶ 62,049 (2000).

The ZEC program not only alters the prices that result from FERC's auction-based system, but also distorts the market mechanism that signals that certain plants are uneconomical and should close. Enabling the three state-favored nuclear plants to remain open increases the supply of capacity in the market above economically efficient levels, reducing the value of energy and capacity produced by other, more efficient generators. A-56 (Compl. ¶¶ 44-45). In turn, the ZEC

9

subsidies' manipulation of the wholesale market will deter investment in and entry of efficient new generators, including zero-carbon renewables like wind and solar. The long-term result will be higher prices to consumers. A-58 (Compl. ¶¶ 47-48).

### 3. New York's Targeted Subsidies for the Exelon Plants

Although the ZEC program is theoretically open to any nuclear generator that has made a "historic contribution" to New York's clean energy mix, A-134, 209 (ZEC Order 50, 125), the program was designed to ensure that the only recipients of the ZEC subsidies will be FitzPatrick, Ginna and Nine Mile Point. A-39, 61 (Compl. ¶ 2-3, 54-58). The PSC enacted the ZEC program in response to Exelon's threat to close those plants. A-61 (Compl. ¶¶ 54-58). The "historic contribution" requirement effectively eliminates all out-of-state nuclear plants.

The original ZEC proposal, which was issued by the PSC staff in January 2016, provided for subsidies to nuclear plants facing "financial difficulties," with the subsidy amount "based upon the difference between the anticipated operating costs of the units and forecasted wholesale prices." A-203 (ZEC Order 119). FitzPatrick, Ginna, and Nine Mile Point were expressly identified as plants with such "financial difficulties." However, after the Supreme Court held in *Hughes* that state subsidies to electricity generators are preempted by the FPA if they are "[]tethered" to FERC-regulated wholesale electricity prices, 136 S.Ct. at 1299, the PSC staff issued a revised recommendation in July 2016 that changed the formula

10

for determining the ZEC subsidy amounts (A-65 (Compl. ¶ 63)). The new

formula was ostensibly based upon a federal interagency working group's

estimated "social cost of carbon." But this merely changed the subsidy's name, not

its intent or effect: to greatly increase the FERC-determined price with a state-

mandated subsidy for the Ginna, FitzPatrick and Nine Mile Point plants. *Id.*

Despite the name change, the final ZEC price was set at a level that would enable

the nuclear plants to stay afloat (A-39 (*id.* ¶ 2)), and Exelon promptly announced

that they would remain open (A-41(*id.* ¶ 5)). Indian Point, a profitable nuclear

plant in Westchester County, was not recommended for inclusion in the ZEC

program. A-65, 67 (*id.* ¶¶ 63, 68).

Although the revised ZEC recommendation was packaged as a "clean air"

measure, a number of environmental groups, as well as ratepayers and other civic

organizations, strongly opposed it. The Sierra Club and other environmental

groups objected that the ZEC program was "blatant corporate favoritism" and a

"consumer rip-off" to force New York's consumers to buy "dirty and dangerous

nuclear power" at high cost, even though "real clean energy options are available

11

for lower cost."[4]  The environmental objectors disputed the PSC's stated premise

for the ZEC program, which was that the nuclear plants must stay open to prevent

"backsliding" that would increase the use of carbon-based fuel until additional

renewable sources become available.[5]  Despite the objections, the PSC adopted the

staff's revised recommendation on August 1, 2016.  A-65 (Compl. ¶ 64).  Several

environmental groups, a municipality, and ratepayers have sued in New York state

court to enjoin the ZEC program; that suit is pending.[6]

### B.  Procedural History

Plaintiffs filed the complaint on October 19, 2016.  A-38.  Exelon, as the

beneficiary of the ZECs, intervened as a Defendant.  ECF 39.  Both Exelon and the

state Defendants filed Rule 12(b)(6) motions to dismiss.  ECF 54, 76.  The district

court first stayed discovery and thereafter granted the motions.  ECF 80, 108, 159.

---

[4] N.Y. State Dep't of Pub. Svc., Matter Master: 15-01168/15-E-0302, DPS.NY.GOV, http://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx? MatterCaseNo=15-e-0302 (Filing No. 328) (comments of Alliance for a Green Econ., Council on Intelligent Energy & Conservation Policy, Nuclear Info. & Res. Serv., Sierra Club-Atl. Chapter).  Other groups filing objections to the ZEC program include Citizens' Environmental Coalition (Filing No. 320), Ampersand Hydro (Filing No. 331), the New York Association of Public Power (Filing No. 333), the City of New York (Filing No. 338), the Public Utility Law Project (Filing No. 343), and Promoting Health and Sustainable Energy (Filing No. 348).

[5] *See, e.g., id*. (Filings nos. 194 & 348) ("voluminous literature demonstrates that nuclear power is extremely ill-suited to combating to [sic] climate change").

[6] *Hudson River Sloop Clearwater, Inc. v. New York State Public Service Commission* (Sup. Ct., Albany Co. Index No. 07242-16) (filed Nov. 30, 2016).

12

In its order of dismissal, the court applied *Armstrong v. Exceptional Child Center, Inc*., 135 S.Ct. 1378 (2015), to find that the "FPA tacitly forecloses private parties from invoking equity jurisdiction to challenge state laws enacted in alleged violation of the FPA because Congress implicitly provided a 'sole remedy' in the FPA—specifically, enforcement by FERC."  SPA-11.  The court distinguished this Court's decision in *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144-47 (2d Cir. 2016), which interpreted *Armstrong* as not precluding equitable relief under the Airport Noise and Capacity Act ("ANCA").

Despite holding that *Armstrong* precluded relief, the court proceeded to the merits.  As to field preemption, the court held that, even though the New York ZEC program directly affects the rate received by the Exelon nuclear plants for their wholesale electricity sales, the program does not impinge upon FERC's exclusive authority.  The court distinguished the Maryland program in *Hughes* on the ground that the New York program "does not condition or tether ZEC payments to wholesale auction participation."  SPA-29.  The court also held that Plaintiffs had not stated a claim for conflict preemption because, while Plaintiffs alleged "clear damage to federal goals," any such damage was "indirect and incidental," and the allegations were not "plausible" in light of FERC's approval of

13

"similar" programs involving Renewable Energy Credits ("RECs"). *Id.* at SPA-31-34.

The court held that Plaintiffs lacked Article III standing to assert Commerce Clause claims because their alleged injuries are not "within the zone of interests to be protected by the dormant Commerce Clause." SPA-41. The court further rejected the Commerce Clause claims on the merits, reasoning that "New York was acting as a market participant, not as a regulator, when it created ZECs [and thus was validly] participating in the energy market and exercising its right to favor its own citizens." SPA-42, 45.

Plaintiffs timely appealed. A-318.

Shortly before the district court's decision in this case, a challenge by some of the Plaintiffs here to a similar ZEC program adopted by the Illinois Legislature also was dismissed. *See Electric Power Supply Ass'n v. Star*, No. 17 CV 1164, 2017 WL 3008289 (N.D. Ill. Jul. 14, 2017). That decision has been appealed to the Seventh Circuit (No. 17-2445, appeal filed July 17, 2017).

## SUMMARY OF ARGUMENT

1.  Plaintiffs properly invoked the district court's equity jurisdiction to enjoin enforcement of the ZEC program as preempted by the FPA. Unlike the Medicaid Act construed in *Armstrong*, 135 S.Ct. 1378, the FPA does not evidence an intent to withdraw equity jurisdiction. On the contrary, the FPA expressly

14

confers jurisdiction on district courts over "all suits in equity," 16 U.S.C. § 825p, and the federal courts, consistent with this grant, have long entertained suits seeking to enjoin state action as preempted by the FPA.

*Armstrong* held that two aspects of the Medicaid Act "combined" to demonstrate Congress's intent to foreclose equity jurisdiction: the withholding of federal funds was the "sole remedy" set forth in the Act for a state's failure to comply with the Act's requirements (the "remedies" factor); and the statutory standard that plaintiffs sought to enforce was "judicially unadministrable" (the "administrability" factor). 135 S.Ct. at 1385. The district court agreed with Plaintiffs that the FPA standard Plaintiffs seek to enforce is "not judicially unadministrable." SPA-12. This finding should have ended the inquiry because the administrability factor was essential to the Supreme Court's holding that the Medicaid Act precludes private enforcement. Accordingly, *Armstrong* is inapplicable here. But even if *Armstrong's* remedies factor were considered, the district court erred in concluding that it was met. The provision of the FPA granting FERC authority to bring an action to enforce the FPA does not impliedly foreclose a private suit. The district court's contrary conclusion ignores the FPA's broad grant of equity jurisdiction and is foreclosed by this Court's decision in *East Hampton*, 841 F.3d 133.

15

2. *Hughes* establishes that New York's ZEC program is field preempted because it intrudes into FERC's exclusive jurisdiction over wholesale power transactions. Just as Maryland, in *Hughes*, could not augment the wholesale auction rate through a contract for differences that changed the amount received by wholesale power generators for auction sales, New York cannot do so by providing a subsidy that increases the rate received by three favored nuclear plants for sales in the wholesale market. In both cases, the state has set a wholesale rate different from the FERC-approved rate. It makes no difference that New York invokes environmental objectives and calls its subsidy a "zero emissions credit"; whatever the merits of those goals, New York may not accomplish them by tethering the subsidy to wholesale markets.

The district court erroneously concluded that *Hughes* does not apply because the ZEC Order, unlike the Maryland statute in *Hughes*, does not formally mandate that ZEC recipients participate in wholesale auctions. But FERC's exclusive jurisdiction cannot be so easily evaded. The three Exelon plants already sell all the electricity they generate in the NYISO auctions, and the program's purpose is to prevent them from closing, as they otherwise would due to insufficient revenue earned in the auctions. The PSC had no need to require that ZEC-subsidized plants participate in and clear the auctions because both the law and the reality of their

16

business compels it. Consequently, the New York ZEC program is no different from the preempted Maryland program in *Hughes*.

3. The district court further erred in dismissing Plaintiffs' conflict preemption claim. The court, notwithstanding well-pleaded allegations in the complaint, failed to credit Plaintiffs' allegations that the ZEC subsidy would severely distort auctions for energy and capacity, and thereby undermine federal policy that wholesale electric rate be determined by such competitive auctions.

4. On the Commerce Clause claim, the district court wrongly held that Plaintiffs lacked standing even though they are the targeted and disadvantaged competitors affected by the ZEC subsidy. On the merits, the court erred in holding that "New York was acting as a market participant, not as a regulator, when it created ZECs." SPA-42. New York is not acting as a participant in the wholesale markets. It is not facilitating commerce, nor taking ownership or possession of any goods. It promulgated the ZEC Order through a regulatory commission in its capacity as a *regulator*. The district court erred in cutting short the factually intensive inquiry required to adjudicate a Commerce Clause claim where a state program operates to benefit only a single company's in-state businesses.

17

# **ARGUMENT**

## I.   **STANDARD OF REVIEW**

This Court reviews *de novo* a district court's decision granting a motion to dismiss under Rule 12(b)(6), "construing the complaint liberally, accepting all factual allegations as true, and drawing all reasonable inferences in the plaintiff's favor." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016). The district court also could refer to the ZEC Order, which is referenced in the complaint, in order to ascertain what actions the PSC took and its stated reasons for doing so. SPA-3 n. 2 (citing *Cortec Indus.. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). The district court could not, however, treat the PSC's factual findings as true where they are inconsistent with the allegations of the complaint. *See Turkmen v. Hasty*, 789 F.3d 218, 226 n.6 (2d Cir. 2015), *rev'd in part on other grounds sub nom. Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017) ("at the pleading stage, although we must consider the words [in a document incorporated into the complaint by reference], we need not consider the truth of those words to the extent disputed by Plaintiffs"; "reliance on any assertion of fact requires a credibility assessment that we are fundamentally unsuited to make at the Rule 12(b)(6) stage"); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order to determine what statements [a document] contained—but again not for the truth of the matters asserted.").

18

## II. THE DISTRICT COURT HAS EQUITY JURISDICTION OVER PLAINTIFFS' PREEMPTION CLAIMS.

The district court erred in concluding that Congress impliedly foreclosed private suits for injunctive relief. SPA-9-14. If upheld, this extraordinary ruling would wipe out a whole category of long-established federal jurisdiction under the FPA and would similarly bar preemption claims to enforce many other federal statutes.

Plaintiffs seek injunctive and declaratory relief to prevent the enforcement of state law on the ground that it is preempted by the FPA. This is a classic invocation of equity jurisdiction. "[T]he Supreme Court has consistently recognized federal jurisdiction over declaratory- and injunctive-relief actions to prohibit the enforcement of state or municipal orders alleged to violate federal law." *East Hampton*, 841 F.3d at 144; *accord Verizon Md., Inc. v. Pub. Svc. Comm'n of Md.*, 535 U.S. 635, 642 (2002) (finding "no doubt that federal courts have jurisdiction" under 28 U.S.C. § 1331 over a suit asking a court to enjoin the enforcement of federally preempted state law). The Supreme Court reconfirmed the availability of such injunctive relief in *Armstrong*, where it noted that the "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." 135 S.Ct. at 1384; *accord Friends of East Hampton Airport*, 841 F.3d at 1144 (collecting cases).

19

As *Armstrong* acknowledged, the "power of the federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." 135 S.Ct. at 1385. But the Supreme Court set a high bar for recognizing any such implied limitations. It found an implied limitation in *Armstrong* only because two interrelated features of the Medicaid Act together "establish[ed] Congress's 'intent to foreclose' equitable relief." *Id*. First, the "sole remedy ... for a State's failure to comply with Medicaid's requirements" was withholding of funds by the agency. While this provision "might not, *by itself*, preclude the availability of equitable relief," it did so "when combined with the judicially unadministrable" standard expressed in the statute. *Id.* (emphasis in original). Neither of these considerations applies to the FPA.

### A. Because the FPA Is Judicially Administrable, the *Armstrong* Exception to Equity Jurisdiction Does Not Apply.

The district court correctly concluded that Plaintiffs' preemption claims do not involve a "judicially unadministrable standard." SPA-12-14. In *Armstrong*, the plaintiffs asked the district court to decide whether state Medicaid reimbursement rates met statutory requirements that the rates be "'consistent with efficiency, economy, and quality of care,' ... while 'safeguard[ing] against unnecessary utilization of ... care and services.'" 135 S.Ct. at 1385. The Supreme Court held that the "sheer complexity" of this "judgment laden standard" made it "judicially unadministrable." *Id.*

20

In sharp contrast, the legal standards for deciding Plaintiffs' preemption claim are well within the traditional competence of the courts. As the district court recognized, Plaintiffs "are not asking the Court to set rates." SPA-12 n.10. Plaintiffs ask the court to determine whether New York's ZEC program impinges upon FERC's exclusive authority over rates and charges "received … in connection with" wholesale electricity rates and "rules and regulations pertaining to or affecting such rates or charges." 16 U.S.C. § 824d(a); *see also* § 824e(a). The FPA provisions allocate regulatory responsibility between the federal government and the states, an issue familiar to the courts.

The statutory text delimiting FERC's power cannot be compared, either in breadth or complexity, to Section 30A of the Medicaid Act. It describes the jurisdictional nexus to wholesale electricity rates using phrases ("in connection with" and "pertaining to or affecting") that courts frequently encounter in statutes. *See FERC v. Elec. Power Supply Ass'n (EPSA)*, 136 S.Ct. 760, 774 (2016) (construing FERC's "affecting" jurisdiction under the FPA and referencing "similar terms like 'relating to' or 'in connection with'"). Just as a federal court could evaluate compliance with ANCA "without engaging in [a] 'judgment-laden' review," *East Hampton Airport*, 841 F.3d at 147, so too may the court determine if the ZEC Order is preempted by the FPA. Indeed, the Supreme Court recently applied the same FPA provisions at issue here in considering the preemption claim

21

in *Hughes*, determining that a state law "contravene[ed] the FPA's division of authority between state and federal regulators." 136 S.Ct. at 1297. And while Plaintiffs ask the Court only to vindicate FERC's ratemaking authority, even determination of a just and reasonable rate would not be "judicially unadministrable." SPA-12-13.

Because Plaintiffs' claims do not require application of a "judicially unadministrable" standard, *Armstrong* does not apply. That should have been the end of the inquiry. The district court erred when it went on to hold—based solely on *Armstrong*'s remedies factor—that the FPA forecloses equity jurisdiction. SPA-13-14 (finding "no indication in *Armstrong* that both factors must be satisfied in order to conclude that Congress intended to foreclose equitable relief to private parties"). *Armstrong* expressly states that the first factor "might not, *by itself*, preclude the availability of equitable relief." *Armstrong*, 135 S.Ct. at 1385 (emphasis in original, citing *Virginia Office of Protection & Advocacy v. Stewart*, 563 U.S. 247, 256 n. 3 (2011)); *see also Armstrong*, 135 S.Ct. at 1388 (Breyer, J., concurring) ("several characteristics of the federal statute before us, when taken together, make clear that Congress intended to foreclose respondents from bringing this particular action for injunctive relief"). That is the reason the Court went on to address the administrability factor and held that both factors "combined" to foreclose private injunction actions. *Id.* at 1385.

22

*Armstrong* thus makes clear that equity jurisdiction cannot be defeated by the mere availability of agency and enforcement remedies. This is underscored by the *Armstrong* Court's supporting citation to *Stewart*, 563 U.S. 247. In *Stewart*, the Court held that a statute's provision of a specific administrative enforcement method, standing alone, "does not demonstrate that Congress has 'displayed an intent not to provide the "more complete and more immediate relief" that would otherwise be available under *Ex parte Young*.'" *Id.* at 256 n. 3. *See also Barry v. Lyon*, No. 13-CV-13185, 2015 WL 12838828, at *2 (E.D. Mich. Jun. 5, 2015) ("To be clear, the [*Armstrong*] Court held that *both* of these aspects *combined* to foreclose equitable relief." [emphasis in original]); *Planned Parenthood Se., Inc. v. Bentley*, 141 F. Supp. 3d 1207, 1216 (M.D. Ala. 2015) (the first *Armstrong* factor, without the second, is insufficient to defeat equity jurisdiction).

### B. The FPA Confirms, Rather than Implicitly Forecloses, a Private Equitable Remedy.

Even if there were a need to consider the first *Armstrong* factor, the district court erred in holding that the FPA evinces an intent to bar private actions against its enforcement. In stark contrast to the Medicaid Act construed in *Armstrong*, the FPA confers jurisdiction on district courts over "*all suits in equity* and actions at law." 16 U.S.C. § 825p. This express grant of equity jurisdiction confirms the background presumption, reaffirmed in *Armstrong*, that courts possess equity jurisdiction to enjoin federally preempted state laws.

23

The federal courts have, for decades, exercised equity jurisdiction to adjudicate private suits seeking to enjoin state action as preempted by the FPA.[7] Despite repeatedly amending the FPA—in 1978, 1980, 1986, 1992, 2005, and 2015—Congress has never cast doubt on courts' equity jurisdiction over such suits or sought to amend Section 825p's grant of equity jurisdiction. Under the prior construction canon, Congress must be presumed to have known of the long line of cases recognizing private equity actions, and to have adopted their interpretation of the FPA. *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 590 (2010); *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 18 (1987).

The district court nevertheless construed the FPA as evidencing an intent to foreclose private enforcement actions because "Congress implicitly provided a 'sole remedy' in the FPA—specifically, enforcement by FERC." SPA-11. This was error.

