# 17-2654-CV

### UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

COALITION FOR COMPETITIVE ELECTRICITY, DYNEGY INC., EASTERN
GENERATION, LLC, ELECTRIC POWER SUPPLY ASSOCIATION, NRG ENERGY,
INC., ROSETON GENERATING LLC, SELKIRK COGEN PARTNERS, L.P.,

*Plaintiffs-Appellants*,

— v. —

AUDREY ZIBELMAN, in her official capacity as Chair of the New York Public Service
Commission, PATRICIA L. ACAMPORA, in her official capacity as Commissioner of
the New York Public Service Commission, GREGG C. SAYRE, in his official capacity as
Commissioner of the New York Public Service Commission, DIANE X. BURMAN, in
her official capacity as Commissioner of the New York Public Service Commission,

*Defendants-Appellees*,

EXELON CORP., R.E. GINNA NUCLEAR POWER PLANT LLC, CONSTELLATION
ENERGY NUCLEAR GROUP, LLC, NINE MILE POINT NUCLEAR STATION LLC,

*Intervenor-Defendants-Appellees*.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

### BRIEF FOR DEFENDANTS-APPELLEES

Scott H. Strauss
Peter J. Hopkins
Jeffrey A. Schwarz
Amber L. Martin
SPIEGEL & MCDIARMID LLP
1875 Eye Street, NW, Suite 700
Washington, DC 20006
(202) 879-4000

Paul Agresta, General Counsel
John Sipos, Deputy General Counsel
John C. Graham
PUBLIC SERVICE COMMISSION
   OF THE STATE OF NEW YORK
Three Empire State Plaza
Albany, New York 12223-1350
(518) 474-5597

Dated: November 17, 2017

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, defendants John B. Rhodes, in his official capacity as Chair of the New York Public Service Commission, and Gregg C. Sayre, Diane X. Burman, and James S. Alesi, in their official capacities as Commissioners of the New York Public Service Commission (collectively, the New York Public Service Commission), provide this corporate disclosure statement.  The New York Public Service Commission is a governmental agency of the State of New York.  The New York Public Service Commission does not have a corporate parent, and no publicly held company holds 10% or more of the stock of the New York Public Service Commission.

# **TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF AUTHORITIES..................................................................iv

GLOSSARY OF TERMS, ABBREVIATIONS, AND ACRONYMS...................ix

ISSUES ...................................................................................1

STATEMENT OF THE CASE.............................................................1

    I.   Industry Framework ................................................................1

    II.   Statutory Framework ..........................................................3

        A.  The Federal Power Act.......................................................3

        B.  State Generation Attribute Programs ...................................6

        C.  The Order ......................................................................7

        D.  The District Court Proceedings..........................................11

SUMMARY OF ARGUMENT...............................................................12

ARGUMENT ...............................................................................17

    I.   Standard of Review ...............................................................17

    II.   Plaintiffs lack a preemption cause of action...............................17

        A.  Plaintiffs' claims are outside *Ex Parte Young.*......................18

        B.  The FPA forecloses private equitable actions in district
           court. ...........................................................................19

           1.   *Armstrong* does not establish a fixed, two-prong test
              for intent to foreclose private equitable actions. ............20

           2.   The FPA forecloses private equitable relief. .................21

3.  The FPA's just and reasonable standard is not judicially administrable. ...................................................23

III. The FPA does not preempt the order. .........................................25

   A.  Environmental-attribute programs are squarely within state authority to regulate generation and retail sales.................................26

     1.  ZECs regulate environmental attributes of electricity generation. ...................................................26

     2.  Generation attribute programs permissibly augment revenue from electricity sales............................................28

   B.  The district court correctly rejected efforts to distinguish ZECs from RECs and to bring the Order within *Hughes*. ..................31

     1.  ZECs are not tethered to wholesale auction participation....................................................34

     2.  Plaintiffs' other alleged tethers fail..................................38

     3.  Plaintiffs' "practical effect" argument ignores the bright line between state and federal FPA fields. .........................41

   C.  The Order is not conflict preempted. .....................................45

IV. The ZEC program does not violate the Commerce Clause. ......................49

   A.  Plaintiffs have abandoned their eligibility claim. .................................50

   B.  The Order does not discriminate against interstate commerce. ........................................50

   C.  The Order does not unduly burden interstate commerce....................57

CONCLUSION .................................................58

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7) ...............................59

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**FEDERAL COURT CASES**

*Allco Fin. Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017)
(*Allco*) ...................................................................................*passim*

*Allco Fin. Ltd. v. Klee*, 805 F.3d 89 (2d Cir. 2015), *as amended*
(Dec. 1, 2015) (*Allco I*) ......................................................... 19

*Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375 (1983) ............ 14

*Ark. La. Gas Co. v. Hall*, 453 U.S. 571 (1981) ......................................... 22

*Armstrong v. Exceptional Child Care Ctr., Inc.*, 135 S. Ct. 1378 (2015) ..................

.......................................................................... 18, 20, 21, 23, 24

*Automated Power Exch. Inc. v. FERC*, 204 F.3d 1144 (D.C. Cir. 2000) ................. 2

*Askins v. Doe No. 1*, 727 F.3d 248 (2d Cir. 2013) .................................... 36

*Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200 (2d Cir. 2003) ........ 52

*Clark v. Gulf Oil Corp.*, 570 F.2d 1138 (3d Cir. 1977) .............................. 22

*Conn. Light & Power Co. v. FPC*, 324 U.S. 515 (1945) ............................... 4

*Davis v. Passman*, 442 U.S. 228 (1979) .............................................. 18

*Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393 (2d Cir. 2013) ........... 5

*Ex Parte Young*, 209 U.S. 123 (1908) ............................................ 18, 19

*Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743 (2002) ................... 3

*FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760 (2016) ............................ 4

*FPC v. E. Ohio Gas Co.*, 338 U.S. 464 (1950) ........................................ 4

*Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133
(2d Cir. 2016), *cert. denied*, 137 S. Ct. 2295 (2017) .......................... 18-19

*Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 152 F. Supp. 3d
90 (E.D.N.Y. 2015), *vacated in part on other grounds*, 841 F.3d 133 (2d
Cir. 2016)*, cert. denied*, 137 S. Ct. 2295 (2017) .................................................21

*Gen. Motors Corp. v. Tracy*, 519 U.S. 278 (1997) ....................................................52

*Grand Council of the Crees v. FERC*, 198 F.3d 950 (D.C. Cir. 2000) .....................4

*Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976) ......................................49

*Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288 (2016)
(*Hughes*)............................................................................................................*passim*

*Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987)....................................................45

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) .......................51, 52

*Mont.-Dakota Utils. Co. v. Nw. Pub. Serv. Co.,* 341 U.S. 246 (1951) ..............21, 22

*Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527
(2008)........................................................................................................................24

*N. Nat. Gas Co. v. State Corp. Comm'n of Kan.*, 372 U.S. 84 (1963)
(*Northern Natural*)........................................................................... 31, 42-43, 44

*New England Power Generators Ass'n v. FERC*, 757 F.3d 283 (D.C. Cir.
2014) ...................................................................................................................5, 44

*New York v. FERC*, 535 U.S. 1 (2002) ...................................................... 4-5, 31, 46

*Niagara Mohawk Power Corp. v. FERC*, 379 F.2d 153 (D.C. Cir. 1967) ..............20

*Niagara Mohawk Power Corp. v. FERC*, 306 F.3d 1264 (2d Cir. 2002)..........19, 20

*NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 130 S. Ct. 693 (2010)............2

*Nw. Cent. Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493
(1989) (*Northwest Central*) .........................................................31, 43, 44, 45, 58

*N.Y. Pet Welfare Ass'n v. New York*, 850 F.3d 79 (2d Cir. 2017) .....................53, 57

*Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015)..........................................44, 45

*Orangeburg v. FERC*, 862 F.3d 1071 (D.C. Cir. 2017) ..........................................22

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
    461 U.S. 190 (1983)................................................................................4

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) .....................................57

*PPL EnergyPlus LLC v. Nazarian*, 974 F. Supp. 2d 790 (D. Md. 2013),
    *aff'd*, 753 F.3d 467 (4th Cir. 2014), *aff'd sub nom. Hughes v. Talen En-
    ergy Mktg., LLC*, 136 S. Ct. 1288 (2016) ...........................................32

*Rochester Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 754 F.2d 99
    (2d Cir. 1985)................................................................................. 40-41

*Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013) ...........52

*Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82 (2d Cir. 2009) ...................................49

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996)............................................21

*Simon v. Keyspan Corp.*, 694 F.3d 196 (2d Cir. 2012)...........................................55

*Touche Ross v. Reddington*, 442 U.S. 560 (1979) ..................................................22

*Utah Power & Light Co. v. Pfost*, 286 U.S. 165 (1932)......................................3, 31

*West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994) ......................................49

*Wheelabrator Lisbon, Inc. v. Conn. Dep't of Pub. Util. Control*, 531 F.3d
    183 (2d Cir. 2008)..........................................................................6, 27

## FEDERAL AGENCY CASES

*Am. Ref-Fuel Co.*, 105 FERC ¶ 61,004 (2003), *reh'g denied*, 107 FERC
    ¶ 61,016 (2004), *appeal dismissed sub nom. Xcel Energy Servs. Inc. v.
    FERC*, 407 F.3d 1242 (D.C. Cir. 2005)................................................27, 28, 31

*Californians for Renewable Energy, Inc. v. CAISO*, 117 FERC ¶ 61,072
    (2006) ................................................................................................4

*Cal. Pub. Utils. Comm'n*, 132 FERC ¶ 61,047 (2010), *reh'g denied*, 134
    FERC ¶ 61,044 (2011) .......................................................................22

*DC Energy, LLC v. H.Q. Energy Servs. (U.S.) Inc.*, 124 FERC ¶ 61,295
    (2008) ..............................................................................................48

*Entergy Nuclear FitzPatrick, LLC*, 118 FERC ¶ 62,085 (2007) ............................35

*ISO New England Inc.*, 155 FERC ¶ 61,023 (2016)*, reh'g denied*, 158 FERC
¶ 61,138 (2017), *appeal pending sub nom. NextEra Energy Resources*,
*LLC v. FERC*, No. 17-1110 (D.C. Cir. filed Apr. 3, 2017) ............................5, 46

*ISO New England Inc.*, 138 FERC ¶ 61,027 (2012).............................................4, 46

*Madison Windpower, LLC*, 93 FERC ¶ 61,270 (2000) ...................................... 37-38

*Midcontinent Indep. Sys. Operator, Inc.*, 161 FERC ¶ 61,056 (2017)...................51

*Morgantown Energy Assocs.*, 139 FERC ¶ 61,066, *reconsideration denied,*
140 FERC ¶ 61,223 (2012) .........................................................................27

*New England States Comm. on Elec. v. ISO New England Inc.*, 142 FERC
¶ 61,108 (2013), *reh'g denied*, 151 FERC ¶ 61,056 (2015) ........................ 47-48

*N.Y. Indep. Sys. Operator, Inc.*, 131 FERC ¶ 61,170 (2010) .................................48

*N.Y. State Pub. Serv. Comm'n v. N.Y. Indep. Sys. Operator, Inc.*, 158 FERC
¶ 61,137 (2017) ...........................................................................................48

*Niagara Mohawk Power Corp.*, 95 FERC ¶ 62,165 (2001) ....................................35

*PJM Interconnection, L.L.C.*, 135 FERC ¶ 61,022, *on reh'g*, 137 FERC
¶ 61,145 (2011), *reh'g denied*, 138 FERC ¶ 61,194 (2012), *petition for
review denied sub nom. N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74
(3d Cir. 2014)...................................................................................... 5-6, 47

*Power Auth. of the State of N.Y.*, 53 N.R.C. 488 (2001) .........................................35

*R.E. Ginna Nuclear Power Plant, LLC*, 151 FERC ¶ 61,023 (2015)......................35

*S. Cal. Edison Co.*, 71 FERC ¶ 61,269 (1995) .........................................................5

*S. Cal. Edison Co.*, 70 FERC ¶ 61,215, at 61,676, *reh'g denied*, 71 FERC
¶ 61,269 (1995) .............................................................................................5

*Windham Solar LLC*, 156 FERC ¶ 61,042 (2016).................................................27

