# 17-2654-cv

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

COALITION FOR COMPETITIVE ELECTRICITY, DYNEGY INC.,
EASTERN GENERATION, LLC, ELECTRIC POWER SUPPLY
ASSOCIATION, NRG ENERGY, INC., ROSETON GENERATING LLC,
SELKIRK COGEN PARTNERS, L.P.,

*Plaintiffs-Appellants*,

v.

AUDREY ZIBELMAN, in her official capacity as Chair of the New York Public
Service Commission, PATRICIA L. ACAMPORA, in her official capacity
as Commissioner of the New York Public Service Commission, GREGG C.
SAYRE, in his official capacity as Commissioner of the New York Public Service
Commission, DIANE X. BURMAN, in her official capacity as Commissioner of
the New York Public Service Commission,

*Defendants-Appellees*,

EXELON CORP., R.E. GINNA NUCLEAR POWER PLANT LLC,
CONSTELLATION ENERGY NUCLEAR GROUP, LLC,
NINE MILE POINT NUCLEAR STATION LLC,

*Intervenors-Defendants-Appellees.*

*On Appeal from the United States District Court
for the Southern District of New York (Caproni, J.)*

### BRIEF FOR INTERVENORS-DEFENDANTS-APPELLEES

Matthew E. Price
David W. DeBruin
Zachary C. Schauf
William K. Dreher
JENNER & BLOCK LLP
1099 New York Ave. NW Ste. 900
Washington, D.C. 20001
(202) 639-6000

*Counsel for Intervenors-Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Intervenors-Defendants-Appellees make the following disclosures:

Constellation Energy Nuclear Group, LLC, is not a public company. Exelon Corporation indirectly owns a 50.01% share in Constellation Energy Nuclear Group, LLC, and is publicly held. Électricité de France SA indirectly owns a 49.99% share in Constellation Energy Nuclear Group, LLC, and is publicly held.

Exelon Corporation is a publicly held company. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

R.E. Ginna Nuclear Power Plant LLC is not a public company. Its indirect parent, Constellation Energy Nuclear Group, LLC, is indirectly owned by Exelon Corporation and Électricité de France SA, two publicly held companies.

Nine Mile Point Nuclear Station LLC is not a public company. Its indirect parent, Constellation Energy Nuclear Group, LLC, is indirectly owned by Exelon Corporation and Électricité de France SA, two publicly held companies.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .................................................... i

TABLE OF AUTHORITIES .......................................................... iv

STATEMENT OF THE CASE ..................................................... 1

    A.    The FPA's Cooperative Federalism. ........................................... 5

    B.    The ZEC Program. ................................................... 8

    C.    Administrative Remedies. ........................................12

SUMMARY OF ARGUMENT ........................................13

ARGUMENT ...................................................14

I.    Plaintiffs Lack a Preemption Cause of Action. ....................................14

    A.    Plaintiffs Do Not Seek Relief That Courts of Equity Historically Provided. ........................................15

    B.    Congress Intended to Foreclose Suits of This Type. ..................16

    C.    The FPA's Jurisdictional Provision Is a Red Herring. ..............23

II.    Plaintiffs' Field Preemption Claim Was Properly Dismissed............. 25

    A.    The ZEC Program Lawfully Regulates Production. ................. 27

        1.    States May Regulate Production, Regardless of Whether Generators Sell at Wholesale............................ 27

        2.    FERC Has Upheld Environmental Credit Programs Tied to Production—Even When Electricity Is Sold at Wholesale. ........................................ 29

        3.    *Hughes* Confirms the ZEC Program Is Valid. ................. 32

        4.    *Hughes* Prevents States from Regulating Through the FERC Auctions. ........................................ 34

    B.    Plaintiffs' Attempts to Broaden *Hughes* Are Meritless. ........... 35

      1.     ZEC Plants Do Not Sell Exclusively at Wholesale and, Regardless, That Would Not Matter. ............................... 36

      2.     Plaintiffs' Arguments About the ZEC Price Are Meritless. ............................................................................. 43

III.    Plaintiffs' Conflict Preemption Claim Was Properly Dismissed. ....... 50

IV.   Plaintiffs' Dormant Commerce Clause Claim Was Properly Dismissed. ...........................................................................................57

    A.    Plaintiffs Lack Standing. ...........................................................57

    B.    The Dormant Commerce Clause Does Not Apply to Subsidy Programs Like the ZEC Program. ............................................. 59

    C.    Plaintiffs' Discrimination Claim Fails. ......................................61

    D.    Plaintiffs' *Pike* Claim Fails........................................................ 64

CONCLUSION ............................................................................................. 65

# TABLE OF AUTHORITIES

## CASES

*Advanced Energy Management Alliance v. FERC*, 860 F.3d 656 (D.C. Cir. 2017) ................................................................. 56

*Allco Finance Ltd. v. Klee*, 805 F.3d 89 (2d Cir. 2015) .............................. 20

*Allco Finance Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017) ............................................... 34, 35, 40, 41, 53, 63, 64, 65

*Allco Finance Ltd. v. Klee*, No. 15-cv-608, 2016 WL 4414774 (D. Conn. Aug. 18, 2016), *aff'd on other grounds*, 861 F.3d 82 (2d Cir. 2017) ....... 60

*Allen v. Wright*, 468 U.S. 737 (1984) ..................................................... 45, 58

*Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015) ...... 14, 15, 16, 18, 19, 21, 22, 23, 24

*Bassler v. Central National Bank in Chicago*, 715 F.2d 308 (7th Cir. 1983) ...................................................................................... 25

*Blue Circle Cement, Inc. v. Board of County Commissioners*, 27 F.3d 1499 (10th Cir. 1994) ................................................................. 42

*C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994) .............. 61

*Calpine Corp. v. FERC*, 702 F.3d 41 (D.C. Cir. 2012) .................................. 38

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ...................................... 29-30

*Connecticut Department of Public Utility Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009) ............................................................... 6, 54

*Connecticut Light & Power Co. v. FPC*, 324 U.S. 515 (1945) ...................... 28

*Department of Revenue of Kentucky v. Davis*, 553 U.S. 328 (2008) ......... 60

*Doe v. Cuomo*, 755 F.3d 105 (2d Cir. 2014) .................................................. 44

*Eastern Kentucky Resources v. Fiscal Court of Magoffin County*, 127 F.3d 532 (6th Cir. 1997) ........................................................... 62

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393 (2d Cir. 2013) ...................................................................... 40

*FERC v. Electric Power Supply Ass'n*, 136 S. Ct. 760 (2016) ................ 33, 34

*FPC v. Southern California Edison Co.*, 376 U.S. 205 (1964) ............... 25, 41

*Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133 (2d Cir. 2016) .....................................................15, 18, 21, 25

*Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 152 F. Supp. 3d 90 (E.D.N.Y. 2015), aff'd in part, *vacated in part on other grounds*, 841 F.3d 133 (2d Cir. 2016) ............................................17

*Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707 (1985) ........................................................................ 29

*Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976)............... 59, 60, 61

*Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016) ..........................2, 5, 8, 13, 16, 19, 26, 32, 33, 34, 35, 39, 45, 46, 47

*Hunter v. FERC*, 711 F.3d 155 (D.C. Cir. 2013) ........................................ 11

*International Franchise Ass'n v. City of Seattle*, 803 F.3d 389 (9th Cir. 2015) ................................................................................. 62

*Johnson v. United States Office of Personnel Management*, 783 F.3d 655 (7th Cir. 2015) ................................................................ 44

*L.A.M. Recovery, Inc. v. Department of Consumer Affairs*, 184 F. App'x 85 (2d Cir. 2006) ........................................................................57

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562 (2016) ......................................................................... 24

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) ................... 62

*Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246 (1951).............................................................. 22, 24

*National Solid Waste Management Ass'n v. Pine Belt Regional Solid Waste Management Authority*, 389 F.3d 491 (5th Cir. 2004) ...............57

v

*Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating District*, 673 F.3d 84 (2d Cir. 2012) .................................................. 27

*Northern Natural Gas Co. v. State Corp. Commission*, 372 U.S. 84 (1963) ............................................................................................... 43

*Northwest Central Pipeline Corp. v. State Corp. Commission of Kansas*, 489 U.S. 493 (1989)...................................................... 14, 43, 51, 55, 56

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) ...............................57, 64, 65

*PPL Energyplus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014) ............ 18-19

*Public Utilities Commission of Rhode Island v. Attleboro Steam & Electric Co.*, 273 U.S. 83 (1927)................................................................ 27

*Retail Industry Leaders Ass'n v. Fielder*, 475 F.3d 180 (4th Cir. 2007) .... 42

*Rochester Gas & Electric Corp. v. Public Service Commission of New York*, 754 F.2d 99 (2d Cir. 1985) ................................................. 27, 47, 48

*Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070 (9th Cir. 2013) ..................................................................................................... 62

*Selevan v. New York Thruway Authority*, 584 F.3d 82 (2d Cir. 2009) ..... 59

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996) ...........................17

*South Dakota Mining Ass'n v. Lawrence County*, 155 F.3d 1005 (8th Cir. 1998) ................................................................................................. 42

*Texas v. EPA*, 726 F.3d 180 (D.C. Cir. 2013) ................................................ 44

*Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979)................................ 25

*Town of Southold v. Town of East Hampton*, 477 F.3d 38 (2d Cir. 2007)...................................................................................................... 65

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Management Authority*, 550 U.S. 330 (2007) ................................................................61

*Utah Power & Light Co. v. Pfost*, 286 U.S. 165 (1932) ................................ 28

*Van Allen v. Walsh*, 370 F. App'x 235 (2d Cir. 2010)...................................57

*Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002) .............................................................. 24

*Village of Old Mill Creek v. Star*, No. 17-cv-1163, 2017 WL 3008289 (N.D. Ill. July 14, 2017), *appeal docketed*, No. 17-2433 (7th Cir. July 17, 2017) ......................................................................... 2

*Virginia Office for Protection & Advocacy v. Stewart*, 563 U.S. 247 (2011) .............................................................................. 18

*Wheelabrator Lisbon, Inc. v. Connecticut Department of Public Utility Control*, 531 F.3d 183 (2d Cir. 2008) ................................. 6, 29, 32

*Wine And Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1 (1st Cir. 2007) .......................................................................... 58

*Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627 (2013) ...................... 43

*Wyeth v. Levine*, 555 U.S. 555 (2009) ........................................ 27

## STATUTES

20 ILCS 3855/1-75(c)(1)(D) ...................................................... 49

16 U.S.C. §824(b)(1) ............................................................... 5

16 U.S.C. §824a-3(h)(2)(B) ...................................................... 20

16 U.S.C. §824d(a) ........................................................... 5, 34, 55

16 U.S.C. §824d(e) ................................................................. 17

16 U.S.C. §824e ..................................................................... 17

16 U.S.C. §824e(a) ................................................................. 17

16 U.S.C. §824*l*(b) ................................................................. 19

16 U.S.C. §825m(a) ................................................................ 19

16 U.S.C. §825p ............................................................. 23, 24, 25

28 U.S.C. §41(1) (1934) ........................................................... 25

28 U.S.C. §1331 ................................................................. 24, 25

Del. Code Ann. tit. 26, §351 .......................................................... 50

Md. Code Ann., Pub. Util. §7-704.1................................................ 49

N.H. Rev. Stat. Ann. §362-F1 ...................................................... 50

N.J. Stat. Ann. § 48:3-87.1 ........................................................... 49

R.I. Gen. Laws §39-26-1(e)........................................................... 50

## LEGISLATIVE MATERIALS

H.R. Rep. No. 74-1318 (1935)....................................................... 28

S. Rep. No. 74-621 (1935) ............................................................. 28

## ADMINISTRATIVE RULINGS

*California Independent System Operator Corp.*, 141 FERC ¶61,237 (2012) .................................................................................. 6

*California Independent System Operator Corp.*, 145 FERC ¶61,254 (2013) ............................................................................... 7, 54

*California Public Utilities Commission*, 132 FERC ¶61,047 (2010) ............ 17

*California Public Utilities Commission*, 133 FERC ¶61,059 (2010)5, 29, 34, 53

*Edison Electric Institute*, 69 FERC ¶61,344 (1994) ....................................... 6

*Entergy Nuclear FitzPatrick, LLC*, 118 FERC ¶62,085 (2007) .................. 37

*ISO New England Inc.*, 158 FERC ¶61,138 (2017) ...................................... 39

*New York State Public Service Commission*, 158 FERC ¶61,137, 2017 WL 496267 (2017) .................................................................. 52

*Nine Mile Point Nuclear Station, LLC v. Niagara Mohawk Power Corp.*, 110 FERC ¶61,033 (2005)............................................. 37