---

[7] *See, e.g.*, *PPL Energy Plus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014); *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84 (2d Cir. 2012); *AEP Tex. N. Co. v. Tex. Indus. Energy Consumers*, 473 F.3d 581 (5th Cir. 2006); *Pub. Serv. Co. v. Patch*, 167 F.3d 15 (1st Cir. 1998); *Sayles Hydro Assocs. v. Maughan*, 985 F.2d 451 (9th Cir. 1993); *Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*, 812 F.2d 898 (4th Cir. 1987); *Ark. Power & Light Co. v. Mo. Pub. Serv. Comm'n*, 829 F.2d 1444 (8th Cir. 1987); *see also New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350 (1989) (district court erred in abstaining in a utility's suit for equitable relief on FPA preemption grounds against state ratemaking order); *Hughes*, 136 S.Ct. at 1296 n.6 (because no party challenged whether plaintiffs could seek declaratory relief, Court "assumes without deciding that they may").

Initially, the district court observed that "the FPA grants FERC broad enforcement authority," including "to bring an action in federal district court to enjoin any person violating the FPA or to enforce compliance." SPA-11 (citing 16 U.S.C. § 825m(a)). Unlike the Medicaid Act, however, § 825p does not give FERC *sole* authority to enforce the FPA. Instead, it confers federal jurisdiction over "all" suits in equity, which includes private suits. *See First Jersey Secs., Inc. v. Bergen*, 605 F.2d 690, 694 (3d Cir. 1979) (the "primary purpose" of statutory provision granting jurisdiction over "all suits in equity and actions at law" is to "provide exclusive federal jurisdiction for suits brought by the [agency] *or private parties*"). FERC's authority under other provisions of the FPA to institute administrative or judicial proceedings cannot be read to negate Congress's express grant of district court jurisdiction over "all suits in equity." These provisions can and thus must be given effect by reading the FPA to allow for parallel private and agency enforcement. *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (discussing anti-surplusage canon).

This Court recently used just such reasoning in *East Hampton*, 841 F.3d 133. The Court held that Congress did not intend in ANCA to limit a federal court's equity power to enjoin preempted local laws restricting use of and access to a town airport. *Id*. at 144-47. The Court concluded that although ANCA permits the Secretary of Transportation to terminate an airport's federal funding if its noise

25

or access restrictions violate ANCA, "there is no textual basis to conclude that the loss of federal funding is the *only* consequence for violating ANCA." *Id*. at 145 (emphasis added). The Court pointed to another provision of ANCA, which allowed the Secretary (but not a private party) to bring an action to obtain legal remedies, including injunctive relief. *Id.* (quoting 49 U.S.C. § 47533(3)). That remedy showed that "Congress did not intend [the funding provision] to be the only means of enforcing ANCA's procedural requirements." *Id.* "The fact that Congress conferred such broad enforcement authority on the [Secretary], and not on private parties, does not imply its intent to bar such parties from invoking federal jurisdiction where, as here, they do so not to enforce the federal law themselves, but to preclude a municipal entity from subjecting them to [preempted] local laws." *Id.* at 146.

These grounds for distinguishing *Armstrong* apply with even greater force here. In this case, as in *East Hampton*, Plaintiffs seek to "preclude a [state] entity from subjecting them to [state] laws enacted in violation of federal requirements." *Cf.* 841 F.3d at 146. Here, as in *East Hampton*, the federal statute at issue does not limit remedies to "withholding funds," *Armstrong*, 135 S.Ct. at 1385, but also confers "enforcement authority" on a federal agency, *East Hampton*, 841 F.3d at 146. In contrast to ANCA, however, the FPA also includes an express grant of

26

equity jurisdiction, which shows Congress *contemplated*, and certainly did not intend to foreclose, private suits in equity.

The district court attempted to distinguish *East Hampton* on the ground that, "unlike ANCA, Congress provided for a narrow private cause of action under the FPA in the Public Utility Regulatory Policies Act ('PURPA'), which authorizes private parties to challenge rules governing small power production facilities, after first exhausting their administrative remedies." SPA-12 (citing 16 U.S.C. § 824a-3(h)(2)(B)). The district court's reasoning is incorrect because it confuses a private cause of action with equity jurisdiction. *See also* SPA-11 n. 9 (stating that this Court's discussion of equity jurisdiction in *East Hampton* "is not entirely clear" and suggesting that the inquiry is "whether a cause of action exists"). Plaintiffs do not claim that the FPA creates a private right of action. As *Armstrong* explained, the "ability to sue to enjoin unconstitutional actions by state ... officers" does not require a general "private right of action." *Id.*, 135 S.Ct. at 1384. *See supra* note 7 (collecting cases that decide FPA preemption claims without regard to existence of private right of action). Plaintiffs may proceed on their preemption suit because federal courts generally have equity jurisdiction over lawsuits challenging state action as preempted; the FPA's grant of jurisdiction specifically allows for such suits to prevent state encroachment on FERC authority, and PURPA does nothing to divest the courts of that jurisdiction.

27

*Verizon Maryland* is on point. There, the Court found no need to decide whether the Telecommunications Act of 1996 created a private cause of action because the preemption claim fell within traditional equity jurisdiction. 535 U.S. at 642-43. The Court also rejected the argument that the Act stripped the courts of such jurisdiction by including a private right of action to obtain judicial review of certain types of state decisions (but not the one at issue in that case) for conformity with the statutory standards. The statute "merely makes *some other* actions by state commissions reviewable in federal court. This is not enough to eliminate jurisdiction under § 1331." *Id*. at 643 (emphasis in original).

Under *Verizon Maryland*, PURPA's subsequent creation of a private right of action to enforce *different* substantive standards cannot be read to foreclose private lawsuits to prevent enforcement of preempted state action. That is doubly so because the district court's interpretation of PURPA would effectively work a highly-disfavored implied repeal of the FPA's express grant of equity jurisdiction. *See Carcieri v. Salazar*, 555 U.S. 379, 395 (2009) (absent clearly stated congressional intention, implied repeal will be found only where two statutory provisions irreconcilably conflict, or where the later act is clearly intended as a substitute). It is impossible to construe PURPA's private cause of action to impliedly repeal an express grant of equity jurisdiction enacted some 50 years

28

earlier, where the two statutes can easily be harmonized and the courts have consistently construed the FPA to allow private preemption suits.

Parallel private and agency remedies have coexisted in the federal courts for decades. Neither *Armstrong* nor any other case has remotely suggested that the government's ability to sue forecloses a private equity action. And since federal agencies have authority to enforce nearly every federal regulatory statute, the district court's holding proves far too much—it would effectively wipe out all rights of private parties to seek to enjoin federally preempted state action.

## III. THE ZEC PROGRAM IS PREEMPTED BY THE FEDERAL POWER ACT.

### A. The ZEC Program Is Preempted Because It Intrudes upon an Exclusively Federal Field of Law by Ensuring that Certain Favored Nuclear Generators Receive Payments in Connection with Their Wholesale Electricity Sales Over and Above the Rates that FERC Has Determined Are Just and Reasonable.

Congress invested FERC with exclusive power over the field of interstate wholesale electricity sales. 16 U.S.C. § 824(a) (FERC's exclusive jurisdiction covers "the sale of [electric] energy at wholesale in interstate commerce"). In particular, the FPA gives FERC exclusive authority to ensure that "[a]ll rates and charges … received by any public utility for or in connection with the … sale of electric energy" for resale are "just [and] reasonable." *See id*. § 824d(a), 824e(a).

FERC's authority to enforce just and reasonable wholesale rates is cast in encompassing terms. It is not limited to regulating the specific rates that utilities

29

pay directly "for" wholesale electricity, but extends to "[a]ll" payments that sellers "receive[]" from whatever source "in connection with" wholesale sales, as well as to "all rules and regulations affecting or pertaining to such rates." *Id*. § 824d(a). As the Supreme Court has explained "[t]he FPA 'leaves no room either for direct state regulation of the prices of interstate wholesales' or for regulation that 'would indirectly achieve the same result.'" *EPSA*, 136 S.Ct. at 780 (quoting *N. Nat. Gas Co. v. State Corp. Comm'n of Kan.*, 372 U.S. 84, 91 (1963)). Because state programs that provide for additional payments to producers "in connection with" their sale of electricity into the wholesale market "invade[] FERC's regulatory turf," they are preempted by the FPA. *Hughes*, 136 S.Ct. at 1297.

When the rates for wholesale electricity sales are established via the FERC-approved auction process, those rates are by definition the rates that FERC has determined to be just and reasonable. *See supra* pp. 4-5. A state's attempt to augment those rates, by requiring purchasers in the wholesale market to pay additional amounts to sellers for the wholesale electricity they purchase, is necessarily an attempt to change the rate that FERC has approved. That is precisely what New York has done. Its ZEC program is therefore preempted.

### 1. The ZEC Program Is Functionally Indistinguishable from the Program that Was Found Preempted in *Hughes*.

The ZEC program ensures that Exelon's three unprofitable nuclear plants in New York receive payments for their wholesale electricity sales that exceed the

30

just and reasonable rates established by the FERC-approved wholesale auctions. The ZEC subsidy payments manipulate the outcome of the wholesale auctions by topping up the FERC-approved auction rates by an amount that brings them to the level that New York deems appropriate. To the extent the FERC-approved auction rates fall below New York's target, the favored producers receive ZEC payments to make up the difference.

In substance, the New York ZEC program is identical to the Maryland subsidy program that the Supreme Court unanimously held pre-empted in *Hughes*. Maryland required LSEs to enter into "contract[s] for differences" with a favored power plant. 136 S.Ct. at 1294. If the plant cleared the PJM capacity auction, but the clearing price fell below the state's target price, LSEs paid the shortfall to the plant; if the PJM price rose above the target, the plant paid the overage to the LSEs. *Id. at* 1295. As long as the plant cleared the capacity auction, it was guaranteed to receive the state's target rate. *See id.*

The Supreme Court had no difficulty seeing that Maryland's program impermissibly "sets an interstate wholesale rate, contravening the FPA's division of authority between state and federal regulators." *Id.* at 1297; *accord id.* at 1300 (Sotomayor, J., concurring); *id.* at 1301 (Thomas, J., concurring in the judgment). It did not matter that Maryland's goal was to encourage construction of new generators. "States may not seek to achieve ends, however legitimate, through

31

regulatory means that intrude on FERC's authority over interstate wholesale rates." *Id.* at 1298.

The New York ZEC program intrudes on FERC's exclusive authority over wholesale rates in the same way. Just as in *Hughes*, the state requires LSEs to make up the difference between the state's rate and the FERC-approved market rates. Just as in *Hughes*, the amount of the subsidy varies inversely with FERC-approved auction rates—as market prices rise, the subsidy falls; and as market prices thereafter fall, the subsidy goes up. And just as in *Hughes*, the subsidy is "received" by the favored producers "in connection with" the sale of electricity on wholesale markets. 16 U.S.C. §§ 824d(a), 824d(e).

*All* of the electricity that these favored producers generate must be bid into and clear the NYISO auctions. The complaint alleges—and it is a well-understood reality—that these generators "have no alternative to selling their output in the NYISO energy auctions" A-51 (Compl. ¶ 34), and so "[a]ll electricity produced by these nuclear generators must be sold directly or indirectly in the NYISO auctions, as there are no alternative markets" A-65 (Compl. ¶ 64). Thus, the ZEC subsidy will not be received "unless the nuclear generators sell their energy into the wholesale market." A-66 (Compl. ¶ 65). The ZEC program is therefore preempted for the same reasons that Maryland's program was preempted.

32

The district court's effort to distinguish *Hughes* is wholly unpersuasive.  The district court recognized that as "the forecast wholesale price of electricity increases, the price of a ZEC decreases."  SPA-7 (citing Compl., ¶ 71); *see also* SPA-18 (ZEC prices are calculated using forecast wholesale rates).  The court also accepted that nuclear generators are eligible to receive ZEC subsidies only if NYISO auction rates are insufficient for the generator to stay in business.  The court nevertheless found *Hughes* distinguishable because the ZEC Order "itself does not require the nuclear generators to sell into the NYISO auction."  SPA-20.  While noting Plaintiffs' allegation that "all of the electricity produced by these nuclear generators must be sold into the NYISO energy auctions because they have no alternative way to sell their output" (SPA-4 (citing Compl. ¶¶ 34, 64)), the district court characterized such sales as a "business decision," not a "requirement imposed by New York" (SPA-20).  The district court similarly dismissed the allegation that, as exempt wholesale generators, the Exelon plants are legally required to sell their output into wholesale markets, finding it dispositive that New York has not required the generators to participate in the wholesale auctions.  SPA-21.

New York had no need to formally require the Exelon plants to participate in the wholesale auctions, because the state knew that federal law requires them to sell into the wholesale electricity market and that those plants had "no alternative"

33

but to do so. A-51(Compl. ¶ 34). Whereas the Maryland plan reviewed in *Hughes* sought to encourage new entry, the ZEC program is directed at three existing plants, which were already participating in the wholesale auctions. The PSC adopted the ZEC program in direct response to the plants' inability to remain profitable at wholesale auction rates. That is why it conditions eligibility for ZEC subsidies on the supposed inadequacy of wholesale rates. Indeed, one nuclear plant was not included in the program because it "has a much higher level of market revenues." A-66 (Compl. ¶ 65 (quoting ZEC Order 130)).

The district court distinguished *Hughes* based entirely on the absence of a formal, express condition mandating that a producer clear the wholesale auction. *See* SPA-21 ("It is that aspect of the ZEC Order that saves the ZEC program from the problems faced in *Hughes*."). This approach cannot be reconciled with *Hughes* and other precedents enforcing the FPA's jurisdictional boundaries, or with the Supreme Court's clear direction about how preemption analysis proceeds. The Maryland program at issue in *Hughes* was preempted because it "set[] an interstate wholesale rate" by ensuring that a favored producer would receive additional state-required payments in connection with the wholesale electricity it sold at auction. 136 S.Ct. at 1297. The ZEC program does the exact same thing. It does not matter whether a state sets a wholesale rate through variable subsidies *expressly* conditioned on clearing the auction, or through variable subsidies conditioned on

34

production that, as a legal and practical matter, must be cleared through the auctions. A-65 (Compl. ¶ 64). "The FPA 'leaves no room either for direct state regulation of the prices of interstate wholesales' or for regulation that 'would indirectly achieve the same result.'" *EPSA*, 136 S.Ct. at 780 (quoting *N. Nat. Gas Co.*, 372 U.S. at 91); *accord Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 360-64 (1988) (invalidating state attempt to second-guess the reasonableness of interstate wholesale rates); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 956-62 (1986) (same).

The Supreme Court has been emphatic that "[p]reemption is not a matter of semantics," *Wos v. E.M.A.*, 568 U.S. 627, 636 (2013), and has repeatedly rejected the kind of form-over-substance evasions in which the district court engaged here:

> a State may not evade the preemptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect…. In a preemption case … a proper analysis requires consideration of what the state law in fact does, not how a litigant might choose to describe it.

568 U.S. at 636-37. *Accord Nat'l Meat Assoc. v. Harris*, 565 U.S. 452, 462-64 (2012) (holding state law preempted based on its practical operation).

Similarly, in *Northern Natural Gas Co. v. State Corporation Commission of Kansas*, 372 U.S. 84 (1963), the Court held that a state rule requiring an interstate pipeline to purchase gas ratably from producers was preempted because its practical effect was to regulate wholesale gas prices. While the state rule did not

35

expressly regulate wholesale prices, "our inquiry is not at an end because the orders do not deal in terms with prices or volumes of purchases …. The federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas, or for state regulations which would indirectly achieve the same result." *Id*. at 90-91; *see also Chicago & N. W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 325 (1981) (state causes of action based on railroad's discontinuation of operation are preempted because their practical effect is to sanction the carrier for abandonment, which is within the federal agency's exclusive jurisdiction).[8]

The district court distinguished *Northern Natural Gas* on the basis that "the ZEC program does not order utilities to make any purchases of energy or capacity" (SPA-29), but this misses the point. *Northern Natural Gas* establishes that state law is preempted even if it does not formally regulate wholesale rates, if that is its

---

[8] *See also N.J. Realty Title Ins. Co. v. Div. of Tax Appeals,* 338 U.S. 665, 673 (1950) ("Our inquiry is narrowed to whether in practical operation and effect the tax is in part a tax upon federal bonds … regardless of the accounting label employed in describing it."); *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 192-95 (4th Cir. 2007) (preempting law that "effectively mandated" conduct subject to exclusive federal jurisdiction, as it left employers with no other "rational choice" but to follow a certain course); *S.D. Mining Ass'n v. Lawrence Cty.*, 155 F.3d 1005, 1011 (8th Cir. 1998) (ordinance that prohibited the "only practical way" of mining in an area deemed a "de facto ban" on all mining in that area and therefore held preempted); *Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs*, 27 F.3d 1499, 1508 (10th Cir. 1994) (local law imposing "explicit or de facto" ban on federally encouraged activity can be preempted).

36

practical effect.  *See N. Nat. Gas*, 372 U.S. at 91.  The states' decisions to order

purchases in *Northern Natural Gas*, or to condition a subsidy on sales in *Hughes*,

were different means by which the states engaged in the forbidden practice of

adjusting wholesale rates.

 This Court's reasoning in *Allco* confirms that the absence of a statutory

compulsion for generators to sell (or for LSEs to purchase) in the wholesale

markets does not by itself save a state program from field preemption under

*Hughes*.  The *Allco* court considered a Connecticut program that encouraged

wholesale purchases of energy through bilateral contracts.  The Court first

explained that the program did not compel any transaction at all, let alone one

connected to FERC auctions as opposed to bilateral contracts.  *See Allco Fin. Ltd.

v. Klee,* 861 F.3d 82, 98-99 (2d Cir. 2017).  This fact, however, was alone

insufficient to distinguish *Hughes*; the Court held *Hughes* inapplicable primarily

because the Connecticut program "requires that any bilateral contract that results

from that process be subjected to review by FERC for justness and

reasonableness." *Id.* at 99.

 The New York ZEC program, unlike the program in *Allco*, *does* effectively

compel generators to sell in the FERC auctions and adjusts the rate that the

generators receive in the auctions.  And, unlike the program in *Allco*, the New

York ZEC program provides no mechanism for FERC approval of the rates

resulting from the ZEC subsidy, but instead is designed to *override* the FERC-mandated auction rates for its beneficiaries.

The district court also gave insufficient weight to the link between the ZEC subsidy amount and wholesale rates. By awarding the subsidy only to those generators whose current market revenues are (in the PSC's determination) insufficient, and then periodically adjusting the subsidy inversely with changes in wholesale market rates, New York has done precisely what *Hughes* forbids: "it disregards an interstate wholesale rate required by FERC." 136 S.Ct. at 1299. Indeed, the subsidy varies in almost exactly the same manner that the contracts for differences in *Hughes* operated, shrinking as rates rise and growing as rates thereafter fall, to make up the difference between supposedly inadequate wholesale market rates and the rate New York thinks the generators should receive. The district court's conclusion that a "whole host" of other subsidies, "such as tax incentives or direct subsidies," also involve "propping up" an unprofitable generator (SPA-18), is beside the point. Unlike those subsidies, the ZEC is *conditioned* on the inadequacy of wholesale rates, and is adjusted in response to those rates. The connection to wholesale auction markets is express and integral to the ZEC program, unlike the "incidental" effect that these other subsidies may have by increasing the supply of electricity.

38

The district court also relied on *Rochester Gas & Electric Corp. v. PSC*, 754 F.2d 99 (2d Cir. 1985), to support its conclusion that tying the ZEC subsidy to wholesale rates is not problematic. SPA-19. In *Rochester Gas*, the Court held that the PSC could take a utility's expected wholesale revenues into account when setting the *retail* rates that the utility could charge its customers. 754 F.2d at 105. This retail ratemaking did not alter the wholesale rate, nor did it compel the utility to engage in a wholesale transaction on state-prescribed terms. *See id.* at 102 (noting that such action may be preempted).