*WSPP, Inc.*, 139 FERC ¶ 61,061 (2012)................................. 27, 29-30, 31

*WSPP, Inc.*, 134 FERC ¶ 61,169 (2011)................................................................30

**STATE AGENCY CASES**

*Petition of Green Mountain Power Corp.*, Docket No. 8445 (Vt. Pub. Serv.
Bd. July 9, 2015)....................................................................................51

**FEDERAL STATUTES**

Federal Power Act, 16 U.S.C. §§ 791a–825r....................................................*passim*

16 U.S.C. § 824(b)................................................................................46

16 U.S.C. § 824(b)(1) ......................................................................3, 31

16 U.S.C. § 824a-3(h)(2)(B)................................................................19

16 U.S.C. § 824d(a) ............................................................................46

16 U.S.C. § 825e...................................................................................21

16 U.S.C. § 825e(a) .............................................................................22

16 U.S.C. § 825m(a) ......................................................................19, 22

16 U.S.C. § 825p...................................................................................22

Natural Gas Act, 15 U.S.C. §§ 717–717w....................................................22, 42

Public Utility Regulatory Policy Act of 1978, Pub. L. No. 95-617,
92 Stat. 3117 ............................................................................13, 19, 28, 29

**OTHER AUTHORITIES**

FERC, *Energy Primer: A Handbook of Energy Market Basics* (2015),
https://perma.cc/97BS-CNH6.............................................................35

FERC, *State Policies & Wholesale Mkts. Operated by ISO New England
Inc.*, *et al.*, Supplemental Notice of Technical Conference, Docket
No. AD17-11-000 (Apr. 28, 2017), eLibrary No. 20170428-3062 ...................56

N.Y. State Energy Research & Dev. Auth., *New York State Greenhouse Gas
Inventory and Forecast: Inventory 1990-2011 and Forecast 2012-2030,
Final Report* (Apr. 2014, rev. June 2015), https://perma.cc/T6FPNBFK............7

## GLOSSARY OF TERMS, ABBREVIATIONS, AND ACRONYMS

| | |
|---|---|
| A- | Citation to Joint Appendix page |
| *Allco* | *Allco Fin. Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017) |
| Br. | Appellants' Opening Brief (Docket No. 56) |
| CES | Clean Energy Standard |
| ESCO | Energy Services Company |
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act |
| GHGs | Greenhouse Gases |
| ISO | Independent System Operator |
| LIPA | Long Island Power Authority |
| LSE | Load Serving Entity |
| MWh | Megawatt-hour |
| NGA | Natural Gas Act |
| NYISO | New York Independent System Operator |
| NYSERDA | New York State Energy Research & Development Authority |
| Order | PSC August 1, 2016 Clean Energy Standard Order |
| PSC | New York State Public Service Commission. John B. Rhodes is the current Chair.  Gregg C. Sayre, Diane X. Burman, and James S. Alesi are the current Commissioners. |
| PURPA | Public Utility Regulatory Policies Act |
| RGGI | Regional Greenhouse Gas Initiative |
| RTO | Regional Transmission Operator |
| RECs | Renewable Energy Credits |
| RES | Renewable Energy Standard (established by PSC August 1, 2016 Clean Energy Standard Order) |
| SCC | Social Cost of Carbon |
| SPA | Special Appendix |
| SEP | State Energy Plan |
| ZECs | Zero-Emissions Credits (established by the Order) |

## ISSUES

The issues in this case are:

(1) Whether Plaintiffs may invoke equity to challenge a utility commission order as preempted when that order does not regulate them and when allowing the suit would subvert Congress's decision to route Federal Power Act (FPA) claims through the Federal Energy Regulatory Commission (FERC);

(2) Whether the FPA preempts New York's program to compensate certain nuclear power plants for the zero-emission attributes of their electricity production, which avoids harmful emissions from burning fossil fuels; and

(3) Whether New York's program violates the dormant Commerce Clause.

## STATEMENT OF THE CASE

## I.    INDUSTRY FRAMEWORK

The interstate electricity market is composed primarily of: generators, which produce electricity; transmitters, which deliver electricity from generators to re-sellers and purchasers; and load serving entities (LSEs), which deliver electricity to retail customers. *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 88 (2d Cir. 2017) (*Allco*). For many years, vertically integrated utilities performed all three functions. *Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288, 1292 (2016) (*Hughes*). But in "restruc-tured" parts of the country, including New York, these functions now are per-

formed largely by different entities. SPA 3-4.[1] Most generation in "restructured" areas is owned by independent companies. LSEs generally no longer own generation, and instead buy power for resale to end users. And at FERC's direction, independent operators now run the transmission systems. *Hughes* at 1292. New York's electric transmission grid is operated by one such entity—the New York Independent System Operator (NYISO). In addition, entities like NYISO perform a separate function: administering auction markets for wholesale electric energy and capacity. *See* SPA 3-4; *Hughes* at 1293.[2]

In New York, generators may sell power at wholesale or at retail. At wholesale, they can sell power in the  NYISO auctions or by contract to individual LSEs, A-153; *see also Hughes* at 1292, or to power marketers who act as middlemen between generators and LSEs, *Automated Power Exch. Inc. v. FERC*, 204 F.3d 1144, 1148 (D.C. Cir. 2000). At retail, generators may form or be owned by "Energy Services Companies" (ESCOs), suppliers who sell energy directly to end users. A-182, 191. New York also retains a few vertically integrated LSEs, such as the Long Island Power Authority (LIPA), which owns generation facilities (including a

---

[1] Citations in the form "A-__" are to the Joint Appendix, and "SPA-__" to the Special Appendix. Unless indicated otherwise, in quotations through this brief, all emphases are added and internal citations omitted.

[2] "In a capacity market," buyers purchase "an option to buy a quantity of energy" rather than "the energy itself." *NRG Power Mktg., LLC v. Me. Pub. Utils. Comm'n*, 130 S. Ct. 693, 697 (2010).

share of the Nine Mile plant) and sells the energy to retail customers. A-144, 178, 182.

## II.  STATUTORY FRAMEWORK

### A.    The Federal Power Act

Dual sovereignty is a "defining feature" of our Nation's "constitutional blueprint." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 751 (2002). The same is true of the FPA, which, "like all collaborative federalism statutes, envisions a federal-state relationship marked by interdependence," *Hughes* at 1300 (Sotomayor, J., concurring). States regulate electricity generation. FERC regulates any ensuing interstate transmission and wholesale sale of that electricity. And states regulate retail sales to end users.

In 1932, the Supreme Court held that generation is a discrete local activity, distinct from subsequent transmission and sale, meaning states could tax generation without implicating the Commerce Clause. *Utah Power & Light Co. v. Pfost*, 286 U.S. 165, 181 (1932) (generation is "purely intrastate," transmission is interstate). In 1935, Congress drew that same line in the FPA,[3] leaving authority over generation facilities to the states. 16 U.S.C. § 824(b)(1) (FERC "shall not have jurisdiction, except as specifically provided …, over facilities used for the generation

---

[3] The 1935 act re-designated the 1920 Federal Water Power Act as FPA Part I, and added "Part II" authorizing FERC to regulate transmission and wholesale sales. Unless indicated otherwise, all FPA references herein are to Part II.

3

of electric energy."). Accordingly, states "regulate energy production," *Hughes* at 1299-1300 (Sotomayor, J., concurring), including "questions of need, reliability, cost, and other related state concerns." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 194, 205 (1983).[4] Congress also preserved state authority over other local activities, including local distribution facilities, *Conn. Light & Power Co. v. FPC*, 324 U.S. 515, 531 (1945), and retail sales, *Hughes* at 1292; *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 766 (2016).

FERC regulates the "middle segment," *FPC v. E. Ohio Gas Co.*, 338 U.S. 464, 488 (1950) (Jackson, J., dissenting): the transmission and wholesale sale of electric energy. *Hughes* at 1292. In doing so, FERC does not consider environmental impacts. *Grand Council of the Crees v. FERC*, 198 F.3d 950, 957 (D.C. Cir. 2000). FERC-regulated wholesale auctions are explicitly neutral as to "environmental or technological goals." *ISO New England Inc.*, 138 FERC ¶ 61,027, P 91 (2012).

Conversely, when states regulate electricity generation, they do so mindful of its environmental consequences. One method states use to mitigate the environmental consequences of electricity generation and consumption is directing their utilities' planning and resource decisions. *New York v. FERC*, 535 U.S. 1, 24

---

[4] *Californians for Renewable Energy, Inc. v. CAISO*, 117 FERC ¶ 61,072, P 10 (2006) (state has authority over generation facilities and environmental impacts).

4

(2002) (states traditionally regulate "integrated resource planning" and "utility generation and resource portfolios"); *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 417 (2d Cir. 2013); *S. Cal. Edison Co.*, 70 FERC ¶ 61,215, at 61,676 ("[R]esource decisions are the prerogative of state commissions," which "may wish to diversify their generation mix to meet environmental goals in a variety of ways."), *reh'g denied*, 71 FERC ¶ 61,269 (1995). For example, "a state may choose to require a utility to … purchase power from the supplier of a particular [] resource." *S. Cal. Edison Co.*, 70 FERC ¶ 61,215, at 61,676.

States also may "impos[e] a tax on fossil generators," give "direct subsidies" or "tax incentives" to "alternative generation," *S. Cal. Edison Co.*, 71 FERC ¶ 61,269, at 62,080, and impose "nonbypassable distribution or retail stranded cost charges," *New York*, 535 U.S. at 24. States may "subsidize the construction of [preferred] generators" to achieve environmental goals, while FERC regulates how those generators participate in wholesale markets and affect prices. *New England Power Generators Ass'n v. FERC*, 757 F.3d 283, 291 (D.C. Cir. 2014).[5]

---

[5] *See also ISO New England Inc.*, 155 FERC ¶ 61,023, P 23 (2016) (exempting certain renewable resources favored by state policy from wholesale market offer rules because FERC balances multiple concerns, including "accomodat[ing] the ability of states to pursue their policy goals"), *reh'g denied*, 158 FERC ¶ 61,138 (2017), *appeal pending sub nom. NextEra Energy Resources*, *LLC v. FERC*, No. 17-1110 (D.C. Cir. Filed Apr. 3, 2017); *PJM Interconnection, L.L.C.*, 135 FERC ¶ 61,022, P 143 (acknowledging state rights "to pursue legitimate policy interests"), *on reh'g*, 137 FERC ¶ 61,145, P 3 (2011) ("[S]tates and localities have their own poli-

### B.    State Generation Attribute Programs

Where utilities remain vertically integrated, states superintend their generation portfolios by directing them to build or buy preferred resources. But where states restructured, they can no longer compel now-independent generators to build new (or continue to run existing) generating plants. Instead, the same resource planning objectives are accomplished through mandated "portfolio standards" or similar laws requiring LSEs to serve end users with power produced by specified generation technologies.

Some states require LSEs to buy the energy produced by these generators. But often, state law separates the environmental attributes of energy production from the energy itself. These "unbundled" attributes are documented with "certificates" that represent one megawatt-hour of electricity produced by environmentally-qualifying means.[6] As this court has explained, these certificates are "inventions of state property law whereby the renewable energy attributes are 'unbundled' from the energy itself and sold separately." *Wheelabrator Lisbon*, *Inc. v. Conn. Dep't of Pub. Util. Control*, 531 F.3d 183, 186 (2d Cir. 2008); *see* SPA 25-27. States "define

---

cies and objectives," with which FERC intends not to "unreasonably interfere"), *reh'g denied*, 138 FERC ¶ 61,194 (2012), *petition for review denied sub nom. N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74 (3d Cir. 2014).

[6] A power plant's instantaneous electric output is measured in megawatts. *See generally How is Electricity Measured?*, Union of Concerned Scientists, https://perma.cc/VNA8-7DX6 (last visited Dec. 1, 2016). Its output over time is measured in megawatt-hours. *Id.*

RECs differently, focusing on various attributes which they deem to be especially relevant." *Allco* at 93. Currently, twenty-nine states have some form of portfolio standard. *Id.* at n.8; A-93. While details differ, each program provides state-driven financial support for facilities that produce electricity by state-selected, environmentally-friendly means.

### C.  The Order

Although New York has had a renewable portfolio standard since 2004, A-105, more than 40 percent of its electricity still is produced by fossil-fueled generators.[7] Burning fossil fuels to produce electricity creates carbon dioxide and other greenhouse gas (GHG) emissions that contribute to climate change, including "sea level rise, heat waves, and extreme weather events" like Superstorm Sandy. A-88. Particulates and other pollutants cause or worsen respiratory diseases and drive up healthcare costs. A-87, 271, 308, 310.