*R.E. Ginna Nuclear Power Plant, LLC*, 151 FERC ¶61,023 (2015) ................................................................................... 37

*Southern California Edison Co.*, 71 FERC ¶61,269 (1995) .................... 53-54

*Transmission Planning & Cost Allocation*, 139 FERC ¶61,132 (2012) ..... 5, 6

*Utilization of Electric Storage*, 158 FERC ¶61,051 (2017) ........................5, 53

*West-Wide Must-Offer Requirements*, 157 FERC ¶61,051 (2016) ...............31

*WSPP, Inc.*, 139 FERC ¶61,061 (2012) .........6, 7, 13, 26, 29, 30, 31, 41, 49, 55

**OTHER AUTHORITIES**

18 C.F.R. §366.7(c)(3) ................................................................. 38

18 C.F.R. §366.7(e) ...................................................................... 38

Lowell E. Alt, Jr., *Energy Utility Rate Setting* (2006) ................................ 48

Amicus Br. of United States, *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016), 2016 WL 344494 ................................... 32, 35, 39

EWG Notification, Docket EG00-53-000 (FERC Feb. 9, 2009) ................ 38

Notice Inviting Post-Technical Conference Comments, Docket No. AD17-11-000 (FERC May 23, 2017) ...........................................13

Notice of Technical Conference, Docket No. AD17-11-000 (FERC Mar. 3, 2017)...............................................................................12

Regional Greenhouse Gas Initiative, *Memorandum of Understanding* (Dec. 20, 2005), https://www.rggi.org/design/history/mou ................. 6

Request for Expedited Action, *IPPNY, Inc. v. NYISO, Inc.*, Docket EL13-62-002 (FERC Jan. 9, 2017) ..........................................12

Transcript of Oral Argument, *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016), http://bit.ly/2q6rjeq ............................................................ 47

WSPP Submission, *WSPP, Inc.*, Docket ER12-1144-000 (FERC Feb. 22, 2012) ........................................................................... 7, 30

## STATEMENT OF THE CASE

Nuclear power plants, like renewable ones, produce electricity without emitting carbon or other air pollutants. Yet those benefits are at risk. Many nuclear plants have been forced to retire prematurely and have been replaced by polluting fossil-fuel plants, resulting in spiking carbon emissions. New York's Zero Emissions Credit ("ZEC") Program rewards the production of nuclear power—just as New York and many other States have done for wind and solar power—in order to avoid the negative environmental consequences of further nuclear plant retirements.

The Program falls within New York's authority. When Congress enacted the Federal Power Act ("FPA") in 1935, States had been regulating electricity's production for decades, and Congress did not want to disturb that authority. So, the FPA preserved state authority over production even as it established federal authority over wholesale sales. Production of electricity often goes hand-in-hand with wholesale sales, because electricity must be consumed instantaneously. But States nevertheless often impose costs on, or provide benefits to, power plants for each megawatt-hour ("MWh") of electricity produced. These state actions affect wholesale markets. But the law is clear that States retain authority over power plants even when these facilities sell output exclusively at wholesale, and even when States impose

1

burdens or bestow benefits on a per-MWh basis.

States often exercise this authority to protect the environment and citizens' health. States regulate and tax electricity production by polluting plants. For example, "cap-and-trade" programs require polluters to purchase allowances for each MWh produced. Conversely, States grant loans, subsidies, or tax credits to promote clean electricity production. For example, renewable energy credit ("REC") programs subsidize each MWh produced by renewable technology. The Federal Energy Regulatory Commission ("FERC") has acknowledged States' authority over these programs.

As the district court held, the ZEC Program respects the jurisdictional line entrenched in the FPA and applied in *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016).[1] When States condition taxes or subsidies on electricity's *production*, they act within their sphere. But if States condition taxes or subsidies on the generator selling in FERC's wholesale auctions, they enter FERC's turf, because they are really paying for auction sales. Thus *Hughes* struck down a subsidy because it "condition[ed] receipt" on auction sales—the subsidy's "fatal defect." *Id.* at 1292, 1299. That condition is absent

---

[1] A similar Illinois program was upheld in *Village of Old Mill Creek v. Star*, No. 17-cv-1163, 2017 WL 3008289 (N.D. Ill. July 14, 2017), *appeal docketed*, No. 17-2433 (7th Cir. July 17, 2017).

here. ZECs are created when emissions-free electricity is produced, regardless of how it is sold.

Plaintiffs concede the Program "does not expressly mandate" that ZEC plants "bid into the [FERC] auctions." Appellants' Br. ("Br.") 8. Yet they contend the Program is field preempted for two other reasons.

First, they assert that in practice, ZEC plants will sell all their electricity into FERC's auctions, Br. 8, so every ZEC will correspond to an auction sale—even though the State does not require it. Br. 32. But the Public Service Commission ("PSC") Order Adopting a Clean Energy Standard ("Order"), which adopted the ZEC Program, refutes Plaintiffs' premise. Long Island Power Authority ("LIPA") owns part of one ZEC plant and sells its share of that plant's electricity at *retail* to its Long Island customers. That plant receives ZECs for that electricity. Plants also receive ZECs for electricity sold via bilateral contracts outside the auctions. And plants receive ZECs for electricity that is immediately consumed (not sold at wholesale). That confirms that the Program provides credits for clean production, not auction sales.

Plaintiffs' legal theory is also wrong. The FPA preempts state regulation of *wholesale sales*. But it reserves state authority over power production—even when plants sell exclusively at wholesale. Thus, it is irrelevant whether ZEC plants sell their electricity at wholesale, so long as the State

does not require it. Here, New York did not compel or regulate wholesale sales. The Program achieves its environmental purpose so long as nuclear plants produce electricity, regardless of how they sell it.

Second, attempting to squeeze this case into *Hughes*, Plaintiffs argue the Program "is expressly tethered to wholesale prices resulting from the NYISO auctions," Br. 6, because the subsidy "varies inversely with FERC-approved auction rates—as market prices rise, the subsidy falls," and vice-versa. Br. 32. That misrepresents the Order. The ZEC price is based on the social cost of carbon—an independent fixed estimate of the value of pollution avoided. The credit price does not change until 2019. After that, the price is fixed for two-year intervals, and *never* "varies inversely with FERC-approved auction rates." *Id.* Instead, to keep the program affordable for consumers, the ZEC price for each interval can adjust below the social cost of carbon— never above it—based on the amount of renewable generation in New York and rough forecasts of future wholesale prices for a region of New York where no ZEC plants are located. Generators' actual wholesale revenues play no role, and there is no true-up to reconcile forecast prices with actual auction rates.

The ZEC Program is a legitimate effort to preserve carbon-free generation facilities to prevent pollution affecting New York residents. Plaintiffs

lack standing and a cause of action, but if the Court reaches the merits, it should affirm.

### A.    The FPA's Cooperative Federalism.

*FPA jurisdiction.*    "The process through which consumers obtain energy stretches across state and federal regulatory domains." *Hughes*, 136 S. Ct. at 1299 (Sotomayor, J., concurring).  States have exclusive jurisdiction over "facilities used for the generation of electric energy," including electricity production.  16 U.S.C. §824(b)(1).  FERC regulates wholesale electricity sales, ensuring "rates and charges made, demanded, or received ... for or in connection with" such sales are "just and reasonable." *Id.* §824d(a).  States regulate retail sales. *Id.* §824(b)(1).

*State regulation of production.*    States have long regulated generation facilities, and their production of electricity, in ways affecting wholesale markets.  Some States guarantee generation facilities full cost recovery, sustaining production by plants that otherwise would close. *Utilization of Elec. Storage*, 158 FERC ¶61,051, P.22 (2017).  Others "grant loans, subsidies, or tax credits" to encourage cleaner generation, *Cal. PUC*, 133 FERC ¶61,059, P.31 n.62 (2010), or impose environmental controls on, or tax, polluting generation, *Transmission Planning & Cost Allocation*, 139 FERC ¶61,132, P.5 (2012).  FERC accepts these policies, notwithstanding that they

"driv[e] significant changes in the mix of resources, resulting in the early re-tirement" of certain generators, and the preservation and entry of others. *Id.*; *Conn. DPUC v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009).

These programs often provide payments, or impose penalties, on a per-MWh basis. Cap-and-trade programs, like the Regional Greenhouse Gas Initiative ("RGGI"), which New York joined in 2005,[2] require polluting generators to purchase emissions allowances. *Cal. ISO Corp.*, 141 FERC ¶61,237, P.5 (2012). These programs impose "a per-megawatt-hour cost" that affects "energy bids from affected units," "impact[ing] ... the wholesale price." *Id.* Nonetheless, FERC has acknowledged States' authority to enact them. *Edison Elec. Inst.*, 69 FERC ¶61,344, 62,288-89 (1994).

Similarly, 29 States (including New York) provide RECs to subsidize renewable generators—to keep them operating or "induce [their] new entry." Br. 40-41. RECs are "state-created and state-issued" credits "certifying that electric energy was generated" by a renewable technology. *WSPP Inc.,* 139 FERC ¶61,061, P.21 (2012). One REC reflects one MWh of electricity produced by renewable generation. States require utilities to buy RECs, thereby paying renewable generators for each MWh produced. *Wheelabrator Lisbon, Inc. v. Conn. DPUC*, 531 F.3d 183, 186 (2d Cir. 2008).

---

[2] RGGI, *Memorandum of Understanding* (Dec. 20, 2005), https://www.rggi.org/design/history/mou.

6

In 2012, 300 utilities in the Western System Power Pool ("WSPP") asked FERC to "confirm" that "unbundled REC transactions" were "not subject to [FERC's] jurisdiction." *WSPP*, 139 FERC ¶61,061, P.9. As WSPP explained, in an "unbundled" REC transaction, RECs are "sold separately from the renewable energy that underlies [them]," whereas a "bundled" REC transaction involves the sale of both RECs *and* the underlying electricity together.[3] FERC agreed it lacked jurisdiction over unbundled REC transactions, explaining that they are not sales of "electric energy at wholesale," but rather of "state-created" certificates reflecting how electricity was *produced*. *Id.* at P.21. Therefore, FERC held, a payment for "unbundled RECs is not a charge in connection with a wholesale sale of electricity," even when the underlying renewable electricity is sold at wholesale. *Id.* at P.24.

REC programs can have massive effects on wholesale prices. FERC has recognized that because renewable generators receive RECs "in addition to market revenues," they often bid into auctions at negative prices, which has led to "*negative* clearing prices" in California and other regions. *Cal. ISO Corp.*, 145 FERC ¶61,254, PP.5, 22 (2013) (emphasis added).

---

[3] WSPP Submission at 4, *WSPP, Inc.*, Docket ER12-1144-000 (FERC Feb. 22, 2012) ("WSPP Filing"). FERC filings can be located by docket number here: https://elibrary.ferc.gov/idmws/docket_search.asp.

***Regulation of wholesale sales.*** FERC regulates wholesale elec-tricity sales. In New York, FERC sets some wholesale prices via auctions ad-ministered by the New York Independent System Operator ("NYISO"). SPA-4. NYISO administers one auction for energy and another for capacity (a commitment to provide electricity later). *Id.*; *Hughes*, 136 S. Ct. at 1293. FERC allows wholesale buyers and sellers to enter bilateral contracts—with their own price—outside the auctions. A-153; A-52 (¶35). NYISO also ad-ministers New York's transmission grid.

### B.    The ZEC Program.

In August 2016, New York adopted the ZEC Program as part of a com-prehensive energy reform aimed at reducing greenhouse-gas emissions by 40% by 2030. A-86. The Order also required REC procurements, financial support for "certain existing at-risk" renewable facilities, and support for "new offshore wind" facilities. A-86, 101-02.

The ZEC Program applies the REC model to preserve prematurely re-tiring nuclear generation. Recently, nuclear plants have been squeezed—be-tween fossil-fuel generators that do not bear the social cost of their pollution, and renewable generators that receive subsidies like RECs. But nuclear plant retirements "significantly increase[] air emissions due to heavier reliance on existing fossil-fueled plants." *Id.* For example, the ZEC plants' continued

8

operation "avoid[s] the emission of over 15 million tons of carbon dioxide per year." A-103. And the "abrupt closure of all [Germany's] nuclear plants resulted in a large increase in the use of coal, causing total carbon emissions to rise." *Id.*

To address this crisis and prevent backsliding on carbon-reduction goals, the ZEC Program "valu[es] and pay[s] for the zero-emissions attributes" of nuclear generators serving New York and at risk of retirement. A-133. A ZEC, like a REC, is a "credit for the zero-emissions attributes of one megawatt-hour of electricity production by" a participating nuclear plant. A-254.