The *Rochester Gas* holding, which address state retail rate-making, has no relevance to the ZEC program, which addresses wholesale rate-making. By establishing the amount that wholesale buyers and sellers must exchange in addition to auction rates, New York impermissibly sets a rate received "in connection with" wholesale sales. *Cf. EPSA*, 136 S.Ct. at 777 ("To set a retail electricity rate is thus to establish the amount of money a consumer will hand over in exchange for power."). Whereas *Rochester Gas* held that considering wholesale revenues in setting retail rates would not cause the utility "to change its position toward" wholesale sales, 754 F.2d at 102, the ZEC program has a direct impact on the nuclear plants' "position toward" the wholesale markets.

The New York ZEC program provides a subsidy that in reality depends on participation in the wholesale market, in an amount that depends on wholesale

39

prices. Because the New York ZEC program is no different in these essential

respects from the Maryland program invalidated in *Hughes*, it too is preempted.

> **2.** **Preemption of the ZEC Program Leaves New York with Ample Authority to Achieve Legitimate Policy Objectives Within Its Protected Sphere of Authority Under the FPA.**

Preempting the ZEC program merely removes one particular "regulatory

means that intrude[s] on FERC's authority over interstate wholesale rates."

*Hughes*, 136 S.Ct. at 1298. New York retains ample authority to promote power

generation and to protect the health and welfare of its citizens through other means

not tethered to the FERC-approved rates set by wholesale auctions. The state can

provide tax incentives or land grants, construct state-owned generation facilities,

opt out of the deregulated market entirely, or even provide direct subsidy payments

not tethered to wholesale markets. *See id*. at 1299 (identifying but not addressing

the permissibility of such measures). But what the state cannot do is dictate the

amounts that generators receive in connection with their sales of electricity at

wholesale.

In particular, Plaintiffs do not allege that state Renewable Energy Credit

("REC") programs are preempted. Typical REC programs allow qualified

renewable energy sources, such as solar, wind, or biomass, to earn RECs for each

unit of output. A-59 (Compl. ¶ 49). States may require LSEs to acquire RECs or

make an alternative compliance payment. *Id*. The purpose of RECs is to induce

40

new entry by renewable generators, not to bail out existing generators that have failed in a competitive market.

For purposes of the preemption analysis in this case, there are at least two fundamental differences between ZECs and RECs. First, while the ZEC subsidy is tethered to wholesale prices, REC prices are essentially determined by the supply and demand of renewable energy: as LSEs seek to buy more RECs, the price goes up, as does the incentive for producers to generate additional clean energy. A-60 (Compl. ¶ 51). As such, the price of RECs can rise or fall based on forces wholly independent of the specific rates set at wholesale auctions (namely, the supply of and demand for renewable energy).

Second, ZECs are available only to generators that sell in wholesale auction markets, guaranteeing that each ZEC sale will be tied to the sale of electricity at wholesale. By contrast, RECs are offered to all qualified renewable power producers (A-60 (Compl. ¶¶ 50-51)), some of which may not participate in the wholesale auctions, or even sell at wholesale at all. For example, an industrial facility that installs solar panels can consume the energy onsite and sell the resulting RECs to a third party (A-163 (ZEC Order 79-80)), neither of which would be a wholesale transaction. Thus, RECs are not necessarily tethered to wholesale market participation, and they do not establish a wholesale rate.

41

Nonetheless, the district court found no "legally significant" distinction between ZECs and RECs in terms of "effect ... on the wholesale auction," since both purport to provide compensation for the environmental "attributes" of certain generation sources. SPA-26-27. The field preemption analysis, however, does not turn on whether New York's goal was environmental. "States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates." *Hughes*, 136 S.Ct. at 1298. The flaw in ZECs, which does not apply to RECs, is that they are tethered to the wholesale market.

The district court believed that "FERC has clearly held that RECs are not preempted" in a pre-*Hughes* administrative decision, *WSPP*, 139 FERC ¶ 61,061 (2012). SPA-27. But the reasoning in *WSPP* only highlights the features of the ZEC program that make it preempted. There, FERC addressed REC programs that had no connection to an organized market with energy and capacity auctions, let alone a program tethered to the wholesale price set by such auctions. FERC explained that "based on available information," the RECs were outside its jurisdiction if they did not provide for payments "in connection with" the sale of electricity at wholesale. 139 FERC ¶ 61,061 at ¶ 24. FERC was careful to limit its holding to the features of the three specific REC products before it, stating that "although a transaction may not directly involve the transmission or sale of electric

42

energy, the transaction could still fall under the Commission's jurisdiction because it is 'in connection with' or 'affects' jurisdictional rates or charges." *Id.* ¶ 22. FERC noted that it would have jurisdiction over programs "that directly affect the rate or are closely related to the rate," and emphasized the lack of connection between the RECs at issue in *WSPP* and wholesale rates. *Id.* (quoting *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 403 (D.C. Cir. 2004)).

The ZEC program, by contrast, is "closely related to the rate" approved by FERC. The subsidy is provided only to generators that sell exclusively in wholesale markets. It is contingent upon the inadequacy of three specific generators' wholesale revenues. And it is periodically adjusted to vary with wholesale rates. The district court's contrary conclusion—that the ZEC program is entirely "separate from a wholesale charge or rate" (SPA-27)—is unsupportable given these facts. New York's ZEC program is precisely the sort of subsidy that, while ostensibly separate from the wholesale electricity markets, is so "closely related" to the FERC rates that it must "still fall under the Commission's jurisdiction." *WSPP*, 139 FERC ¶ 61,061 at ¶ 22. In fact, by artificially separating the ZEC subsidies from the wholesale auction transactions, New York's program underscores the prescience of FERC's warning in *WSPP*:

> The Commission further notes that parties cannot avoid Commission jurisdiction by simply separating a bundled REC transaction so that the sale of energy and the REC sale are included in separate

43

documents. Contracting parties cannot avoid Commission jurisdiction by splitting a unified agreement into separate agreements, one for the sale of unbundled RECs and one for the sale of energy.
*Id*. at ¶ 26.

### B.    The ZEC Program Conflicts with Federal Law that Requires Wholesale Rates to Be Determined in Approved Auction Markets.

Even if it does not intrude on a preempted federal field, a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Oneok, Inc. v, Learjet, Inc.*, 135 S.Ct. 1591, 1595 (2015) (internal quotation marks omitted), or "interferes with the methods by which the federal statute was designed to reach this goal," *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).

FERC has chosen to achieve the statutory goal of just and reasonable rates for wholesale power transactions by relying on auctions administered by NYISO. In its review and approval of NYISO rules, FERC sought to balance competing interests. Rates should be high enough to encourage development of new generation when demand exceeds supply or when power can be generated more efficiently. Rates should be low enough to encourage the retirement of inefficient facilities if more efficient generators can meet expected demand; rates should be affordable based on current needs but also sufficient to encourage investment to satisfy projected future needs; rates should encourage innovation without discouraging investment by undermining settled expectations; and so forth. *See,*

44

*e.g.*, *Hughes*, 136 S.Ct. at 1293; *NYISO, Inc.*, 158 FERC ¶ 61,028 at ¶ 19 (2017) (approving in part a NYISO tariff designed to provide, among other things, "appropriate price signals regarding the value of capacity in each capacity region, while simultaneously providing the needed revenues to elicit new market entry if and when required to ensure reliability"); *N.Y. Pub. Svc. Comm'n v. NYISO*, 153 FERC ¶ 61,022, at ¶¶ 47 – 51 (2015) (considering the incentives facing current and future renewable energy providers in evaluating provisions of NYISO tariff); *NYISO and N.Y. Transm. Owners.*, 126 FERC ¶ 61,046 at ¶ 115 (2009) (approving aspects of tariff modification "because it strikes a reasonable balance between existing capacity, pre-existing agreements and the needs of the market").

The intended and actual effect of New York's ZEC program is to ensure that the targeted nuclear plants will be compensated for their wholesale electricity sales at rates above what FERC has determined they should receive. *See Vango Media, Inc. v. City of New York*, 34 F.3d 68, 73 (2d Cir. 1994) ("[T]he question of preemption is defined, in part, by the purpose of the state law, and, in part, by the state law's actual effect."). Countermanding the outcome of FERC's competitive auctions is the express purpose of the ZEC program. As the PSC stated: "Increased natural gas availability has increased competition in the wholesale electricity market, pricing out some nuclear operators that face increasing costs. This *problem* is especially relevant to upstate nuclear plants." A-271 (ZEC Order,

45

App. G, at 5). What the PSC described as a "problem"—competition from more efficient generators—is the very goal of FERC's wholesale market design. The distortion of FERC-approved "just and reasonable" rates in wholesale markets, and frustration of FERC's broader regulatory objectives, are therefore not mere "incidental" effects, but rather the very aim of the ZEC program.

The distortive effects of the ZEC program radiate through the FERC-approved auction process in multiple ways. The subsidy enables the unprofitable plants to keep dumping substantial amounts of electricity into the FERC markets for over a decade, even though the FERC-approved price signals should cause the plants to retire. Worse still, because the ZEC subsidy requires the plants to commit to remaining in the market for the program's entire 12-year contract term (A-227 (ZEC Order 143-146), the plants will bid all of their output into the NYISO energy auctions as price takers (A-51 (Compl. ¶ 34)). Further, the plants have every incentive to bid into the capacity auctions at a price low enough to ensure that they clear, even zero.

ZECs not only insulate these generators from FERC's ratesetting, thereby thwarting FERC's goal of "encourag[ing] retirement of existing high-cost generators," *Hughes*, 136 S.Ct. at 1293, but also distort price signals to all other wholesale generators by encouraging the favored generators to bid as price takers and thereby artificially depress market prices. The combined result is to keep

46

aging nuclear plants in operation past their natural lifespan, while creating barriers to entry for more efficient and cleaner energy generators. *See PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 478-79 (4th Cir. 2014) (finding that state rate-setting "has the potential to seriously distort the PJM auction's price signals, thus 'interfer[ing] with the method by which the federal statute was designed to reach its goals'" (quoting *Pub. Util. Dist.*, 379 F.3d at 650)), *aff'd on other grounds* in *Hughes*,136 S.Ct. at 1297, 1299 n.13.

The district court brushed aside this conflict based on its view that the ZEC program was not "aimed at wholesale market participation or wholesale prices." SPA-36 (stating that "this would be a stronger case for conflict preemption" if the program were so aimed). The ZEC program could hardly be more targeted at wholesale rates, as it is awarded only to certain wholesale market sellers, whose wholesale revenues are inadequate, at an amount set with reference to wholesale rates. Once those sellers are guaranteed a subsidy, they lose the incentive to compete on price and to innovate—two key pillars of FERC's wholesale market.

The tethering to wholesale markets makes the ZEC program unlike the program considered in *Allco*, in which the only connection to wholesale markets was that the program would increase the supply of electricity. *See Allco*, 861 F.3d at 101. *Allco* did not address a program that was expressly tied to wholesale rates, let alone a program that intentionally overrides such rates.

47

The district court observed that "FERC has approved state programs with 'renewable portfolio mandates and greenhouse reduction goals.'" SPA-32 (quoting *Pac. Gas & Elec. Co.*, 123 FERC ¶ 61,067, at ¶ 34 (2008)). Plaintiffs, however, do not contend that all state attempts to promote clean energy are incompatible with the FPA and FERC policy. States are authorized, when acting within their jurisdiction, to encourage use of clean energy. What they may not do is interfere with market signals from FERC-mandated auctions. FERC's decision in *Pacific Gas & Electric*, cited by the district court, does not support the conclusion that states can advance their environmental goals by any means they choose, and it says nothing about state subsidies tethered to market prices. On the contrary, FERC stated that it, not a state, would in the future evaluate whether the utility's costs incurred in connection with its transmission project "were prudently incurred and will result in just and reasonable rates." *Id.* ¶ 38. That holding is diametrically opposed to the district court's suggestion that states can affect wholesale rates *without* FERC oversight as long as their asserted objectives are environmental.

FERC has never approved an environmental subsidy that is tethered to wholesale rates. On the contrary, FERC has approved subsidies that encourage renewable power generation only after determining that they would "not affect wholesale electricity rates." *See WSPP*, 139 FERC ¶ 61,061 at ¶¶ 22-24.

48

New York has authority to subsidize clean power generation through non-rate-related measures that may have an indirect effect on the price signals that the FERC-approved auction rates provide to the market. But New York cannot directly distort the price signals that the auctions send by setting a higher, state-approved rate for wholesale electricity sales to certain favored wholesale energy generators so that they can disregard the FERC-approved rates. That is the necessary consequence of the FPA's allocation of authority between the federal government and the states. Because the ZEC program interferes in a direct and substantial way with FERC's regulation of the wholesale market, it is also conflict preempted.

## IV.   THE ZEC PROGRAM VIOLATES THE COMMERCE CLAUSE.

The Commerce Clause protects Plaintiffs from New York's attempt to insulate its in-state generators from the rigors of interstate competition. The "dormant" component of the Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *W. Lynn Creamery v. Healy*, 512 U.S. 186, 192 (1994) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988)). The ZEC subsidy was enacted for the purpose of allowing favored New York power plants to prevail in interstate competition against Plaintiffs,

thereby preserving local jobs and tax revenue. This protectionism violates the Commerce Clause.

### A.     Plaintiffs State a Claim for a Commerce Clause Violation.

Courts apply "a two-tiered approach to analyzing state economic regulation under the Commerce Clause." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986). Under the first "tier," a state law is *per se* invalid if it discriminates against interstate commerce on its face, *see, e.g., Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 575 (1997); has the "practical effect" of discriminating against interstate economic activity, *see, e.g., Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350-51 (1977); or evinces a protectionist purpose, *see, e.g., Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 270 (1984). Under the second "tier," even a state law that survives the first tier because it "regulates even-handedly" with only "incidental" effects on interstate commerce," *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 255 (2d Cir. 2001), is invalid if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits," *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

The ZEC subsidy fails both tiers of Commerce Clause scrutiny.

### 1.     The ZEC Subsidy Is a *Per Se* Violation of the Commerce Clause.

NYISO is a hub of interstate commerce; it operates integrated energy and capacity markets where in-state and out-of-state participants buy and sell wholesale electricity. A-48 (Compl. ¶ 28). Plaintiffs compete directly with the in-state Exelon plants in this interstate market. A-43, 51 (Compl. ¶¶ 10-15, 34). These plants, however, have failed in that interstate competition, as the PSC itself found (A-271 (ZEC Order, App. G, at 5), leading Exelon to threaten to close the plants absent "price support from the state" (A-61, 62 (Compl. ¶¶ 54, 56-57). New York then enacted the ZEC program to provide this support. A-62, 64 (Compl. ¶ 58, 61-62).

New York's market manipulation to prop up local businesses presents a textbook Commerce Clause violation. For instance, the town in *C & A Carbone, Inc. v. Town of Clarkstown, New York*, 511 U.S. 383 (1994), determined "that special financing [was] necessary to ensure the long-term survival" of a local solid waste transfer station. Like New York, it decided to "employ discriminatory regulation to give that project an advantage over rival businesses." *Id.* at 394. The Supreme Court held this was impermissible because the station operated on "the open market to earn revenues" and though the regulation did not "in explicit terms seek to regulate interstate commerce, it [did] so nonetheless by its practical effect and design." *Id.* Likewise, in *Alliance for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995), Illinois sought to prop up its local coal industry by encouraging the use

51

of scrubbers to allow the continued burning of Illinois coal. This ran afoul of the Commerce Clause by "neutralizing the advantage possessed by lower cost out of state producers." *Id.* at 595. The Seventh Circuit recognized that "even ingenious discrimination is forbidden by the Commerce Clause." *Id.* at 596 (quoting *West Lynn Creamery*, 512 U.S. 186).

Plaintiffs similarly allege that the ZEC program discriminates on its face, and in effect and purpose, by deliberately propping up the in-state Exelon plants via a distortion of the interstate energy market. A-63 (Compl. ¶ 59). As the district court recognized, only New York plants currently reap the competitive benefits of the ZEC program (SPA-45 n.34), and as Plaintiffs allege, only New York plants ever will (A-67, 78 (Compl. ¶¶ 67-68, 98)).

Because the ZEC subsidy on its face, and in effect, interferes with interstate commerce by subsidizing the local Exelon plants in their competition against out-of-state generators in the NYISO auctions, and because this tilting of the playing field was the motive for the subsidy, the ZEC program triggers all three concerns that apply at the first "tier" of Commerce Clause scrutiny. *See supra* p. 10. For that reason, the subsidy is a *per se* Commerce Clause violation, and there is no need to weigh the putative local interests.

    **2.**    **The ZEC Subsidy Inflicts Harms on Interstate Commerce that Outweigh Any Putative Local Interests.**

Even if there were some legitimate interest for a measure intended to protect the in-state facilities, the complaint pleads that the harm to interstate competition in the wholesale energy market outweighs that interest. For that reason, the subsidy would fall at the second tier just as it must at the first. The complaint alleges that the ZEC program imposes market-distorting burdens that will drive out, and deter entry of, more cost-efficient, environmentally friendly out-of-state generators. A-58, 66, 78 (Compl. ¶¶ 47-48, 66, 99-100). Further, any reduction of carbon emissions can be achieved more effectively by non-discriminatory means. A-77 (Compl. ¶ 97). At the motion-to-dismiss stage, these allegations of the putative benefits and burdens must be accepted as true, and Plaintiffs are entitled to prove their allegations at trial. *See, e.g., Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 51 (2d Cir. 2007) (remanding for consideration of fact issues that existed on both the burden and benefits sides of the *Pike* balancing equation).

This Court's decision in *Allco* confirms this conclusion. There, in upholding Connecticut's REC program, the Court instructed that to withstand a motion to dismiss, plaintiffs must plead facts illustrating that a state regulation's burden is clearly excessive in relation to putative local benefits, including the financial burdens imposed by the regulation and "facts relating to any putative local benefits that may be derived." 861 F.3d at 108. In contrast to the plaintiff in *Allco*, Plaintiffs have pleaded detailed facts in the complaint establishing how the ZEC

53

program works, how it distorts the interstate electricity market, and how the

purported environmental benefits can be better achieved through other means.

### B. Plaintiffs' Allegations Fall Within the "Zone of Interests" Protected by the Commerce Clause

The district court incorrectly reasoned that, even if the ZEC program

violated the Commerce Clause, Plaintiffs could not state a claim because their

injuries do not "fall within the zone of interests protected by the dormant

Commerce Clause—namely the protection of *out-of-state* economic interests."

SPA-40-42 (emphasis in original). This misapprehends the nature of Plaintiffs'

Commerce Clause injury. Plaintiffs do not complain about an inability to compete

for ZECs. Rather, Plaintiffs complain about having to compete in the interstate

wholesale energy market when the playing field has been tilted by New York's

subsidies for the favored local Exelon plants.

A claim under the Commerce Clause would be outside the zone of interests

only if it were "marginally related to or inconsistent with the purposes" of the

Commerce Clause. *Clarke v. Securities Industry Ass'n* 479 U.S. 388, 399 (1987).

"The test is not meant to be especially demanding." *Id.* "The Supreme Court has

held that this requirement is satisfied whenever the interest sought to be protected

by plaintiffs is *arguably* within the zone of interests to be protected or regulated by

the statute or constitutional guarantee in question." *Selevan v. New York Thruway

Auth.*, 584 F.3d 82, 92 (2d Cir. 2009) (emphasis in original). As this Court held in

54

*Selevan*, a plaintiff's claim is within the Commerce Clause's "zone of interests" if the challenged regulation "in some way *affects* interstate commerce." *Id.*

Here, Plaintiffs—who include out-of-state electricity generators (A-43 (Compl. ¶¶ 9-12))—assert a claim in the heartland of that zone of interests: "the right of businesses to compete on an equal footing wherever they choose to operate." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 438 F.3d 150, 161 (2d Cir. 2006). As pleaded in the complaint, New York's ZEC "program is not even-handed … with respect to out-of-state generation." A-78 (Compl. ¶ 98). The question is not whether discrimination between generation technologies "constitute[s] a cause of action under the dormant Commerce Clause" (SPA-41), but whether out-of-state generators harmed by a program designed to prop up failing New York wholesale energy sellers fall within the Commerce Clause's zone of interests. Respectfully, that is not a close question: they do.