New York is addressing these concerns. The 2015 New York State Energy Plan (SEP) set statewide goals to reduce GHG emissions by 40 percent from 1990 levels and to produce 50 percent of electricity from renewable sources by 2030.

---

[7] N.Y. State Energy Research & Dev. Auth. (NYSERDA), *New York State Greenhouse Gas Inventory and Forecast: Inventory 1990-2011 and Forecast 2012-2030, Final Report* at 11, Table S-1 (Apr. 2014, rev. June 2015), https://perma.cc/T6FPNBFK.

A-86, 89. Governor Cuomo directed development of a Clean Energy Standard (CES) that would convert the SEP goals into enforceable requirements. A-90.

To that end, New York's Public Service Commission (New York or PSC) broadened an inquiry regarding renewable resources (A-105-107), and undertook the proceedings culminating in the Order. New York's Order adopts the SEP goals and multiple strategies to fulfill them. A-86, 90, 96-97, 149, 160, 162. One major component is a new "Renewable Energy Standard" (RES), which requires state LSEs to procure new renewable resources that deliver electricity to New York. A-98, 189-190.[8]

The other major component—challenged here—established a complementary program to delay, while the renewable build-out occurs, the retirement of needed nuclear plants. By 2015, inexpensive natural gas had pushed most of the state's nuclear plants to the verge of retiring years before their operating licenses expire. A-203. Prematurely losing those facilities—and replacing their output with fossil-fuel energy—would cause the additional emission of 15.5 million tons of carbon dioxide per year (plus other pollutants), devastating New York's ability to meet its GHG goals. A-103, 129, 161-162, 212-213, 221; SPA-6.

---

[8] The RES also includes a program to support existing renewable facilities that show they are likely to cease operations without such support. A-201.

To avoid these harms, the Order compensates eligible nuclear plants for their environmentally beneficial zero-emission attributes by creating new "Zero-Emissions Credits" (ZECs) to be sold to NYSERDA by eligible plants. Each megawatt-hour (MWh) "produc[ed]" (up to a cap based on historic production) creates one ZEC. A-228-229, 254; SPA-5. Consistent with the program's limited role as a "bridge" to a "renewable energy future," ZEC payments end in 2029, A-134, 228,[9] or earlier if ZECs are replaced by another, functionally equivalent program. A-228.

ZEC eligibility is based on a determination of public necessity, which takes into account:

> (a) the verifiable historic contribution the facility has made to the clean energy resource mix consumed by retail consumers in New York State regardless of the location of the facility; (b) the degree to which energy, capacity and ancillary services revenues projected to be received by the facility are at a level that is insufficient to provide adequate compensation to preserve the zero-emission environmental values or attributes historically provided by the facility; (c) the costs and benefits of such a payment for zero-emissions attributes for the facility in relation to other clean energy alternatives for the benefit of the electric system, its customers and the environment; (d) the impacts of such costs on ratepayers; and (e) the public interest.

---

[9] In selecting that duration, New York balanced its preference for a short-term transition with the need to provide facility owners with a durable enough attribute payment to induce them to make necessary investments. A-227.

A-255. So far, the PSC has determined that three nuclear plants—Ginna, FitzPatrick, and Nine Mile Point—are eligible to sell ZECs. A-212, 255. Going forward, additional nuclear plants could be eligible. A-104, 255.

Although the PSC "[relies] on markets where feasible" (A-186), it determined there were "too few owners of … affected nuclear generation facilities to create sufficient competition to determine an accurate [ZEC] price." A-130, 214. Accordingly, ZECs are priced administratively. *Id.* ZEC prices are set in two-year tranches, and start with the 2015 federal estimate of the "social cost of carbon," expressed in dollars per ton of carbon avoided. A-215, 218. The Commission then subtracts the portion of that cost already captured through the state's participation in the Regional Greenhouse Gas Initiative (RGGI), A-219, and multiplies the result by the tons of carbon avoided per MWh of zero-emission energy. A-220. The resulting ZEC price, for the first two-year tranche, is $17.48 per MWh. A-104.

ZEC prices are adjusted biannually to reflect increases in the 2015 social cost of carbon estimate, adjusted for inflation. A-215, 219. The Commission will re-examine the conversion factor beginning with Tranche 4. A-221. Finally, to avoid paying for attributes less likely to remain at risk, ZEC prices will decrease to the extent that independent, forward-looking wholesale energy and capacity price forecasts exceed $39/MWh. A-222. Should those forecasts predict higher prices, ZEC prices will decline. *Id.*

The PSC considered arguments that emission-reduction goals should be met by encouraging even more renewables instead of retaining nuclear facilities, but concluded it would be "virtually impossible" to develop sufficient new renewables quickly enough to offset the imminent loss of at-risk nuclear energy. A-211; SPA-6. The PSC therefore required each LSE to buy ZECs from NYSERDA in proportion to its share of total state electric load. A-104, 233-234. Alternatively, with Commission approval, LSEs may purchase both ZECs and energy directly from the generators. A-236.

NYISO assessed the ZEC program, and concluded it raised no wholesale market power concerns. A-140. NYISO stated that it supported ZECs as a program to retain nuclear generation "until longer-term market solutions can be developed."[10]

### D.    The District Court Proceedings

On October 19, 2016, Plaintiffs filed a complaint alleging that the ZEC portion of the Order was field and conflict preempted by FERC's authority over wholesale electricity sales (A-42-43), and violated the dormant Commerce Clause

---

[10] *See* ECF 105, Reply in Support of Defendants' Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) at 8-9 & n.11, *Coalition for Competitive Elec. v. Zibelman*, No. 1:16-cv-8164 (S.D.N.Y. 2017); ECF 55-1, Order Adopting a Clean Energy Standard, App'x B at 73, *Coalition for Competitive Elec. v. Zibelman*, No. 1:16-cv-8164 (S.D.N.Y. 2017). Hereafter, all citations to record material not in the Appendix or Special Appendix will refer to the document's district court ECF number. All ECF references are to documents filed with the court below.

because the first nuclear plants receiving ZECs are in New York. A-43.[11] Plaintiffs did not challenge the REC portions of the Order. A-39 n.1.

New York (ECF 54) and Exelon (ECF 76) moved to dismiss. The district court granted the motions, SPA-2, holding that Plaintiffs lacked a cause of action to pursue preemption claims, SPA-14, and, in any event, had failed to state plausible claims. *Id.*; SPA-30, 36. The court likewise held that Plaintiffs, who failed to allege injury arising from the supposed discrimination against interstate commerce, lacked a cause of action to pursue their Commerce Clause claims. SPA-40. Regardless, the court found that Plaintiffs' claims would fail on the merits because the Commerce Clause does not preclude New York from subsidizing nuclear power production. SPA-46-47.[12]

## SUMMARY OF ARGUMENT

The district court was correct: Neither the FPA nor the Commerce Clause requires New York to tolerate increased GHG emissions and climate- and health-

---

[11] The first ZEC-receiving nuclear plants are in New York, but owned largely by out-of-state corporations. When New York issued the Order, FitzPatrick was owned by Entergy, a Delaware corporation headquartered in New Orleans. Entergy then sold FitzPatrick to Exelon, a Pennsylvania corporation headquartered in Chicago. Exelon and Électricité de France indirectly own Ginna and most of Nine Mile Point. LIPA owns 18% of one of the Nine Mile Point units.

[12] On November 30, 2016, nuclear power opponents filed a state-court challenge to the CES Order, which remains pending. *Hudson River Sloop Clearwater, Inc. v. N.Y. Pub. Serv. Comm'n*, No. 7242-2016 (N.Y. Sup. Ct. Albany Cty. filed Nov. 30, 2016).

related harms just because Plaintiffs, who generate electricity burning fossil fuels, might make more money if non-emitting rivals retire.

The district court correctly held that Plaintiffs' preemption claims fail for two independent reasons. Plaintiffs lack a private right of action to enforce the FPA, and cannot invoke the court's equitable jurisdiction to fill that gap. But even if they could, Plaintiffs' complaint failed to state a plausible claim that the FPA preempts New York's Order.

Neither the Supremacy Clause nor the FPA creates a private right of action. Subjects of state regulation can invoke equity proactively to enjoin preempted regulation, but Plaintiffs are not in that class. They challenge the Order not because it regulates them, but because they would benefit from forcing rivals to retire. Regardless, the FPA's comprehensive administrative remedial scheme implicitly forecloses equitable actions. Unlike the Public Utility Regulatory Policies Act of 1978 (PURPA), which allows plaintiffs to sue in court after exhausting administrative remedies, the FPA created no private right of action. Congress instead routed all FPA claims exclusively through FERC. This enables FERC to achieve needed uniformity informed by technical expertise, and allows FERC to exercise discretion in crafting remedies, including preemption where appropriate. Plaintiffs' approach undermines these goals in favor of patchwork decisions by non-expert courts. Plaintiffs' recourse is to FERC.

The district court also correctly rejected Plaintiffs' preemption claims on the merits. Electric energy is fungible, but, as the FPA and FERC recognize, fuels and power plants are not. Consistent with the bright line drawn in the FPA, states regulate generation, and determine which fuels and technologies supply end users; FERC regulates interstate wholesale power sales. While FERC has developed fuel-neutral marketplaces for wholesale energy, nothing requires states to remain neutral when regulating generation and retail sales. FERC itself has acknowledged that states may tax, subsidize, or otherwise regulate how electricity is produced and the generation used to serve retail consumers.

Regulating utilities is one of the states' most important police powers. *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983). And states frequently do so using the very tools employed by the Order: requiring regulated utilities to procure intangible property reflecting environmental attributes of producing electricity by favored means. FERC has disclaimed jurisdiction over the sale of such attributes independent of the energy that is produced, and this Court has affirmed that such sales are governed by state law. The Order falls squarely in the reserved state field.

Plaintiffs cannot overcome this by seizing on a single word from the Supreme Court's avowedly limited *Hughes* opinion, but ignoring the Court's definition of the word. In *Hughes*, the Court considered a Maryland program to promote

14

new generation, and acknowledged that states have broad authority do so by means not "tethered" to wholesale auctions. Maryland triggered preemption by conditioning state payments on a new generator making sales in the wholesale auctions. But as Plaintiffs concede, the Order here imposed no such condition. That absence means New York's Order lacks the Maryland program's "fatal defect," and remains in the state's proper field.

The district court correctly rejected Plaintiffs' other alleged "tethers." Plaintiffs claim New York did not need to mandate auction sales because such sales are legally and practically required. But ZEC plants can sell their output in many ways, within or outside of the auctions. They can sell by contract to LSEs, as the Order contemplates and as these same plants did for years following New York's restructuring. Or they can sell directly to end users. One ZEC plant is partly owned by LIPA, which serves retail load and receives ZECs. And New York is a "retail competition" state, meaning that any qualified entity—including the ZEC plants—can become a competitive supplier offering electricity to end users. The Order's indifference to how ZEC plants sell the energy they produce is dispositive. As payments are not conditioned on auction sales, they are not payments "for" or "in connection with" those sales.

The Order also is not conflict preempted. State regulation of generation and retail sales necessarily affects wholesale sales, but is preempted only when the reg-

ulation would cause "clear damage" to FERC goals. None is present here. Virtually all electric energy sources are subsidized, some explicitly, others less so (e.g., by failing to require polluting generators to internalize their activities' full social cost). And all production subsidies or taxes affect wholesale markets by altering participants' cost structures. But none damages FERC's authority to ensure that wholesale marketplaces themselves remain non-discriminatory and produce efficient prices given those cost structures. Plaintiffs' objections are especially misplaced here, where NYISO supports the ZEC program, and its rules allow the ZEC recipients to bid in its auctions. Plaintiffs have asked FERC to change the rules, but FERC so far has declined. Plaintiffs complain that ZECs "artificially depress" auction prices, but the prevailing prices are what FERC has decided sellers should receive for auction sales.