A nuclear plant can receive ZECs "regardless of [its] location." A-208. The PSC selects plants based on five criteria: (a) "verifiable historic contribution ... to the clean energy resource mix ... in New York"; (b) degree to which projected wholesale revenues are insufficient to prevent retirement; (c) costs and benefits of ZECs relative to clean-energy alternatives; (d) impacts on ratepayers; and (e) public interest. *Id.* The PSC chose three plants—FitzPatrick, Ginna, and Nine Mile Point—to receive the first two-year "tranche" of ZECs. Other facilities may be selected for future tranches. A-104.

The New York State Energy Research and Development Authority ("NYSERDA") purchases ZECs—not electricity—from selected plants, A-103-04, and retail suppliers purchase ZECs from NYSERDA. *Id.*[4] The ZEC Program is indifferent about how plants sell electricity. In practice, ZEC plants sell electricity in a variety of ways, including outside FERC's auctions. *See infra* 37-38.

The ZEC price is capped at the social cost of carbon—a federal interagency task force's estimate of damage from carbon emissions, which the PSC used to measure the damage from nuclear plants' closure. A-215-17. The PSC then discounted that estimate to reflect the portion of carbon's social cost that nuclear plants already recover through RGGI. A-219-20. This yields the current price of $17.48, which is fixed for the Program's first two years. A-257-58.

Beginning in 2019, a new price is fixed for every subsequent two-year period. Two adjustments can reduce the ZEC price below the social cost of carbon. First, the price falls if there is "additional renewable energy penetration," A-221, reflecting that nuclear plants have less environmental value when the mix of generators that would replace them becomes cleaner.

---

[4] Retail suppliers purchase ZECs in proportion to their customers' share of statewide electricity consumption. That share does not correspond to the retail suppliers' wholesale electricity purchases. A-231-33. For example, some retail suppliers (like LIPA) generate their own electricity for their customers' consumption, rather than purchase it.

Second, to ensure the Program remains affordable even if consumers' electricity bills are forecast to rise, A-212, the price fixed for each two-year period can adjust downward based on *forecast* wholesale prices. For each two-year period, the PSC calculates one "reference price forecast" equal to the sum of forecast NYISO "Zone A" energy prices and forecast capacity prices during that period. A-222, 258-62. The "reference price forecast" is never paid to ZEC plants. Rather, it is a benchmark for reducing the ZEC price. If the reference price forecast exceeds $39/MWh (a historical approximation of Zone A energy and capacity prices), the two-year ZEC price is reduced by the difference. *Id.*; A-222-23.

The ZEC price does not "var[y] inversely with FERC-approved auction rates." Br. 32. *First*, the ZEC price is fixed for two-year periods, and the first two-year price is based solely on the social cost of carbon and the value of RGGI emissions permits. *Second*, the discount to the ZEC price in later two-year periods is calculated using forecast, not actual, prices. Those forecasts are based on futures prices FERC does not regulate. *Hunter v. FERC*, 711 F.3d 155, 157 (D.C. Cir. 2013); A-222-23. There is no true-up to reconcile forecasts with actual auction rates. *Third*, the relevant forecast is of a price (for "Zone A," in Western New York) that ZEC plants do not receive, because they "are located in NYISO Zones B and C." A-223; *see* Br. 7 n.3 (conceding

11

as much).[5]  Thus, the ZEC price is not based upon, and does not track, prices for the relevant wholesale auctions.

### C.  Administrative Remedies.

FERC has mechanisms stakeholders can invoke if they believe a state program prevents "just and reasonable" wholesale prices.  16 U.S.C. §824e(a).  Plaintiff EPSA has pursued these remedies.[6]  In January 2017, it asked FERC to apply a "minimum offer price rule" to ZEC plants selling capacity in NYISO's wholesale markets, which would have the effect of excluding ZEC plants from FERC's capacity markets.[7]  EPSA did not claim the Program violated FERC's *existing* market rules.  It urged FERC to "modify" its rules.[8]  That relief, it said, would "address" the "threat" posed by the Program and "restore a more level playing field for all generation," without needing to "address preemption."[9]  FERC has not yet ruled on EPSA's request.

In May 2017, FERC held a conference to address "the increasing interest by states to support particular ... resource attributes," in light of FERC's desire to "respect state policies."[10]  FERC is now reviewing proposals and

---

[5] Historically, Zone A prices have substantially differed from the auction prices received by ZEC plants.  A.40 (¶3) (ZEC plants receive $19.71/MWh and $20.63/MWh); A-224 (Zone A price "about $33/MWh").

[6] Request for Expedited Action, *IPPNY, Inc. v. NYISO, Inc.*, Docket EL13-62-002 (FERC Jan. 9, 2017).

[7] *Id.* at 6, 15-16.

[8] *Id.* at 2.

[9] *Id.* at 11 & n.46.

[10] Notice of Technical Conference 2, Docket No. AD17-11-000 (FERC Mar. 3, 2017).

comments from that conference.  Its options include: (1) maintaining the status quo, under which States regulate in parallel with FERC; (2) integrating state regulatory objectives into federal market design; and (3) making other rule changes, only one of which is EPSA's proposal.[11]

## SUMMARY OF ARGUMENT

I.    As bystanders not regulated by the ZEC Program, Plaintiffs cannot assert an equitable cause of action under *Ex parte Young*.  Even if they could, the FPA would foreclose it:  Congress did not create a detailed administrative remedial scheme, nor grant broad policy discretion to FERC, only to allow Plaintiffs to bypass FERC and sue in district court.

II.    The Program is not field preempted because it pays generators for electricity's *production*, not for its wholesale sale.  In *WSPP*, 139 FERC ¶61,061, FERC held that indistinguishable REC programs, which pay generators a per-MWh production incentive, are within States' jurisdiction *even when* those generators sell electricity at wholesale.  And *Hughes* expressly declined to "foreclose" States' authority to enact subsidy programs as long as States did not "condition payment" on wholesale sales.  136 S. Ct. at 1299.

---

[11] Notice Inviting Post-Technical Conference Comments 2, Docket No. AD17-11-000 (FERC May 23, 2017).

III.    The Program is not conflict preempted.  Plaintiffs have not iden-
tified any FERC policy the Program "clear[ly] damage[s]."  *Nw. Cent. Pipe-
line Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 518, 522 (1989).
Indeed, FERC has acknowledged States' authority to enact programs like this
one, notwithstanding that they affect wholesale prices.

IV.    The Commerce Clause claim was properly dismissed.  Plaintiffs
lack standing to raise this claim, because their asserted injury is not traceable
to any alleged discrimination against or burden on out-of-state competitors.
On the merits, Plaintiffs' claim fails because subsidy programs are not sub-
ject to the dormant Commerce Clause and, in any event, Plaintiffs have not
established any discrimination against, or real burden on, interstate com-
merce.

## ARGUMENT

## I.    Plaintiffs Lack a Preemption Cause of Action.

Plaintiffs "do not claim that the FPA creates a private right of action"
for preemption claims.  Br. 27.  Before *Armstrong v. Exceptional Child Cen-
ter, Inc.*, this Court and others believed the Supremacy Clause created one.
135 S. Ct. 1378, 1383-84 (2015).  *Armstrong*, however, held that absent a
statutory cause of action, preemption plaintiffs can only bring a "judge-made
action at equity."  *Id.* at 1386.  Such actions may only seek relief that "courts
of equity" historically provided.  *Id.* at 1384.  Even that relief is unavailable

14

if Congress "inten[ded] to foreclose" it. *Id.* at 1385 (quotation marks omitted). Each limitation bars Plaintiffs' suit.

### A. Plaintiffs Do Not Seek Relief That Courts of Equity Historically Provided.

Historically, equity courts enjoined executive action only where, as in *Ex parte Young*, a plaintiff "invokes equity preemptively to assert a defense that would be available to it in a state or local enforcement action." *Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016) (*"E. Hampton"*). In *East Hampton*, for example, the plaintiffs could invoke *Ex parte Young* because they were "threatened with escalating fines." *Id.* at 144-45. As this Court explained, a "party is not required to pursue arguably illegal activity ... before bringing suit to challenge a statute alleged to violate federal law." *Id.* (internal quotation marks omitted).

Here, Plaintiffs cannot be "'subject[ed] to'" the ZEC Program. Br. 26 (quoting *E. Hampton*, 841 F.3d at 146). They are not regulated by it, and cannot face an "enforcement action" under it. *E. Hampton*, 841 F.3d at 144. They are mere bystanders complaining about the Program's indirect effects on their revenues. Their preemption claim falls outside *Ex parte Young*.

### B.  Congress Intended to Foreclose Suits of This Type.

Even if Plaintiffs' suit fell within *Ex parte Young*, the FPA "establish[es] Congress's intent to foreclose equitable relief" here.  *Armstrong*, 135 S. Ct. at 1385 (quotation marks omitted).

*Armstrong* found that "[t]wo aspects of" the Medicaid Act "establish[ed] Congress's intent to foreclose equitable relief."  *Id.*  Plaintiffs suggest *Armstrong* applies only where *the same* factors are present.  Br. 22-23.  Not so.  *Armstrong* is about "Congress's intent," 135 S. Ct. at 1385, not whether a statute has features identical to the Medicaid Act.  As Justice Breyer—*Armstrong*'s essential fifth vote—put it:  No "simple, fixed legal formula" can provide the answer.  *Id.* at 1388 (Breyer, J., concurring).  Indeed, in *Hughes*, the Supreme Court *sua sponte* questioned whether the plaintiffs had a cause of action.  136 S. Ct. at 1296 n.6.  That would be nonsensical if the Court shared Plaintiffs' crabbed reading of *Armstrong*.

Regardless, here four factors, including those in *Armstrong*, demonstrate Congress's intent to foreclose this suit.

***Administrative scheme.***  First, Plaintiffs complain that the Program harms them by interfering with FERC's markets.  But the FPA sets up a detailed administrative scheme to address just that type of complaint.  A person who believes a state program interferes with FERC's markets may

bring a "complaint" to FERC, asking it to address the interference. 16 U.S.C. §§824d(e), 824e(a); 825e; *supra* 12. FERC also can act on its own initiative, 16 U.S.C. §§824d(e), 824e(a), or solicit stakeholders' views, *supra* 12-13. FERC can then calibrate its response: it can do nothing, modify its rules to mitigate any market effects, or deem the program preempted—which it has authority to do. *E.g.*, *Cal. PUC*, 132 FERC ¶61,047, PP.1-2 (2010).

Allowing bystanders complaining of interference with FERC's markets to pursue equitable relief is inconsistent with this "detailed remedial scheme." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996); *Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 152 F. Supp. 3d 90, 104 (E.D.N.Y. 2015) (AIAA's "comprehensive administrative enforcement scheme" precluded suit), *aff'd in part, vacated in part on other grounds*, 841 F.3d 133. Congress intended complaints about FERC's markets to be brought to FERC, which can decide whether preemption, or a more tailored remedy, is appropriate. Congress did not license private parties to circumvent FERC whenever they feel they may fare better before non-expert judges.

Plaintiffs say the "availability" of this administrative scheme cannot *alone* foreclose equitable relief. Br. 23. That is beside the point given the other indicia discussed below. Anyway, it is wrong. In *Seminole Tribe*, an administrative scheme *alone* was enough. 517 U.S. at 74-76. Plaintiffs rely

17

on *Virginia Office of Protection & Advocacy v. Stewart* ("*VOPA*"), Br. 23, but as in *Armstrong*, the administrative remedy there was solely "oversight of a federal spending program and ... withhold[ing of] funds." *VOPA*, 563 U.S. 247, 256 n.3 (2011). Blunt fiscal remedies are unlikely to be effective, and so are not enough, alone, to foreclose equitable relief. *Id.*; *see E. Hampton*, 841 F.3d at 146; *Armstrong*, 135 S. Ct at 1389 (Breyer, J., concurring) (asking whether "other forms of relief are inadequate"). But here, FERC's remedies are adequate to address alleged injuries from state actions' effects on FERC's markets. Plaintiffs told FERC exactly that. *Supra* 12.

Plaintiffs contend that "courts have, for decades, ... adjudicate[d] private suits seeking to enjoin state action as preempted by the FPA." Br. 24 & n.7. But their cases precede *Armstrong*, and, as Plaintiffs admit, not one *considered* whether an equitable cause of action was available. Br. 27 (cases proceeded "without regard to" issue). Moreover, these cases spotlight what is missing here: All but one involved a classic *Ex parte Young* claim, brought by plaintiffs directly regulated by the state action. Those plaintiffs complained not about indirect harms from effects on FERC's markets, but about direct harms from state action *outside* those markets (for example, lowered retail rates or denied permits). Plaintiffs' only bystander-suit case is *PPL*

*Energyplus, LLC v. Solomon*, 766 F.3d 241 (3d Cir. 2014), which was pending before the *Hughes* Court when it questioned the availability of equitable relief under the FPA. 136 S. Ct. at 1296 n.6.