The district court speculated that "the same price-distorting effects and the same alleged injury would occur ... if ZECs were extended to nuclear power plants nationwide." SPA-41. But that is irrelevant. The ZEC program does not extend nationwide; it is crafted to benefit only the favored local plants. Moreover, Plaintiffs did not ask the district court to rewrite the ZEC Order to extend nationwide. The district court could not grant such relief, and given the protectionist motivations behind the ZEC program (A-60 (Compl. ¶¶ 52-68)), it is

55

highly unlikely that New York would ever adopt such a program. The remedy sought by Plaintiffs is to enjoin the program, as adopted, and that injunction would remedy Plaintiffs' Commerce Clause injury.

### C. New York Adopted the ZEC Program as a Regulator, Not a Market Participant.

Relying on *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976), the district court concluded that the ZEC program was permissible under the dormant Commerce Clause because "New York is participating in the energy market and exercising its right to favor its own citizens." SPA-45. This conclusion is wrong.

In *Selevan*, this Court rejected a similar market-participant defense. The Court explained that the question to be answered is whether "the government is acting like a private business or a governmental entity." 584 F.3d 82 at 93. Where the government "competes with other entities" in an open market, it is a market participant. *Id.* By contrast, when the government exercises any of its unique powers, it is behaving as a regulator. *Id.* at 93-94. Thus, in *Alexandria Scrap*, Maryland acted as a market participant when it paid a bounty for the removal of automobile hulks from Maryland streets and junkyards. 426 U.S. at 809.

In contrast to the market participation in *Alexandria Scrap*, New York's ZEC program "cannot plausibly be analogized to the activity of a private purchaser." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278 (1988). New York is not using state funds to purchase energy in the marketplace. Rather, the

56

state is mandating that third-party LSEs engage in transactions that funnel private money to private nuclear power plants. There are no private companies behaving analogously to New York; no private company *could* behave that way because a private company could not mandate that LSEs buy energy from Exelon's plants. New York no more "participates" in the electricity market through the ZEC program than it "participates" in the automobile insurance market by mandating that drivers purchase car insurance.

The district court also relied on *Allco Finance Limited v. Klee*, No. 3:15-cv-608 (CSH), 2016 WL 4414774 at *24 (D. Conn. Aug. 18, 2016), which held that Connecticut's REC program did not implicate the Commerce Clause because Connecticut's creation of a REC market was analogous to Maryland's market participation in *Alexandria Scrap*. SPA-45. While this Court affirmed the dismissal of the *Allco* complaint, it did not hold that Connecticut was acting as a market participant, but rather that its regulations were not impermissible under *Pike*. *See Allco*, 861 F.3d at 102-08. Indeed, the Court made clear that it viewed the REC program as a "*regulatory* response to the needs of the local energy market." *Id.* at 107 (emphasis added). The ZEC program is also "regulatory" in nature, but, as explained above, it lacks the features that made the REC program in *Allco* permissible.

57

Finally, the district court ignored the nature of the ZEC program in holding that it is a "pure subsidy" funded out the state's own revenue. SPA-45-47. It is simply not true that "New York is paying the nuclear plants a set dollar amount" as Maryland did in *Alexandria Scrap*. SPA-45. New York has established a regulatory mandate, requiring private third parties to funnel cash to the in-state nuclear plants. A-67, 68, 70 (Compl. ¶¶ 67, 69, 73). Although this transaction nominally flows through NYSERDA, it is in reality a transaction between a private LSE and a private generator. The state is not paying the generators a single dollar out of its general revenue. The distinction is constitutionally significant—as is shown by the very cases cited by the district court. *See* SPA-46; *Carbone*, 511 U.S. at 393 (1994); *United Haulers Ass'n v. Oneida-Herkimer Waste Mgmt. Auth.*, 550 U.S. 330, 368 (2007).

## **CONCLUSION**

The dismissal of Plaintiffs' claims should be reversed and the case remanded for plenary consideration.

58

Dated:  October 13, 2017                    Respectfully submitted,


                                   By:  */s/ Donald B. Verrilli, Jr.*
                                        Donald B. Verrilli, Jr.
                                        MUNGER, TOLLES & OLSON LLP
                                        1155 F Street, NW
                                        Washington, DC  20004
                                        Telephone:    (202) 220-1100

                                        Henry Weissmann
                                        Fred A. Rowley, Jr.
                                        Mark R. Yohalem
                                        MUNGER, TOLLES & OLSON LLP
                                        350 South Grand Ave., Ste. 5000
                                        Los Angeles, CA  90071
                                        Telephone:    (213) 683-9100

                                        Jonathan D. Schiller
                                        David A. Barrett
                                        BOIES SCHILLER FLEXNER LLP
                                        575 Lexington Ave.
                                        New York, NY  10022
                                        Telephone:    (212) 446-2300

                                        Stuart H. Singer
                                        BOIES SCHILLER FLEXNER LLP
                                        401 E. Las Olas Blvd., Ste. 1200
                                        Fort Lauderdale, FL  33301
                                        Telephone:    (954) 356-0011


                            *Attorneys for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,689 words, as determined by Microsoft Word 2010.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)  and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

By:  */s/ Donald B. Verrilli, Jr.*
         Donald B. Verrilli, Jr.
         *Attorney for Plaintiffs-Appellants*

SPECIAL APPENDIX

**i**

## TABLE OF CONTENTS

**Page**

Memorandum Opinion and Order of the Honorable
   Valerie Caproni, filed July 25, 2017, Appealed
     From........................................................................ SPA-1