Last, the Order does not violate the Commerce Clause, which, as the district court held, allows New York to subsidize zero-emission energy production. And ZECs do not discriminate against interstate commerce. They are available to any nuclear plant, regardless of location, whose supply of zero-emission energy to New York is at risk. While the plants initially meeting those criteria are in New York, out-of-state plants that begin supplying zero-emission energy to New York in the future may qualify for ZECs if that supply is jeopardized. ZECs boost competition by countering the failure to price polluting generators' full social cost and by keep-

ing in the market zero-emission resources that might be forced out by that failure. ZECs prevent the use of even more fossil-fuel generation—that is the point—with no disparate impact on out-of-state entities; fossil-fueled generators in state and out-of-state are affected equally. Any incidental burden on interstate commerce is far outweighed by the benefits of New York's policy.

## ARGUMENT

## I.    STANDARD OF REVIEW

The court reviews Rule 12(b)(6) dismissals *de novo*, but may affirm on any basis supported in the record. *Allco* at 94-95. To survive a motion to dismiss, a complaint must state a facially plausible claim and include factual content allowing a reasonable inference that the defendant is liable. *Id*. For Rule 12(b)(6) purposes, the complaint includes any written material attached or incorporated by reference. *Id*. at 97 n.13; SPA-3 & n.2. Contrary to Plaintiffs' contention (Br. 18), courts need not accept as true alleged facts contradicted by the express terms of challenged laws. *Id*. at 97-98 (affirming dismissal when allegations of compelled transactions were "contrary to" the challenged order).

## II.    PLAINTIFFS LACK A PREEMPTION CAUSE OF ACTION.

Plaintiffs seek reinstatement of their preemption claims on grounds that the "district court ha[d] equity jurisdiction." Br. 19. But in focusing on jurisdiction, the court's "power … to hear a case," Plaintiffs ignore the separate inquiry into wheth-

er they are among "the class of litigants that may … appropriately invoke" the court's power. *Davis v. Passman*, 442 U.S. 228, 239-40 n.18 (1979). The Supremacy Clause provides no cause of action. *Armstrong v. Exceptional Child Care Ctr., Inc.*, 135 S. Ct. 1378, 1383 (2015). Plaintiffs concede that the FPA creates no private cause of action either. SPA-9; Br. 27. Plaintiffs thus must show "the availability" to them of "a judge-made action at equity." *Armstrong*, 135 S. Ct. at 1386. They failed to do so below, SPA-14, and their claim fares no better on appeal.

### A.  Plaintiffs' claims are outside *Ex Parte Young*.

Equitable preemption actions are grounded in the "claim [that] federal law immunizes [plaintiffs] from state regulation." *Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016), *cert denied*, 137 S. Ct. 2295 (2017). "The principle is most often associated with *Ex parte Young*." *Id.* But "*Ex parte Young* involves 'nothing more than the pre-emptive assertion in equity of a defense that would otherwise have been available in the state's enforcement proceedings at law.'" *Id.*

Plaintiffs argue (Br. 26) that they are "subject" to the Order. But they made no such allegation in their Complaint—nor could they plausibly do so. Unlike the litigants in *Friends*, Plaintiffs face no threat of state enforcement. The Order places obligations upon LSEs, and neither regulates Plaintiffs nor "threaten[s them] with

… sanctions." *Friends*, 841 F.3d at 144. Plaintiffs are therefore outside the class of litigants protected by *Ex Parte Young*.

### B. The FPA forecloses private equitable actions in district court.

Even if Plaintiffs could invoke *Ex Parte Young*, 209 U.S. 123 (1908), they still would lack a cause of action because "the FPA precludes private enforcement … and private parties such as Plaintiffs 'cannot, by invoking [the Court's] equitable powers, circumvent Congress's exclusion of private enforcement.'" SPA-12 (quoting *Armstrong*, 135 S. Ct. at 1385).

In *Niagara Mohawk Power Corp. v. FERC*, 306 F.3d 1264, 1269-70 (2d Cir. 2002), this court held that preemption claims and statutory claims are not "legally distinct," and plaintiffs cannot evade Congress's limits on statutory actions by couching their grievances in preemption terms. *Accord Allco Fin. Ltd. v. Klee*, 805 F.3d 89, 95 (2d Cir. 2015) (*Allco I*).[13] Invoking equity changes nothing. Congress routed all FPA claims through FERC to achieve uniform regulation, informed by FERC's expertise and exercise of discretion.[14] Allowing plaintiffs to pursue FPA

---

[13] *Niagara* and *Allco* involved the Public Utility Regulatory Policies Act (PURPA), 16 U.S.C. § 824a-3(h)(2)(B). PURPA provides an express private cause of action to challenge state conduct regarding small generation facilities, but only after first petitioning FERC to initiate enforcement itself. *Id.*; *Allco I* at 91-92.

[14] 16 U.S.C. § 825m(a) (FERC "may in its discretion bring an action" in district court to enjoin alleged FPA violations). "[A]gency discretion is … at zenith" in "fashioning … policies, remedies and sanctions, including enforcement and volun-

preemption claims in district court upends these goals. Just as plaintiffs could not avoid exhaustion requirements in *Niagara* and *Allco*, Plaintiffs may not go directly to court when Congress refrained from creating any private FPA cause of action. Plaintiffs' recourse is to FERC.

### 1. *Armstrong* does not establish a fixed, two-prong test for intent to foreclose private equitable actions.

As the district court recognized (SPA-13), *Armstrong* supports dismissal when a statute's administrative scheme suggests Congress meant to foreclose private enforcement. Plaintiffs contend (Br. 22), however, that *Armstrong* required two showings: a sole statutory remedy and a judicially unadministrable standard. In Plaintiffs' view, "the first ... without the second is insufficient to defeat equity jurisdiction." *Id.* at 23. The district court correctly rejected that view. As *Armstrong* made clear, determining Congress's intent requires statute-specific analysis, 135 S. Ct. at 1385, not application of a "simple, fixed legal formula." *Id.* at 1388.

On *Armstrong*'s facts, the majority observed that "[t]wo aspects of" Medicaid Act § 30(A) "establish[ed] Congress's 'intent to foreclose' equitable relief." *Id.* at 1385. Plaintiffs misread *Armstrong* to construe both as universally necessary. Rather, the majority and dissent in *Armstrong* each acknowledged that a comprehensive remedial scheme, without more, could demonstrate Congressional intent to

tary compliance programs in order to arrive at maximum effectuation of Congressional objectives." *Niagara Mohawk Power Corp. v. FERC*, 379 F.2d 153, 159 (D.C. Cir. 1967).

foreclose private equitable suits. Citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996), the majority observed that a particular remedial scheme "might," "by itself," preclude private equitable relief (as it did in *Seminole*). *Armstrong*, 135 S. Ct. at 1385. The dissent, too, conceded that point. *See id.* at 1392-93. Thus, the district court correctly saw "no indication in *Armstrong* that both factors must be satisfied in order to conclude that Congress intended to foreclose equitable relief to private parties." SPA-13-14.[15]

### 2. The FPA forecloses private equitable relief.

The FPA's sole remedy, enforcement by FERC, "tacitly forecloses private parties from invoking the [district court's] equity jurisdiction." SPA-11. The statute includes a "detailed remedial scheme," and empowers FERC with "broad enforcement authority." *Id.* The FPA sets "standards for [FERC] to apply, and independent of Commission action, *creates no rights which courts may enforce*." *Mont.-Dakota Utils. Co. v. Nw. Pub. Serv. Co.,* 341 U.S. 246, 251 (1951).

The "FPA … requires every public utility to file … rates for all sales subject to FERC's jurisdiction," SPA-11. On complaint by "any person," 16 U.S.C. § 825e,

---

[15] *See, e.g., Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 152 F. Supp. 3d 90, 104 (E.D.N.Y. 2015) (Airport and Airway Improvement Act foreclosed *Ex Parte Young* action, because "Congress intended to place authority for the enforcement of the [statute's] Grant Assurances exclusively in the hands of the Secretary of Transportation"), *vacated in part on other grounds*, 841 F.3d 133 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2295 (2017).

or its own motion, *id.* § 824e(a), FERC may modify any "rate [or] charge … for any … sale subject to [FERC] jurisdiction," or "any rule, regulation, practice, or contract affecting such rate [or] charge," to ensure that it is just, reasonable, and not unduly discriminatory or preferential. *Id*. FERC can declare state laws preempted. *E.g.*, *Orangeburg v. FERC*, 862 F.3d 1071, 1081 (D.C. Cir. 2017); *Cal. Pub. Utils. Comm'n*, 132 FERC ¶ 61,047, P 69 (2010), *reh'g denied*, 134 FERC ¶ 61,044, (2011). And FERC, "in its discretion," may sue in district court to enjoin "any person" from taking "any acts" that violate the FPA. 16 U.S.C. § 825m(a).

Plaintiffs contend that 16 U.S.C. § 825p, giving district courts "jurisdiction" over "all" FPA enforcement "suits in equity and actions in law," shows that FERC's authority to enforce the FPA is not exclusive.  Br. 23-25. But that provision speaks to judicial power, not who can invoke it. *Mont.-Dakota Utils. Co.*, 341 U.S. at 249 (Such provisions "do[] not create causes of action, but only confer[] jurisdiction to adjudicate those arising from other sources"); *accord Touche Ross v. Reddington*, 442 U.S. 560, 576-77 (1979). FERC alone is authorized, "in its discretion," to bring FPA actions in the district courts. 16 U.S.C. § 825m(a).[16]

---

[16] *See also Clark v. Gulf Oil Corp.*, 570 F.2d 1138, 1146 (3d Cir. 1977) ("[G]rant of jurisdiction in the district courts need not be read as extending beyond  those causes of action *expressly* provided for elsewhere in the Act"). *Clark* construed the jurisdictional provision of the Natural Gas Act (NGA). The FPA and NGA are construed *in para materia*. *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981).

That courts adjudicated FPA preemption cases before *Armstrong*, and Congress did not disapprove them (Br. 24), shows nothing. Those decisions assumed the existence of a Supremacy Clause cause of action. But at argument in *Hughes*—the first FPA preemption case decided after *Armstrong*—Justice Breyer questioned "the procedural posture of the case" because "there isn't" a "Supremacy Clause private right of action."[17] And in its opinion, because the parties did not raise the issue,[18] the Court assumed without deciding that plaintiffs alleging FPA preemption could seek relief in federal court. *Hughes* at 1296 n.6.

### 3. The FPA's just and reasonable standard is not judicially administrable.

Even if both *Armstrong* indicia of intent were required, Plaintiffs' claims would still fail because the FPA's just-and-reasonable standard is analogous to the Medicaid Act's judgment-laden ratemaking standard. While *Armstrong* observed that it was hard to imagine "a requirement broader and less specific than" the Medicaid statute's standard that state plans be "consistent with efficiency, economy, and quality of care," 135 S. Ct. at 1385, the FPA's requirement that wholesale electricity rates be "just and reasonable" is one such example, "incapable of precise judi-

---

[17] Transcript of Oral Argument at 24:3-7, *Hughes* (No. 14-614), https://www.supremecourt.gov/oral_arguments/argument_transcripts/14-614_g2hk.pdf.

[18] The Court decided *Armstrong* after the lower court proceedings in *Hughes* were complete.

cial definition," *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 532 (2008).

Plaintiffs deny that they are asking the courts to construe and apply this standard, but their arguments are rife with the sort of rate-related judgment calls that Congress meant FERC to make. The FPA counsels against the courts embroiling themselves in "rate-related requests for injunctive relief." *Armstrong*, 135 S. Ct. at 1389 (Breyer, J., concurring). Here, Plaintiffs cannot claim that ZECs interfere with FERC's reliance on auctions to ensure just and reasonable rates (e.g., A-56, 72-76) without assuming that auction prices will be *un*reasonable if (as the rules allow) ZEC-subsidized resources participate. That is something only FERC could decide. Although courts may review FERC's determination of reasonableness, SPA-13, they should not adjudicate rate-related matters in the first instance.

While some of Plaintiffs' field-preemption arguments might be judicially administrable, they cannot "separate … the [allegedly] simple sheep from the more harmful rate-making goats." *Id.* Thus, all FPA preemption claims must be directed to FERC. The FPA's exclusive grant of wholesale ratemaking authority to FERC "achiev[es] the expertise, uniformity, widespread consultation, and resulting administrative guidance that … accompanies agency decisionmaking." *Id.* at 1385. Allowing Plaintiffs to bypass FERC and proceed in court undercuts these important goals.