It makes sense that courts might allow plaintiffs subject to direct state enforcement (such as escalating fines) to immediately sue in federal court. But where, as here, plaintiffs allege indirect harm from effects on FERC-administered markets, there is no reason to allow evasion of the agency that oversees those markets and can remedy any effects it finds problematic.

**Other express causes of action.** Second, Congress provided three judicial causes of action to enforce the FPA, and each time declined to authorize bystander suits like this one. Congress's "express provision of [these] method[s] of enforcing" these FERC-administered provisions "suggests that Congress intended to preclude others." *Armstrong*, 135 S. Ct. at 1385 (quotation marks omitted); *id.* at 1389 (Breyer, J., concurring).

First, individuals who file a complaint before FERC may seek review of any order FERC issues in response. 16 U.S.C. §824*l*(b).

Second, the United States may bring suits like this one: "an action" "to enjoin" "any acts or practices which ... violat[e]" the FPA. *Id.* §825m(a). As

19

the district court recognized, "FERC['s] broad enforcement authority" indicates the FPA "forecloses private parties from" bringing suits in equity. SPA-11.

Third, in one context not applicable here (sales by small producers under the Public Utility Regulatory Policies Act ("PURPA")), individuals may sue in district court to challenge state rules as inconsistent with FERC rules "treated as ... enforceable under the Federal Power Act." 16 U.S.C. §824a-3(h)(2)(B). Even then, Congress required plaintiffs to "exhaust[] ... administrative remedies." SPA-12; *see Allco Fin. Ltd. v. Klee*, 805 F.3d 89, 91-92 (2d Cir. 2015). This "limited private cause of action suggests that 'the omission of a general private right of action in the [FPA] should ... be understood as intentional.'" SPA-12 (quoting *Vill. of Old Mill Creek*, 2017 WL 3008289, at *9).

Plaintiffs rely on *East Hampton*, where the agency similarly could "bring an action to obtain legal remedies," yet the plaintiffs were permitted to sue in court. Br. 26 (citing 841 F.3d at 145). But in *East Hampton*, the plaintiffs were *directly* regulated and subjected to fines by the laws they contended were preempted. The Court held that the agency's "enforcement authority" was not enough to preclude relief only "where, as [in that case]," the plaintiffs sought "not to enforce the federal law themselves, but to preclude

20

a municipal entity from subjecting them to [preempted] local laws." 841 F.3d at 146. Here, Plaintiffs are suing to enforce federal law themselves. *East Hampton* implied that in a bystander case like this one, private equitable relief is unavailable. *Id.*

**Complexity of enforcement.** Also like *Armstrong*, the "sheer complexity" of FERC's wholesale-market regulation confirms that Congress intended to foreclose bystander suits. 135 S. Ct. at 1385. Regulating interconnected interstate electricity markets, and determining how those markets should interact with States' authority, requires the "expertise, uniformity, widespread consultation, and resulting administrative guidance" FERC's oversight brings. *Id.* (quotation marks omitted). Suits like this one threaten to upend FERC's role. For example, Plaintiffs' suit would short-circuit FERC's recently initiated process to develop policies integrating state subsidy programs and federal markets. And it asks federal courts to invalidate the Program even though FERC's designated market operator, NYISO, supports it. ECF 42-2 at 244, 349. FERC, not federal courts, should referee Plaintiffs' disagreement with NYISO.

**Unadministrable Standards.** Finally, as in *Armstrong*, Plaintiffs' preemption theories below and on appeal demonstrate that FPA preemption claims will often invoke "judicially unadministrable" standards. Before the

21

Case 17-2654, Document 121, 11/20/2017, 2175937, Page32 of 78

district court, Plaintiffs' primary "beef" was "that [the ZEC Program] is affecting the wholesale market." MTD Hr'g Tr. 21, ECF 141; A-40-43 (¶¶3-7), 56-58 (¶¶43-47), 72-73 (¶¶79-83), 74-76 (¶¶86-92) (complaining of market effects). But Plaintiffs acknowledged that States lawfully take many actions, like creating REC programs, affecting wholesale prices. SPA-24 (Plaintiffs' concession that such programs "have some of the same effects" (quoting MTD Hr'g Tr. 26, ECF 141)). Plaintiffs thus argued that there was a "difference in degree"—that the Program distorts the market *too much*. SPA-25. Similarly, on appeal, Plaintiffs' conflict-preemption argument is that states can permissibly "[a]ffect" wholesale prices, but cannot "distort" them. Br. 49.

But what counts as "distortion" is a policy question only FERC can resolve in the first instance. Plaintiffs essentially ask the court to identify some threshold (one dollar? five?) at which effects move from permissible to not. Only FERC, however, can "reduce the abstract concept of reasonableness to concrete expression in dollars and cents." *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951).[12]

---

[12] The district court mistakenly believed that, because courts review FERC's determinations under the "just and reasonable" standard, that standard cannot be judicially unadministrable. SPA-12-13. There is a difference, however, between "reviewing for reasonableness" FERC's rate-setting judgments, and making a rate-setting judgment directly. *Armstrong*, 135 S. Ct. at 1389 (Breyer, J., concurring).

22

Plaintiffs point out that they have abandoned their "too much distortion" *field*-preemption theory—along with others—on appeal,[13] and claim their remaining field-preemption theory (based on *Hughes*) is administrable. Br. 21. But as Justice Breyer explained, even if "courts might in particular instances be able to resolve" *certain* "requests for injunctive relief quite easily," there is "no easy way to separate in advance the potentially simple sheep from the more harmful rate-making goats." *Armstrong*, 135 S. Ct. at 1389. And Congress could not have intended that plaintiffs would split their preemption claims, litigating the sheep in federal court and the goats at FERC. The question is whether Congress wanted *all* FPA claims—including Plaintiffs' unadministrable theories—adjudicated in federal court. It did not.

## C. The FPA's Jurisdictional Provision Is a Red Herring.

Plaintiffs argue that the FPA cannot foreclose equitable relief because 16 U.S.C. §825p confers "jurisdiction" over "all suits in equity and actions at law." Plaintiffs say §825p "must be given effect by reading the FPA to allow" their suit, Br. 25, and that Congress's express provision of other causes of action is irrelevant because they cannot be read to "impliedly repeal" the FPA's "equity jurisdiction." Br. 28.

---

[13] Plaintiffs also have abandoned their field-preemption arguments that the Program "directly affects" or is improperly "aimed at" wholesale markets. Br. 29-44 (never mentioning those theories).

Plaintiffs confuse jurisdiction with a cause of action. Plainly, there is subject-matter jurisdiction to hear Plaintiffs' suit. "[V]esting jurisdiction," however, "does not create causes of action, but only confers jurisdiction to adjudicate those [claims] arising from other sources." *Montana-Dakota Utils.*, 341 U.S. at 249. *Armstrong* itself illustrates the flaw in Plaintiffs' theory. The *Armstrong* Court unquestionably "ha[d] jurisdiction under [28 U.S.C.] § 1331 over" that equitable suit. Br. 19 (quotation marks omitted). Yet *Armstrong* rejected a "judge-made action at equity." 135 S. Ct. at 1386. That did not "impliedly repeal" §1331, or deny it "effect." Br. 25, 27-28. Plaintiffs' reliance on *Verizon* confirms their confusion. Plaintiffs cite a discussion of whether a specific *jurisdictional* provision stripped federal courts of "*jurisdiction* under § 1331." *Verizon Md., Inc. v. PSC of Md.*, 535 U.S. 635, 643 (2002) (emphasis added).[14]

Plaintiffs contend that §825p's reference to "all suits in equity and actions at law" is somehow a uniquely broad invocation of equity jurisdiction. Br. 23, 25. But that language was common boilerplate in New Deal-era statutes and is identical in scope to §1331's "arising under" formulation. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562, 1566, 1568 (2016). The Supreme Court rejected the argument that this language's

---

[14] *Verizon* also did not involve the FPA and was not a bystander suit. 535 U.S. at 639-40.

breadth "implied" that Congress anticipated private enforcement. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 577 (1979); *Bassler v. Cent. Nat'l Bank in Chicago*, 715 F.2d 308, 312-13 (7th Cir. 1983).

There is a simple explanation for §825p: it was added to make federal jurisdiction over FPA suits "exclusive" (unlike §1331), 16 U.S.C. §825p, and eliminated the amount-in-controversy requirement then applicable under §1331, 28 U.S.C. §41(1) (1934). The Court should reject Plaintiffs' efforts to read more into it.

Plaintiffs also rely on *East Hampton*'s description of *Armstrong* as about whether plaintiffs could "invok[e] equitable jurisdiction," *E. Hampton*, 841 F.3d at 147, suggesting that accordingly, this Court must treat §825p as dispositive. Br. 19, 27. That makes too much of too little. *East Hampton*'s use of the term "jurisdiction" was imprecise, but in that case nothing turned on that label. *East Hampton* did not abrogate settled law that jurisdiction and a cause of action are distinct, and that the former does not imply the latter.

## II. Plaintiffs' Field Preemption Claim Was Properly Dismissed.

The ZEC Program respects a "bright line" that is commonsense and well-settled. *FPC v. S. Cal. Edison*, 376 U.S. 205, 215 (1964). States regulate production, so payments and taxes triggered by production fall within States'

25

sphere. Thus, FERC has held that emissions allowances and RECs are lawful because they tie payments to how energy is *produced*. *WSPP*, 139 FERC ¶61,061, PP.21-24. Conversely, payments triggered by wholesale auction sales are *really* payments for such sales, and are preempted. Thus, in *Hughes*, Maryland entered FERC's domain because it "condition[ed] payment" on auction sales. 136 S. Ct. at 1299.

The Program complies with this line. ZECs are created when electricity is produced, regardless of whether or how electricity is sold: a ZEC is a "credit for the zero-emissions attributes of one megawatt-hour of electricity *production*." A-254 (emphasis added). And Plaintiffs concede that New York does not condition payment on completing wholesale sales. Br. 8.

Plaintiffs nevertheless claim that ZECs are "payments for ... wholesale electricity sales," for two reasons. Br. 30. First, they claim every ZEC plant will in practice sell all its electricity through the auctions, even though New York did not require it. Br. 32. But that is not true; ZEC plants sell at retail and bilaterally outside the auctions, and self-consume some of the electricity they produce. Nor is it relevant. Congress preserved state authority over production *even when* generators sell exclusively at wholesale. Second, Plaintiffs claim the ZEC price is "tethered" to wholesale auction prices. *Id.*

That is also wrong. The ZEC price is based on the social cost of carbon, and *never* varies based on wholesale auction prices.

## A. The ZEC Program Lawfully Regulates Production.

There is a "strong presumption against finding that the [State's] powers" are preempted by the FPA, *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 94 (2d Cir. 2012), which was "drawn with meticulous regard for the continued exercise of state power." *Rochester Gas & Elec. Corp. v. PSC of N.Y.*, 754 F.2d 99, 104 (2d Cir. 1985). The presumption is overcome only if displacing state authority was Congress's "clear and manifest purpose." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

### 1. States May Regulate Production, Regardless of Whether Generators Sell at Wholesale.

The FPA preserved States' authority over production, even when every MWh generated is instantaneously sold at wholesale. So long as States regulate the activity of generation, they stay within their domain.

The distinction between electricity's production and its wholesale sale predates the FPA. In 1927, the Supreme Court held that the Commerce Clause prevented States from regulating interstate wholesale sales. *PUC of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83 (1927). Five years later, the Supreme Court clarified that States retain their authority over *generation*,

even when the electricity is sold interstate. *Utah Power & Light Co. v. Pfost*, 286 U.S. 165, 179 (1932). The Court knew it was drawing a fine line, acknowledging that electricity is "not stored in advance," so transmission and sale are "substantially instantaneous" with production. *Id.* Nonetheless, the Court treated generation as "separable and distinct." *Id.* Thus, a tax "imposed in respect of generation" was "not invalidated by" the generator's "intent ... to transport [the resulting electricity] across state lines," even "substantially all" of it. *Id.* at 178, 182.

The FPA carried forward this distinction between regulating electricity's *production* and regulating its wholesale *sale*. The initial Senate bill proposed stripping States of their *Utah Power* jurisdiction over "generating facilities which produce energy for interstate [wholesale] sale." S. Rep. No. 74-621, at 48 (1935) (discussing *Utah Power*). But Congress opted against that "usurpation" of existing "State regulatory authority," electing to preserve state authority over *all* generating facilities, including those selling only at wholesale. H.R. Rep. No. 74-1318, at 8, 27 (1935); *see Conn. Light & Power Co. v. FPC*, 324 U.S. 515, 525-27 (1945).