Judgment, filed July 25, 2017, Appealed From ......... SPA-48

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/25/2017
```

------------------------------------------------------------X
COALITION FOR COMPETITIVE     :
ELECTRICITY,     :
DYNEGY INC.,     :
EASTERN GENERATION, LLC,     :     16-CV-8164 (VEC)
ELECTRIC POWER SUPPLY ASSOCIATION,     :
NRG ENERGY, INC.,     :     MEMORANDUM
ROSETON GENERATING LLC, and     :     OPINION & ORDER
SELKIRK COGEN PARTNERS, L.P.,     :
    :
                       Plaintiffs,     :
    :
           -against-     :
    :
AUDREY ZIBELMAN, in her official     :
capacity as Chair of the New York Public     :
Service Commission, PATRICIA L.     :
ACAMPORA, GREGG C. SAYRE, and     :
DIANE X. BURMAN, in their official     :
capacities as Commissioners of the New York     :
Public Service Commission,     :
    :
                       Defendants,     :
    :
            -and-     :
    :
CONSTELLATION ENERGY NUCLEAR     :
GROUP, LLC, EXELON CORPORATION, R.E.     :
GINNA NUCLEAR POWER PLANT LLC, and     :
NINE MILE POINT NUCLEAR STATION LLC,     :
    :
                       Intervenors.     :
------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

       Some say that human-caused global warming is a "hoax,"[1] while others accept the

overwhelming scientific conclusion that human activities, and particularly carbon dioxide

---

[1]      Multiple times before and during his presidential campaign, President Donald Trump stated that climate change is a hoax. Louis Jacobson, *Yes, Donald Trump Did Call Climate Change a Chinese Hoax*, POLITIFACT (June 3, 2016), http://www.politifact.com/truth-o-meter/statements/2016/jun/03/hillary-clinton/yes-donald-trump-did-call-climate-change-chinese-h/. President Trump has recently refused to confirm whether he still considers climate

1

discharges into the atmosphere, are causing the planet to warm.  Although no individual State

can reverse the trend all by itself, New York and many other States have decided that they will

do their part to reduce the emissions that contribute to global warming.  The issue in this case is

whether the method New York has chosen to facilitate its doing so is constitutional.  For the

reasons that follow, the Court concludes that the New York program is constitutional.

Plaintiffs are various electrical generators and trade groups of electrical generators.  They

challenge one aspect of the Clean Energy Standard ("CES") Order, adopted by the New York

Public Service Commission ("PSC"), that awards credits to certain nuclear generators for their

zero-emissions electricity production.  Plaintiffs claim that this program is preempted under the

Federal Power Act ("FPA") and that it violates the dormant Commerce Clause.

Defendants, who are PSC members, move to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6), arguing that there is no private right of action for Plaintiffs' preemption

claims and that, even if there were, Plaintiffs' claims would fail as a matter of law.  Notice of

Defendants' Motion to Dismiss, Dkt. 54.  Intervenors, who are the nuclear generators receiving

the zero-emissions credits and their owners, also move to dismiss pursuant to Rule 12(b)(6).

Notice of Motion, Dkt. 76.  For the following reasons, the Court GRANTS both motions to

dismiss.

---

change to be a hoax, Peter Baker, *Does Donald Trump Still Think Climate Change Is a Hoax? No One Can Say*,
NEW YORK TIMES (June 2, 2017), https://www.nytimes.com/2017/06/02/us/politics/climate-change-trump-hoax-
scott-pruitt.html, and a number of senior leaders and advisers in the Executive and Legislative branches, including
Scott Pruitt, the head of the Environmental Protection Agency, have been deeply skeptical of human-caused climate
change, including to the point of outright denial.  Coral Davenport, *Climate Change Denialists in Charge*, NEW
YORK TIMES (Mar. 27, 2017), https://www.nytimes.com/2017/03/27/us/politics/climate-change-denialists-in-
charge.html.

SPA-3

BACKGROUND[2]

**The Electricity Market**

In New York, wholesale electricity is bought and sold through market-based auctions administered by the New York Independent System Operator ("NYISO").  Compl. ¶ 28.  The NYISO, which is regulated by the Federal Energy Regulatory Commission ("FERC"), conducts two types of auctions: energy and capacity.  Compl. ¶¶ 28-29.  Energy auctions are for the purchase and sale of electricity itself, whereas capacity auctions are for the purchase and sale of options to purchase electricity.  Compl. ¶ 36.  Retail electricity suppliers, also called load-serving entities ("LSEs"), purchase electricity at wholesale from generators in these auctions. Compl. ¶ 35.  Although some of the buyers are located outside New York, most of the buyers are in-state utilities that resell energy at retail to New York customers and businesses.  Compl. ¶ 28. The energy suppliers in the wholesale auction include generators located inside and outside of New York.  Compl. ¶ 28.

The NYISO auctions determine electricity prices in the New York wholesale market. Compl. ¶ 27.  The auction operates by "stacking" bids from generators for the sale of energy or capacity, beginning with the lowest bid and moving up until demand is satisfied.  Compl. ¶¶ 32-33.  The price of the highest-stacked bid that satisfies demand is known as the "market clearing price." Compl. ¶ 33.  Any generator that bids at or below the market-clearing price "clears" the

---

[2]       The facts are taken from the Complaint and the Order Adopting a Clean Energy Standard ("CES Order"), which is incorporated by reference in the Complaint.  In deciding the motions to dismiss, the Court accepts as true the facts alleged in the Complaint and draws all reasonable inferences in Plaintiffs' favor.  *Koch v. Christie's Intern, PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  The Court may rely directly on the CES Order because a complaint is "deemed to include . . . any statements or documents incorporated in it by reference."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).  The parties do not dispute that the Complaint incorporated the CES Order by reference.

SPA-4

auction and is paid the market-clearing price, regardless of the price the generator actually bid.[3]

Compl. ¶¶ 33, 39.  This pricing mechanism incentivizes generators to be efficient and cost-

effective: "it creates price signals for new capacity to enter the market if [the generator] can

supply capacity at prices below the clearing price.  At the same time, the market provides price

signals for existing suppliers to exit the market if they are unable to beat the clearing price."

Compl. ¶ 40 (citation and internal quotation marks omitted).

 Nuclear generators, such as Intervenors, bid as so-called "price-takers" in the NYISO

auctions, meaning that they sell their entire output at the market-clearing price.  Compl. ¶ 34.

Unlike other types of electricity generators that can adjust their output to produce more or less

energy depending on price, nuclear generators run continuously at maximum output.

Compl. ¶ 34.  Nuclear generators thus sell their entire electricity output into the auctions

regardless of the price—even if the price is below their cost of production.  Compl. ¶ 34.

 Plaintiffs allege that the nuclear generators' price-taking behavior depresses market-

clearing prices because the nuclear generators increase the energy supply available at auction.

Compl. ¶ 34.  Plaintiffs further allege that all electricity produced by these nuclear generators

must be sold in the NYISO energy auctions because they have no alternative way to sell their

output.  Compl. ¶¶ 34, 64.

**New York's ZEC Program**

 In order to promote the development of clean energy as part of New York's effort to

stanch global warning, the PSC issued the CES Order.  CES Order, Dkt. 76-1.  The CES Order

created two programs: Renewable Energy Credits ("RECs") and Zero-Emission Credits

---

[3]    An example from *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288 (2016) is illustrative:  "For example, if four power plants bid to sell capacity at, respectively, $10/unit, $20/unit, $30/unit, and $40/unit, and the first three plants provide enough capacity to satisfy projected demand, [the auction administrator] will purchase capacity only from those three plants, each of which will receive $30/unit, the clearing price."  136 S. Ct. at 1293.

SPA-5

("ZECs").  CES Order at 13-14.  The CES Order was adopted in furtherance of New York's goal

to generate fifty percent of its electricity using renewable sources by 2030, which supports New

York's broader mission to reduce greenhouse gas emissions statewide by forty percent by 2030.

CES Order at 2, 12.

Tier 1 of the CES Order, which implements the REC program, requires all New York

LSEs "to serve their retail customers by procuring new renewable resources."  CES Order at 14;

*see also* Compl. ¶ 49.  Generators that produce energy from renewable sources, like wind or

solar, are awarded a credit (a REC) for each megawatt-hour ("MWh") of renewable-generated

electricity produced from renewable resources.  Compl. ¶ 49; CES Order at 106.  The New York

State Energy Research and Development Authority ("NYSERDA") purchases RECs from

generators, thereby subsidizing their cost of production, and, in turn, sells those RECs to LSEs.

CES Order at 16, 107-08.  Each LSE is required to purchase RECs in an amount based on a

percentage of the total load served by that LSE or make an alternative compliance payment.

Compl. ¶ 49; CES Order at 14-16.  The cost of the RECs is passed on to commodity customers.

CES Order at 17.

Tier 3 of the CES Order establishes New York's ZEC program, the program challenged

in this case.  CES Order at 19.  A ZEC is a "credit for the zero-emissions attributes of one

megawatt-hour of electricity production by" an eligible nuclear facility.  CES Order, App'x E, at

1.  Through the ZEC program, New York aims to "encourage the preservation of the

environmental values or attributes of zero-emissions nuclear-powered electric generating

facilities for the benefit of the electric system, its customers and environment."  CES Order,

App'x E, at 1.  In particular, the ZEC program ensures that New York's nuclear generators—

which comprise thirty-one percent of New York's electric generation mix and collectively avoid

5

the emission of over fifteen million tons of carbon dioxide per year—continue to contribute to New York's electric generation mix pending the development of new renewable energy resources between now and 2030. CES Order at 19. According to the CES Order, losing the nuclear energy contributed by the generators before new renewable resources are developed "would undoubtedly result in significantly increased air emissions" and a "dangerously higher reliance on natural gas"; without the carbon-free attributes of the nuclear generators, New York would have to rely more heavily on existing fossil-fueled energy plants or the construction of new natural gas plants for its electricity, all of which would significantly increase carbon emissions.[4] CES Order at 19. The CES Order cites Germany as a case in point: when Germany abruptly closed its nuclear plants following the Fukushima nuclear disaster, the electricity that had formerly been produced by nuclear generation was replaced by electricity generated by coal, causing carbon emissions to rise despite a simultaneous and "aggressive" increase in solar generation. CES Order at 19.

A nuclear generator is eligible for ZECs if it makes a showing of "public necessity," i.e., the facility's revenues "are at a level that is insufficient to provide adequate compensation to preserve the zero-emission environmental values or attributes historically provided by the facility." Compl. ¶ 67 (quoting CES Order at 124). Any nuclear generator, regardless of its

---

[4]    *Amici* New York Public Interest Research Group, Green Education and Legal Fund, Inc., Safe Energy Rights Group, Inc., and Promoting Health and Sustainable Energy, Inc. (collectively, "PIRG *Amici*") argue that the generation of nuclear power is "neither emissions free nor 'zero-emissions,'" but instead emits radiation, waste heat, and greenhouse gases. Memorandum of Law of the Amici ("PIRG *Amici* Mem.") 5-13, Dkt. 112-3. This may be true, but PIRG *Amici* do not go so far as to argue that the generation of nuclear power produces the same amount of noxious emissions as the generation of energy from fossil fuel or natural gas. At least with respect to greenhouse gas emissions, they assert that among the various ways to generate electricity, nuclear generation falls in the middle of the spectrum (wind producing the least and coal the most greenhouse gas emissions). PIRG *Amici* Mem. 8-9. The thrust of PIRG *Amici*'s argument is that when creating the ZEC program, the PSC did not consider whether renewable energy sources could have replaced the nuclear generators or whether some nuclear power plants could be retired with no impact on electricity availability. PIRG *Amici* Mem. 8, 14-16, 18. The Court acknowledges that New York may have been able to adopt a more aggressive approach to reducing greenhouse gas emissions, but nothing requires the States to make the perfect the enemy of the good.

**SPA-7**

location, is eligible for ZECs, so long as the generator has historically contributed to the resource mix of clean energy consumed by New York retail consumers.[5]  Compl. ¶ 68 (citing CES Order at 124).  Pursuant to the CES Order, the nuclear generators sell their ZECs to NYSERDA at a price administratively determined by the PSC.  Compl. ¶ 69.  LSEs are required to purchase ZECs from NYSERDA in an amount proportional to their customers' share of the total energy consumed in New York.[6]  CES Order at 20, 151; Compl. ¶ 73.  The LSEs pass the costs of their ZEC purchases to their customers, the retail ratepayers.  CES Order at 20; Compl. ¶ 73.

ZEC prices are calculated by the PSC using the federal estimate of the social cost of carbon and a forecast of wholesale electricity prices.[7]  Compl. ¶ 71 (citing CES Order at 131). Specifically, for a two-year period, the price of each ZEC is the social cost of carbon less the generator's putative value of avoided greenhouse gas emissions less the amount of the forecast energy price.  Compl. ¶¶ 70-71 (citing CES Order at 131).  Put differently, if the forecast wholesale price of electricity increases, the price of a ZEC decreases.  Compl. ¶ 71.  For the first two years of the ZEC program, from April 1, 2017, through March 31, 2019, the PSC has set the ZEC price at $17.48 per MWh.  Compl. ¶ 70.  Thus, "each qualifying nuclear generator will get

---

[5]      This year, only three nuclear generators in New York, Intervenors Robert Emmett Ginna plant ("Ginna"), James A. FitzPatrick plant ("FitzPatrick"), and Nine Mile Point plant, were deemed eligible for ZECs.  CES Order at 128; *see also* Compl. ¶ 58.  Plaintiffs allege that without financial support from the State, the Ginna, FitzPatrick, and Nine Mile Point nuclear generators would have gone out of business.  Compl. ¶¶ 52, 54, 56-58.  The Ginna and Nine Mile Point nuclear plants are indirectly owned by Intervenor Constellation Energy Nuclear Group, LLC, which is a joint venture between Intervenor Exelon and non-party EDF Inc.  Declaration of Jeanne Jones ("Jones Decl.") ¶ 2, Dkt. 40-3; *see also* Compl. ¶ 54.  Exelon is in the process of purchasing the FitzPatrick nuclear plant.  Jones Decl. ¶¶ 6-7.

[6]      LSEs are required to purchase the percentage of ZECs "that represents the portion of the electric energy load served by all such LSEs" in a given year.  CES Order at 20.  Although LSEs must "enter into a contractual relationship" with NYSERDA to purchase their *pro rata* portion of ZECs, LSEs also may seek permission to purchase ZECs directly from the eligible nuclear facilities.  CES Order at 151-52.

[7]      The PSC noted that it established an administrative process to set ZEC prices, rather than allowing them to be set by the market, because there would not be a competitive market process to set ZEC prices.  CES Order, App'x E at 4 ("[T]here are too few owners of the affected generation facilities for there to be a valid competitive process to determine the prices as the owners would have too much market power for effective competition.").

an additional $17.48 for each MWh of electricity it generates (subject to a possible cap), in addition to the price the facility receives for the sale of the electricity and capacity in the [NYSIO] market."  Compl. ¶ 70.

Plaintiffs allege that under the ZEC program, the nuclear generators eligible for ZECs effectively receive a higher price for their energy than they would have without the ZEC program and that the ZEC subsidies distort the market-clearing price in the NYISO auctions. Compl. ¶¶ 43-45.  Plaintiffs allege that because the ZEC program allows the eligible nuclear generators to participate in the NYISO auctions when they otherwise would have gone out of business, New York "is using the ZEC subsidy to exert a large depressive effect on energy and capacity prices, which one group of experts estimated at $15 billion over 12 years." Compl. ¶ 47.  According to Plaintiffs, this depressive effect will cause generators, including Plaintiffs, to receive a lower price than they otherwise would have received and will cause their bids to fail to clear the auctions when they otherwise would have cleared.  Compl. ¶¶ 74, 81, 87.

Plaintiffs claim that the ZEC program is preempted under the FPA and that it violates the dormant Commerce Clause.  Defendants and Intervenors move to dismiss, arguing that: Plaintiffs lack a private right of action to pursue their preemption claims in federal court; the ZEC program is not preempted; and the ZEC program does not violate the dormant Commerce Clause.  For the following reasons, the Court holds that Plaintiffs may not raise their preemption claims pursuant to the Court's equity jurisdiction; that the ZEC program is neither field nor conflict preempted; and that the ZEC program does not violate the dormant Commerce Clause.

## DISCUSSION[8]

In reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts all of the non-movant's factual allegations as true and draws all reasonable inferences in the non-movant's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although all factual allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Twombly*, 550 U.S. at 555. To survive a Rule 12(b)(6) motion to dismiss, the complaint must "state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## I.   EQUITY JURISDICTION

The Supremacy Clause does not create a cause of action for preemption claims, *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383 (2015), and Plaintiffs do not argue that the FPA itself creates a private right of action. Accordingly, Plaintiffs' preemption claims are dependent on this Court having equity jurisdiction over the claims.

Since *Ex parte Young*, 209 U.S. 123 (1908), "the Supreme Court has consistently recognized federal [equity] jurisdiction over declaratory—and injunctive—relief actions to prohibit the enforcement of state or municipal orders alleged to violate federal law." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016) (collecting cases). Nevertheless, federal courts' "equity [jurisdiction] to enjoin unlawful

---

[8]     The Court cites the parties' briefs as the following: Memorandum of Law in Support of Defendants' Motion to Dismiss, Dkt. 55, is "Defs. Mem."; Memorandum of Law in Support of Motion to Dismiss of Movant-Intervenors, Dkt. 77, is "Intervenors Mem."; Plaintiffs' Memorandum in Opposition to Motions to Dismiss, Dkt. 95, is "Opp."; Reply in Support of Defendants' Motion to Dismiss, Dkt. 105, is "Defs. Reply"; and Reply in Support of Motion to Dismiss of Intervenors, Dkt. 103, is "Intervenors Reply."

SPA-10

executive action is subject to express and implied statutory limitations." *Armstrong*, 135 S. Ct. at 1385.  The FPA does not expressly preclude actions in equity, but the parties contest whether Congress implicitly intended to foreclose equitable relief under the FPA.

In *Armstrong*, the Supreme Court held that Congress implicitly foreclosed equitable relief under Section 30(A) of the Medicaid Act, which healthcare providers sought to enforce by enjoining state officials from reimbursing medical service providers at rates lower than the federal statute required.  135 S. Ct. at 1382, 1385.  The *Armstrong* Court reasoned that Congress intended to foreclose equitable relief because (1) pursuant to the Medicaid Act, "the sole remedy" for a State's failure to comply with the Medicaid Act's requirements was the withholding of Medicaid funds by the Secretary of Health and Human Services, and (2) Section 30(A), which mandates that States provide for payments that are "consistent with efficiency, economy, and quality of care" while "safeguard[ing] against unnecessary utilization of . . . care and services," was judicially unadministrable.  *Id.* at 1385 (alteration in *Armstrong*).  According to the Supreme Court, the combination of those two features means that Congress intended to preclude private enforcement in equity of Section 30(A).  *Id.* ("Explicitly conferring enforcement of this judgment-laden standard upon the Secretary alone establishes . . . that Congress 'wanted to make the agency remedy that it provided exclusive,'. . . ." (quoting *Gonzaga Univ. v. Doe,* 536 U.S. 273, 292 (2002) (Breyer, J., concurring))).

In *Friends of the East Hampton Airport*, the Second Circuit applied *Armstrong's* two criteria to the Airport Noise and Capacity Act ("ANCA") in considering whether Congress intended to foreclose equitable relief; the Second Circuit held that Congress did not so intend. 841 F.3d at 145-47.  Under ANCA, there is no "sole remedy" because ANCA not only provides for the loss of federal funding as a penalty for violating ANCA but also grants the Secretary of

10

SPA-11

Transportation authority to pursue appropriate legal remedies, including injunctive relief.  *Id.* at 145-46 (citing 49 U.S.C. §§ 47526, 47533).  The Second Circuit reasoned that "[t]he fact that Congress conferred such broad enforcement authority on the [Federal Aviation Administration], and not on private parties, does not imply its intent to bar such parties from invoking federal jurisdiction where, as here, they do so not to enforce the federal law themselves, but to preclude a municipal entity from subjecting them to local laws enacted in violation of federal requirements."[9]  *Id.* at 146.  The Second Circuit also held that ANCA was judicially administrable because it set forth a simple rule—namely, that airports seeking to impose noise restrictions on certain types of aircraft must obtain the consent of aircraft operators or the approval of the Federal Aviation Administration.  *Id.* at 146-47 (citing 49 U.S.C. § 47524(c)).

The FPA tacitly forecloses private parties from invoking equity jurisdiction to challenge state laws enacted in alleged violation of the FPA because Congress implicitly provided a "sole remedy" in the FPA—specifically, enforcement by FERC.  Similar to ANCA, the FPA grants FERC broad enforcement authority.  For example, the FPA grants FERC discretion to bring an action in federal district court to enjoin any person violating the FPA or to enforce compliance.  16 U.S.C. § 825m(a).  The FPA also requires every public utility to file with FERC rates for all sales subject to FERC's jurisdiction and empowers FERC to hold hearings to examine new or changed rates, to suspend rates, and to determine rates.  16 U.S.C. §§ 824d(c)-(e), 824e(a).  Finally, the FPA authorizes any person to file a complaint with FERC to challenge, *inter alia*,

---

[9]     The Second Circuit's caveat relative to private parties who invoke federal jurisdiction "to enforce the federal law themselves" as compared to seeking "to preclude a municipal entity from subjecting them to local laws enacted in violation of federal requirements" is not entirely clear.  It would seem that the Second Circuit is raising a standing issue because a private party who seeks to enforce the federal law but does not seek to preclude the application of a local law to itself would appear to lack standing.  But the Second Circuit does not mention standing in its equity jurisdiction analysis, nor is it clear how the issue of standing *vel non* should be viewed when attempting to determine whether a cause of action exists in the first instance.

11

anything done by a regulated entity in contravention of the FPA.  16 U.S.C. §§ 824e(a), 825e.

But, unlike ANCA, Congress provided for a narrow private cause of action under the FPA in the

Public Utility Regulatory Policies Act ("PURPA"), which authorizes private parties to challenge

state rules governing small power production facilities, after first exhausting their administrative

remedies.  16 U.S.C. § 824a-3(h)(2)(B).  Congress's decision to create a limited private cause of

action suggests that "the omission of a general private right of action in the [FPA] should . . . be

understood as intentional."  *Vill. of Old Mill Creek v. Star*, No. 17 CV 1163, 2017 WL 3008289,

at *9 (N.D. Ill. July 14, 2017); *see Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) ("The

express provision of one method of enforcing a substantive rule suggests that Congress intended

to preclude others."); *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985) (("[W]here a

statute expressly provides a particular remedy or remedies, a court must be chary of reading

others into it." (citation and internal quotation marks omitted omitted)).  Thus, the FPA precludes

private enforcement except as provided for by PURPA, and private parties such as Plaintiffs

"cannot, by invoking [the Court's] equitable powers, circumvent Congress's exclusion of private

enforcement."  *Armstrong,* 135 S. Ct. at 1385.

    The second indicator of congressional intent to preclude equitable relief to a private

litigant, according to *Armstrong*, is the presence of a judicially unadministrable standard.  The

FPA's requirement that wholesale electricity rates be just and reasonable, 16 U.S.C. § 824d(a), is

not judicially unadministrable.[10]  The fact that courts must "afford great deference" to FERC in

---

[10]    Independent of whether the FPA's requirement that wholesale electricity rates be just and reasonable is a
judicially administrable standard, the parties dispute whether Plaintiffs' preemption claims require the Court to
apply that standard.  Plaintiffs argue that they seek only to ensure that the FERC-set rate continues to govern New