## III. THE FPA DOES NOT PREEMPT THE ORDER.

Plaintiffs' field preemption claim depends on deliberately conflating a production subsidy—like the ZECs—with the rates a seller receives "for" or "in connection with" the subsequent sale (at wholesale) of the energy produced. *E.g.*, Br. 1, 2, 3, 6, 8, 8-9, 30, 31, 32, 45. Plaintiffs assert that the ZEC program "replaces the FERC-determined just and reasonable auction prices with a different rate determined by a state." Br. 3. But the district court correctly rejected their claim:

> In *EPSA*, the Supreme Court stated that "[t]o set a retail electricity rate is … to establish the amount of money a consumer will hand over in exchange for power." *EPSA*, 136 S. Ct. at 777.
>
> \* \* \*
>
> Here, the ZEC sales and the wholesale sales of energy or capacity are entirely separate transactions, with the ZEC sales occurring independently of the wholesale auction and neither one conditioned on the other. Therefore, the ZEC program does not adjust or "set" the amount of money that a generator receives in exchange for the generator's sale of energy or capacity into the auction.

SPA-22-23. Under the Order, NYSERDA "hand[s] over" money "in exchange for" ZECs, not energy, and the LSEs reimburse NYSERDA in proportion to their retail consumption. Neither payment turns on how ZEC plants sell power or from whom LSEs buy it. Plaintiffs have no answer to this. They instead conflate the *production* of zero-emission electric energy with the sale of that energy in the NYISO auctions. The FPA recognizes the difference, however, and preserves state authority

to regulate generation for environmental reasons, separate and apart from FERC's authority over the wholesale sale of the generator's output.

### A. Environmental-attribute programs are squarely within state authority to regulate generation and retail sales.

Contrary to Plaintiffs' straw man argument, the Order does not regulate wholesale electricity sales.

### 1. ZECs regulate environmental attributes of electricity generation.

New York created ZECs to value properly the "emission-free attributes" of power produced by "eligible nuclear generating plants," and thereby "prevent backsliding [in] the state's efforts to limit greenhouse gas emissions." A-203. ZECs are defined as "the zero-emissions attributes of one megawatt-hour of electricity production by an eligible Zero Carbon Electric Generating Facility." A-254. What matters for ZEC purposes is that the eligible generators produce electricity—not how it is sold. *See* A-145, 229 (ZECs created and paid "on a per unit output basis"); SPA-5 (citing Order, A-254). Plaintiff Electric Power Supply Association (EPSA) admitted as much to FERC: "[ZEC] payments are tied to energy production."[19]

_____

[19] *Indep. Power Prods. of N.Y., Inc. v. N.Y. Indep. Sys. Operator, Inc.*, Request for Expedited Action of the Electric Power Supply Association at 11 (Jan. 9, 2017), FERC eLibrary No. 20170109-5121, https://perma.cc/2CRX-XHFX (EPSA Motion).

This Court and FERC recognize that states may create instruments reflecting environmental attributes of electricity production. *Wheelabrator*, 531 F.3d at 186; *WSPP, Inc.*, 139 FERC ¶ 61,061, P 21 (2012); *Allco*, 861 F.3d at 106 ("These means and ends are well within the scope of what Congress … allowed the states to do in the realm of energy regulation."). Twenty-nine states have done so, "focusing on various attributes which they deem to be especially relevant."*Allco*, 861 F.3d at 93 & n.8. States decide how the instruments are created, valued, sold, and retired. *Am. Ref-Fuel Co.*, 105 FERC ¶ 61,004, P 23 (2003) (*Am. Ref-Fuel*), *reh'g denied*, 107 FERC ¶ 61,016 (2004), *appeal dismissed sub nom. Xcel Energy Servs. Inc. v. FERC*, 407 F.3d 1242, 1244 (D.C. Cir. 2005); *Windham Solar LLC*, 156 FERC ¶ 61,042, P 4 (2016); *Morgantown Energy Assocs.*, 139 FERC ¶ 61,066, P 46, *reconsideration denied*, 140 FERC ¶ 61,223 (2012).

State decisions on these matters are not preempted by federal law. *Wheelabrator*, 531 F.3d at 189 n.10, 190. As this court held, neither Congress nor FERC has "evince[d] an intent to occupy the relevant field—namely, the regulation of renewable [or zero-emissions] energy credits." *Id.* at 190. In fact, both FERC and Plaintiff EPSA have pointed to RECs as examples of permissible state generation support.[20]

---

[20] Brief for the U.S. and FERC as Amici Curiae at 15-16, *PPL EnergyPlus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014) (Nos. 13-4330, 13-4501) (comparing

## 2. Generation attribute programs permissibly augment revenue from electricity sales.

Plaintiffs complain that ZECs "augment" wholesale sales revenues, but *all* such attribute programs provide additional revenue in exchange for environmentally-friendly energy production. That is their purpose: to support preferred generation facilities that would not be developed or retained on the basis of electricity sales revenue alone. Yet FERC has consistently found that such programs do not intrude into FERC's field.

In *Am. Ref-Fuel*, FERC addressed the interplay between state-created generation attributes and FERC's regulation of wholesale sales under PURPA. Through that 1978 statute, Congress sought to promote renewable energy and co-generation ("qualifying facilities" or QFs) by requiring electric utilities to purchase, at rates not to exceed the utility's "avoided cost," the output of any QF attached to the utility's system. Avoided cost is what the purchasing utility would pay if buying electricity from a source other than the QF.

Years later, restructured states began adopting programs to further promote renewable energy by requiring utilities to buy such energy or certificates (RECs) representing its unbundled environmental attributes. *Am. Ref-Fuel*, PP 4-5. By

---

preempted wholesale rate-setting with non-preempted REC regulation); Brief of the Electric Power Supply Association, *et al.* as Amici Curiae in Support of Respondents at 19-20, *Hughes* (Nos. 14-614, 14-623), https://perma.cc/Y2L5-MTFJ (citing "renewable or other fuel-based standards" as non-preempted state actions).

2003, thirteen states had such programs, and questions arose as to how new-ly-created RECs should be treated under pre-existing PURPA contracts. Purchasers claimed the newly-created RECs should convey to them along with the energy. *Id.* P 12. Sellers argued for the right to sell RECs separately from (and in addition to) the energy. *Id.* PP 7, 10. States said the question was governed by state law, not PURPA. *Id.* P 14.

FERC agreed with the states, using reasoning applicable directly to ZECs. PURPA rates are based on a utility's *avoided* costs, so they do not vary based on how the QF energy is produced. *Id.* P 22. And because PURPA rates (like the NYISO auctions) are fuel- and technology-neutral, FERC concluded that they compensate sellers only for capacity and energy—not production attributes. *Id.* P 22. Thus, FERC determined that state law, not PURPA, governs RECs. "States, in creating RECs, have the power to determine who owns the REC in the initial in-stance, and how they may be sold or traded." *Id.* P 23. FERC was not troubled that unbundled sales of RECs, in addition to separate, "avoided cost" sales of capacity and energy, will yield total compensation above the PURPA avoided cost cap.

The same reasoning applies to the relationship between RECs and wholesale auction rates, and FERC "supports … efforts to facilitate the purchase and sale of RECs," even when the associated energy may be sold in wholesale auctions. *WSPP*, *Inc.*, 139 FERC ¶ 61,061, P 14. In *WSPP*, parties to the "WSPP Agree-

ment," which facilitates wholesale sales among 300 American and Canadian parties, added provisions governing bundled and unbundled REC sales and asked FERC to disclaim jurisdiction over unbundled REC transactions. *Id.* PP 2, 5, 9. FERC accepted the provisions, finding that they would "increase efficiency and liquidity in RECs sales." *Id.* P 14. FERC asserted jurisdiction over *bundled* REC transactions, "where a wholesale energy sale and a REC sale take place as part of the same transaction," but disclaimed jurisdiction over unbundled REC sales. *Id.* P 24. "RECs are state-created and state-issued instruments certifying that electric energy was generated pursuant to certain requirements." *Id.* P 21. When RECs are unbundled—i.e., sold separately from the associated energy—FERC concluded that they are not charges "in connection with" wholesale sales and "do[] not fall within the Commission's jurisdiction under sections 201, 205 and 206 of the FPA." *Id.* P 24.

Plaintiffs' efforts to distinguish *WSPP* fail. Their unsupported claim that *WSPP* "addressed REC programs that had no connection to an organized market with energy and capacity auctions" (Br. 42) is wrong. *See WSPP, Inc.*, 134 FERC ¶ 61,169, P 23 & n.14 (2011) ("[S]ellers under the WSPP Agreement can make sales ... at market-based rates to an RTO/ISO."). Plaintiffs also distort *WSPP*'s holding: FERC did not just recite the standard that RECs are outside its jurisdiction "if" they do not provide payments "in connection with" wholesale sales. *See*

Br. 42. FERC *applied* the standard and disclaimed jurisdiction because it found that unbundled RECs do not constitute payments in connection with wholesale sales. *WSPP*, 139 FERC ¶ 61,061, P 24.[21] The same reasoning applies to the ZEC program and dooms Plaintiffs' challenge.

### B. The district court correctly rejected efforts to distinguish ZECs from RECs and to bring the Order within *Hughes*.

Plaintiffs concede the legality of state REC programs (Br. 40), including the RES portion of New York's Order. The district court correctly understood that concession to be fatal to Plaintiffs' case. SPA-24. Federal law distinguishes "production" from wholesale "sales."[22] States may regulate the former but not the latter. *Compare Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493 (1989) (*Northwest Central*) (non-preempted regulation of wells' production of gas for sale to pipelines) *with N. Nat. Gas Co. v. State Corp. Comm'n of Kan.*, 372

---

[21] Plaintiffs also err in implying that ZECs should be considered one component of artificially-bifurcated, bundled sales. Br. 43-44. "Bundled" sales are those in which energy and attributes are sold as "part of the same transaction." *WSPP*, 139 FERC ¶ 61,061, P 24. That is not the case here. Eligible nuclear plants sell unbundled ZECs—not energy—to NYSERDA. As discussed below, they can sell their energy in myriad ways. LSEs, for their part, buy ZECs from NYSERDA in proportion to their share of total retail electric load, but generally do not buy all their energy from NYISO wholesale auctions. To manage risk, LSEs may instead cover some of their electricity needs by contract. There is virtually no chance that an LSE's ZEC payments will end up being proportional to the share (if any) of ZEC plant energy the LSE ends up buying, whether through the auction or by contract.

[22] *Utah Power & Light Co.*, 286 U.S. at 182; *New York*, 535 U.S. at 24; *Hughes* at 1298; *Am. Ref-Fuel*, PP 22-24; 16 U.S.C. § 824(b)(1).

U.S. 84, 94 (1963) (*Northern Natural*) (preempted state regulation of pipeline purchases from in-state gas wells). RECs and ZECs stay on the correct side of that jurisdictional line, compensating production attributes regardless of how the energy is sold. As the district court held, the Order "does not require the nuclear generators to sell into the NYISO auction," and "grants ZECs to eligible nuclear generators, without any mention of whether or where the generators sell their power." SPA-20 (citing A-208-213).

Plaintiffs attempt to distinguish ZECs from RECs and to paint ZECs as more akin to the preempted contracts for differences in *Hughes*. But their effort mischaracterizes both the Order and applicable law. In *Hughes*, Maryland did not compensate generation attributes; it changed the rate a seller received for actual sales of energy and capacity in a wholesale auction. SPA-18 n.15. Maryland "require[d]" the seller to "offer [the] Facility's output into the PJM Markets," "dictate[d]" how it participated in those auctions, conditioned contract payments on the resource clearing in the auction, and set prices "for each unit of energy and capacity sold to PJM in the PJM Markets." *PPL EnergyPlus LLC v. Nazarian*, 974 F. Supp. 2d 790, 821, 835 (D. Md. 2013), *aff'd*, 753 F.3d 467 (4th Cir. 2014), *aff'd sub nom. Hughes*. The contracts substituted "the fixed contract price" for the variable market price for every unit of "Capacity" and "Energy" the generator actually sold to PJM. *Id.* at 833, 836-37.