28

### 2. FERC Has Upheld Environmental Credit Programs Tied to Production—Even When Electricity Is Sold at Wholesale.

FERC has applied Congress's distinction to confirm that REC programs fall within state authority. RECs "certif[y] that electric energy was *generated* pursuant to certain requirements and standards"; thus, a REC is created when electricity is produced, regardless of whether or how it is sold. *WSPP*, 139 FERC ¶61,061, P.21 (emphasis added). Because RECs are triggered by production, FERC views them as "separate commodities" that "are not compensation for capacity and energy," but rather for a particular method of generation. *Cal. PUC*, 133 FERC ¶61,059, P.31 n.62.

"Generally speaking, RECs ... are 'unbundled' from the energy itself and sold separately." *Wheelabrator*, 531 F.3d at 186. *WSPP* held that when RECs are unbundled in that way, the payment is "not a charge in connection with a wholesale sale," does not set or "affect wholesale electricity rates," and falls outside FERC's jurisdiction. 139 FERC ¶61,061, P.24. That is so even when the underlying electricity is sold at wholesale.

*WSPP*'s holding is "dispositive" "unless ... inconsistent with clearly expressed congressional intent." *Hillsborough Cty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 714 (1985); *see City of Arlington v. FCC*, 569 U.S. 290,

307 (2013). FERC's reasoning straightforwardly applies to ZECs. As the district court explained: "Like a REC, a ZEC is a certification of an energy *attribute* that is separate from a wholesale charge or rate. ... Like a REC, the purchase or sale of a ZEC is independent of the purchase or sale of wholesale energy. Like a REC, a payment for a ZEC is not conditioned on the generator's participation in the wholesale auction; rather, RECs and ZECs are given in exchange for the renewable energy or zero-emissions *production* of energy by generators." SPA-27; *see* A-103-04, 254.

Because it disposes of their theory, Plaintiffs try to distort *WSPP*. First, Plaintiffs assert that FERC "was careful to limit its holding to the ... three specific REC products before it" or to particular state "REC programs." Br. 42. Not so. FERC *categorically* held that RECs, when sold separately from electricity, fall outside its jurisdiction. *WSPP*, 139 FERC ¶61,061, P.24. *WSPP* did not address *any* particular REC program, but REC sales by 300 utilities across many "states with [REC] programs."[15] Those statutes varied, and neither FERC nor WSPP's filing discussed their particulars. Nor did FERC's holding depend on the features of any particular REC product; the only feature that mattered was whether the REC was "unbundled" (sold separately from electricity) or "bundled" (sold together). *Id.*

---

[15] WSPP Filing 3.

Plaintiffs claim that unbundled REC transactions "could still fall under [FERC's] jurisdiction" if they were "in connection with" or "affect[ed]" wholesale rates. Br. 43 (quoting 139 FERC ¶61,061, P.22). But Plaintiffs are deceptively quoting *WSPP*, focusing on FERC's rote description of its jurisdiction. Two paragraphs later, FERC *applied* that standard and held, categorically, that unbundled REC payments are "*not* ... in connection with a wholesale sale" and "do[] *not* affect wholesale electricity rates." *WSPP*, 139 FERC ¶61,061, P.24 (emphases added).

Plaintiffs also cannot distinguish *WSPP* on the ground that the REC programs had "no connection to an organized market with energy and capacity auctions." Br. 42. *WSPP* acknowledged that some REC recipients are exempt wholesale generators ("EWGs") selling *exclusively* at wholesale. 139 FERC ¶61,061, P.9 n.15. And in several States addressed in *WSPP*, FERC tariffs required renewable generators to bid into wholesale auctions.[16] Yet *WSPP* upheld their REC programs.[17]

---

[16] *West-Wide Must-Offer Requirements*, 157 FERC ¶61,051, PP.2-5 (2016) (generation in western half of country subject to must-offer mandate from 2001 to 2016).

[17] Plaintiffs imply that ZECs are "bundled" because they are *really* being sold together with ZEC plants' electricity, and are merely "artificially separat[ed]." Br. 43. That is false. ZECs and nuclear plants' electricity are sold to different purchasers, via different agreements. Indeed, retail suppliers must purchase ZECs even when they cannot purchase nuclear plants' electricity, as when they purchase 100% renewable electricity. A-232-33. Thus, a retail supplier's ZEC purchase does not correspond to the purchase of a MWh of electricity from a ZEC plant, or even from the wholesale auction more generally. *See supra* 10 n.4.

31

Ultimately, Plaintiffs acknowledge *WSPP*'s holding: RECs sold separately from electricity are outside FERC's jurisdiction. Br. 41 (RECs sold "to a third party" are not "a wholesale transaction"). FERC has "not evince[d] an intent to occupy the ... field [of] regulation of [RECs]." *Wheelabrator*, 531 F.3d at 190. If Plaintiffs think FERC would change its position if faced with the ZEC Program, that argument belongs at FERC.

### 3. *Hughes* Confirms the ZEC Program Is Valid.

*Hughes* confirms the distinction drawn in the FPA and applied by FERC in *WSPP*: States can compensate generators for production, but may not condition payment on wholesale sales. In *Hughes*, Maryland offered subsidies to a new generator, but "condition[ed] receipt" on "selling capacity into a FERC-regulated wholesale auction." 136 S. Ct. at 1292. That state-imposed condition was the "fatal defect." *Id.* at 1299. Because Maryland tied payment to wholesale sales, not production, the payment was "received ... in connection with" that sale and "set[] [the] interstate wholesale rate." *Id.* at 1297 & n.9 (quoting 16 U.S.C. §824d(a)).

*Hughes* was intentionally narrow. FERC's brief emphasized the range of "[p]ermissible state programs" and twice endorsed REC programs. Amicus Br. of United States at 19, 34, *Hughes*, 136 S. Ct. 1288, 2016 WL 344494 ("U.S. Amicus Br."). *Hughes* thus "limited" its holding, stressing it was *not*

invalidating "other measures States might employ to encourage development of ... clean generation, including ... direct subsidies." 136 S. Ct. at 1299. It underscored that "[n]othing in this opinion should be read to foreclose ... States from encouraging production of new or clean generation through measures 'untethered to a generator's wholesale market participation.'" *Id.* (quoting Br. for Resp't 40). That is, so "long as a State does not condition payment of funds on capacity clearing the auction, the State's program would not suffer from [Maryland's] fatal defect." *Id.*

The ZEC Program does not condition payment on auction clearance, and so lacks this "fatal defect." *Id.* As the district court explained, it "does not require the nuclear generators to sell into the NYISO auction.... [N]uclear generators receive ZECs for their zero-emissions *production* of energy, and not for the sale of that energy into the wholesale market." SPA-20. It there-fore does not "violate the bright line laid out in *Hughes.*" *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 102 (2d Cir. 2017).

*FERC v. EPSA*, 136 S. Ct. 760 (2016), confirms that States do not in-vade FERC's domain by compensating generation facilities for how they pro-duce electricity. It explained that a regulation does not "set a [wholesale] electricity rate" unless it "establish[es] the amount ... a consumer will hand

over *in exchange for* [*wholesale*] *power.*" *Id.* at 777-78 (emphasis added).[18]

REC and ZEC payments, by contrast, are "in exchange for" *producing* electricity using particular methods, not "compensation for capacity and energy." *Cal. PUC*, 133 FERC ¶61,059, P.31 n.62. *EPSA* rejected any broader notion that States "effectively" set wholesale rates merely by compensating for generation methods. *See* SPA-22-23; *EPSA*, 136 S. Ct. at 777. States set wholesale rates when they condition payment on auction sales, because that changes "the amount" received "in exchange for [wholesale] power."

*Allco* likewise confirmed, post-*Hughes*, that REC programs are "within the scope of what Congress and FERC have traditionally allowed the States to do." 861 F.3d at 98-100, 106. ZECs are as well.

### 4. *Hughes* Prevents States from Regulating Through the FERC Auctions.

*Hughes*'s holding is not mere formalism: it identifies state programs that attempt to regulate wholesale activity, not electricity production. State programs regulating electricity's production should be indifferent to how electricity is sold. So States that require wholesale-auction participation are not simply regulating production; they are using FERC's auctions as the "regulatory means" to accomplish their "ends." 136 S. Ct. at 1298.

---

[18] EPSA defined *retail* rate-setting under the FPA, but the FPA uses the same term—"rates"—to define FERC's wholesale-price jurisdiction. 16 U.S.C. § 824d(a). Plaintiffs do not dispute that *EPSA*'s definition applies to wholesale rate-setting. Br. 39.

For example, in *Hughes*, Maryland wanted to encourage "new in-state generation" to bid into the PJM auction to reduce wholesale prices. *Id.* at 1294; *see* U.S. Amicus Br. 10 (Maryland's concern was that "lack of new generation caused Maryland consumers to pay too high a [wholesale] price"). If generators did not clear the auction, they would not reduce prices. So Maryland conditioned its payment on auction sales, because the generators' auction participation was a key *component* of Maryland's regulatory program. Maryland was regulating "through the FERC-approved auction." *Allco*, 861 F.3d at 99.

Here, by contrast, the Program does not, and does not need to, hijack FERC's auctions to accomplish its aims. The ZEC Program does not require auction participation because it aims to "fight climate change and ... reduce carbon emissions." A-234. That goal is achieved whenever clean electricity is generated and consumed (thereby displacing fossil-fuel generation), whether the electricity is sold in auctions, bilateral contracts, or at retail.

### B. Plaintiffs' Attempts to Broaden *Hughes* Are Meritless.

Despite all this, Plaintiffs argue that ZECs are really payments for wholesale electricity sales, just as in *Hughes*. First, Plaintiffs allege that ZECs will correspond to auction sales, even though New York did not require such sales—because "[a]ll of the electricity" ZEC plants generate will in fact be sold

through "NYISO auctions."  Br. 16-17, 32-34.  Second, Plaintiffs claim the ZEC price is "tethered" to wholesale prices and economically "identical" to *Hughes*'s contract-for-differences.  Br. 31.  Each claim is factually wrong and legally flawed.

### 1. ZEC Plants Do Not Sell Exclusively at Wholesale and, Regardless, That Would Not Matter.

Plaintiffs contend that ZEC plants will sell "[a]ll" their electricity in wholesale auctions, and thus ZECs "will not be received" absent auction sales.  Br. 32-34.  Plaintiffs do not claim the PSC *required* such sales, *supra* 26, or even *cared* how ZEC plants sell.[19]  Plaintiffs argue that the Program is preempted because plants *happen* to sell in the auctions.

***ZEC plants do not sell all their electricity through wholesale auctions.***  Plaintiffs' premise is wrong: the ZEC plants do *not* sell all electricity in wholesale auctions.  They sell some electricity at retail, sell other electricity in bilateral contracts, and consume some without any sale.  All that production yields ZECs.  So even under Plaintiffs' (incorrect) legal theory, the Program is valid.

---

[19] Amicus American Petroleum Institute (at 16) contends that the ZEC form contracts require wholesale sales because they refer to a plant's "revenue meter."  Plaintiffs do not make any such argument, and it is wrong.  Electricity passes through the revenue meter when it enters the grid to be transmitted.  Not all electricity entering the grid is sold at wholesale.  *See infra* 37-38.

First, Nine Mile Point will receive ZECs for electricity sold at retail. A-232. LIPA is a "co-owner of the Nine Mile Point 2 Nuclear Station," but sells its share of electricity directly to retail customers. A-144, 231-32.[20] The plant gets ZECs for that electricity. A-232. That refutes Plaintiffs' premise that ZEC plants sell exclusively at wholesale. Other ZEC plants could choose to do the same. A-178 (noting that industrial retail customers sometimes purchase from generators directly).

Second, plants receive ZECs for electricity sold through bilateral contracts at negotiated prices, outside the auctions. ZEC plants have done so in the past and do so now. *R.E. Ginna Nuclear Power Plant, LLC*, 151 FERC ¶61,023, P.2 (2015) (noting Ginna's bilateral contract); *Entergy Nuclear FitzPatrick, LLC*, 118 FERC ¶62,085, 64,222 (2007) (same for FitzPatrick).