York wholesale energy transactions and are not asking the Court to set rates.  Opp. 16-17.  Defendants, on the other
hand, argue Plaintiffs' preemption claims are rate-related requests for injunctive relief that implicate the just and
reasonable rate-setting standard.  Defs. Reply 11.  The Court agrees with Plaintiffs but does not base its holding on
this argument.

its determination of just and reasonable rates, *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty., Wash.*, 554 U.S. 527, 532 (2008), does not mean that the determination of just and reasonable rates is judicially unadministrable—courts may defer to FERC's determination, but they do not abstain from all judgment regarding what constitutes a just and reasonable rate, *see, e.g.*, *id.* at 545-46 (the Supreme Court in *Fed. Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348 (1956), "provided a definition of what it means for a rate to satisfy the just-and-reasonable standard in the contract context"); *Cent. Hudson Gas & Elec. Corp. v. FERC*, 783 F.3d 92, 109-11 (2d Cir. 2015) (holding that FERC's determination of just and reasonable rates was adequately supported and not unreasonable); *Mont. Consumer Counsel v. FERC*, 659 F.3d 910, 918 (9th Cir. 2011) ("The Supreme Court has long held that the statutory command that rates be 'just and reasonable' means that courts must balance 'the investor and the consumer interests,' and '[i]f the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry . . . is at an end.'" (quoting *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602–03 (1944))).  Indeed, by allowing FERC to file federal lawsuits, 16 U.S.C. § 825m(a), Congress necessarily anticipated that courts might have to oversee the enforcement of the just and reasonable rate standard, albeit with deference to FERC. [11]

In sum, the Court finds that the first but not the second of *Armstrong's* factors indicates that Congress intended to preclude equitable relief to private parties.  There is no indication in

---

[11]     In a nearly identical case in which electricity generators challenged a ZEC program as preempted by the FPA, the District Court for the Northern District of Illinois came to the opposite conclusion, namely that determining a "just and reasonable" rate is a judicially unadministrable standard.  *Vill. of Old Mill Creek*, 2017 WL 3008289, at *9.  For the reasons explained *supra*, this Court disagrees with the Northern District of Illinois's conclusion that "just and reasonable" is judicially unadministrable.  Moreover, unlike this Court, *see supra* note 10, that court thought that it would need to apply that standard and effectively get involved in rate-setting in order to resolve the plaintiffs' preemption claim.  The Northern District of Illinois concluded that because there was "too much" distortion of the wholesale market, the court would be required to address how much states could subsidize local industry that touched the wholesale energy market before the effect of those subsidies resulted in a rate that was not just and reasonable.  *Id.* at *9.

SPA-14

*Armstrong* that both factors must be satisfied in order to conclude that Congress intended to foreclose equitable relief to private parties.  To the contrary, the Supreme Court in *Armstrong* considered the second factor—judicial administrability—in the event the provision authorizing the Secretary of Health and Human Services to enforce the statute by withholding funds "might not, *by itself*, preclude the availability of equitable relief."  135 S. Ct. at 1385.  The limited private right of action provided by PURPA is by itself sufficient to establish that Congress intended to foreclose equitable relief.  Between a statute that establishes a narrow private cause of action allowing private lawsuits in some but not most cases and a statute that establishes a specific administrative remedy, the former indicates more clearly than the latter that Congress chose to eliminate general equitable relief for private parties.  The issue of creating a private cause of action was squarely before Congress when it drafted and enacted the former provision, whereas Congress did not necessarily consider the possibility of a private right of action in drafting and enacting the latter provision.  This Court can, therefore, more confidently infer that Congress intended to foreclose a private right of action in equity in the former scenario than in the latter.  Accordingly, this Court does not have equity jurisdiction over Plaintiffs' FPA preemption claims.  Nevertheless, even if the Plaintiffs could invoke the Court's equity jurisdiction, for the reasons provided below, Plaintiffs' preemption claims would fail.

## II.  PREEMPTION

The Supremacy Clause provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. CONST., art. VI, cl. 2.  In other words, "federal law preempts contrary state law."  *Hughes*, 136 S. Ct. at 1297.

14

**SPA-15**

In considering a federal law's preemptive effect, "the ultimate touchstone" is Congress's purpose in enacting the law. *Id*. at 1297 (quoting *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008)). Relatedly, in determining whether a state law is preempted, the Court must "consider[] the *target* at which the state law *aims*." *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1599 (2015) (emphases in original).

State laws may be either "field" or "conflict" preempted. Field preemption exists where "Congress has forbidden the State to take action in the *field* that the federal statute pre-empts." *Oneok*, 135 S. Ct. at 1595. In such circumstances, "Congress may have intended to foreclose any state regulation in the *area*, irrespective of whether state law is consistent or inconsistent with federal standards." *Id*. (citation and internal quotation marks omitted). Conflict preemption, by contrast, "exists where compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. (citation and internal quotation marks omitted).

Plaintiffs allege that the CES Order is both field and conflict preempted by the FPA. For the reasons set forth below, the Court concludes that it is neither.[12]

### A.  Field Preemption

The FPA is a paragon of cooperative federalism; it divides responsibility for the regulation of energy between state and federal regulators. *See Hughes*, 136 S. Ct. at 1292. For statutes such as the FPA, "where 'coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for

---

[12]     The Court notes that the Northern District of Illinois also held that the Illinois ZEC program was neither field nor conflict preempted, for many of the same reasons discussed *infra*. *Vill. of Old Mill Creek*, 2017 WL 3008289, at *10-14 (granting motions to dismiss).

SPA-16

federal pre-emption becomes a less persuasive one.'" *Id.* at 1300 (Sotomayor, J., concurring) (quoting *New York State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 421 (1973)).

FERC, on behalf of the federal government, has exclusive authority "to regulate 'the transmission of electric energy in interstate commerce' and 'the sale of electric energy at wholesale in interstate commerce.'" *FERC v. Elec. Power Supply Ass'n* (hereafter, "*EPSA*"), 136 S. Ct. 760, 767 (2016) (quoting 16 U.S.C. § 824(b)(1)).[13]  Particularly relevant here, FERC also has the authority "to ensure that rules or practices 'affecting' wholesale rates are just and reasonable." *Id.* at 774 (discussing 16 U.S.C. § 824e(a)); *see also* 16 U.S.C. § 824d(a).  This "affecting" jurisdiction is limited to rules or practices that "*directly* affect the wholesale rate." *EPSA*, 136 S. Ct. at 774 (internal marks and citation omitted).  "Indirect or tangential impacts on wholesale electricity rates" do not suffice; otherwise, the FPA's grant of jurisdiction to FERC would "assum[e] near-infinite breadth." *Id.*

Although FERC has substantial authority over interstate wholesale energy sales, the regulation of retail rates for sales of electricity belongs to the States. *Hughes*, 136 S. Ct. at 1292. Within the zone of exclusive state jurisdiction are "within-state wholesale sales" and "retail sales of electricity (i.e.*,* sales directly to users)." *EPSA*, 136 S. Ct. at 768.  States also retain jurisdiction "over facilities used for the generation of electric energy." 16 U.S.C. § 824(b)(1). As discussed *supra*, to determine whether a State is regulating retail or wholesale rates, the Court must consider the target of the state law. *Oneok*, 135 S. Ct. at 1599.[14]

---

[13]     A wholesale sale is "a sale of electric energy to any person for resale." 16 U.S.C. § 824(d).

[14]     Although *Oneok* involved the Natural Gas Act ("NGA") rather than the FPA, the Supreme Court "has routinely relied on NGA cases in determining the scope of the FPA, and vice versa." *Hughes*, 136 S. Ct. at 1298 n.10.

1.   Unconstitutional "Tethering" Under *Hughes*

The Supreme Court recently grappled with the issue of preemption under the FPA in

*Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016).  In *Hughes*, the Court

concluded that a Maryland energy program was preempted because it impermissibly "set[] an

interstate wholesale rate, contravening the FPA's division of authority between state and federal

regulators."  136 S. Ct. at 1297.  The Maryland program, which obliged Maryland LSEs to enter

into a contract-for-differences with a favored generator, required the favored generator to

participate in the wholesale capacity auction, but guaranteed that generator the more favorable

contract price (rather than the market-clearing price) for its energy.  *Id.* at 1294-95, 1297.

Importantly, the generator's receipt of the subsidy was explicitly contingent on the generator's

sale of capacity into the wholesale auction: if the generator's capacity cleared the auction, and

the market-clearing price was below the price stipulated in the contract-for differences, the LSEs

paid the generator the difference between the contract price and the clearing price.  *Id.* at 1295.

The generator did not receive the subsidy if its capacity failed to clear the auction.  *Id.*  Because

the Maryland program conditioned the generator's receipt of the subsidy on the generator's

participation in the auction, but guaranteed the generator a rate distinct from the market-clearing

price, *Hughes* concluded that the Maryland program "adjust[ed] an interstate wholesale rate" and

was accordingly preempted.  *Id.* at 1297.

     *Hughes*, however, left open the possibility for States to "encourag[e] production of new

or clean generation through measures 'untethered to a generator's wholesale market

participation.'"  *Id.* at 1299 (citation omitted).  In doing so, the Supreme Court declined to

address the permissibility of other State measures to incentivize clean energy, such as "tax

incentives, land grants, direct subsidies, construction of state-owned generation facilities, or re-

regulation of the energy sector."  *Id. Hughes* emphasized: "So long as a State does not condition

17

SPA-18

payment of funds on capacity clearing the auction, the State's program would not suffer from the fatal defect that renders Maryland's program unacceptable." *Id.*

Plaintiffs argue that the ZEC program is preempted under *Hughes* because, like the challenged Maryland program, the ZEC program is "tethered" to the wholesale auction. Plaintiffs argue that there is an impermissible tether because: (1) a nuclear generator is eligible for a ZEC only if the NYISO auction rates are insufficient for the generator to stay in business; (2) ZEC prices are calculated using forecast wholesale rates; and (3) the nuclear generators receiving the ZECs sell all of their power directly into the auction markets.  Opp. 19-22; Oral Arg. Tr. (hereafter, "Tr.") 22:2-23:22, 32:16-34:14, Dkt. 141 (Mar. 29, 2017).  Unsurprisingly, Defendants and Intervenors dispute all of these arguments.  The Court agrees with Defendants and Intervenors.

The Court is not convinced by Plaintiffs' first argument.  A whole host of measures that States might employ to encourage clean energy development—such as tax incentives or direct subsidies—involve propping up the operation of a generator that might otherwise be unprofitable.  *Hughes* did not prohibit such state assistance, *see Hughes*, 136 S. Ct. at 1299, and Plaintiffs have not argued that such state subsidies are *per se* preempted.

Nor does the use of forecast wholesale rates in calculating the ZEC price create an unconstitutional tether.  *Hughes* clearly stated that the impermissible tether was "to a generator's wholesale market *participation*," *id.* at 1299 (emphasis added), and nowhere stated, implied or even considered that a State program's incorporation of the wholesale market price would provide a basis for preemption.[15]  Plaintiffs have not provided any persuasive argument why

---

[15]     For that reason, Plaintiffs' argument that *Hughes* would not have been decided differently if the Maryland program incorporated forecast prices rather than actual ones, Opp. 19, misses the mark.  Plaintiffs do not cite, and the Court has not found, any language in *Hughes* indicating that the Supreme Court considered the pricing calculation for the subsidies to be constitutionally relevant.  The problem with Maryland's program was that the

18

SPA-19

using wholesale prices, actual or forecast, as a metric for calculating the price of a ZEC creates a tether that leads to preemption.

*Rochester Gas & Electric Corp. v. PSC*, 754 F.2d 99 (2d Cir. 1985) forecloses Plaintiffs' attempt to hook preemption to price. *Rochester Gas* concluded that the State's consideration of a "reasonable estimate" of wholesale sales revenue in calculating intrastate retail rates (an area of State jurisdiction) did not render the state program at issue preempted. 754 F.2d at 100-01, 105. The Second Circuit found "a distinction between, on the one hand, regulating [wholesale] sales, and on the other, reflecting the profits from a reasonable estimate of those sales in jurisdictional rates." *Id*. at 105. Plaintiffs attempt to distinguish *Rochester Gas* by noting that *Rochester Gas* involved regulation at the retail level, Tr. 31:24-32:8, 48:6-10, but that is a distinction without a difference. Regulation of retail rates, like the regulation of environmental attributes, is within the zone of state jurisdiction, and *Rochester Gas* held that merely considering or incorporating wholesale prices in rate-setting for a state-regulated activity does not intrude upon federal authority.[16] *Rochester Gas*, 754 F.2d at 105 (New York "may impute revenue from a reasonable estimate of [wholesale] sales" in considering the generator's retail revenue).

Plaintiffs also argue that the ZEC program is directly tied to the wholesale auction because "[a]ll electricity produced by these nuclear generators must be sold directly or indirectly

---

contract-for-difference guaranteed a price and conditioned that guaranteed price on the generator's energy clearing the auction. Although the auction-clearing price was considered in calculating the amount that would be received under the contract-for-difference (because the generator received the difference between the contract price and the clearing price), the use of the auction-clearing price as a metric was not constitutionally relevant; rather, the impermissible tether was relative to the generator's wholesale market *participation*. *Id*. at 1295, 1299. The Court finds no basis to conclude that consideration of wholesale prices (whether forecast or actual) in pricing a subsidy is material to the preemption analysis.

[16]     As a policy matter, using the forecast wholesale prices in the ZEC price calculation is a rational policy decision: it creates a one-way ratchet pursuant to which the ZEC price can be adjusted only downwards, s*ee* Compl. ¶ 71, Tr. 40:11-13, which inures to the benefit of Plaintiffs and the ratepayers. In addition, and as noted by Intervenors, "this is an odd argument for [Plaintiffs] to make, because it effectively concedes the legality of the first two years of the program where the price is fixed . . . ." Tr. 46:19-21.

in the NYISO auctions, as there are no alternative markets." Compl. ¶ 64; *see also* Tr. 22:7-8

("[T]he nuclear plants[] have no alternative but to sell their output in the energy auction . . . ."):

Plaintiffs highlight that the nuclear generators are "price takers," Tr. 22:8, and that the nuclear

generators "are exempt wholesale generators under the Public Utility Holding Act [("PUHA")],"

which, according to Plaintiffs, requires the generators to sell all of their power and capacity into

the wholesale auction.  Tr. 22:10-16.

 This argument is no more than an attempt to fashion a "tether" by jamming a square peg

into a round hole; Plaintiffs' argument rewrites the CES Order.  The CES Order itself does not

require the nuclear generators to sell into the NYISO auction.  As discussed *supra*, the nuclear

generators receive ZECs for their zero-emissions *production* of energy, and not for the sale of

that energy into the wholesale market; the CES Order grants ZECs to eligible nuclear generators,

without any mention of whether or where the generators sell their power.  *See* CES Order at 124-

29 (discussing criteria for generators to receive ZECs).  In that respect, the ZEC program is

critically different from the challenged program in *Hughes*, which specifically *conditioned*

subsidy payments on the generator's sale of capacity into the auction.  *See Hughes*, 136 S. Ct. at

1295, 1297, 1299.

 Even accepting as true Plaintiffs' allegation that the generators do, as a matter of fact, sell

their entire output into the auction, *see* Compl. ¶ 64, that is a business decision; it is not a

requirement imposed by New York.  Plaintiffs have not cited, and the Court has not been able to

find, any case in which a state program has been found to be field preempted based on a private

business decision rather than a state directive.  What the generators choose to do, as a matter of

their business organization or as a product of their business decisions, is irrelevant from a

preemption perspective.  *See Vill. of Old Mill Creek*, 2017 WL 3008289, at *13 (finding the ZEC

program not preempted because "the ZEC program does not *mandate* auction clearing . . . and the state, while taking advantage of these attributes to confer a benefit on nuclear power, is not imposing a condition directly on wholesale transactions").

The fact that the nuclear generators currently claim status as exempt wholesale generators under PUHA is similarly irrelevant.  Intervenors note that PUHA permits generators to withdraw their wholesale generator status, 18 C.F.R. § 366.7(c)(3),[17] but even if PUHA did not permit withdrawal and did require the generators to sell entirely into the auction, the critical point is that *New York* has not required the generators to participate in the auction: nothing about the CES Order tethers the generators' receipt of ZECs to their sale of energy into the auction.  Put differently, a change in PUHA would not unravel the CES Order or interfere with New York's ZEC program.  That is why PUHA is a red herring.  The law of preemption examines state action and considers whether state action has intruded upon the federal government's turf.  It cannot be disputed that the CES Order does not *require* the generators to sell into the auction—that is, it does not tether the generators' receipt of ZECs to their participation in the auction.  It is that aspect of the CES Order that saves the ZEC program from the problems faced in *Hughes*.

In summary, the Maryland program at issue in *Hughes* conditioned the generators' receipt of a favorable rate (distinct from the auction rate) on the generators' capacity clearing the auction; there was a direct and concrete tie (or tether) between the contracts-for-difference and the generator's wholesale market participation.  Here, a ZEC is available based on the environmental attributes of the energy production—specifically, for the generators' production

---

[17]     To claim status as an exempt wholesale generator, the generator may file with FERC a notice of self-certification or a petition for a declaratory order requesting such status, which FERC then reviews. 18 C.F.R. §§ 366.7(a)-(b).  A generator with exempt wholesale generator status may notify FERC that it no longer seeks to maintain its status if "there is any material change in facts that may affect" that generator's status. § 366.7(c)(3).  In addition, the generator's status may be revoked if it fails to conform to the criteria required for such status.  § 366.7(d).

SPA-22

of zero-emissions energy—without consideration of the generators' participation in the auction. Like the challenged Connecticut program in *Allco Fin. Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017), the ZEC program does not suffer from *Hughes*'s "fatal defect" because the ZEC program "does not condition capacity transfers on [the wholesale] auction."  861 F.3d at 99.  Rather, the purchase or sale of ZECs, like the contracts at issue in the Connecticut program, reflect transactions that occur "independent of the auction."  *Id.*

> 2.   ZECs Do Not Directly Adjust, Alter, or Affect the Wholesale Rate

Plaintiffs argue that the ZEC program is preempted because "the ZEC payments directly alter the wholesale price paid by LSEs and received by the nuclear generators."  Opp. 19.  They argue that by guaranteeing nuclear generators greater total compensation (i.e., the auction clearing price plus the value of its ZECs) than what they will receive at auction (clearing price only), the ZEC program disregards interstate wholesale rates that FERC has deemed just and reasonable.  In addition, Plaintiffs argue that ZECs artificially depress the auction market-clearing price by allowing the nuclear generators to continue to participate as price-takers, thus increasing the supply of energy and thereby reducing the wholesale price.

Plaintiffs' argument commits the logical fallacy of concluding that state actions that affect the wholesale price in some way are the same as state actions that set the wholesale rate. In *EPSA,* the Supreme Court stated that "[t]o set a retail electricity rate is . . . to establish the amount of money a consumer will hand over in exchange for power."  *EPSA*, 136 S. Ct. at 777. Although *EPSA* was addressing retail rates, this Court sees no principled basis—in the statutory text, *EPSA*'s discussion or otherwise—to conclude that the definition of "to set a rate" is different in the retail and wholesale contexts.  Moreover, the *EPSA* definition is consistent with *Hughes*.  *Hughes* concluded that the Maryland program did adjust and "set" an interstate

wholesale rate because the program "required [the generator] to participate in the []capacity auction, but guarantees [the generator] a rate distinct from the clearing price for its interstate sales of capacity." *Hughes*, 136 S. Ct. at 1297. Here, the ZEC sales and the wholesale sales of energy or capacity are entirely separate transactions, with the ZEC sales occurring independently of the wholesale auction and neither one conditioned on the other. Therefore, the ZEC program does not adjust or "set" the amount of money that a generator receives in exchange for the generator's sale of energy or capacity into the auction.

Nor is the ZEC program preempted because of the ZECs' effects on the wholesale auction. FERC has jurisdiction over "rules or practices that *directly* affect the [wholesale] rate," *EPSA*, 136 S. Ct. at 774 (alterations in original) (citation and quotation marks omitted), but "indirect or tangential impacts on wholesale electricity rates" fall outside FERC jurisdiction, *id.* Even if ZECs have an effect on the wholesale auction—which Plaintiffs allege and the Court must accept as true—Plaintiffs have not plausibly alleged that the ZECs directly affect wholesale rates such that they intrude upon federal jurisdiction.

In *Allco*, the Second Circuit squarely rejected the argument that the fact that the challenged contracts would "increase the supply of electricity available to Connecticut utilities," thereby exerting "downward pressure . . . that will have an effect on *wholesale* prices," meant that the Connecticut contracts "infring[ed] upon FERC's regulatory authority." *Allco*, 861 F.3d at 101. The Second Circuit concluded that any such effect on wholesale prices was "incidental" and did not "amount to a regulation of the interstate wholesale electricity market that infringes on FERC's jurisdiction." *Id.* Plaintiffs here allege that ZECs affect wholesale prices by exerting pressure on the market forces that play out in the wholesale auction, but they, too, fail to state a

plausible claim that ZECs *directly* affect wholesale rates.  Like the *Allco* contracts, ZECs have only an incidental effect on wholesale rates and thus do not intrude upon FERC jurisdiction.

Fatal to Plaintiffs' argument is their failure to offer any cogent explanation why ZECs are preempted but other state incentives to generate clean energy—such as tax exemptions, land grants, or direct financial subsidies—are not.  Such incentives also allow clean energy generators to be more competitive than they would otherwise be, and they therefore also affect price signals in the wholesale auction.  Plaintiffs even concede that such measures "would have some of the same effects" on the market.  Tr. 26:2-3.

*Hughes* declined to rule on the permissibility of such state-incentive measures, *see Hughes*, 136 S. Ct. at 1299 ("We . . . need not and do not address the permissibility of various other measures States might employ to encourage development of new or clean generation, including tax incentives, land grants, [and] direct subsidies . . . ."), and Plaintiffs do not argue here that such incentives are *per se* impermissible, Tr. 25:22-26:4 (acknowledging that "if New York decided to just write a check to a nuclear plant, that would have some of the same effects"). *Hughes* made clear that it did not mean to discourage States from incentivizing clean energy generation so long as the measures taken are not tethered to a generator's wholesale market participation.  *Hughes*, 136 S. Ct. at 1299.  The Supreme Court implicitly acknowledged that state actions to encourage clean energy production may make price signals from the auction less relevant.  *Id.* (citing Respondents' discussion that States may make the price signals in the auction "less relevant by subsidizing new generation," Brief for Respondents 40).  Other than their theories of "tethering," which this Court has already rejected, Plaintiffs offer no explanation for why the effects of ZECs on price signals in the auction are any different from, for example,