On those facts, the Supreme Court "had no difficulty seeing" (Br. 31) that Maryland's program impermissibly set wholesale rates. But *Hughes* did not find that Maryland engaged in wholesale rate setting merely by giving money for producing energy by favored means. *Hughes* held that Maryland engaged in wholesale rate-setting by "condition[ing] receipt of those subsidies on the new generator selling capacity into a FERC-regulated wholesale auction." *Hughes* at 1292. The Court explicitly cautioned that its holding was "limited" and that "[n]othing in [its] opinion should be read to foreclose Maryland and other states from encouraging production of new or clean generation through measures untethered to a generator's wholesale market participation." *Id.* at 1299; *see also id.* at 1300 (Sotomayor, J., concurring).

Seizing on a single word in *Hughes*, Plaintiffs invent ways in which they believe ZECs to be "tethered" to wholesale sales. But they ignore the limiting definition the Court itself provided: "So long as a State does not condition payment of funds on capacity clearing the auction, the State's program would not suffer from the fatal defect that renders Maryland's program unacceptable." *Id.* at 1299. The condition was essential to the court's reasoning and conclusion. It was only "because" payments were "conditioned on … capacity clearing the auction" that the

Court understood the payments to be "received … in connection with" those sales. *Id.* at 1297 n.9.[23]

### 1.    ZECs are not tethered to wholesale auction participation.

Plaintiffs concede that the Order "does not formally mandate that ZEC recipients participate in wholesale auctions." Br. 16. They claim instead that New York had no need to do so "because both the law and the reality of their business compels it." *Id.* at 16-17.

That claim is both wrong and irrelevant. It is wrong because (as shown below) the nuclear plants can elect to sell their output in many ways, to many parties, in the NYISO auctions or outside of them. It is irrelevant because, whatever considerations might make certain sales more feasible or attractive now, the Order did not create them and is not immunizing them from change. As far as the Order is concerned, ZEC-recipient nuclear plants may sell power in any manner permitted by applicable law. Non-NYISO auction options include:

---

[23]  *See also id.* at 1292, 1295; Brief for the U.S. as Amicus Curiae at 17, *Hughes* (No. 14-614) (*Hughes* U.S. Amicus Brief), https://perma.cc/4ELB-QKCU (Subsidies raise preemption concerns when "combined with state-mandated bidding and clearing"). In *Allco* at 99, this court distinguished *Hughes* on grounds that Connecticut's procurement transferred electricity by contract, independent of the wholesale auction. New York's Order similarly "transfers ownership … independent of" wholesale auctions, but what it transfers are unbundled attributes of producing electricity by certain means, not the energy or capacity itself. ZECs are thus even further removed from *Hughes* than the energy procurement challenged in *Allco.*

*Selling by contract to LSEs or power marketers*. Plaintiffs' complaint alleged that the nuclear plants' output would be sold in NYISO auctions "directly or indirectly." A-66. The word "indirectly" acknowledges obliquely that generators may sell power to LSEs by contract, either directly or through one or more power marketers, after which the LSEs may use the power to meet their needs or sell it in the NYISO auctions to hedge their costs. *See supra*, p. 2; *see also Hughes* at 1292, 1293-94 & n.3; *FERC, Energy Primer: A Handbook of Energy Market Basics* at 57-58 (2015), https://perma.cc/97BS-CNH6. Such contract sales, which transfer capacity or energy external to the auction, are "precisely what the *Hughes* court placed outside its limited holding." *Allco* at 99; *Hughes* at 1299.

The ZEC plants indisputably may sell their output by contract. They did so for years after New York restructured its retail market and the original nuclear plant owners divested the plants. When Constellation acquired the Ginna plant from Rochester Gas & Electric Corporation (RG&E) in 2004, it agreed to sell roughly 90 percent of the plant's output to RG&E by contract for ten years. *R.E. Ginna Nuclear Power Plant, LLC*, 151 FERC ¶ 61,023, P 2 (2015). The other ZEC plants had similar contracts.[24] Going forward, whether ZEC plants sell their energy

---

[24] *Niagara Mohawk Power Corp.*, 95 FERC ¶ 62,165, at 64,245 (2001) (contracts for Nine Mile output); *Power Auth. of the State of NY*, 53 N.R.C. 488, 517 (2001) (contract for FitzPatrick output); *Entergy Nuclear FitzPatrick, LLC*, 118 FERC ¶ 62,085, at 64,222 (2007) (another FitzPatrick contract).

in NYISO auctions or by contract with individual purchasers "is a business deci-

sion … not a requirement imposed by New York." SPA-20.[25]

*Retail sales.* ZEC plants also can sell their energy directly to end users. New

York is a "retail competition" state, which means that end users typically can

choose to buy power either from their local distribution utility  or from an "energy

service company" (ESCO). A-182, 183-84. Most ESCOs buy power for resale ra-

ther than generating it themselves (A-182), but nothing prohibits them from devel-

oping and owning generation. A-191. Likewise, nothing prohibits existing genera-

tion owners, including ZEC plant owners, from forming ESCOs to sell power at

retail.[26] Whether ZEC plant owners sell energy to end users or operate under some

---

[25] Amici American Petroleum Institute and Natural Gas Petroleum Association contend (API Br. 15-16) that contracts with NYSERDA, and rules of the NYSERDA-run New York Generator Attribute Tracking System (NYGATS), re-quire ZEC plants to sell in the NYISO auctions. This new argument, based on ex-tra-record matter, is both improper, *Askins v. Doe No. 1*, 727 F.3d 248, 252 (2d Cir. 2013), and wrong. Amici confuse arrangements that enable ZEC plants to sell in NYISO auctions with requirements to do so. That ZEC plants are "NYISO Genera-tors," with NYISO-assigned "Generator IDs" (see API Br. 16 n.13), and "Revenue-Quality Meter[s]" "accepted by NYISO for settlements" (*id*. at 16 n.15), means that ZEC plants can sell in the NYISO auctions—not that they must. NYGATS, the system for tracking unbundled environmental attributes, uses generation infor-mation received from NYISO and other sources; but NYISO supplying the data does not mean the output is sold in its auctions. NYISO, as transmission operator, would need to know the ZEC plants' output even if they sold nothing in the auc-tions.

[26] Exelon, through its subsidiary Constellation, already owns an ESCO that sells power to New York retail customers. Constellation's website states that it provides electricity supply to retail customers in six utility service areas encompassing al-

other arrangement is, again, a private "business decision," not a "requirement imposed by New York." SPA-20.

If retail customers choose not to buy power from an ESCO, their distribution utility supplies the power. LIPA, one such utility, co-owns one of the ZEC plants and has indicated its intent to obtain ZECs for its share of the plant's output. A-144. LIPA sells power to retail customers. A-97.

Plaintiffs allege that the generators receiving ZECs are all "Exempt Wholesale Generators" (EWGs), which requires them to sell only at wholesale and precludes retail sales. A-61. But the generation owners are not all EWGs, and, even if they were, that status is not mandatory. It simply affords an exemption from certain regulations—an exemption the generator may relinquish in order to sell to end users if it deems the tradeoff worthwhile. SPA-21.

Factual inaccuracy aside, Plaintiffs' reliance on the ZEC plants' EWG status as a tether also proves too much. If EWG status were such a tether, then, contrary to their representations (Br. 40), New York could provide no subsidy to these plants, regardless of form. And the same would be true for the myriad renewable-energy sellers that choose to be EWGs. *E.g., Madison Windpower, LLC*, 93 FERC

---

most the entire state. *See Choosing Your New York Electric and Gas Companies*, Constellation, https://perma.cc/7R3R-VYBH (last visited Nov. 14, 2017).

¶ 61,270, at 61,871 (2000). Plaintiffs' theory would imperil the RES portion of New York's Order along with an array of REC programs in other states.

### 2. Plaintiffs' other alleged tethers fail.

Plaintiffs allege two other tethers, but neither triggers preemption. First, Plaintiffs complain that ZECs are "conditioned on the inadequacy of wholesale rates" (Br. 38) to support the nuclear plants' continued operation. True: ZECs are intended to "shore up the three plants' economic performance" (*id.* at 9) and "prevent them from closing" (*id.* at 16). But that is not illegal. All production subsidies are targeted to support preferred resources that would not be developed or retained based on expected electricity-sales revenue alone. New York's decision to use ZECs to support struggling nuclear generators temporarily was not materially different from its decision to make Tier 1 RECs available only to new renewable resources—facilities which to date have not been built on the basis of expected energy and capacity revenues alone. In each case, New York focused on obtaining or retaining incremental zero-emission attributes beyond what would be secured without the program.

Second, Plaintiffs object to the ZEC pricing details. They complain that ZECs are priced administratively, while RECs (they say)[27] are priced by the mar-

---

[27] Plaintiffs overlook that states define REC products, determine which are so alike that they can substitute for each other and which should be subject to separate re-

ket. Br. 41. They also object that New York provided a mechanism to reduce ZEC payments if forecasted electricity prices rise. *Id.* at 7, 32, 38. None of this has constitutional significance, however. SPA-26 ("*WSPP* did not even … address how RECs were priced."). What matters is the field in which New York is acting. If New York were setting rates for wholesale sales, its regulation would be preempted no matter how it set those prices. Conversely, as New York is acting within its FPA-preserved jurisdiction by setting environmental-attribute prices, the FPA countenances the state's pricing mechanism.

Plaintiffs' objection to the potential ZEC price reduction beginning with Tranche 2 (e.g., Br. 38) is especially misdirected. Their argument has no application to the first two years of ZEC subsidies, and, oddly, complains about the potential for *lower* subsidies in later years. The Order creates a potential one-way adjustment, reducing ZEC prices if certain electricity-price forecasts rise. But those forecasts do not predict revenues the ZEC units actually will receive, even if they choose to sell in the NYISO auctions. *See* Br. 7 n.3 ("No subsidized plant is in Zone A.").[28]

---

quirements, and set the requirements that drive demand. *See Allco* at 93. States also let LSEs meet their obligations by making "Alternative Compliance Payments" instead of buying RECs at market prices, effectively capping those prices. A-193-194.

[28] In contrast, REC prices rise or fall in line with sellers' expectations of their actual electricity-sales revenue. New renewable generators will build facilities only if

Regardless, Circuit precedent forecloses Plaintiffs' argument that the FPA preempts adjusting state-jurisdictional rates in recognition of anticipated wholesale revenues. In *Rochester Gas & Electric Corp. v. Public Service Commission of New York*, 754 F.2d 99, 102-03 (2d Cir. 1985), this court affirmed the Rule 12(b)(6) dismissal of claims that the FPA preempted the PSC's policy of reducing retail utility rates to account for estimates of likely wholesale sales revenue. *Id.* at 100. The court held that recognizing expected wholesale revenues in setting retail rates does not "cross[] the FPA's … bright jurisdictional line and regulate[] [FERC]-jurisdictional activity." *Id.* at 103.

Plaintiffs' effort to distinguish *Rochester* depends entirely on their false premise that "the ZEC program," unlike *Rochester*, "addresses wholesale ratemaking." Br. 39. Without that false premise, *Rochester* plainly controls and forecloses their claim that the ZEC price adjustment triggers preemption. SPA-19.

Plaintiffs next attempt a sleight-of-hand. In *Rochester*, the court rejected the preemption claim in part because New York had not "ordered a utility to begin making [wholesale] sales" or made an "unreasonably high estimate" of those sales "in an effort to force the utility to change its position toward such sales." *Roches-*

---

their total expected compensation from all sources exceeds their cost of entry. The long-term marginal cost of providing RECs is the difference between a new generator's expected entry cost and its expected electricity-sales revenue. *See* A-175. As wholesale prices fall, REC prices rise, and vice versa. A-211.

*ter*, 754 F.2d at 102. Plaintiffs twist that language, claiming that "the *ZEC program* has a direct impact on the nuclear plants' 'position toward' the wholesale markets." Br. 39. But the question *Rochester* addressed was not whether the overall program—there, retail sales—affected the seller's position toward wholesale markets. It obviously did; retail sales are often supplied by wholesale purchases. *Rochester*'s inquiry was narrower: whether the rate *adjustment*, recognizing expected wholesale sales revenues, forced the utility to make wholesale sales. The analogous question here would be whether the potential ZEC price reduction forces recipients to make wholesale sales, and it obviously does not. The reduction is neither triggered nor affected by how much energy (if any) the ZEC plants sell at wholesale.