Third, plants receive ZECs for electricity that is consumed, not sold for resale. When a nuclear reactor goes offline, it still needs electricity, which other nuclear plants can provide. Nine Mile Point has "self-suppl[ied] [one] unit's station power remotely from power generated by the sister unit." *Nine Mile Point Nuclear Station, LLC v. Niagara Mohawk Power Corp.*, 110 FERC ¶61,033, P.3 (2005). That "remote self-supply" involves no wholesale

---

[20] Plaintiffs thus cannot distinguish RECs from ZECs on the ground that REC generators "may not participate in the wholesale auctions, or even sell at wholesale at all." Br. 41. The same is true of ZEC generators like LIPA.

sale.  *Calpine Corp. v. FERC*, 702 F.3d 41, 42, 47-50 (D.C. Cir. 2012) (remote self-supply outside "FERC's wholesale jurisdiction").

ZEC plants receive ZECs even if electricity is sold at retail, sold bilaterally, or consumed.  These are the very reasons Plaintiffs give for why REC programs are lawful—because *some* renewable generators receive RECs for electricity sold at retail or "consume[d]."  Br. 41.  That concedes the ZEC Program's legality, too.

Plaintiffs claim that the ZEC plants' owners are EWGs, "legally required to sell their output into wholesale markets."  Br. 33; *id.* at 9.  But nothing requires owners to be EWGs.  Exelon Generation Company, LLC ("ExGen"), which owns FitzPatrick, is not one.  *Compare* Br. 9 (citing FERC's 2000 acceptance of EWG status by ExGen's predecessor company, Amergen), *with* EWG Notification, Docket EG00-53-000 (FERC Feb. 9, 2009) (withdrawal of Amergen's EWG status).  LIPA also is not an EWG.[21]

In sum, the ZEC Program does not require that plants sell exclusively in NYISO wholesale auctions, and in reality, they do not.

---

[21] Becoming an EWG is voluntary; plants become EWGs to avoid certain filing requirements and inspection rules under the Public Utility Holding Company Act.  A generator can withdraw that status at any time.  18 C.F.R. §366.7(c)(3), (e).  An EWG is not required to sell in wholesale auctions; it can also sell through bilateral contracts.

**FPA preemption does not turn on whether, in fact, plants sell at wholesale**. Plaintiffs' legal theory is also wrong. They claim that New York cannot regulate ZEC plants' production if those plants sell exclusively at wholesale. However, when drafting the FPA, Congress specifically chose to preserve States' authority to regulate generation facilities, *even when* those facilities sold exclusively at wholesale. *See supra* 27-28. States exceed their authority only when they regulate wholesale sales. SPA-20-22.

That is why *Hughes* asked whether the State "condition[ed] payment" on auction clearance. 136 S. Ct. at 1299. By conditioning payment on wholesale auction clearance, Maryland regulated the wholesale sale itself. And that is why FERC has interpreted *Hughes* to mean that absent such a state-imposed condition, state payments are "not foreclose[d]." *ISO New England Inc.*, 158 FERC ¶61,138, P.8 n.19 (2017) (emphasis added) (quotation marks omitted). Even if private parties choose to sell at wholesale, their "decision to bid ... into the auction" is simply "different from a state mandate." U.S. Amicus Br. 31.

*Allco* recognizes that a state mandate to sell at wholesale differs from private parties' choices to do so. *Allco* addressed a Connecticut statute that arranged for utilities to enter into wholesale electricity contracts with renew-

39

able generators.  861 F.3d at 97.  The plaintiff argued that the statute "[c]om-pell[ed] a wholesale transaction" between renewable generators and utilities. *Id.* (quotation marks omitted).  But this Court disagreed, finding that renew-able generators and utilities, not the State, made the ultimate decision to sign the contracts and sell at wholesale.  *Id.* at 98, 100.  Thus, the statute was not preempted.[22]  Even though its purpose and result was to encourage whole-sale sales that would not have otherwise occurred, the absence of state com-pulsion was dispositive.  *Id.* at 90.[23]  Plaintiffs admit that the ZEC Program "does not expressly mandate that the plants receiving ZEC subsidies bid into the NYISO auctions."  Br. 8.  That is the end of their case.

Nonetheless, Plaintiffs claim *Allco* supports them because it empha-sized that the contracts were subject to FERC review, while ZEC transactions are not.  Br. 37-38.  But the *Allco* contracts were subject to FERC review be-cause they were contracts *for wholesale electricity sales*, over which FERC has jurisdiction.  861 F.3d at 99.  Here, FERC does not review the *ZEC* sales (which are the only sales the State compels) because, as *WSPP* explains, when RECs or ZECs are sold *separately* from wholesale sales, there is no

---

[22] *Allco* did not address whether a State might permissibly compel a utility to purchase electricity from a particular wholesale seller.  *Cf. Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 417 (2d Cir. 2013) (State "can direct retail utilities" to purchase electricity from particular generator).

[23] *Allco* was brought under PURPA's express cause of action.  861 F.3d at 87.

wholesale sale and FERC lacks jurisdiction. 139 FERC ¶61,061, P.24. This case thus is easier than *Allco*. New York does nothing as to actual wholesale sales. It provides environmental production credits, whose sales Plaintiffs concede are not "wholesale transaction[s]," Br. 41, and parties choose to sell their electricity however they wish.

Plaintiffs' theory is untenable for other reasons, too. Plaintiffs would make state programs' validity turn on whether generators choose to sell at wholesale. Br. 32-34. Thus, States could not enact any regulation of production without first canvassing the universe of potential beneficiaries to determine their (often confidential) business plans. Likewise, federal courts confronting field-preemption claims would need third-party discovery into whether business "realities" actually compel auction sales—all to determine whether the State is regulating production or wholesale sales. And business plans may change during a 12-year program. So, the program might be legal one day, illegal the next. That is not the "bright line easily ascertained" drawn in the FPA and recognized in *Hughes* and *Allco*. *S. Cal. Edison*, 376 U.S. at 215; *Allco*, 861 F.2d at 102.

The consequences of Plaintiffs' theory are staggering. Outside New York, market operators often require *all* existing generators (subject to ex-

ceptions) to participate in wholesale auctions—including renewable genera-tors. *Supra* 31 & n.16. In these regions, Plaintiffs' theory would doom any state subsidy to virtually any existing generator, including REC programs. State cap-and-trade programs, *see supra* 6, and carbon taxes would also be illegal, as they impose costs on fossil-fuel generators selling at wholesale. But *WSPP* upheld RECs even though generators receiving them were required by FERC tariffs to participate in the wholesale auctions. *Supra* 31 & n.16.

To support their theory that FPA field preemption turns on what pri-vate parties do, rather than what the State regulates, Plaintiffs cite various preemption cases involving other statutes. Br. 35-36 & n.8. Many are con-flict cases, and focus not on whether the *State* is acting in the federal field, but rather on whether state actions have *effects* that conflict with federal goals. *E.g.*, *S.D. Mining Ass'n v. Lawrence Cty.*, 155 F.3d 1005, 1010-11 (8th Cir. 1998). Others are express preemption cases, which turn on statutory language. *E.g.*, *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 192-95 (4th Cir. 2007). The few field preemption cases hold merely that a state law that "de facto" prohibits conduct can be preempted—but still, *the State* must impose the *de facto* prohibition. *E.g.*, *Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs*, 27 F.3d 1499, 1508 (10th Cir. 1994). Plaintiffs do not argue that the *ZEC Program* mandates ZEC plants to sell at wholesale, "de facto" or

otherwise.  Rather, they assert (incorrectly) that, for reasons unrelated to the State, ZEC plants will sell at wholesale.  Per Plaintiffs' citation, requiring wholesale sales is not what "the *state law* in fact does."  *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 637 (2013) (emphasis added).

Plaintiffs imply that *Northern Natural Gas Co. v. State Corp. Commission*, 372 U.S. 84 (1963), forbids States from paying for production, because that would "indirectly" set wholesale rates.  But there, as in *Hughes*, the State directly regulated interstate gas pipelines' wholesale transactions, even though such sales fall within FERC jurisdiction.  *Id.* at 88-89, 92.  This case would be *Northern Natural* if New York instructed ZEC plants how to bid or where to sell.  As *Northwest Central* explains, as long as States regulate *production* (rather than wholesale sales), it is irrelevant whether their regulation will "have some effect on interstate rates."  489 U.S. at 513.

### 2. Plaintiffs' Arguments About the ZEC Price Are Meritless.

Plaintiffs also say the ZEC Program violates *Hughes* because the price "varies inversely" with plants' wholesale revenues, which they contend makes the Program "identical" to *Hughes*'s contract-for-differences.  Br. 31-32.  Plaintiffs identify this as a "fundamental difference[]" between ZECs and RECs.  Br. 41.  This argument fails for three independent reasons.

***First: Plaintiffs lack standing.*** Plaintiffs lack standing to challenge a price adjustment that makes them better off. For Article III standing, a plaintiff must show traceability—that "inclusion of" the "*specific aspect*[]" of a statute that is allegedly illegal "actually *caused* him injury." *Johnson v. U.S. OPM*, 783 F.3d 655, 662 (7th Cir. 2015); *Doe v. Cuomo*, 755 F.3d 105, 114 (2d Cir. 2014) (no standing to challenge statutory requirements that did not harm plaintiff). "[D]emonstrating an injury caused by one aspect of a legislative action [is] not sufficient to give [a plaintiff] standing to challenge other aspects." *Johnson*, 783 F.3d at 662. That is so even if the provisions are "related," and "regardless of [a provision's] organizational relationship to other provisions (illegal or not) that do" allegedly cause injury. *Id.* at 661, 663.

That rule applies here. Plaintiffs claim injury from "lower auction prices" and "revenues" due to "below-cost bids" by ZEC generators. A-42 (¶6), 71 (¶74). That injury does not stem from the price adjustment. The adjustment *mitigates* that injury by reducing ZEC prices, which (per Plaintiffs) requires ZEC plants to bid higher. Plaintiffs lack standing to challenge this provision that "mitigate[s], rather than cause[s], their asserted injuries." *Texas v. EPA*, 726 F.3d 180, 184, 198 (D.C. Cir. 2013); *Johnson*, 783 F.3d at 662. It is no answer for Plaintiffs to say an injunction would *redress* their

injuries; traceability and redressability are separate requirements. *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984).

**Second: The ZEC Program differs fundamentally from Hughes's *contract-for-differences*.** The district court properly rejected Plaintiffs' argument that ZEC prices are "tethered to wholesale prices" and "identical" to *Hughes*'s contract-for-differences. Br. 31, 41; SPA-22-27.

The *Hughes* contract's defining feature was that it insulated the subsidized generator absolutely from fluctuations in wholesale prices by moving in tandem with the generator's actual wholesale revenues. It paid the generator "the difference between … the clearing price" *received by the generator* and the "price guaranteed in the contract for differences." 136 S. Ct. at 1295.

The ZEC price neither insulates generators from market risk, nor is based on their actual wholesale revenues. The price cannot vary from carbon's social cost until 2019. A-213-14, 266. Even afterwards, the ZEC price never fluctuates based on actual wholesale prices. The price is fixed for two-year periods, and cannot fluctuate to match wholesale-price variations during that time. That fixed price is capped at the social cost of carbon: it cannot go higher, leaving generators exposed to risk that wholesale prices fall. The price can be fixed below the social cost of carbon, but only based on composites of *forecasted* prices—not actual prices, let alone generators' actual

wholesale revenues. The forecasts fall outside FERC's jurisdiction, and are not even for the pricing zones in which ZEC plants are located. *Supra* 11-12. And there is no true up to reconcile forecasts with actual rates. *Supra* 11. The ZEC price also adjusts based on amounts of renewable generation in New York, which is unrelated to ZEC plants' revenues. *Supra* 10. Thus, the adjustment protects consumers, A-212; it does not set a "floor price" for ZEC plants' wholesale sales. A-223. Generators remain exposed to market risk.

In short, the ZEC price is not "tethered" to wholesale prices, let alone particular generators' actual wholesale revenues (as in *Hughes*). Plaintiffs' many assertions to the contrary are simply wrong. *E.g.*, Br. 38 (claiming that the "subsidy varies in almost exactly the same manner" as in *Hughes*, "shrinking as rates rise and growing as rates thereafter fall").

***Third: Plaintiffs Distort* Hughes*'s Holding*. Not only do Plaintiffs misrepresent how the Program works, they also mischaracterize *Hughes*, claiming that it "held" that state programs "are preempted" if "tethered to FERC-regulated wholesale electricity prices." Br. 10, 40, 41, 42, 48. Plaintiffs incant similar phrasing often, as if saying will make it so. But that is not what *Hughes* held. *Hughes* described the illegal "tether" as one to "wholesale market *participation*," not wholesale market *prices*. 136 S. Ct. at 1299 (emphasis added). And as the next sentence shows, the unlawful

46

"tether" to "market participation" was Maryland conditioning payment on auction sales. *Id.* Indeed, the Court emphasized that "[n]othing in its opinion" condemned state programs lacking *that* "fatal defect." *Id.*; *id.* at 1297 & n.9. As the district court recognized, *Hughes* "nowhere stated, implied or even considered [whether] a State program's incorporation of the wholesale market price would provide a basis for preemption." SPA-18.