24

the effects a tax incentive given to the nuclear plants would have on those same price signals. There may (or may not) be a difference in degree, but there is no difference in kind.

The death knell for Plaintiffs' field-preemption argument is their failure to distinguish ZECs from RECs.  In *WSPP*, FERC concluded that RECs fall outside FERC jurisdiction because they are state-created certifications of an energy attribute that are unbundled from wholesale energy sales.  *WSPP, Inc.*, 139 FERC P 61061, 2012 WL 1395532, ¶¶ 18, 21, 24 (FERC Apr. 20, 2012).  *WSPP* held that these unbundled transactions did not affect wholesale rates and were not "in connection with" wholesale sales of electricity.  *Id.* ¶ 24; *see also Allco*, 861 F.3d at 93 ("RECs are inventions of state property law whereby the renewable energy attributes are 'unbundled' from the energy itself and sold separately." (quoting *Wheelabrator Lisbon Inc. v. Conn. Dep't of Pub. Util. Control*, 531 F.3d 183, 186 (2d Cir. 2008))).  Curiously, Plaintiffs argue that *WSPP* supports their position.

Plaintiffs argue that *WSPP* does not foreclose their preemption claim because *WSPP* noted that a wholesale sale that "requires the use of an emissions allowance" is subject to FERC jurisdiction because such a transaction would directly affect and be "in connection with" the wholesale rate, *WSPP* ¶¶ 22-23.  Plaintiffs argue that because the ZEC program requires that LSEs purchase ZECs in proportion to the electric energy load that they serve, Compl. ¶ 73, ZECs are not "unbundled" from wholesale sales as RECs are.  Opp. 28-29.

Plaintiffs' argument fails given the allegations in their own Complaint: the REC program also requires that LSEs purchase RECs in proportion to their total electricity load or to make a compliance payment.  Compl. ¶ 49; CES Order at 14, 16.  That LSEs may make a REC compliance payment, but no analogous ZEC compliance payment exists, is immaterial; the REC program, like the ZEC program, requires that LSEs make a proportional payment.  *See* CES

Order at 109-10.  Like RECs, ZECs are credits for the environmental attributes of energy production.  Like the sales of RECs, sales of ZECs are unbundled from wholesale sales for energy or capacity.  If RECs are not preempted (and *WSPP* makes clear that they are not), then the Court fails to see how ZECs are.

Plaintiffs further argue that RECs are distinguishable from ZECs because: REC prices are not calculated using forecast wholesale prices, Opp. 30-31; RECs are available to all generators, not just a favored few, Opp. 31; and ZECs are not unbundled from or "independent of other 'attributes'" of the eligible generators because the generators receive ZECs based on their inability to remain profitable from wholesale market sales, Opp. 31.  *See also* Compl. ¶¶ 50-51.  For these reasons, Plaintiffs claim that "the REC is different and is not subject to the same issues."  Tr. 21:6-7; *see also* Tr. 31:4-5 ("You don't have that tie for the RECs").

Although there are factual differences between ZECs and RECs, none is legally significant.  As discussed above, the fact that the ZEC price is calculated using a forecast of wholesale prices does not mean that the ZEC program is preempted.  Nothing in *WSPP* considered the REC pricing mechanism to be constitutionally significant; indeed, *WSPP* did not even explicitly address how RECs were priced.[18]  That RECs are available to any energy producer that uses renewable sources, whereas ZECs are available only to energy producers that satisfy certain other requirements does not pose a preemption concern.[19]  Plaintiffs cite no cases

---

[18]     WSPP Inc. proposed two structures for the purchase and sale transactions of RECs: (1) RECs that were transferred independently (or unbundled) from energy and (2) RECs that were bundled with energy in the sale transaction.  *WSPP*'s only discussion of REC prices considered whether, in the context of RECs bundled with energy, to allocate the contract price between the RECs and energy or to impose a single price, subject to a cap, for both.  *WSPP* ¶¶ 7, 15.  *WSPP*, however, nowhere discussed how RECs themselves were to be priced, and *WSPP* did not address the price of RECs in transactions where, as here, the sales of RECs were unbundled from the sales of wholesale energy.

[19]     ZECs are available only to energy producers that have historically contributed to clean energy resources in New York, produce zero-emissions electricity, and satisfy other standards.  Compl. ¶¶ 67-68; CES Order at 124.

26

supporting their theory that subsidizing only a few generators is problematic from a preemption perspective.  Plaintiffs' creative rephrasing of "unbundled" as "independent of other 'attributes'" also is unavailing.  *WSPP* held that the "unbundled REC transaction" was not preempted because it was "independent of a *wholesale electric energy transaction*."  *WSPP* ¶ 24 (emphasis added).  *WSPP* nowhere said that that RECs were not preempted because they were independent of other attributes.

Like a REC, a ZEC is a certification of an energy *attribute* that is separate from a wholesale charge or rate.  Like a REC, the purchase or sale of a ZEC is the purchase or sale of this attribute, rather than the purchase or sale of wholesale energy.  Like a REC, the purchase or sale of a ZEC is independent of the purchase or sale of wholesale energy.  Like a REC, payment for a ZEC is not conditioned on the generator's participation in the wholesale auction; rather, RECs and ZECs are given in exchange for the renewable energy or zero-emissions *production* of energy by generators.  Compl. ¶ 64 ("payment of ZEC subsidies occurs if, and only if, the nuclear generator 'produces' electricity"); CES Order, App'x E at 1.  Because of these similarities between ZECs and RECs, the effect of ZECs on the wholesale auction is legally indistinguishable from the effect of RECs on the wholesale auction.[20]  FERC has clearly held that RECs are not preempted.   The Court cannot find any principled basis to hold that the ZEC program is preempted even though its sibling REC program is not.

---

[20]        Plaintiffs assert that "[u]nlike New York's REC program, which is not tethered to the wholesale markets (and which Plaintiffs do not challenge), the ZEC program directly affects wholesale rates."  Opp. 30.  Plaintiffs' distinction between ZECs and RECs hinges on their legal conclusion that ZECs, and not RECs, are "tethered to the wholesale markets."  The Court rejects Plaintiffs' purported "tether" for the reasons discussed *supra*.

SPA-28

3.  Plaintiffs' Attempt to Analogize to Other Preempted State Measures Is Unpersuasive

Plaintiffs argue that the ZEC program's effect on wholesale prices is "far greater" than the effects of programs held preempted in *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293 (1988), *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988), *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953 (1986), and *Northern Natural Gas Company v. State Corporation Commission of Kansas*, 372 U.S. 84 (1963).  The Court disagrees. Those cases all involved obvious state intrusions into the federal government's area of responsibility that are absent from the ZEC program.  In *Oneok*, the Supreme Court made clear that the *Schneidewind* program was preempted because the state law was "*directed at . . . the control of rates and facilities of natural gas companies . . . precisely the things over which FERC has comprehensive authority.*"  *Oneok*, 135 S. Ct. at 1600 (quoting *Schneidewind*, 488 U.S. at 1600).  The Court found that the *Schneidewind* program "was designed to keep a natural gas company from raising its equity levels above a certain point in order to keep the company's revenue requirement low, thereby ensuring lower *wholesale* rates."  *Id.* (citing *Schneidewind*, 488 U.S. at 307-08).  As discussed *supra*, and unlike in *Schneidewind*, the ZEC program is not directed at and does not directly affect wholesale rates.

*Mississippi Power* and *Nantahala* also do not help Plaintiffs' case.  In *Mississippi Power*, which is a conflict (not field) preemption case, the State barred the utility from recovering costs that the utility was required to pay under a FERC order mandating a certain allocation of power. *Mississippi Power*, 487 U.S. at 373-74.  The Supreme Court concluded that "Mississippi's inquiry into the reasonableness of FERC-approved purchases" was preempted by FERC.  *Oneok*, 135 S. Ct. at 1601-02 (discussing *Mississippi Power*).  Similarly, in *Nantahala*, which also is a conflict preemption case and a case on which *Mississippi Power* relied, a State commission

28

prevented the utility from recovering the costs incurred in paying the wholesale rate for a FERC-mandated allocation of power.  *Mississippi Power*, 487 U.S. at 370-71 (discussing *Nantahala*).  As in *Nantahala*, the Supreme Court held that the State commission's action was preempted.  *Id*. at 370-73 (discussing *Nantahala*).  Here, the ZEC program does not challenge or seek to re-determine the reasonableness of the wholesale rate.  Rather, ZECs are payments for the environmental attributes of zero-emission energy.  Unlike the challenged state laws in *Mississippi Power* and *Nantahala,* and despite Plaintiffs' protestations otherwise, the ZEC program is simply not tethered to the wholesale rate.

Lastly, *Northern Natural Gas* is simply inapposite.  In that case, Kansas required the ratable purchase of gas from a particular gas field.  *N. Nat. Gas*, 372 U.S. at 85-86.  The Supreme Court held that Kansas' orders were preempted because they were "unambiguously directed at purchasers who take gas in Kansas for resale after transportation in interstate commerce" and thereby invaded federal jurisdiction "over the sale and transportation of natural gas in interstate commerce for resale."  *Id*. at 90-92 (Kansas orders "directly affect[ed] the ability of the Federal Power Commission to regulate comprehensively and effectively the transportation and sale of natural gas, and to achieve the uniformity of regulation, which was an objective of the Natural Gas Act.").  Unlike in *Northern Natural Gas*, the ZEC program does not order utilities to make any purchases of energy or capacity, let alone from any particular electricity source.

In sum, the Court concludes that the ZEC program is not field preempted.  By establishing a program that does not condition or tether ZEC payments to wholesale auction participation, New York has successfully threaded the needle left by *Hughes* that allows States to adopt innovative programs to encourage the production of clean energy.  *See Hughes*, 136 S. Ct.

at 1299.  For the foregoing reasons, the Complaint does not state a plausible claim of field

preemption.

### B.  Conflict Preemption

Conflict preemption "exists where compliance with both state and federal law is

impossible, or where the state law stands as an obstacle to the accomplishment and execution of

the full purposes and objectives of Congress."  *Oneok*, 135 S. Ct. at 1595 (quotation marks and

citation omitted).  "State regulation of production may be pre-empted as conflicting with FERC's

authority over interstate transportation and rates if it is impossible to comply with both state and

federal law; if state regulation prevents attainment of FERC's goals; or if a state regulation's

impact on matters within federal control is not an incident of efforts to achieve a proper state

purpose."  *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 515-16

(1989).  Where, as here, conflict preemption is alleged based on the obstacle presented by state

law to the federal purpose and objective, "[w]hat constitutes a sufficient obstacle is a matter of

judgment, to be informed by examining the federal statute as a whole and identifying its purpose

and intended effects."  *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d

65, 101 (2d Cir. 2013) (internal quotation marks and citation omitted); *see also PPL EnergyPlus,*

*LLC v. Nazarian*, 753 F.3d 467, 478 (4th Cir. 2014) (same).

In "a system of 'interlocking' [state and federal] jurisdiction" like the FPA, *Nazarian*,

753 F.3d at 478; *see also Hughes*, 136 S. Ct. at 1300 (Sotomayor, J., concurring), "conflict pre-

emption analysis must be applied sensitively . . . so as to prevent the diminution of the role

Congress reserved to the States while at the same time preserving the federal role," *Nw. Cent.*

*Pipeline*, 489 U.S. at 515.  When state law has an impact on matters within FERC's control, "the

State's purpose must be to regulate production or other subjects of state jurisdiction, and the

30

means chosen must at least plausibly be related to matters of legitimate state concern." *Nw. Cent. Pipeline*, 489 U.S. at 518. A state law "creates a conflict rather than demands an accommodation" when the State is attempting to regulate a matter of federal concern in the guise of regulating a matter of state concern. *Id*. But when the State is legitimately regulating a matter of state concern, "FERC's exercise of its authority must accommodate" that state regulation "[u]nless clear damage to federal goals would result." *Id.* at 522.

Plaintiffs argue that the ZEC program is conflict preempted because it causes "clear damage" to and "interferes with FERC's regulatory objective" of maintaining competitive energy markets. Opp. 32-33. Plaintiffs allege that the ZEC program "disrupt[s] market signals" and "interferes with FERC's decision to structure the wholesale markets . . . on market-based principles" to encourage the maintenance of efficient generators. Compl. ¶¶ 88-89. Plaintiffs further argue that conflict preemption presents a factual issue inappropriate for resolution on a motion to dismiss. Opp. 34.

Defendants and Intervenors respond that the ZEC program is consistent with FERC's policy statements and that NYISO, which administers FERC's markets in New York, has endorsed the ZEC program. Defs. Mem. 8-9; Intervenors Mem. 19-20. Intervenors further note that if the ZEC program were interfering with federal objectives, "FERC has abundant steps it could take but has chosen to take none of them," Tr. 15:21-22. To the contrary, as Intervenors note, FERC has concluded that state programs that incentivize clean energy generation are consistent with FERC's policy objectives. Intervenors Mem. 19 (collecting FERC decisions).

Accepting the Complaint's factual allegations as true, as the Court must at this stage, the Complaint does not state a plausible claim of conflict preemption. The ZEC program is plainly related to a matter of legitimate state concern: the production of clean energy and the reduction

of carbon emissions from the production of other energy.  Thus, in the interlocking jurisdictional

scheme provided by the FPA, there is no conflict preemption "[u]nless clear damage to federal

goals would result."  *Nw. Cent. Pipeline*, 489 U.S. at 522.

Plaintiffs allege that the ZEC program "interferes with FERC's decision to structure the

wholesale markets . . . on market-based principles" to encourage efficient generators.

Compl. ¶ 89.  Accepting as true that one of FERC's goals is to promote market efficiency

through energy auctions, there is no conflict.  The ZEC program does not run afoul of the goal of

having an efficient energy market.  Instead, by incentivizing clean energy production, it seeks to

minimize the environmental damage that is done by generating electricity through the use of gas

and fossil fuels.  CES Order at 19.  Far from objecting to state programs that encourage energy

production with certain desirable environmental attributes, FERC has approved state programs

with "renewable portfolio mandates and greenhouse reduction goals."  *See, e.g.*, *Pac. Gas &*

*Elec. Co.*, 123 FERC P 61067, 2008 WL 1780603, ¶ 34 (FERC Apr. 21, 2008).  The ZEC

program does not thwart the goal of an efficient energy market; rather, it encourages through

financial incentives the production of clean energy.

Plaintiffs' only remaining allegations relative to their conflict preemption claim are that

ZECs "will disrupt market signals" within the auction, Compl. ¶ 88, and that "the ZECs will

have market-distorting ripple effects throughout the national market and beyond New York's

borders," Compl. ¶ 90.  Accepting these factual allegations as true, Plaintiffs have not stated a

plausible claim of conflict preemption.

Plaintiffs' core complaint is that the ZEC program will permit certain nuclear generators

to continue to participate in the energy market when they otherwise would have gone out of

business.[21]  Compl. ¶ 58.  But, as discussed *supra*, *Allco* concluded that the fact that the

Connecticut program would "increase the supply of electricity," thereby affecting wholesale

prices, did not mean that the Connecticut program was preempted.  *Allco*, 861 F.3d at 101 ("This

incidental effect on wholesale prices does not . . . amount to a regulation of the interstate

wholesale electricity market that infringes on FERC's jurisdiction.").[22]  Here, too, any effects

exerted by ZECs on the market auctions are indirect and incidental; those effects do not cause the

sort of "clear damage to federal goals," *Nw. Cent.* 489 U.S. at 522, that would give rise to a

claim of conflict preemption.  *See Nazarian*, 751 F.3d at 479-80 ("Obviously, not every state

regulation that incidentally affects federal markets is preempted.  Such an outcome 'would

thoroughly undermine precisely the division of the regulatory field that Congress went to so

much trouble to establish . . . , and would render Congress' specific grant of power to the States

to regulate production virtually meaningless.'" (quoting *Nw. Cent. Pipeline*, 489 U.S. at 515)).

As discussed *supra*, other forms of state incentives give the incentive recipient this same sort of

leg up in the market.  If those incentives, including RECs, are not conflict preempted—and

Plaintiffs do not argue that they are—then the Court fails to see how ZECs are.

       Plaintiffs argue that the issue of conflict preemption is not appropriately decided on a

motion to dismiss, pointing out that other district courts decided the conflict preemption question

---

[21]      The Court notes that Plaintiffs' alleged economic harm is that other generators were awarded ZECs while they were not and that Plaintiffs must compete against the generators receiving ZECs.  *See* Compl. ¶ 74.  But that harm exists because Plaintiffs do not produce energy with the environmental attributes encouraged by the ZEC program.  That is, Plaintiffs fail to qualify for the ZEC program because of their business decisions about how they generate electricity.

[22]      Although the Second Circuit did not explicitly discuss whether its discussion of the contracts' effects on wholesale prices was relevant to the field or conflict preemption question, the Second Circuit cited *Hughes* throughout that discussion, which is a field preemption case.  Nevertheless, *Allco* concluded, as a matter of law, that the kind of effect alleged by Allco was an "incidental effect on wholesale prices."  *Allco*, 861 F.3d at 101.  The Court finds no basis to find that an effect that is "incidental" when contemplating field preemption loses its "incidental" nature when contemplating conflict preemption.

SPA-34

after considering factual and expert evidence in the case. *See PPL EnergyPlus, LLC v. Nazarian* (hereafter, "*Nazarian II*"), 974 F. Supp. 2d 790 (D. Md. 2013); *PPL EnergyPlus, LLC v. Hanna*, 977 F. Supp. 2d 372 (D.N.J. 2013). *Nazarian II* and *Hanna*, however, presented plausible claims of conflict preemption. In those cases, the programs guaranteed a fixed price that displaced the wholesale auction price; that displacement resulted in clear damage to FERC's goal of setting wholesale prices at auction. *See* Mem. and Order re: Mot. to Dismiss at 11, ECF 71, *Nazarian II*, No. MJG-12-1286 (D. Md. Aug. 3, 2012) (Plaintiffs asserted a plausible claim of conflict preemption based on their allegation that the generator benefitting from the Maryland program was "guaranteed receipt of the PSC fixed price" through a contract for difference and was therefore "not appropriately market-based.");[23] *see also* Mem. and Order at 9, ECF 69, *PPL EnergyPlus, LLC v. Solomon* ("*Hanna*"), No. 11-745 (D.N.J. Oct. 19, 2011) (Conflict preemption claim survived the motion to dismiss because the New Jersey program, which "impermissibly guarantee[d] a wholesale capacity price," thereby "impede[d] FERC's policy of establishing a market-based approach to setting wholesale energy rates in the mid-Atlantic market." (citing allegations that New Jersey's utilities are required to procure power at a fixed price approved by the State)). Put differently, the *Nazarian II* and *Hanna* programs stood as an obstacle to FERC's policy of using market principles to set wholesale prices because those programs guaranteed a predetermined, state-approved price, rather than the market auction price, for the wholesale sale of energy or capacity.

No such obstacle exists for the ZEC program. Unlike *Nazarian II* and *Hanna*, the ZEC program does not guarantee a certain wholesale price that displaces the market-determined price.

---

[23]     *Nazarian II* concerned the Maryland program that was struck down in *Hughes*. The district court denied the motion to dismiss in *Nazarian II* but later concluded after a bench trial that the Maryland program was field preempted, a decision affirmed by the Fourth Circuit, *PPL Energyplus, LLC v. Nazarian*, 753 F.3d 467 (4th Cir. 2014), and the Supreme Court, *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288 (2016).

Recognizing FERC's goal to set wholesale prices through a market-based approach, the Court fails to see how the ZEC program causes clear damage to that goal.  As discussed above, the nuclear generators receiving ZECs will receive for their energy whatever the market-clearing price is.  Separately, they will be compensated for their ZECs, which are awarded based on the positive attributes of the energy they generate.  Any price-distorting effects exerted by the ZECs on the market signals at the wholesale auctions are, at best, indirect and do not present the sort of "clear damage" required for a plausible conflict preemption claim.  To hold otherwise would call into question RECs and all state subsidies, such as tax incentives and land grants; such subsidies, too, exert price-distorting effects on market signals and allow some generators to clear the auction when they otherwise would be priced out.

Plaintiffs cite *International Paper Co. v. Oullette*, 479 U.S. 481 (1987), to argue that state programs with the potential to undermine a federal regulatory structure are conflict preempted because States "cannot 'do indirectly what they could not do directly.'"  Opp. 32 (quoting *Oullette*, 479 U.S. at 495).  *Oullette* is inapposite.  In *Oullette*, the Court considered whether a Vermont nuisance law was preempted by the Clean Water Act, which established a federal permit program regulating the discharge of pollutants and assigned different state regulatory roles based on whether the State was the source of the discharge.  479 U.S. at 489-91.  Because application of the Vermont law could "effectively override the permit requirements and the policy choices made by the source State," the Court concluded that the Vermont law effectively circumvented and upset the balance of interests contemplated by the Clean Water Act.  *Id*. at 494-95.  Accordingly, the Court held that the Vermont law was conflict preempted.  *Id*. at 487, 493-97.

SPA-36

Nothing about the ZEC program "effectively override[s]," *id*. at 495, the FPA. ZECs do not circumvent the FERC auction—at the risk of being redundant, ZECs, like RECs, are payments for environmental attributes that are unbundled from and involve separate transactions than those for the wholesale sales of energy or capacity. If the ZEC program were aimed at wholesale market participation or wholesale prices for sales of energy or capacity, then this would be a stronger case for conflict preemption. Unlike the Vermont law at issue in *Oullette*, which did present a clear conflict between the state law and the federal regulatory scheme, the ZEC program does not "stand[] as an obstacle," *Oneok*, 135 S. Ct. at 1595 (internal quotation marks and citation omitted), to the FERC auction or the FPA.

Plaintiffs' proposed discovery highlights the implausibility of their conflict preemption claim. The only two topics of discovery proposed by Plaintiffs relevant to the conflict preemption claim are: (1) fact discovery supporting Plaintiffs' allegation that "the nuclear energy is not being sold directly to any customers at retail; it's going into the auction process"; and (2) fact and expert discovery to demonstrate that the ZEC program "will, in fact, have a substantial impact on the wholesale rate." Status Conference Tr. 29:25-30:9-10, Dkt. 90 (Dec. 16, 2016). Again, even if all of the nuclear generators' electricity is sold into the auction and the ZECs have an impact on the wholesale rate by affecting market signals, Plaintiffs will not have stated a plausible claim of conflict preemption. No factual discovery into these topics will surmount the core problem with Plaintiffs' claim: the ZECs are not tethered to wholesale sales in a way that causes clear damage to federal goals.

Therefore, the Court concludes that the Complaint does not state a plausible claim of conflict preemption.[24]

_____

[24]     It is difficult to fathom how the ZEC program could cause "clear damage" to FERC goals inasmuch as FERC has taken no steps to oppose the ZEC program, despite having had several months to do so, and has approved

### III.   DORMANT COMMERCE CLAUSE

The Commerce Clause empowers Congress "[t]o regulate Commerce . . . among the several States."  U.S. CONST. art. I, § 8, cl. 3.  "The negative or dormant implication of the Commerce Clause prohibits state. . . regulation . . . that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace."  *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (internal citations and quotation marks omitted).  But "there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it."  *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 669 (1981) (internal quotation marks and citation omitted).  Therefore, a state law or regulation violates the dormant Commerce Clause "only if it (1) 'clearly discriminates against interstate commerce in favor of intrastate commerce,' (2) 'imposes a burden on interstate commerce incommensurate with the local benefits secured,' or (3) 'has the practical effect of "extraterritorial" control of commerce occurring entirely outside the boundaries of the state in question.'"  *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009) (quoting *Freedom Holdings Inc. v. Spitzer,* 357 F.3d 205, 216 (2d Cir. 2004)).