### 3. Plaintiffs' "practical effect" argument ignores the bright line between state and federal FPA fields.

While Plaintiffs concede that ZECs are not "expressly conditioned on clearing the auction" (Br. 34), they contend that ZECs must be preempted anyway because their "practical effect" is to regulate prices for wholesale sales. Br. 35. We explained above why the underlying factual premise—that ZEC plants must "sell [their output] in the FERC auctions" (Br. 37)—is implausible. Nor does it matter that, with the ZECs, nuclear plants might sell power in the FERC auctions when, without them, they would retire and sell none. In light of the FPA's careful intertwining of state and federal roles, FPA field preemption analysis focuses on what

41

the state has regulated, not whether it affects—or even whether it is intended to affect—wholesale sales.

A pair of Supreme Court cases, both addressing Kansas's efforts to regulate the rate at which gas was withdrawn from in-state wells, exemplifies the inquiry.[29] In *Northern Natural*, on which Plaintiffs rely (Br. 35-36), Kansas sought to address problems created by the unequal rates at which different wells drew gas from a common field, and directed an interstate pipeline company to purchase gas ratably from all wells connected to its system. *Northern Natural* at 85-86. The Court held Kansas's law preempted because it did not regulate gas production (*id.*) but, rather, was "unmistakably and unambiguously directed at *purchasers* [i.e., interstate pipelines] who take gas in Kansas for resale after transportation in interstate commerce." *Id.* at 92. The purchaser pipelines, not the producers, were subject to criminal sanctions for noncompliance with the law. *Id.*[30] The Court explained that its cases "consistently recognize[] a significant distinction," with "constitutional con-

---

[29] The Supreme Court has "routinely relied on NGA cases in determining the scope of the FPA." *Hughes* at 1298 n.10.

[30] And compliance would be difficult: The pipeline had FERC-filed contracts obligating it to buy as much gas as one producer (Republic) could supply and the remainder of its needs from other producers. *Id.* at 87. The pipeline could comply with the state's directive only by breaching its Republic contract (buying less than that producer could supply) or increasing purchases from other producers and buying more gas in total than it needed. *Id.* at 89.

sequences, between conservation measures aimed directly at interstate purchasers and wholesales for resale, and those aimed at producers and production." *Id.* at 94.

This distinction yielded the opposite result in *Northwest Central*, when Kansas again sought to "persuad[e] [the purchasers] to take additional [Kansas-Hugoton] gas,"[31] but this time by regulating *producers*. Kansas subjected producers directly (and purchaser pipelines indirectly) to a use-it-or-lose-it policy: If the producers' wells did not produce their allowable quantity of gas within certain time frames, they would lose the right to produce it (and the pipelines could not purchase it) later. *Northwest Central* at 497, 505. The pipelines asked the U.S. Supreme Court to invalidate the regulation "because it exert[ed] pressure" on them to "increase purchases from Hugoton producers" (*id.* at 497). Relying on *Northern Natural*, the pipelines made the same argument Plaintiffs advance here: that federal law preempts state regulations that have "either a direct or indirect effect" on matters within federal control. *Id.* at 507.

FERC argued against preemption, stating that even though Kansas "intended to influence" the pipeline's purchasing decisions, its action did "no more than fix[] limits on when producers may produce their gas," and so stayed within the state's jurisdictional limits. *Northwest* FERC Br. at *20, *31. FERC explained that state

---

[31] Brief for the U.S. and FERC as Amici Curiae at *31, *Northwest Central*, 1988 U.S. S. Ct. Briefs LEXIS 1531 (No. 86-1856) (*Northwest* FERC Br.)

regulation of production is "part of the marketplace environment in [which pipelines] make their purchasing choices" (*id.* at *20), and the fact that pipelines are federally regulated does not "protect [them] from the effects of state regulations that form the environment in which [they] conduct[] business within the state." *Id.* at *32.

A unanimous Court agreed, admonishing courts to "take seriously the lines Congress drew in establishing [this] dual regulatory system" (*Northwest Central* at 513), and take care not to diminish reserved state powers through "extravagant" interpretation of the scope of the federal field. *Id.* at 512. The Court recognized that it would be "strange indeed" to hold that Congress reserved state authority to regulate production—but only if it had no effect on subsequent sales. *Id.* at 512-13. Instead, Congress drew "a brighter line … more favorable to the States' retention of their traditional powers." *Id.* at 514. Whereas Kansas in *Northern Natural* "crossed the dividing line … by imposing purchasing requirements on interstate pipelines," in *Northwest Central* the state achieved the same end by "regulat[ing] production," a matter "firmly on the States' side of that dividing line," so the Court sustained its order. *Id.* Plaintiffs' "practical effect" field preemption argument is squarely contrary to *Northwest Central*.[32]

---

[32] The Court's more recent, FPA preemption cases maintain the same focus on what the state has regulated, not how it affects the FERC-regulated market. In *Oneok*,

### C. The Order is not conflict preempted.

State law may be preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes" of federal law, *Oneok*, 135 S. Ct. at 1595, or "interferes with the method by which the federal statute was designed to reach this goal," *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). But Congress's adoption of the FPA's "dual regulatory scheme" significantly tempers the analysis. Under the FPA, conflict preemption "must be applied sensitively … so as to prevent the diminution of the role Congress reserved to the states while at the same time preserving the federal role." *Northwest Central* at 514-15; *accord Hughes* at 1300 ("Pre-emption inquiries related to such collaborative programs are particularly delicate.") (Sotomayor, J., concurring). Where a state "regulate[s] production or other subjects of state jurisdiction" in pursuit of "matters of legitimate state concern," there is no conflict preemption "unless clear damage to federal goals would result." *Northwest Central* at 518, 522. Plaintiffs run roughshod over this delicate inquiry.

In the FPA, Congress sought to ensure, through FERC's supervision, that rates for wholesale sales would remain just, reasonable, and not unduly discrimina-

---

*Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015), the Court held that State antitrust laws regulating "all businesses in the marketplace" did not intrude into FERC's field (*id.* at 1601), even as later applied to interstate pipeline conduct that FERC already regulated due to its effect on jurisdictional prices (*id.* at 1597-98). In *Hughes*, by contrast, Maryland intruded into FERC's field by conditioning state payments on completion of sales in FERC wholesale auctions. *Hughes* at 1299.

tory (16 U.S.C. § 824d(a)), while simultaneously preserving state authority to regulate generation facilities, utility "generation and resource portfolios," and retail sales. *Id.* § 824(b); *New York*, 535 U.S. at 24. Within this reserved state field, New York has acted to protect its citizens' health and environment by delaying retirement of needed nuclear plants and the loss of their zero-emission energy. The ZEC program is entirely consistent with Congress's purposes.

Contrary to Plaintiffs' view, FERC has not mandated that auction price signals be the sole determinants of generator entry and exit. FERC has made clear that the products sold in its markets are undifferentiated commodity products. For FERC's purposes, all megawatt-hours are the same, regardless of whether they are produced by burning coal, splitting atoms, or converting sunlight to electricity. *E.g.*, *ISO New England Inc.*, 138 FERC ¶ 61,027, ¶ 91 (FERC markets "[have] no feature to explicitly recognize … environmental or technological goals.").

FERC instead recognizes that environmental objectives are within the states' role as regulators of generation facilities and retail sales. Just as states may tax generators for emitting pollutants, they may subsidize other generators for avoiding those emissions. *Supra*, pp. 5–7. FERC has expressly approved, and has acted in its regulatory sphere to facilitate, state clean energy programs.[33] While these programs

---

[33] *See ISO New England Inc.*, 155 FERC ¶ 61,023, P 23 (2016) (exempting certain renewable resources favored by state policy from wholesale market offer rules be-

potentially *affect* the FERC auctions, they do not interfere with FERC's effort to ensure that the wholesale auctions themselves remain fuel-neutral marketplaces for commodity energy.

Unsurprisingly, FERC already has rejected the core of Plaintiffs' conflict preemption argument. Plaintiffs complain that the ZEC "subsidy enables the unprofitable plants to keep dumping substantial amounts of electricity into the FERC markets for over a decade, even though the FERC-approved price signals should cause the plants to retire." Br. 46. But as FERC told the Supreme Court in *Hughes*, states may procure generation resources "even if the price signals in the regional wholesale capacity market indicate that no [such] resources are needed." *Hughes* U.S. Amicus Brief at 33; *see also New England Power Generators Ass'n*, 757 F.3d at 291 ("[S]tates remain free to subsidize the construction of [preferred] generators" while FERC regulates how they bid in wholesale markets and affect prices); *New England States Comm. on Elec. v. ISO New England Inc.*, 142 FERC ¶ 61,108, at 61,490 (2013) (LaFleur, Comm'r, concurring) ("[S]tates have the un-

---

cause FERC balances multiple concerns, including "accomodat[ing] the ability of states to pursue their policy goals"), *reh'g denied*, 158 FERC ¶ 61,138 (2017), *appeal pending sub nom. NextEra Energy Resources, LLC v. FERC*, No. 17-1110 (D.C. Cir. filed Apr. 3, 2017); *PJM Interconnection, L.L.C.*, 135 FERC ¶ 61,022, P 143 (acknowledging state rights "to pursue legitimate policy interests"), *on reh'g*, 137 FERC ¶ 61,145, P 3 (2011) ("[S]tates and localities have their own policies and objectives," which may not be reflected in the wholesale market design and with which FERC intends not to "unreasonably interfere"), *aff'd sub nom. N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74 (3d Cir. 2014).

questioned right to make policy choices through the subsidization of capacity."),
*reh'g denied*, 151 FERC ¶ 61,056 (2015). Plaintiffs' efforts to sidestep this prece-
dent depend on recycling their field preemption claim that the ZEC subsidy, unlike
others, is impermissibly tethered to the wholesale auctions. *See* Br. 47, 48. But the
argument is no more valid the second time around.

Finally, Plaintiffs claim that subsidizing the ZEC plants' continued produc-
tion of zero-emission energy "distort[s] price signals to all other wholesale genera-
tors by encouraging the favored generators to bid as price takers and thereby artifi-
cially depress market prices." Br. 46. But, subsidy or not, most existing generators
bid as price takers,[34] as these same plants did before receiving ZECs, A-51. And,
subsidy or not, the NYISO tariff allows them to do so. *Id.*[35] Certain Plaintiffs have
asked FERC to change the rules for ZEC plants, but so far FERC has declined.[36] It
is hard to see how Plaintiffs can complain about receiving "artificially depress[ed]"

---

[34] *See New York Indep. Sys. Operator, Inc.*, 131 FERC ¶ 61,170, P 20 (2010); *DC
Energy, LLC v. H.Q. Energy Servs. (U.S.) Inc.*, 124 FERC ¶ 61,295, at 62,659
(2008).

[35] As FERC's past Chairman emphasized, "all energy resources" receive subsidies
and some "have received [them] for decades." *N.Y. State Pub. Serv. Comm'n v. N.Y.
Indep. Sys. Operator, Inc.*, 158 FERC ¶ 61,137, at 61,865 (2017) (Bay, Chairman,
concurring). "[A]n idealized vision of markets" free from the "pervasive" influence
of "public policies that support [generation] resources" does not exist. *Id.*

[36] *Indep. Power Producers of New York, Inc. v. New York Indep. Sys. Operator,
Inc.*, Request for Expedited Action, FERC Docket No. EL13-62-002 (Jan. 9, 2017),
eLibrary No. 20170109-5121, https://elibrary.ferc.gov/idmws/common/opennat.
asp?fileID=14461776.

48

auction prices when those rates are "established via the FERC-approved auction process" and are "by definition the rates that FERC has determined to be just and reasonable." Br. 30.

## IV. THE ZEC PROGRAM DOES NOT VIOLATE THE COMMERCE CLAUSE.

As relevant here, a state law violates the dormant Commerce Clause "only if it (1) 'clearly discriminates against interstate commerce in favor of intrastate commerce,' [or] (2) 'imposes a burden on interstate commerce incommensurate with the local benefits secured[.]'" SPA-37; *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009). The district court dismissed Plaintiffs' Commerce Clause claim on standing grounds. SPA-40. On the merits, it held that Plaintiffs stated no claim because a pure subsidy uncoupled from a discriminatory tax "ordinarily imposes no burden on interstate commerce, but merely assists local businesses," SPA-46 (quoting *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 199 (1994)). The court also was "skeptical" of Plaintiffs' claims that ZECs discriminated against or imposed an undue burden on interstate commerce, as the "alleged harm is not disparate—it affects in-state and out-of-state power plants equally." SPA-47 n.36.