That was no accident. FERC itself repeatedly told the Court that the *only* problem was the tether to wholesale market *participation*, not prices. FERC's lawyer affirmed at argument that a state-imposed "contract for differences is not preempted here. It's just when there's a bidding-and-clearing requirement." Tr. Of Oral Arg. at 57:2-4, *Hughes*, 136 S. Ct. 1288, http://bit.ly/2q6rjeq.

The district court also correctly recognized that *Rochester Gas* forecloses Plaintiffs' price-tethering theory. SPA-19. There, this Court allowed New York to consider a "reasonable estimate" of wholesale sales revenue in calculating retail rates, which (like RECs and ZECs) are under state jurisdiction. 754 F.2d at 100-01, 105. Tying retail prices to estimates of wholesale revenues—even estimates of *actual* wholesale revenues—is permissible, because there is "a distinction between" a State actually "regulating [wholesale] sales" and a State "reflecting the profits from a reasonable estimate of those

47

sales" when acting within its sphere. *Id.* at 105. That distinction is important. In many States, generators are owned by vertically integrated utilities that are entitled under state law to recover their full costs of operation from retail customers. When setting retail rates to ensure cost recovery, States do (and have long done) exactly what Plaintiffs claim is impermissible: they set a price (a retail rate) by "subtracting" from the utility's costs its "revenue from wholesale electricity sales." Lowell E. Alt, Jr., *Energy Utility Rate Setting* 59 (2006). Under *Rochester Gas*, New York is allowed to use forecasted wholesale prices when setting state-jurisdictional prices like ZEC prices.

Plaintiffs claim *Rochester Gas* is distinguishable because the ZEC Program, *as a whole*, changes "nuclear plants' 'position toward' the wholesale markets" by preventing retirement. Br. 39. But the same was true in *Rochester Gas*: generators could keep operating, regardless of wholesale revenues, because they were assured to recover their costs through retail rates. What mattered in *Rochester Gas* was that the State's use of *forecasted wholesale revenues* did not change the plants' "position toward" wholesale markets. That is true here. *Reducing* the ZEC price based on forecasted wholesale prices does not prevent a ZEC plant from retiring.

48

Pricing is also not a "fundamental difference" between ZECs and RECs that would distinguish this case from *WSPP*. Br. 41. FERC's reasoning in *WSPP* did not turn on how RECs were priced. Rather, ZECs, like RECs, fall within state authority because they base payment on a production method. *WSPP*, 139 FERC ¶61,061, P.24. Anyway, it is false that all REC prices are set in markets "determined by … supply and demand." Br. 41. New York, for example, "centrally-procure[s] [RECs] … in long-term contracts" with fixed prices. A-94. Even when States use "markets," the REC prices move in response to wholesale prices, as the PSC recognized. A-211. Other REC prices are set administratively, *e.g.*, N.J. Stat. Ann. §48:3-87.1; Md. Code Ann., Pub. Util. §7-704.1, or by "price benchmarks" based on "expected current and future regional energy prices," 20 ILCS 3855/1-75(c)(1)(D). FERC's approval of REC programs did not turn on pricing mechanisms.[24]

Finally, Plaintiffs claim the ZEC Program is impermissibly "tethered" to "wholesale markets," Br. 40; *see* Br. 16, 42, 47, because it was designed as a response to "inadequacy of wholesale rates." Br. 38, 34. But this is just rewriting *Hughes*, which—again—did not hold that state programs are

---

[24] Even if it were true (and relevant) that REC prices only fluctuate based on "the supply and demand of renewable energy," the ZEC price also fluctuates based on New York's supply of renewable generation. A-220-22; *supra* 10.

49

preempted simply because they have some "connection" to "wholesale markets." *Supra* 46-47. Indeed, Plaintiffs' rule would invalidate many programs that *Hughes* sought to preserve and Plaintiffs concede are lawful. Every REC program responds to wholesale market "inadequac[ies]": They aim to "induce new entry" of renewable generation, Br. 40-41,[25] which is necessary only because existing wholesale prices have been inadequate to attract the amount of renewable generation that States desire. Similarly, cap-and-trade programs, carbon taxes, and the like exist only because States conclude that wholesale markets are not producing sufficient clean generation. And it is not just new generation. The Order that created the ZEC Program also created a "maintenance tier" to "financially support the maintenance of certain existing at-risk" renewables. A-86, 101-02. If these programs are valid, as Plaintiffs concede, so are ZEC programs.

## III. Plaintiffs' Conflict Preemption Claim Was Properly Dismissed.

Because of how Congress divided regulation between States and FERC, conflict claims are disfavored. The FPA prescribes "not only the intended reach of the [federal] power, but also ... the areas into which this power was

---

[25] *E.g.*, Del. Code Ann. tit. 26, §351 (ensure "a minimum level of [renewable] resources"); N.H. Rev. Stat. Ann. §362-F1 ("stimulate ... renewable energy ... at new or existing facilities"); R.I. Gen. Laws §39-26-1(e) ("increase ... energy supplied ... from renewable resources").

not to extend"—production and retail sales. *Nw. Central*, 489 U.S. at 510 (quotation marks omitted). Hence, "conflict-pre-emption analysis must be applied sensitively" to prevent "diminution of the role Congress reserved to the States." *Id.* at 515. So long as the State is "regulat[ing] production or other subjects of state jurisdiction, and the means chosen [are] at least plausibly ... related to matters of legitimate state concern," a program is valid absent "*clear damage* to [FERC's] goals." *Id.* at 518, 522 (emphasis added).

Plaintiffs' conflict claim fails. New York is "regulat[ing] production," and the ZEC Program is "at least plausibly ... related to matters of legitimate state concern." *Id.* at 518. It is part of the Clean Energy Standard, a broader initiative to promote renewables and reduce emissions. A-85-90. The Program advances these goals by "preserv[ing] existing zero-emissions nuclear generation resources as a bridge to the clean energy future," to "prevent backsliding" that otherwise "likely could not be avoided." A-85, 229.

Nor have Plaintiffs identified any genuine FERC "goal" to which the Program causes "clear damage." *Nw. Central*, 489 U.S. at 518, 522. They claim the Program conflicts with "the very goal of FERC's wholesale market design," Br. 46, because it allows participants to "keep ... plants in operation" that would have "retire[d]" if relying solely on wholesale sales at "FERC-ap-

proved" rates, *id.*, and "distort[s] price signals" by increasing supply and "depress[ing the] market prices" that result, *id.* But while FERC indeed uses auctions to set prices and promote efficiency, Plaintiffs have simply invented the broader claim—essential to their argument—that FERC's "very goal" is for auctions *exclusively* to drive which plants operate and which retire.

Plaintiffs cite nothing supporting that broader claim. Their assertion that the ZEC Program is irreconcilable with "NYISO rules," Br. 44, is meritless, as NYISO supports the Program. ECF 42-2 at 244, 349. NYISO "share[d] the State's concerns about the potential retirement of nuclear" plants, and "urge[d] quick implementation of a short-term program to retain" them. ECF 42-2 at 349.

FERC's precedent shows that FERC's view is the opposite of Plaintiffs'. Plaintiffs imagine "an idealized vision of markets free from the influence of public policies," but "such a world does not exist." *N.Y. State PSC*, 158 FERC ¶61,137, 2017 WL 496267, at *11 (2017) (Bay, concurring). FERC's auctions take existing state initiatives as a given, and use auctions to set prices against such initiatives' *backdrop*, including many that change generators' revenues, alter which generators operate, and affect wholesale prices. For example, many plants owned by vertically integrated utilities remain in business only because States guarantee financial viability by allowing them to "recover ...

costs through cost-based retail rates." *Utilization of Elec. Storage*, 158 FERC ¶61,051, P.22. Yet "years of [FERC] precedent" allow them to participate in FERC's auctions, and FERC has not "required ... measures to address the[ir] potential competitive impact." *Id.*

Likewise, many initiatives Plaintiffs concede are lawful—tax breaks, emissions allowances, cap-and-trade programs, REC programs—encourage clean or polluting generators to operate or retire, which affects prices. *Supra* 5-7. *Allco* considered one example: Connecticut sought "to increase[e] re-newable energy generation" by raising generators' revenues via long-term contracts. 861 F.3d at 89. This "increased the supply of electricity," and "place[d] downward pressure on" prices. *Id.* at 101. Yet it was not conflict-preempted. In so holding, *Allco* followed settled law. Last year, FERC af-firmed that States are "free" to adopt such policies even if "price signals in the ... capacity market indicate" the generation is "[not] needed." U.S. Ami-cus Br. 33. FERC similarly has held that States may "grant loans, subsidies or tax credits to particular facilities on environmental or policy grounds," *Cal. PUC*, 133 FERC ¶61,059, P.31 n.62, including when that makes clean generation "more competitive in a cost comparison with fossil-fueled gener-ation" or "allow[s] states to affect the [wholesale] price." *S. Cal. Edison Co.*,

71 FERC ¶61,269, 62,080 (1995). States may also "require retirement of existing generators" or construction of "environmentally-friendly units, or ... take any other action in their role as regulators of generation," even though that "affects the market clearing price." *Conn. DPUC*, 569 F.3d at 481. Indeed, FERC has allowed renewable generators receiving RECs to drive prices *negative. See supra* 7.

Faced with this precedent, Plaintiffs concede New York's authority to enact "measures that may have an indirect effect on ... price signals," but claim New York cannot "distort" these signals. Br. 49. But "distort" is just a pejorative word for "affect." This Court cannot invalidate the ZEC Program based on that subjective distinction.

Plaintiffs claim the Program has the "very aim" of sustaining generators that otherwise would close, whereas other programs' effects on auctions are "incidental." Br. 46. But as just explained, REC programs' *point* is to increase renewable generation beyond what wholesale markets otherwise yield; that is no "incidental" byproduct. *Supra* 50. There is nothing suspect about States responding to wholesale market conditions in this way. Three decades ago, *Northwest Central* affirmed that state regulation does not become conflict-preempted simply because it is "[d]esigned as a counterweight

to [FERC's] market, contractual, and regulatory forces." 489 U.S. at 497.[26]

Plaintiffs assert that FERC has approved only state policies that do "'not affect wholesale electricity rates,'" citing *WSPP*. Br. 48 (quoting *WSPP*, 139 FERC ¶61,061, P.24). But the FERC precedent cited above proves otherwise. *WSPP* did not enact a case-by-case inquiry based on *size* of effects. Its holding was categorical, based on *how* RECs affect wholesale prices: FERC has jurisdiction over practices that "directly affect" wholesale rates, but REC programs' effects on rates are *not* direct. 139 FERC ¶61,061, PP.22, 24. REC payments, like ZEC payments, increase revenues for renewable generators, in turn increasing supply, in turn lowering auction clearing prices—at best, an "indirect[]" effect. *Id.* P.22.[27]

Plaintiffs also rehash their field-preemption arguments, claiming the Program is "tether[ed] to wholesale markets," that ZEC prices are "set with reference to wholesale rates," and that "FERC has never approved an environmental subsidy that is tethered to wholesale rates." Br. 47-48. Plaintiffs

---

[26] Also baseless is Plaintiffs' reliance on the PSC's characterization of low wholesale prices as a "problem" facing nuclear generators. Br. 45-46 (quoting A-271). The "problem" that concerned New York was not that nuclear plants received low prices, or would retire, but that such retirements would increase reliance on "fossil fuel generating plants," increasing "carbon dioxide ... and other pollutants." A-271.

[27] To be clear, if a program "directly affects" rates, this authorizes FERC to regulate it, but the program is not automatically preempted. While FERC's jurisdiction over wholesale rates is exclusive, its jurisdiction over practices that merely "affect[] ... such rates" is concurrent. 16 U.S.C. §824d(a).

never explain why these arguments prevail as conflict-preemption theories if they fail as field-preemption theories. *Supra* 43-50.

Confirming the absence of conflict is that, if FERC believes the Program interferes with its auctions, Br. 49, FERC can address the issue. *Northwest Central* explained that when a "dual regulatory scheme" has "a mechanism for resolving jurisdictional conflicts," "conflict-pre-emption analysis ha[s] no proper place." 489 U.S. at 516 n.12. In *Northwest Central*, "there [was] no [such] provision ... to resolve jurisdictional tensions," making conflict-preemption analysis necessary. *Id.* Here, FERC's mechanisms are purpose-built to address any "tensions" caused by state initiatives that affect wholesale prices too much. Thus, conflict preemption has "no ... place." *Id.* FERC reviews auction results, and if FERC determines rates are unjust or unreasonable, FERC changes the rules. *E.g.*, *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 660, 664 (D.C. Cir. 2017). Unlike courts entertaining conflict-preemption claims, FERC can distinguish between initiatives that "[a]ffect" price signals and those that "distort" them, and can match its remedy—minor tweak or substantial revision—to any problem it finds. *Supra* 13, 17. The ZEC Program cannot be conflict-preempted when FERC has permitted state subsidy programs and, if it thinks the Program problematic, can tailor a remedy.