Only the first two means of violating the dormant Commerce Clause are at issue here. Plaintiffs allege that the ZEC program violates the dormant Commerce Clause because: (1) the ZEC program facially discriminates against out-of-state energy producers, including nuclear and other carbon-free energy producers, by selecting only New York nuclear power plants to receive

---

REC programs, which have an identical impact on the market.  *See WSPP*, 139 FERC P 61061, 2012 WL 1395532. The fact that FERC has convened a technical conference "to understand the potential for sustainable wholesale market designs that both preserve the benefits of regional markets and respect state policies" that encourage particular resource attributes would seem to indicate that FERC concurs with the Court's conclusion that there is not a conflict between federal goals regarding wholesale market auctions and state policies that incentivize the production of energy with positive environmental attributes.  *See* Notice of Technical Conference at 2, Dkt. 121-1 (FERC Mar. 3, 2017).

ZECs, Compl. ¶ 98; and (2) the ZEC program imposes an undue burden on interstate commerce by distorting market pricing and incentives, which will cause energy generators, including out-of-state energy providers, to leave the market or discourage their entry into the market, Compl. ¶ 99.  Plaintiffs have no cause of action under either theory and have, in any event, failed to allege a dormant Commerce Clause claim.

### A.  Cause of Action

Intervenors argue that Plaintiffs lack prudential standing to bring a dormant Commerce Clause claim because they do not allege a nexus between their injury and any discriminatory aspect of the ZEC program.  Intervenors Mem. 22; Intervenors Reply 15.  In other words, Intervenors argue that Plaintiffs lack prudential standing because Plaintiffs' injury does not fall within the dormant Commerce Clause's zone of interests.  Courts have consistently applied the zone of interests test to dormant Commerce Clause claims to determine whether plaintiffs have prudential standing.  *See, e.g.*, *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320 n.3 (1977); *Selevan*, 584 F.3d at 91-92; *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 474-76 (5th Cir.2013); *Fla. Transp. Services, Inc. v. Miami-Dade Cty.*, 703 F.3d 1230, 1255-56 (11th Cir. 2012), *cert. denied*, 134 S. Ct. 116 (2013); *Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 654 F.3d 919, 932-33 (9th Cir. 2011); *Freeman v. Corzine*, 629 F.3d 146, 156-57 (3d Cir. 2010); *Nat'l Solid Wastes Mgmt. Ass'n v. Daviess Cty.*, 434 F.3d 898, 901-02 (6th Cir. 2006), *vacated and remanded on other grounds*, 127 S. Ct. 2294 (2007).

The Supreme Court recently held that the zone of interests test does not fall under the prudential standing rubric; instead, whether a plaintiff's injury falls within a law's zone of interests goes to whether the plaintiff has a cause of action.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014).  The Supreme Court in *Lexmark* addressed the

Case 17-2654, Document 56, 10/13/2017, 2147657, Page113 of 123

zone of interests inquiry only as it applies to statutory claims; it did not address constitutional

claims, such as Plaintiffs' dormant Commerce Clause claim.  *Id.*  To the Court's knowledge,

only the Third Circuit has addressed whether *Lexmark* applies to constitutional claims.  In *Maher*

*Terminals*, the Third Circuit applied the zone of interests test to determine whether the plaintiff

had stated a Tonnage Clause[25] claim, while clarifying that post-*Lexmark* this was not a prudential

standing issue.[26]  *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 805 F.3d 98, 105, 110 (3d

Cir. 2015).  This Court sees no reason not to apply *Lexmark* to constitutional claims.  Just as "a

rose by any other name would smell as sweet,"[27] so, too, does the zone of interests test apply

whether labeled a prudential standing issue or a cause of action issue.  The Supreme Court's

reasoning that the zone of interests test is more logically a cause of action question applies

equally to statutory and constitutional claims, and *Lexmark* did not reject the zone of interests

test—it merely reclassified it.  Accordingly, and in light of the numerous cases that have applied

the zone of interests test to dormant Commerce Clause claims, the Court applies the zone of

interests test to determine whether Plaintiffs have alleged a cause of action.[28]

---

[25]    The Tonnage Clause of the Constitution prohibit states from imposing taxes on cargo shipments without the consent of Congress.  U.S. CONST. art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress, lay any Duty of Tonnage . . . .").

[26]    The District Court for the Northern District of California has also addressed whether *Lexmark* applies to constitutional claims.  In *HomeAway Inc. v. City & Cty. of San Francisco*, the district court held that *Lexmark* did not address the prudential doctrine of third-party standing as applied to constitutional claims and declined to extend *Lexmark* as invalidating that strand of prudential standing doctrine.  No. 14-CV-04859-JCS, 2015 WL 367121, at *6-7 (N.D. Cal. Jan. 27, 2015).  Because third-party interests are not at issue here, the decision in *HomeAway* is not relevant.

[27]    William Shakespeare, *Romeo and Juliet*, act 2, sc. 2.

[28]    In their opposition brief, Plaintiffs did not address Intervenors' argument that Plaintiffs' dormant Commerce Clause claim should be dismissed because Plaintiffs lack prudential standing, although Plaintiffs did attempt to address the issue in response to the Court's question during oral argument, *see* Tr. 35:4-39:15.  "[F]ailure to adequately brief an argument constitutes waiver of that argument at [the] motion to dismiss stage." *Guzman v. Macy's Retail Holdings, Inc.*, No. 09 CIV. 4472 (PGG), 2010 WL 1222044, at *8 (S.D.N.Y. Mar. 29, 2010) (quotation marks and citation omitted).  Nevertheless, the Court will consider the merits of the prudential standing issue, albeit reframed as a cause of action issue.

The zone of interests protected by the dormant Commerce Clause is the economic interests of out-of-state entities. *Allocco Recycling, Ltd. v. Doherty*, 378 F. Supp. 2d 348, 358 (S.D.N.Y. 2005); *see also Yakima Valley Mem'l Hosp.*, 654 F.3d at 932 ("Any alleged injury 'must somehow be tied to a barrier imposed on interstate commerce.'" (quoting *City of Los Angeles v. Cty. of Kern*, 581 F.3d 841, 848 (9th Cir. 2009))). In other words, Plaintiffs must "allege an injury stemming from the application of the [ZEC program] in a manner discriminatory to out-of-state interests," *L.A.M. Recovery, Inc. v. Dep't of Consumer Affairs*, 184 F. App'x 85, 88-89 (2d Cir. 2006) (summary order) (citing *Boston Stock Exch.*, 429 U.S. at 321), whether due to facial discrimination against or an undue burden on out-of-state economic interests.

Plaintiffs entirely fail to allege any injury arising from discrimination against or an undue burden on out-of-state economic interests. As to their claim that the ZEC program facially discriminates against out-of-state nuclear power providers by awarding ZECs only to New York nuclear power plants, Plaintiffs do not allege that they own or represent an out-of-state nuclear power plant.[29] In addition, Plaintiffs allege that the ZEC program is "directly discriminatory" because it "is not even-handed with respect to other technologies that could produce carbon-free electricity," Compl. ¶ 98, and that various Plaintiffs own or have members that own in- and out-of-state power suppliers (without specifying whether the power suppliers are nuclear), Compl. ¶¶ 10-15. That those Plaintiffs may be discriminated against because the ZEC program

---

[29]   At oral argument, counsel for Plaintiffs represented to the Court that Plaintiff Electric Power Supply Association includes at least one member that is an out-of-state nuclear power plant. Tr. 35:17-25. But, "[o]n a motion to dismiss, the Court must only examine the allegations in the complaint to determine whether Plaintiff has met the [zone of interests test]." *Allocco Recycling, Ltd.*, 378 F. Supp. 2d at 357 (citing *Nash v. Califano*, 613 F.2d 10, 14 (2d Cir. 1980)). Because the Court holds that even if Plaintiffs had a cause of action, their dormant Commerce Clause claims would fail, it would be futile for Plaintiffs to amend their Complaint to include allegations that they own or represent out-of-state nuclear facilities.

is available only to nuclear power plants—as opposed to other kinds of power plants that produce few or no greenhouse gas emissions—does not constitute a cause of action under the dormant Commerce Clause. That alleged injury does not fall within the zone of interests protected by the dormant Commerce Clause—namely the protection of *out-of-state* economic interests. The dormant Commerce Clause does not protect the economic interests of non-nuclear power plants, regardless of where they are located or whether they are carbon-free. *See Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 500 (5th Cir. 2004) (plaintiffs did not have prudential standing to bring dormant Commerce Clause claim on a facial discrimination theory because the plaintiffs' injury was "not related to any out-of-state characteristic of their business").

Plaintiffs also lack a cause of action to bring a dormant Commerce Clause claim on their undue burden theory. According to that theory, Plaintiffs will be injured by the ZEC program because the otherwise unprofitable nuclear power plants receiving ZECs will drive down the auction prices received by all power plants, including Plaintiffs' power plants, and will thus cause them to leave or discourage them from entering the market. Compl. ¶¶ 47, 74. But this alleged injury also falls outside the zone of interests protected by the dormant Commerce Clause. Under Plaintiffs' theory, the same price-distorting effects and the same alleged injury would occur (probably to a more significant degree) if ZECs were extended to nuclear power plants nationwide.[30] Thus, because Plaintiffs would be allegedly injured by the ZEC program's market distortion effect even if New York provided ZECs to in- and out-of-state nuclear power plants,

---

[30]     The District Court for the Northern District of Illinois made a similar point with respect to a dormant Commerce Clause challenge in *Vill. of Old Mill Creek*, 2017 WL 3008289, at *7, but did so in the context of holding the complaining plaintiffs lacked Article III standing to challenge Illinois' ZEC program. That district court wrote: "If the procurement process were non-discriminatory, the out-of-state, non-nuclear plaintiffs would still be injured. Similarly, the general market-distorting effects on non-nuclear plants outside of Illinois would still be felt if the ZEC procurement process subsidized nuclear plants without favoring in-state interests." *Id.*

SPA-42

Plaintiffs are not harmed because of an alleged undue burden on out-of-state economic interests.[31]

Although "the zone of interests test is not a rigorous one," *Nat'l Weather Serv. Employees Org., Branch 1–18 v. Brown*, 18 F.3d 986, 989 (2d Cir. 1994), the interest sought to be protected must be at least *arguably* within the zone of interests to be protected by the dormant Commerce Clause, *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970).  Because Plaintiffs' interests are, at best, "marginally related" to the protection of out-of-state economic interests, Plaintiffs lack a cause of action.[32]  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

## B. Market Participant Exception and Subsidies

Even if Plaintiffs had a cause of action, their dormant Commerce Clause claim would fail because New York was acting as a market participant, not as a regulator, when it created ZECs. The dormant Commerce Clause "does not prohibit a state from participating in the free market if it acts like a private enterprise."  *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 255 (2d Cir. 2001).  "'[A] state regulates when it exercises governmental powers that are unavailable to private parties,' such as the imposition of civil or criminal penalties to compel behavior."  *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d

---

[31]     In evaluating whether the plaintiffs had a cause of action under the Copyright Act, the Supreme Court in *Lexmark* analyzed the zone of interests and proximate cause requirements separately.  134 S. Ct. at 1388-91.  The proximate cause analysis is similar to the zone of interests analysis and concerns "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits."  *Id.* at 1390.  In other words, "the proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct."  *Id.* For the same reasons that Plaintiffs' undue burden claim is not within the dormant Commerce Clause's zone of interests, it also fails to satisfy the proximate cause requirement.

[32]     Moreover, the Supreme Court has suggested that a less generous approach may be appropriate outside of the Administrative Procedure Act ("APA") context.  *Lexmark Int'l, Inc.*, 134 S. Ct. at 1389 ("[T]he breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the 'generous review provisions' of the APA may not do so for other purposes." (quoting *Bennett v. Spear*, 520 U.S. 154, 163 (1997))).

42

200, 208 (2d Cir. 2003) (quoting *United Haulers Ass'n, Inc.*, 261 F.3d at 255).  But, "[n]othing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others."  *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810 (1976).

In *Alexandria Scrap*, in order to ameliorate the aesthetic and environmental problem associated with abandoned automobiles, Maryland created a bounty payable to any licensed processor that destroyed any vehicle formerly titled in Maryland.  *Id.* at 797.  Maryland imposed a more burdensome title documentation requirement on out-of-state processors than in-state processors in order to receive the bounty.  *Id.* at 801.  An out-of-state processor claimed that the Maryland law violated the dormant Commerce Clause because it gave Maryland processors an unfair advantage in the market for bounty-eligible hulks.  *Id.* at 802.  The Supreme Court disagreed.  It held that the Maryland law did not violate the dormant Commerce Clause because Maryland did not seek to prohibit the flow of hulks or regulate that flow but instead "entered into the market itself to bid up their price" for the legitimate purpose of protecting Maryland's environment.  *Id.* at 806, 809.  The Court acknowledged that the effect of the law was that Maryland hulks would be primarily destroyed by in-state processors and that in-state processors would primarily receive the bounties, but the Court held that "no trade barrier of the type forbidden by the Commerce Clause" restricted the movement of Maryland hulks out-of-state.  *Id.* at 810.  Instead, the hulks remained in Maryland "in response to market forces, including that exerted by money from the State."  *Id.*

Building on *Alexandria Scrap*, in a case involving facts and allegations much closer to those at issue here, the District Court for the District of Connecticut dismissed the plaintiff's dormant Commerce Clause claim, reasoning that Connecticut was acting as a market participant

when it created a market for RECs that subsidized clean energy generation.  *Allco Fin. Ltd. v. Klee*, Nos. 3:15-cv-608 (CSH), 3:16-cv-508 (CSH), 2016 WL 4414774, at *23-25 (D. Conn. Aug. 18, 2016), *aff'd*, 861 F.3d 82 (2d Cir. 2017).  In *Allco*, the Plaintiff generated RECs in Georgia through one of its solar power facilities, but those RECs did not satisfy Connecticut's requirements, which required that RECs be generated from power plants within the Northeast. *Id.* at *21.  The district court concluded that, just as Maryland had incentivized market participants to destroy hulks by financially rewarding them to do so, Connecticut was merely making it "more lucrative for generators to produce and distribute clean energy in Connecticut" by creating a secondary REC market.  *Id.* at *24.  Connecticut is "not obligated to spread the benefit of that market to states that do not also bear the burden of the cost of the subsidy, which is ultimately paid by Connecticut ratepayers."  *Id.*  The district court held that Connecticut was not acting as a regulator because it was "not preventing the flow of clean energy or regulating the conditions on which it may occur."[33]  *Id.*

This case follows in the footsteps of *Alexandria Scrap* and the district court's decision in *Allco*.  New York's ZEC program does not create a trade barrier or prevent or regulate the flow of energy—renewable, nuclear, or otherwise.  New York gives financially eligible nuclear generators that have historically contributed power into the New York market credit for the zero-emission attributes of each MWh of electricity they produce.  Compl. ¶ 67.  NYSERDA then

---

[33]       The Second Circuit affirmed the district court's dormant Commerce Clause ruling on a different ground without commenting on the district court's analytical approach.  The Second Circuit applied *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), to conclude that the Connecticut REC program did not violate the dormant Commerce Clause because a REC that satisfies Connecticut's REC program can be produced only in the Northeast and is thus a different product that does not compete against a REC produced in Georgia.  *Allco*, 861 F.3d at 103-08.  The district court's analytical approach is more applicable here than the Second Circuit's approach given that the dormant Commerce Clause claim is not that New York is discriminating against a competing product from out-of-state but that New York (1) is not giving ZECs to out-of-state energy producers, and (2) is creating an undue burden on interstate commerce because ZECs distort market pricing and incentives.

buys the ZECs from the nuclear generators at an administratively determined price, and the cost

is ultimately passed on to New York ratepayers.  Compl. ¶¶ 69, 73.  Just like Maryland in

*Alexandria Scrap* and Connecticut in *Allco*, by distributing subsidies through the ZEC program

to otherwise financially struggling nuclear power plants, New York is participating in the energy

market and exercising its right to favor its own citizens.[34]  Moreover, just as Maryland and

Connecticut were not required to subsidize out-of-state businesses when in-state residents were

paying for the subsidies, neither is New York required to provide financial assistance in the form

of ZECs to out-of-state power plants when the ZECs are ultimately paid for by New York

ratepayers.

Plaintiffs argue that this case is distinguishable because New York, and not the free

market, sets the price of the ZECs and because ZECs are distributed on the basis of financial

need.  Opp. 40.  Plaintiffs have not articulated why those distinctions are relevant to the dormant

Commerce Clause analysis, and the Court does not find them to be relevant.  New York is

paying the nuclear power plants a set dollar amount for each MWh of electricity they produce in

recognition of the zero-emission attributes of their electricity.  This is no different than Maryland

paying a set bounty to hulk processors.  Whether the subsidy amount is at a government-set rate,

as it is here and as it was in *Alexandria Scrap*, 496 U.S. at 797 n.5, or set by market forces, as it

was in *Allco*, 2016 WL 4414774, at *20, has no impact on the market participant analysis.  Nor

does the fact that ZECs are distributed based on financial need.  The dormant Commerce Clause

does not restrict which in-state businesses a State may subsidize when it is expending its own

---

[34]     New York is favoring its own citizens in the ZEC program as it is currently applied because only three
power plants currently receive ZECs, and they are all in New York.  The parties dispute whether the ZEC program,
by requiring nuclear power plants to have been historical providers of energy to New York, effectively limits
eligibility to New York nuclear power plants.  *Compare* Defs. Mem. 23, *and* Intervenors Mem. 23, *and* Defs. Reply
13-14, *with* Opp. 37.

SPA-46

funds to do so, so long as the State does not also impose "taxes and regulatory measures impeding free private trade in the national marketplace," *Reeves, Inc. v. Stake*, 447 U.S. 429, 436-37 (1980).

Indeed, regardless of the market participant exception, although the Supreme Court has "never squarely confronted the constitutionality of subsidies," *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 589 (1997) (quotation marks and citation omitted), "[a] pure subsidy funded out of general revenue ordinarily imposes no burden on interstate commerce, but merely assists local business," *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 199 (1994); *see also New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278 (1988) ("Direct subsidization of domestic industry does not ordinarily run afoul of [the dormant Commerce Clause] . . . .").[35]  The Supreme Court has, however, struck down a state subsidy; it did so when a subsidy to in-state producers was coupled with a tax on in-state and out-of-state producers and thus functioned like a discriminatory tax on out-of-state producers.  *West Lynn Creamery, Inc.*, 512 U.S. at 214-15. But the subsidy at issue here is not linked to a tax on out-of-state electricity generators—it is "a pure subsidy" for the environmental attributes of nuclear energy and is paid for by New York retail energy consumers.  *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 394 (1994) (noting that instead of instituting an unconstitutional flow control ordinance to make a waste disposal facility commercially viable, the town could have subsidized the facility through general taxes or municipal bonds); *see also United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 368 (2007) (same).  Accordingly, the ZEC program is a

---

[35]     Courts often apply the market participant exception to dormant Commerce Clause cases concerning subsidies, but because some cases have analyzed whether subsidies violate the dormant Commerce Clause independent of—and without mention of—the market participant exception, this Court also addresses whether ZECs are a permissible subsidy pursuant to those cases, independent of the market participant exception doctrine.

SPA-47

permissible subsidy, and the market participant exception to the dormant Commerce Clause applies.  For these additional reasons, the Complaint does not state a plausible dormant Commerce Clause claim.[36]

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' and Intervenors' motions to dismiss.  The American Wind Energy Association's motion for leave to file an *amicus* brief is GRANTED.  The Clerk of Court is respectfully directed to terminate Docket Entry Nos. 54, 76 and 150 and to close this case.


**SO ORDERED.**

**Date:  July 25, 2017**
        **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**

---

[36]      Because Plaintiffs lack a cause of action, the market participant exception applies, and the ZEC program is a permissible subsidy, the Court need not reach the parties' arguments regarding whether the ZEC program is facially discriminatory or poses an undue burden.  Nevertheless, the Court is skeptical that the ZEC program poses a disparate, undue burden on out-of-state economic interests on the theory, as alleged by Plaintiffs, that ZECs artificially reduce market prices.  That alleged harm is not disparate—it affects in-state and out-of-state power plants equally.

**SPA-48**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
COALITION FOR COMPETITIVE
ELECTRICITY, DYNEGY INC., EASTERN
GENERATION, LLC, ELECTRIC POWER SUPPLY
ASSOCIATION, NRG ENERGY, INC., ROSETON
GENERATING LLC, and SELKIRK COGEN
PARTNERS, L.P.,
                                        Plaintiffs,

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #:_____ |
| DATE FILED: 7/27/17 |

                                        16 **CIVIL** 8164 (VEC)
                                        **JUDGMENT**

            -against-

AUDREY ZIBELMAN, in her official capacity
As Chair of the New York Public Service
Commission, PATRICIA L. ACAMPORA, GREGG
C. SAYRE, and DIANE X. BURMAN, in their
Official capacities as Commissioners of the New
York Public Service Commission,
                                        Defendants,

            -and-

CONSTELLATION ENERGY NUCLEAR
GROUP, LLC, EXELON CORPORATION, R.E.
GINNA NUCLEAR POWER PLANT LLC, and
NINE MILE POINT NUCLEAR STATION LLC,

                                        Intervenors.

-------------------------------------------------------X

        Defendants, who are Public Service Commission ("PSC") members, move to dismiss

pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that there is no private right of action

for Plaintiffs' preemption claims and that, even if there were, Plaintiffs' claims would fail as a

matter of law.  Intervenors, who are the nuclear generators receiving the zero-emissions credits

and their owners, also move to dismiss pursuant to Rule 12(b)(6), and The American Wind Energy

Association having filed a motion for leave to file an amicus brief, and the matter having come

before the Honorable Valerie Caproni, United States District Judge, and the Court, having rendered

its Memorandum Opinion & Order, on July 25, 2017, granting Defendants' and Intervenors'

motions to dismiss; granting the American Wind Energy Association's motion for leave to file an

amicus brief; and directing the Clerk of Court to close this case, it is,

      **ORDERED, ADJUDGED AND DECREED:**  That for the reasons stated in the Court's

Memorandum Opinion & Order dated July 25, 2017, Defendants' and Intervenors' motions to

dismiss are granted. The American Wind Energy Association's motion for leave to file an

amicus brief is granted; accordingly, the case is closed.

**Dated:**  New York, New York
        July 27, 2017


                        **RUBY J. KRAJICK**

                        **Clerk of Court**

     **BY:**

                        **Deputy Clerk**