This court should affirm. New York stands on the district court's lucid justification of its standing determination and its holdings based on *West Lynn Creamery* and *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976), but amplifies here the court's last point, which is an independent basis for sustaining its judgment: the

Order neither discriminates against nor imposes an undue burden on interstate commerce.

### A.    Plaintiffs have abandoned their eligibility claim.

Plaintiffs' complaint stated a garden variety denial-of-eligibility claim: the "Order is directly discriminatory because … only … New York nuclear facilities are eligible to receive ZECs." A-78. The district court rejected this claim on multiple grounds, including that Plaintiffs did not "own or represent an out-of-state nuclear plant." SPA-40. Plaintiffs now waive the claim: "Plaintiffs do not complain about an inability to compete for ZECs." Br. 54.

Plaintiffs instead contend that the Order "attempt[s] to insulate [ZEC recipients] from the rigors of interstate competition" in the wholesale energy market. Br. 49. They now allege discrimination against "out-of-state generators in the NYISO auctions." *Id.* at 52. But that claim also fails.

### B.    The Order does not discriminate against interstate commerce.

*The Order is not facially discriminatory*. ZECs are available to at-risk nuclear plants, wherever located, that have contributed energy to the state's power supply. A-103, 211-12. That the first plants to qualify are in New York reflects trading patterns that pre-date the Order—not state-imposed geographic limits. *Allco* at 107 (state program "makes geographic distinctions … only insofar as it piggybacks on top of geographic lines drawn by ISO-NE and the NEPOOL-GIS … not the state

50

of Connecticut."). If out-of-state nuclear plants begin supplying zero-emission energy to New York and that supply becomes jeopardized, those plants could qualify for later tranches. A-104, 254. Neither legal nor technical impediments prevent nuclear plants from selling across state lines.[37]

Limiting ZEC eligibility to nuclear plants is of no moment; singling out a preferred technology does not violate the Commerce Clause. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 473 (1981). Besides, the Order *in toto* is not limited to nuclear energy. The Order also includes a Renewable Energy Standard that provides RECs to renewable-energy resources that commenced operation after January 1, 2015, in New York or an adjacent region, when those resources produce energy for sale or resale to a New York retail customer. A-249.

*The Order evinces no discriminatory purpose.* Plaintiffs baldly assert that the ZECs are intended to favor New York power plants and "thereby preserv[e] local jobs and tax revenue." Br. 49-50. But the Order shows that New York's purpose was to avoid the "increased air emissions" that would result from losing zero-emission nuclear energy and replacing it with fossil-fuel energy before development of adequate new renewable resources between now and 2030. SPA-6 (quoting

---

[37] *See Petition of Green Mountain Power Corp.*, Order at 1-2, 4-5, Docket No. 8445 (Vt. Pub. Serv. Bd. July 9, 2015) (authorizing Vermont utility to buy capacity and energy from New Hampshire nuclear plant); *Midcontinent Indep. Sys. Operator, Inc.*, 161 FERC ¶ 61,056, PP 9, 34 (2017) (enabling nuclear plant in PJM to sell capacity and energy in an adjacent regional market).

Order, A-103). New York's articulated purpose—not Plaintiffs' breezy claim of protectionism—is controlling. *Clover Leaf Creamery*, 449 U.S. at 463 n.7. Plaintiffs allege nothing that compels a conclusion that protecting New York's air quality and public health "could not have been a goal." *Id.*[38]

*The Order is not discriminatory in effect*. That the Order favors zero-emission energy over polluting energy does not make it discriminatory for Commerce Clause purposes. Commodity wholesale energy, on the one hand, and unbundled zero-emission attributes procured through the ZEC program, on the other, are separate products sold in different markets and are not similarly situated for purposes of Commerce Clause analysis. *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 310 (1997).

And any downstream effect of the CES Order is geographically neutral. The burden of competing against subsidized zero-emission resources falls equally on pollution-emitting resources in and out of New York. *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 212 (2d Cir. 2003) (rejecting discriminatory effect claim where in-state and out-of-state shippers "face the same difficulties" un-

---

[38] "Whether or not one agrees with the science underlying [New York's] views [of GHG regulation], those determinations are permissible ones for [New York] to make, and the Supreme Court has recognized that these risks constitute local threats." *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1106 (9th Cir. 2013). Here, Plaintiffs concede the "import[ance]" of "reduc[ing] … carbon emissions." A-77.

der state statute); *N.Y. Pet Welfare Ass'n v. New York*, 850 F.3d 79, 90 (2d Cir. 2017) (Commerce Clause "protects the interstate market, not particular interstate firms.").

*Allco dictates dismissal of Plaintiffs' claims.* If any question remained about the merits of Plaintiffs' discrimination claim, this court's recent *Allco* decision laid it to rest. *Allco* considered whether Connecticut discriminated against interstate commerce by applying geographic limits to RECs credited toward meeting local utility renewable-energy requirements. *Allco* at 102. A renewable-energy developer of a Georgia solar project complained that Connecticut's refusal to credit the plant's RECs discriminated against interstate commerce. *Id.* at 103. The court disagreed, holding that Connecticut "[did] no more than treat different products differently in a nondiscriminatory fashion." *Id.* Application of the *Allco* analysis here leads to the same result.

*Allco* considered whether "two allegedly similar products," Connecticut-eligible RECs and Georgia RECs, were "substantially different for the purposes of the dormant Commerce Clause because they served two different markets." *Id.* at 104. To do so, the court asked four questions. First, do "the allegedly competing entities … provide different products"? *Allco* answered affirmatively, holding that as the Connecticut-invented RECs were different from those produced by the Georgia facility, the two RECs can be "treated as different, even though they …

also have some underlying similarities." *Id.* at 105. Here, the difference is far starker. ZECs and RECs represent the environmental attributes of nuclear and non-nuclear zero-emission resources. Ineligible, "higher-emitting resources" (A-221) provide no comparable attributes.

Second, the court asked "whether there is a market that only one of the two entities serves, and in which competition would not be increased if the differential treatment of the two entities were removed." *Allco* at 105. *Allco* answered affirmatively, finding that the needs of Connecticut consumers for renewable supplies "would not be served by RECs produced by Allco's facility in Georgia—which is unable to transmit its electricity into [New England]." *Id.* Similarly here, "higher-emitting" generation (whether in-state or out-of-state) cannot serve New York's needs for zero-emission power. Purchasing ZECs forestalls temporarily the retirement of recipient nuclear plants and avoids the annual emission of more than 15 million tons of carbon dioxide. A-103. If those resources retired, they would be replaced in the short term almost entirely by fossil-fuel generation, producing a spike in carbon dioxide and other emissions. A-87, 103. Plaintiffs seek relief that would defeat the environmental and health rationales for zero-emission power.

Third, *Allco* asked whether there is "also a separate market in which these two types of producers compete, and in which competition potentially would be served if [the state] were prohibited from treating them disparately." *Allco* at 106.

In *Allco*, the court focused on the "national market for RECs that does not distinguish between RECs on the basis of their geographic origin." *Id.* Plaintiffs here point to New York's fuel-neutral wholesale electricity market. But it is not clear that eliminating ZECs would enhance competition in that market. ZECs address a "well-recognized externality," the failure to internalize the full social cost of power plant emissions, which can lead to the "uneconomic loss of significant zero-emissions attributes." A-217. In this case, absent ZECs, New York could lose zero-emission generation comprising a substantial portion of its power supply, which would increase market concentration, supplier market power, and dependence on delivery-constrained natural gas supplies. In light of this, NYISO, the market operator, has indicated that it supports using ZECs to retain the nuclear plants until longer-term solutions are in place. ECF 105, at 13-14 & n.11; ECF 55-1, at 244.[39]

In any case, the court need not worry that ZECs might affect wholesale auctions negatively. ZECs can affect NYISO auctions only as permitted by FERC, "which … tightly controls the [NYISO] auction process." *Simon v. Keyspan Corp.*, 694 F.3d 196, 207 (2d Cir. 2012). To the extent FERC chooses to do so, it is fully

---

[39] Plaintiffs also cannot explain why ZEC units' auction participation allegedly interferes with interstate commerce but participation of REC subsidized resources does not.

empowered to address the incidental, wholesale market impacts of ZEC-subsidized units.[40]

Last, *Allco* asked which of the two markets—the Connecticut and national REC markets—should be given "controlling significance" in dormant Commerce Clause analysis. *Allco* held that Connecticut's "legitimate interest in promoting increased production of renewable power generation in the region, thereby protecting its citizens' health, safety, and reliable access to power" counseled giving such "significance" to the Connecticut-created market that the Georgia facility could not reach. *Allco* at 106-07. The same is true here. As in *Allco*, New York's ZEC program furthers a "legitimate state interest" of environmental protection "relating to the health, life and safety of [its] citizens." *Id.* at 108. Because the controlling market for Commerce Clause purposes is the market for ZECs, ZEC-eligible nuclear facilities are sufficiently different from other, higher-emitting resources "that the enterprises should not be considered 'similarly situated'" for purposes of dormant Commerce Clause analysis. *Id.* at 107.

---

[40] FERC is fulfilling its duty to ensure that wholesale rates for undifferentiated energy and capacity remain just, reasonable, and not unduly discriminatory. *State Policies & Wholesale Mkts. Operated by ISO New England Inc., et al.*, Supplemental Notice of Technical Conference, Docket No. AD17-11-000 (Apr. 28, 2017), eLibrary No. 20170428-3062.

**C.    The Order does not unduly burden interstate commerce.**

The ZEC program likewise imposes no burden on interstate commerce, let alone one "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

This court "recognize[s] three types of 'incidental' burdens: regulations that have a disparate impact on in- versus out-of-state entities, laws that regulate beyond the state's borders, and laws that create regulatory inconsistencies between states." *N.Y. Pet Welfare Ass'n*, 850 F.3d at 91. Plaintiffs have not pled (and, so, have waived) the second and third theories. And as to the first, Plaintiffs "fail[ed] sufficiently to allege that the burden" of the Order "will fall disproportionately on out-of-state [generators]." *Id.* The alleged burden of competing against subsidized New York generators (whether that subsidy is a ZEC, a REC, or something else) is no greater for unsubsidized generators outside the state than unsubsidized generators within it.

Moreover, as in *Allco*, "the same reasons discussed above" show that any "burden imposed by [New York's ZEC] program is also not 'clearly excessive in relation to the putative local benefits,' and therefore passes the more permissive *Pike* test." *Allco* at 107. As the Supreme Court has recognized, the FPA preserves state authority to regulate energy production, and Congress "cannot but have contemplated that state oversight of production would have some effect on interstate

57

commerce." *Northwest Central* at 524. There would be "little point" to reserving state "power over production rates if the inevitable repercussions of States' exercise of this power in the arena of interstate commerce meant a State could not constitutionally enforce its … orders." *Id.* Whatever burden may result from the Order—or from the federally permitted participation of ZEC-recipient generators in NYISO auctions—does not "override the State's weighty interest" (*id.* at 526) in addressing global warming and avoiding the more immediate harms from burning fossil fuels.

## CONCLUSION

The district court's dismissal of Plaintiffs' preemption and Commerce Clause claims should be affirmed.

Respectfully submitted,


*/s/ Scott H. Strauss*
_____

| | |
|---|---|
| Scott H. Strauss | Paul Agresta, General Counsel |
| Peter J. Hopkins | John Sipos, Deputy General Counsel |
| Jeffrey A. Schwarz | John C. Graham |
| Amber L. Martin | PUBLIC SERVICE COMMISSION |
| SPIEGEL & MCDIARMID LLP | OF THE STATE OF NEW YORK |
| 1875 Eye Street, NW, Suite 700 | Three Empire State Plaza |
| Washington, DC 20006 | Albany, New York 12223-1350 |
| (202) 879-4000 | (518) 474-5597 |

*Attorneys for Defendants-Appellees*

Dated: November 17, 2017

## **CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)**

1.   This brief complies with the type-volume limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted Fed. R. App. P. 32(f), this document contains 13, 809 words, as determined by Microsoft Word 2010.

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

*/s/ Scott H. Strauss*
Scott H. Strauss

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that true and accurate copies of the foregoing brief were filed electronically on November 17, 2017. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/Scott H. Strauss*
Scott H. Strauss