## IV. Plaintiffs' Dormant Commerce Clause Claim Was Properly Dismissed.

Plaintiffs claim the ZEC Program violates the Commerce Clause because it discriminates against out-of-state plants, and because, under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), its burdens on interstate commerce are clearly excessive relative to its local benefits.

### A. Plaintiffs Lack Standing.

Plaintiffs lack Article III and prudential standing.

Regarding the discrimination claim, Plaintiffs lack standing because their injury is not caused by the alleged discrimination against out-of-state facilities. Article III requires injury that is "fairly traceable to" the "*allegedly unlawful* conduct"—here, discrimination against out-of-state generators. *Van Allen v. Walsh*, 370 F. App'x 235, 237 (2d Cir. 2010) (emphasis added) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1994)). Similarly, for prudential standing, Plaintiffs must allege "injury stemming from the application of the [ZEC program] in a manner discriminatory to out-of-state interests." *L.A.M. Recovery, Inc. v. Dep't of Consumer Affairs*, 184 F. App'x 85, 88-89 (2d Cir. 2006). Plaintiffs whose injuries are not caused by a program's *discriminatory* aspects thus lack standing. *E.g.*, *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 499-500 (5th Cir. 2004).

Plaintiffs "do not allege that they own or represent an out-of-state nuclear plant," SPA-40, and concede they cannot "complain about an inability to compete for ZECs." Br. 54. Thus, even "if favoritism exists" in selecting among nuclear plants, Plaintiffs could not "have suffered any cognizable harm as a result." *Wine And Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 12 (1st Cir. 2007).

Instead, Plaintiffs allege injury because the Program allows "favored New York power plants to prevail in interstate competition against Plaintiffs." Br. 49. Yet Plaintiffs lack Article III and prudential standing for this claim, too—for two reasons.

First, that injury results from New York's decision to favor nuclear plants over fossil-fuel plants, and would be equally felt by Plaintiffs regardless whether in-state or out-of-state nuclear plants are selected. Their injury is not traceable to geographic discrimination; it is traceable to their production of electricity using dirty fuels that New York disfavors. Plaintiffs assert that an injunction would *redress* their "Commerce Clause injury." Br. 56. That is irrelevant. Traceability and redressability are separate Article III requirements. *E.g., Allen*, 468 U.S. at 753 n.19.

Second, Plaintiffs' Complaint does not even allege that they engage in interstate competition in New York. They allege they own in-state and out-

58

of-state plants, but *not* that their out-of-state plants compete in NYISO auctions. A-43-45 (¶¶9-15). Below, Plaintiffs' counsel repeatedly refused to confirm that they do. MTD Hr'g Tr. 36-38, ECF 141. Plaintiffs' only alleged harm, therefore, is that New York "tilted" the "playing field" against their New York-based facilities. Br. 55. That injury is not traceable to burdens on *out*-of-state competition, so cannot confer Article III or prudential standing.[28]

## B. The Dormant Commerce Clause Does Not Apply to Subsidy Programs Like the ZEC Program.

Plaintiffs' Commerce Clause claims also fail because, as Plaintiffs admit, the ZEC Program is a "subsidy" for zero-emissions nuclear generation. Br. 50. The dormant Commerce Clause does not apply to subsidies addressing environmental problems. *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976).

*Alexandria Scrap* upheld a Maryland program paying a "bounty" to third parties for destroying automobile hulks in junkyards, which "protect[ed] the State's environment" from their ill effects. 426 U.S. at 797, 809. Like ZEC plants, these processors competed in an interstate market (for auto

---

[28] In *Selevan v. N.Y. Thruway Authority*, the plaintiffs had standing because they were directly subject to the toll that burdened commerce. 584 F.3d 82, 87-89 (2d Cir. 2009). Because only a *Pike* claim went forward, it was enough that the toll "affect[ed] interstate commerce." *Id.* at 93-95.

hulks).  The program favored in-state processors, "effect[ively]" limiting the bounty to them.  *Id.* at 799-802, 803.  Yet because Maryland had not erected a "trade barrier of the type forbidden by the Commerce Clause," but merely provided a subsidy "payment" to "encourage the removal of automobile hulks," *id.* at 809-10, "the Commerce Clause" was "not ... concerned."  *Id.* at 805.

Similarly, New York has not enacted a "trade barrier" but provided a subsidy—a ZEC payment—for eliminating pollution.  *Id.*  The Commerce Clause has no application.  On this ground, the *Allco* district court held the "dormant Commerce Clause [did] not apply" to an indistinguishable REC program.  *Allco Fin. Ltd. v. Klee*, No. 15-cv-608, 2016 WL 4414774, at *23-25 (D. Conn. Aug. 18, 2016).  This Court affirmed on other grounds, without doubting that conclusion.

Plaintiffs argue that *Alexandria Scrap* cannot apply because the ZEC Program uses regulation.  Br. 56.  Not so.  Maryland did the same, using documentation requirements, penalties on scrapyards with old hulks, and grants of civil immunity.  426 U.S. at 796-97; *see Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 346 (2008) (plurality op.).  These subsidies do not violate the Commerce Clause because they do not burden the free flow of commerce.

Instead, they simply "bid up" the value of environmental services (there, processing hulks; here, generating zero-emissions energy). *Alexandria Scrap*, 426 U.S. at 806; SPA-44 ("[The] ZEC [P]rogram does not create a trade barrier or prevent or regulate the flow of energy ....").

Plaintiffs note that New York is not "purchas[ing] energy" but instead is subsidizing "third-party" transactions, and is not paying "out of its general revenue." Br. 56, 58. But in *Alexandria Scrap*, Maryland was not purchasing hulks; it subsidized scrapyards' "sales to third-parties." 426 U.S. at 809. Plaintiffs cite nothing supporting their claim that it is "constitutionally significant" whether funds come from general revenues. Br. 58. *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994), cited subsidies from "general taxes or municipal bonds" as *examples* of measures outside the dormant Commerce Clause. *Id.* at 394. Plaintiffs' citation to *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Management Authority*, 550 U.S. 330, 368 (2007), is to Justice Alito's dissent.

### C. Plaintiffs' Discrimination Claim Fails.

Even ignoring *Alexandra Scrap*, the discrimination claim fails. Plaintiffs assert that the ZEC Program "tilt[s] the playing field" in favor of ZEC plants. Br. 52. But the Commerce Clause prohibits only discrimination based on *geography*; States can "tilt the playing field" in favor of particular

products, technologies, or industry segments, including zero-emissions nuclear facilities. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471-72 (1981) (state favored pulpwood producers over plastic-resin producers). Hence, States can regulate generators differently based on "real variations in emissions from different methods [of] ... production," even if they are "intertwined with geography." *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1089-90 (9th Cir. 2013).

Plaintiffs cannot avoid dismissal by asserting that the PSC's true purpose was protectionist rather than environmental. Br. 52. Courts must "assume that the objectives articulated by the [State] are [the] actual purposes ..., unless an examination of the circumstances forces [the Court] to conclude that they *could not have been* a goal." *Clover Leaf*, 449 U.S. at 463 n.7 (emphasis added) (quotation marks omitted); *see id.* at 471 n.15; *Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 400 (9th Cir. 2015); *E. Ky. Res. v. Fiscal Ct. of Magoffin Cty.*, 127 F.3d 532, 542 (6th Cir. 1997). Here, the PSC's Order states its purpose was to reduce carbon emissions, and relies on evidence showing that nuclear facilities are crucial to that goal. *Supra* 8-9. Plaintiffs do not, and cannot, plead facts showing that this "could not have been" at least "a goal." *Clover Leaf*, 449 U.S. at 463 n.7 (citation omitted).

Moreover, the ZEC Program pursues that goal without geography-

based discrimination. Nuclear plants are eligible "regardless of the[ir] location"; the Program does not even *consider* plants' locations. A-209. The Program does, to be sure, consider where electricity *ends up*, as measured by "verifiable historic contributions to the clean energy resource mix consumed by retail consumers in New York." *Id. Allco*, however, holds that such limits do not violate the dormant Commerce Clause.

*Allco* considered a Georgia renewable generator's challenge to Connecticut's REC program, which restricted participation to generators that, unlike the Georgia generator, served "Connecticut consumers[]." 861 F.3d at 106. Only generators hooked to Connecticut's "regional grid" could participate. *Id. Allco* rejected the argument that this discriminated against the Georgia generator, explaining that it was not "similarly situated" to generators serving Connecticut: "Connecticut consumers' need for a more diversified and renewable energy supply, accessible to them ..., would not be served by RECs produced by" the Georgia generator. *Id.* Connecticut had a "legitimate interest in promoting increased ... renewable power generation *in the region*, thereby protecting its citizens' health, safety, and reliable access to power." *Id.* (emphasis added). Georgia generators could not further this interest because of "the boundaries of the electrical grid," not Connecticut's discrimination. *Id.* at 105, 107.

63

*Allco* confirms the ZEC Program's validity. The "historic contribution[]" factor is another way of measuring whether plants produce electricity consumed in New York, and so further New York's interest in clean "energy supply … accessible to" its citizens. *Id.* at 106. And "the boundaries of the electrical grid," *id.* at 105, determine which plants satisfy that factor. New York happens to have a single-state grid, but any nuclear plant can become eligible by showing it has sold into New York.

Plaintiffs assert, without elaboration, that the Program discriminates "in effect," Br. 52—perhaps because New York plants thus far have been selected. But Plaintiffs conceded below that as "far as we know," "no nuclear plant outside of New York" has ever "provided energy inside New York." MTD Hr'g Tr. 36, 38, ECF 141. It is not discriminatory to pick New York plants when *only* those plants currently serve New York's geographically neutral environmental goals.

### D. Plaintiffs' *Pike* Claim Fails.

*Allco* rejected a challenge to Connecticut's REC program under *Pike*, 397 U.S. 137, because it was a "legitimate state pursuit … relat[ed to] the health, life, and safety of [its] citizens." *Allco*, 861 F.3d at 107. The result is the same here.

*Pike* requires a "burden … on interstate commerce" that is "different

from that imposed on intrastate commerce" and "clearly excessive in relation to the putative local benefits." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 50 (2d Cir. 2007) (quotation marks omitted). But Plaintiffs do not allege any *burden* on commerce (like shipping restrictions, *Pike*, 397 U.S. at 138); they allege only indirect price effects from a subsidy. A-71 (¶74). Likewise, any price effects from the ZEC Program affect in- and out-of-state facilities alike, *id.*, so any *interstate* burden is no "different from that imposed on intrastate commerce." *Southold*, 477 F.3d at 50 (quotation marks omitted).

Finally, Plaintiffs' conclusory assertions that the Program's burdens outweigh its benefits fail as a pleading matter. Plaintiffs must plead "facts ... relevant to ... the amount[]" of burden, and "facts relating to any putative local benefits." *Allco*, 861 F.3d at 108. Here, the PSC found that the Program's benefits from carbon reductions *alone* outweighed its costs by half a billion dollars. A-210. Plaintiffs plead no "facts" disputing that analysis, much less showing any burdens are "clearly excessive."

## CONCLUSION

The judgment below should be affirmed.

November 17, 2017                    Respectfully submitted,

                                     /s/ Matthew E. Price
                                     Matthew E. Price
                                     David W. DeBruin
                                     Zachary C. Schauf
                                     William K. Dreher
                                     JENNER & BLOCK LLP
                                     1099 New York Ave. NW Ste. 900
                                     Washington, D.C. 20001
                                     (202) 639-6000

              *Counsel for Intervenors-Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(a)(7)(B), I hereby certify that this brief contains 13,994 words, as counted by Microsoft Word, excluding the items that may be excluded under Federal Rule 32(a)(7)(B)(iii).  This brief uses a proportionally spaced typeface, Georgia, and the size of the typeface is 14 points, in compliance with Rules 32(a)(5)(A) and (a)(6).

/s/ Matthew E. Price

November 17, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of November, 2017, a true and correct copy of the foregoing Brief for Intervenors-Defendants-Appellees was served on all counsel of record in this appeal via CM/ECF pursuant to Local Rule 25.1(h)(1) and (2).

/s/ Matthew E. Price

68