# 17-2654-CV

# United States Court of Appeals

*for the*

## Second Circuit

COALITION FOR COMPETITIVE ELECTRICITY, DYNEGY INC.,
EASTERN GENERATION, LLC, ELECTRIC POWER SUPPLY
ASSOCIATION, NRG ENERGY, INC., ROSETON GENERATING LLC,
SELKIRK COGEN PARTNERS, L.P.,

*Plaintiffs-Appellants,*

– v. –

AUDREY ZIBELMAN, in her official capacity as Chair of the New York Public
Service Commission, PATRICIA L. ACAMPORA, in her official capacity
as Commissioner of the New York Public Service Commission,

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

DONALD B. VERRILLI, JR.
MUNGER, TOLLES & OLSON LLP
1155 F Street, NW, 7th Floor
Washington, DC 20004
(202) 220-1100

– and –

HENRY WEISSMANN
FRED A. ROWLEY, JR.
MARK R. YOHALEM
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Suite 5000
Los Angeles, California 90071
(213) 683-9100

JONATHAN D. SCHILLER
DAVID A. BARRETT
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

– and –

STUART H. SINGER
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
(954) 356-0011

*Attorneys for Plaintiffs-Appellants*

GREGG C. SAYRE, in his official capacity as Commissioner of the New York Public Service Commission, DIANE X. BURMAN, in her official capacity as Commissioner of the New York Public Service Commission,

*Defendants-Appellees,*

EXELON CORP., R.E. GINNA NUCLEAR POWER PLANT LLC, CONSTELLATION ENERGY NUCLEAR GROUP, LLC, NINE MILE POINT NUCLEAR STATION LLC,

*Intervenor-Defendants-Appellees.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

ARGUMENT ...............................................................................................3

I.     PLAINTIFFS' PREEMPTION CLAIMS ARE JUSTICIABLE ...................3

    A.     Plaintiffs Have Article III Standing .......................................3

    B.     Plaintiffs May Sue in Equity to Enjoin Operation of a
        Preempted State Law.................................................................5

        1.     Plaintiffs May Bring Suit in Equity Even If They Are Not
                the Targets of State Enforcement................................6

        2.     Congress Did Not Intend for the FPA to Foreclose
                Equitable Actions Such as Plaintiffs' Suit Here ......................10

                (a)     The Text of the FPA Confirms Plaintiffs' Right to
                        Bring an Equitable Action to Enjoin Preempted
                        State Law .....................................................10

                (b)     The FPA Does Not Support the Inference that
                        Congress Intended to Displace Traditional
                        Equitable Remedies .......................................13

II.    THE ZEC PROGRAM IS FIELD-PREEMPTED .........................................20

    A.     The ZEC Subsidy is Tethered to Wholesale Rates in the Same
        Manner as the Preempted Subsidy in *Hughes*.....................20

    B.     In Operation and Effect, the ZEC Program Cannot be
        Distinguished from the Maryland Program Preempted in
        *Hughes*..................................................................................25

    C.     FERC Has Never Approved Anything Resembling the ZEC
        Program ..................................................................................33

III.   THE ZEC PROGRAM CONFLICTS WITH FEDERALLY
      ESTABLISHED WHOLESALE RATES ....................................................36

IV.    PLAINTIFFS HAVE STATED A CLAIM FOR VIOLATION OF
      THE COMMERCE CLAUSE.................................................................40

    A.     Plaintiffs Have Standing to Pursue Their Dormant Commerce
        Clause Challenge....................................................................40

**TABLE OF CONTENTS**
**(continued)**

**Page**

B.    The PSC Is Regulating, Not Participating in, the Wholesale
      Energy Market ........................................................................41

C.    Plaintiffs Have Alleged Discrimination and *Per Se* Invalidity ...........43

D.    Plaintiffs Have Stated a *Pike* Claim ...................................................46

CONCLUSION .................................................................................................48

CERTIFICATE OF COMPLIANCE ......................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Air Evac EMS, Inc. v. Tex. Dep't of Ins.*,
    851 F.3d 507 (5th Cir. 2017) ............................................................7

*Allco Finance Ltd. v. Klee*,
    805 F.3d 89 (2d Cir. 2015) ............................................................17

*Allco Finance Ltd. v. Klee*,
    861 F.3d 82 (2d Cir. 2017) ....................................................passim

*Alliance for Clean Coal v. Miller*,
    44 F.3d 591 (7th Cir. 1995) ..............................................40, 42, 44

*Armstrong v. Exceptional Child Center, Inc.*,
    135 S. Ct. 1378 (2015) ...........................................................passim

*Avocados Plus Inc. v. Veneman*,
    370 F.3d 1243 (D.C. Cir. 2004) ...................................................16

*Bacchus Imports, Ltd. v. Dias*,
    468 U.S. 263 (1984) ......................................................................46

*Bassler v. Cent. Nat'l Bank in Chicago*,
    715 F.2d 308 (7th Cir. 1983) ........................................................11

*Calpine Corp. v. FERC*,
    702 F.3d 41 (D.C. Cir. 2012) .......................................................30

*Crosby v. National Foreign Trade Council*,
    530 U.S. 363 (2000) ...................................................................7, 8

*Dean Milk Co. v. City of Madison*,
    340 U.S. 349 (1951) ......................................................................45

*Doe v. Cuomo*,
    755 F.3d 105 (2d Cir. 2014) ...........................................................4

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin*,
    733 F.3d 393 (2d Cir. 2013) ........................................................45

# TABLE OF AUTHORITIES
## (continued)

**Page**

*FERC v. Elec. Power Supply Ass'n,*
  136 S. Ct. 760 (2016)............................................................19, 23, 36

*Florida State Conference of N.A.A.C.P. v. Browning,*
  522 F.3d 1153 (11th Cir. 2008) ...........................................................38

*Foster-Fountain Packing Co. v. Haydel,*
  278 U.S. 1 (1928)................................................................................45

*Friends of E. Hampton Airport, Inc. v. Town of E. Hampton,*
  841 F.3d 133 (2d Cir. 2016) ...................................................9, 15, 18

*Hardin v. Kentucky Utilities Co.,*
  390 U.S. 1 (1968)..................................................................................9

*Hughes v. Alexandria Scrap Corp.,*
  426 U.S. 794 (1976)......................................................................42, 43

*Hughes v. Oklahoma,*
  441 U.S. 322 (1979)............................................................................44

*Hughes v. Talen Energy Marketing LLC,*
  136 S. Ct. 1288 (2016).................................................................passim

*Idaho v. Coeur d'Alene Tribe of Idaho,*
  521 U.S. 261 (1997)..............................................................................6

*Johnson v. U.S. Office of Personnel Management,*
  783 F.3d 655 (7th Cir. 2015) ................................................................4

*Lewis v. BT Investment Managers, Inc.,*
  447 U.S. 27 (1980)..............................................................................46

*McCarthy v. Madigan,*
  503 U.S. 140, 145, 152 (1992)............................................................16

*McKart v. United States,*
  395 U.S. 185 (1969)............................................................................17

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*,
    136 S. Ct. 1562 (2016) ................................................................12

*Minnesota v. Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981) .............................................................44, 45

*Morgan Stanley Capital Group Inc. v. Pub. Util. Dist. No. 1 of
    Snohomish County*,
    554 U.S. 527 (2008) ................................................................28

*Nat'l Meat Ass'n v. Harris*,
    565 U.S. 452 (2012) ................................................................26

*New Energy Co. of Ind. v. Limbach*,
    486 U.S. 269 (1988) .........................................................41, 42, 47

*New York State Conference of Blue Cross & Blue Shield Plans v.
    Travelers Ins. Co.*,
    514 U.S. 645 (1995) ..................................................................8

*Niagara Mohawk Power Corp. v. FERC*,
    306 F.3d 1264 (2d Cir. 2002) .......................................................17

*Nw. Central Pipeline Corp. v. State Corp. Comm'n*,
    489 U.S. 493 (1989) ................................................................36

*PPL EnergyPlus, LLC v. Nazarian*,
    753 F.3d 467 (4th Cir. 2014) ...........................................24, 37, 38, 39

*PPL Energyplus, LLC v. Solomon*,
    766 F.3d 241 (3d Cir. 2014) ..........................................................8

*Park Pet Shop, Inc. v. City of Chicago*,
    872 F.3d 495 (7th Cir. 2017) .......................................................47

*Pharm. Research & Mfrs. of Am. v. Walsh*,
    538 U.S. 644 (2003) ..................................................................8

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970). AOB 53-54 ............................................................ 46, 47

*Pub. Util. Dist. No. 1 of Grays Harbor County v. IDACORP Inc.*,
    379 F.3d 641 (9th Cir. 2004) ................................................................ 24, 36

*Selevan v. N.Y. Thruway Auth.*,
    584 F.3d 82 (2d Cir. 2009) ..................................................................... 46

*Seminole Tribe of Fla. v. Florida*,
    517 U.S. 45 (1996) ................................................................................ 15, 16

*Touche Ross & Co. v. Redington*,
    442 U.S. 560 (1979) ............................................................................... 11

*Town of Barnstable v. O'Connor*,
    786 F.3d 130 (1st Cir. 2015) ................................................................... 7

*United States v. Locke*,
    529 U.S. 89 (2000) ................................................................................. 24

*Va. Office for Protection and Advocacy v. Stewart*,
    563 U.S. 247 (2011) ............................................................... 6, 9, 10, 14

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
    535 U.S. 635 (2002) ............................................................................. 5, 11

*West Lynn Creamery, Inc. v. Healy*,
    512 U.S. 186 (1994) ............................................................................... 45

*Woodford v. Ngo*,
    548 U.S. 81 (2006) ............................................................................... 26, 31

*Wos v. E.M.A.*,
    568 U.S. 627 (2013) ............................................................................. 26, 31

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992) ....................................................................... 40, 42, 43

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Ex parte Young*,
209 U.S. 123 (1908)................................................................passim

REGULATORY CASES

*Calpine Corp. v. PJM Interconnection, LLC*,
FERC Docket No. EL16-49-000 (Feb. 23, 2017)..............................................38

*Consumers Energy Co.*,
94 FERC ¶ 61,180 (2001)..................................................................37

*Golden Spread Elec. Coop., Inc. v. Sw. Pub. Serv. Co.*,
123 FERC ¶ 61,047 (2008)..................................................................37

*ISO New England, Inc.*,
158 FERC ¶ 61,138 (2017)..................................................................35

*PSEG Long Island LLC*,
145 FERC ¶ 61010 (2013)..................................................................29

*WSPP Inc.*,
139 FERC ¶ 61,061 (2012)..........................................................33, 35, 36

FEDERAL STATUTES

16 U.S.C. § 824(a) ..................................................................20

16 U.S.C. § 824a-3(h)(2)(B) ...........................................................17

16 U.S.C. § 824d(a) ......................................................19, 20, 21, 30

16 U.S.C. § 825*l*..................................................................16

16 U.S.C. § 825p ................................................................passim

28 U.S.C. § 1331..................................................................12

# TABLE OF AUTHORITIES
## (continued)

**Page**

OTHER AUTHORITIES

Felix Mormann, *Clean Energy Federalism*, 67 Fla. L. Rev. 1621
(2015) ................................................................................................34

# INTRODUCTION

New York's zero-emissions credit (ZEC) program violates federal law because it supplants interstate wholesale rates for electricity that FERC has deemed just and reasonable. It disrupts and distorts the auction process FERC has approved for setting those wholesale rates. And it discriminates against out-of-state electricity producers by subsidizing three favored New York power plants and shielding them from interstate competition.

These legal infirmities flow from the regulatory means New York has chosen, not from the ends it claims to advance. If the State genuinely seeks to combat climate change by promoting zero-emissions electricity generation, it has ample means to do so without impermissibly intruding on the federal government's exclusive authority over wholesale electricity markets and without discriminating against out-of-state suppliers. Most obviously, the State could have adopted a carbon tax or a cap-and-trade program for carbon emissions, as have many other states. While these measures might affect wholesale prices, they would operate independently of the wholesale power markets. But New York has not chosen to promote its ostensible environmental objectives in any of these ways, or even by offering a fixed subsidy to nuclear plants. Instead, it adjusts the amount of the subsidy based on wholesale market prices.

1

This price-setting mechanism is preempted because it impinges upon, and conflicts with, FERC's exclusive jurisdiction. "States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates." *Hughes v. Talen Energy Marketing LLC*, 136 S. Ct. 1288, 1298 (2016). That is precisely what the ZEC program does. In both intended operation and effect, it is no different from the Maryland program that a unanimous Supreme Court found preempted in *Hughes*.

Defendants' assertion that the ZEC subsidy pays for the "environmental attributes" of production is beside the point. The relevant question is not the State's characterization of the "attribute," but the structure of the payment. If New York had purported to pay for the environmental attributes of nuclear plants by expressly conditioning the payment on those plants selling into wholesale markets, and expressly calibrating those payments to the amount received from such wholesale sales, the law would unquestionably be preempted under *Hughes*. The question in this case is whether the absence of such express provisions matters. As shown below, it does not.

## ARGUMENT

## I.  PLAINTIFFS' PREEMPTION CLAIMS ARE JUSTICIABLE

### A.  Plaintiffs Have Article III Standing

Plaintiffs' field and conflict preemption claims allege the ZEC subsidy will

set prices that "effectively replac[e]" and "artificially suppress[]" FERC-mandated

auction prices (A-72, A-75 (Compl. ¶¶ 80, 90)), resulting in "lower revenues" for

other generators (A-42 (Compl. ¶ 6)), and causing Plaintiffs competitive injury (A-

42-43, A-72-74 (Compl. ¶¶ 7, 81, 87)).  These allegations establish injury in fact

(loss of revenue) that is fairly traceable to the challenged government action (the

ZEC subsidy program) and redressable by a favorable judgment (an injunction

against enforcement of the ZEC program).  *See Allco Finance Ltd. v. Klee*, 861

F.3d 82, 95-96 (2d Cir. 2017) (solar generating company had standing to challenge

state renewable energy policy as preempted by the Federal Power Act (FPA) based

upon allegations that the policy impermissibly excluded plaintiff's power plants).

Although the district court found no standing deficiency (*cf.* SPA-11 n.9),

and the State does not dispute Plaintiffs' standing, Exelon persists in that

challenge.  Exelon does not dispute, however, that Plaintiffs have alleged injury-in-

fact and concedes that this injury would be redressed by a favorable judgment; its

only contention is that Plaintiffs fail to establish traceability, suggesting that

Plaintiffs' injury can be traced only to the Base Subsidy Amount, not to the price

adjustment feature.  (Exelon Answering Brief (EAB) 44-45.)  This argument is meritless.

Plaintiffs' injury is traceable to the ZEC subsidy.  This subsidy cannot be deconstructed into the Base Subsidy Amount and the price adjustment feature, because the total subsidy is a function of the interaction of those two integrated provisions.  That is clear both from the face of the PSC order (*see* Appellants' Opening Brief (AOB) 6-7) and Plaintiffs' allegations about how the subsidy works (A-69-70 (Compl. ¶¶ 70-71)).  In conceding that Plaintiffs have properly pleaded redressability, Exelon necessarily also concedes that the Base Subsidy Amount and the price adjustment are not severable (or, at least, that non-severability must be assumed at this stage).  This concession dooms Exelon's argument, as the injury is traceable to the operation of those non-severable and interconnected elements that comprise the ZEC subsidy.

The case might be different if, as in *Johnson v. United States Office of Personnel Management*, 783 F.3d 655, 661-62 (7th Cir. 2015), and *Doe v. Cuomo*, 755 F.3d 105, 114 (2d Cir. 2014), the Order included disparate provisions, only some of which affected Plaintiffs.  Imagine, for example, that the PSC had issued an order that included one section establishing the ZEC subsidy and another section providing ratepayer funding for research into greenhouse gas emissions.  Competing generators would not suffer competitive injury traceable to the research

4

funding provision. But in this case, it is the ZEC subsidy that harms Plaintiffs. Because the ZEC payment is computed by combining the Base Subsidy Amount and the price adjustment, and those variables are interrelated and non-severable, the subsidy provision cannot be broken apart for purposes of either traceability *or* redressability.

### B. Plaintiffs May Sue in Equity to Enjoin Operation of a Preempted State Law

Plaintiffs' prayer for an injunction against enforcement of the ZEC subsidy program is a traditional claim for equitable relief under *Ex parte Young*, 209 U.S. 123 (1908), *i.e.*, a "complaint [that] alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). The district court thus has jurisdiction unless the FPA manifests an intent to withdraw such jurisdiction. *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378, 1392 (2015). Because the FPA reconfirms, rather than strips the courts of, jurisdiction over private actions in equity, the district court erred in concluding it lacked jurisdiction. *See* AOB 19-20.

Defendants advance two counter-arguments. First, they assert that Plaintiffs' claim is not a traditional equitable action, which they contend is limited to plaintiffs who are the targets of a potential enforcement action. EAB 15; New York PSC Answering Brief (NYAB) 18-19. Second, they maintain that despite the FPA's express grant of equity jurisdiction, the district court properly construed the

5

FPA to foreclose equitable actions like Plaintiffs' suit here. EAB 16-25; NYAB 19-24. Both arguments are unavailing.

### 1. Plaintiffs May Bring Suit in Equity Even If They Are Not the Targets of State Enforcement

Defendants erroneously assert that *only* a party that is the potential target of state enforcement may bring an equitable action under *Ex parte Young* to enjoin enforcement of a preempted or unconstitutional state law. The Supreme Court has made clear that equity jurisdiction entitles any plaintiff with Article III standing to seek an injunction against enforcement of a preempted state law. "An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke … *Young*[.]" *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997); *see also id.* at 296 (O'Connor, J., concurring in part and concurring in the judgment) (*Young* requires "a straightforward inquiry into whether a complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective"); *Va. Office for Protection and Advocacy v. Stewart* ("*VOPA*"), 563 U.S. 247, 256 (2011) ("there is no warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff").

There are innumerable examples of equitable actions under *Young* to enjoin preempted or otherwise unconstitutional state laws where the plaintiff was not a potential target of a state enforcement action. *Armstrong* itself was such a case:

6

plaintiffs claimed that the state's reimbursement rates for habilitation services were too low. 135 S. Ct. at 1382. Plaintiffs did not face an enforcement action, yet the Court had no doubt that the claim fell within the courts' traditional equity jurisdiction. *Id*. at 1384. The entire discussion of how the Medicare Act forecloses equity jurisdiction would have been unnecessary if, as Defendants contend, equity jurisdiction does not extend to plaintiffs, such as the provider plaintiffs in *Armstrong*, who do not face an enforcement action. *Id.*; *see also, e.g.*, *Town of Barnstable v. O'Connor*, 786 F.3d 130, 137, 139-40 (1st Cir. 2015) (lawsuit by town, nonprofit group, businesses, and residents seeking to enjoin, as preempted by FPA and in violation of dormant Commerce Clause, state officials' approval of contracts for power from offshore wind farm); *Air Evac EMS, Inc. v. Tex. Dep't of Ins.*, 851 F.3d 507, 519 (5th Cir. 2017) (the "type of direct enforcement found in *Ex parte Young*" is "not required" for lawsuit to proceed).

Indeed, many *Ex parte Young* cases have arisen in the same posture as this one: businesses suing to enjoin the operation of a state law that favored competitors at their expense.

- In *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), businesses argued that federal law preempted a state statute that prohibited the state from doing business with them. They faced no

enforcement action, but the federal courts nonetheless entertained their claim for injunctive relief on preemption grounds. *Id.* at 367.

- In *Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644 (2003), drug manufacturers sued to enjoin, as preempted by the Medicaid Act, a state drug rebate program that benefited competitors. The plaintiffs were not potential subjects of an enforcement action. *Id.* at 654-56.

- In *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, 514 U.S. 645 (1995), commercial health insurers, asserting ERISA preemption, sued to enjoin a state law requiring hospitals to collect surcharges from commercial insurers but not from competing Blue Cross plans. *Id.* at 650-51.

- In *Hughes* 136 S. Ct. at 1296, and *PPL Energyplus, LLC v. Solomon*, 766 F.3d 241, 249 (3d Cir. 2014), existing power generators raised an FPA preemption challenge to a state statute subsidizing new generators. *See also Allco*, 861 F.3d at 90 (preemption challenge brought by operator of facility excluded from state renewable energy program).

These cases reflect the general rule that where a statute evidences "a legislative purpose to protect a competitive interest," the injured competitor is a

8

proper party to challenge it. *Hardin v. Kentucky Utilities Co.*, 390 U.S. 1, 6 (1968).

Defendants insist that these and many other cases involving equitable actions by private parties under the FPA (AOB 24 n.7) should be disregarded because they "precede *Armstrong*" and supposedly did not "*consider*[] whether an equitable cause of action was available" (EAB 18; *see also* NYAB 23). But *Armstrong* did not purport to change the law. Rather, it reaffirmed the "long history of judicial review" of preempted or unconstitutional governmental action that "is the creation of courts of equity." 135 S. Ct. at 1384.

While there are cases in which the plaintiff faces an enforcement action, *see, e.g.*, *Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016) (cited at EAB 20, NYAB 18), Defendants cite no case that *limits* equity jurisdiction to such plaintiffs. This Court had no occasion in *East Hampton* to consider whether *Ex parte Young*-type relief was available *only* if the plaintiffs sought to "preclude a municipal entity from subjecting them to local laws [preempted by federal law]." *Id.* at 146. Much less did it consider whether a statute that, like the FPA, broadly confers jurisdiction over "all suits in equity" could be so construed. The notion that such a limitation was somehow lurking unnoticed in the decades of decisions applying *Young* is refuted by *VOPA*. There, the plaintiff was a state agency seeking a declaration that a state law privileging

9

certain medical peer-review documents was preempted. 563 U.S. at 252-53. The

Court concluded that the state agency's claim was cognizable under *Young* even

though the plaintiff state agency was not, and could never be, the subject of a state

enforcement action. *Id.* at 255.

### 2. Congress Did Not Intend for the FPA to Foreclose Equitable Actions Such as Plaintiffs' Suit Here

Because Plaintiffs' claim is within the equitable jurisdiction of federal

courts, it is justiciable unless the FPA establishes "Congress's 'intent to foreclose'

equitable relief." *Armstrong*, 135 S. Ct. at 1385. No such intent appears in the

FPA.

### (a) The Text of the FPA Confirms Plaintiffs' Right to Bring an Equitable Action to Enjoin Preempted State Law

Section 825p of the FPA confers jurisdiction on district courts over "*all suits

in equity* and actions at law … to enjoin *any* violation of[] this chapter." 16 U.S.C.

§ 825p (emphases added). Congress would not have used this language if it had

intended to displace the settled rule that an equitable action is available to enjoin

state regulatory actions preempted by the FPA. The courts would not have allowed

such equity actions for decades if the FPA barred them. And the Supreme Court

would not have issued its opinion in *Hughes* if it believed that the FPA reflected an

intent to strip the courts of jurisdiction. 136 S. Ct. at 1296.

10

Defendants' contention that section 825p does not create a cause of action (EAB 23-25; NYAB 19-20) misses the point. A plaintiff that invokes the courts' equity jurisdiction to enjoin a preempted state law does not need to rely on a statutorily created private right of action. That is because an action "to sue to enjoin unconstitutional conduct by state and federal officers *is the creation of courts of equity.*" *Armstrong*, 135 S. Ct. at 1384 (emphasis added); *see* AOB 27.

*Verizon Maryland* reinforces this point: the Court entertained a suit seeking an injunction against an allegedly preempted state order notwithstanding the absence of any statutory provision authorizing such a cause of action. 535 U.S. at 642. Nor can *Verizon Maryland* be distinguished, as Defendants suggest (EAB 24), as merely addressing a "specific *jurisdictional* provision" rather than a cause of action. The Court considered it irrelevant that the statute did not create a private cause of action for injunctive relief, because that power is inherent in courts of equity. *Verizon Md.*, 535 U.S. at 642-43. Thus, cases holding that language similar to that of Section 825p is insufficient to create a cause of action for claims that *cannot* be brought under *Young*—such as damages actions or suits against private parties—are inapposite. EAB 24-25 (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 576-77 & n.17 (1979), and *Bassler v. Cent. Nat'l Bank in Chicago*, 715 F.2d 308, 312-13 (7th Cir. 1983)).

11

The Public Utility Regulatory Policies Act (PURPA) is irrelevant.  *See* EAB 20; *see also* SPA-12.  *Verizon Maryland* teaches that PURPA's creation of a private right of action for one type of claim does not affect equity jurisdiction for a different type of claim.  PURPA, enacted decades after the FPA, does not impliedly repeal the FPA's broad jurisdictional grant or disturb the courts' well-established equity jurisdiction.  *See* AOB 28.

Defendants argue that Section 825p simply reflects "common boilerplate in New Deal-era statutes and is identical in scope" to federal question jurisdiction under 28 U.S.C. § 1331.  EAB 24 (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562, 1575 (2016)).  That too misses the point.  Plaintiffs do not contend that the jurisdiction contemplated by Section 825p is broader than, or different from, Section 1331 jurisdiction, which was the issue in *Merrill Lynch*, 136 S. Ct. at 1567.  Plaintiffs instead contend that the reference to "all suits in equity … to enjoin any violation of[] this chapter" in Section 825p cannot be squared with the notion that Congress intended to foreclose *Ex parte Young* actions under the FPA.

12

**(b)** **The FPA Does Not Support the Inference that Congress Intended to Displace Traditional Equitable Remedies**

Given Section 825p's unequivocal confirmation that courts have traditional equity jurisdiction under the FPA, Defendants cannot establish that other provisions of the FPA reflect Congress's intent to foreclose such relief.

*Armstrong*, 135 S. Ct. at 1382, does not support Defendants' argument. *See* EAB 16-23; NYAB 19-24. The "two aspects" of the Medicaid Act provision that led the *Armstrong* Court to conclude that Congress had "'inten[ded] to foreclose' equitable relief" were (1) the limited remedies available under the statute and (2) the "judicially unadministrable nature" of the standard governing the plaintiff's claim. 135 S. Ct. at 1385. Because neither of these factors is present here, let alone both, the FPA cannot be construed to foreclose equity jurisdiction.

As an initial matter, the district court erred in reading *Armstrong* to hold that either of these factors alone is sufficient to infer a congressional intent to displace traditional equitable remedies. SPA-14; *see* NYAB 20-21. *Armstrong* made clear that that it was the Act's limited remedies, "*combined with* [its] judicially unadministrable nature," that "preclude[d] the availability of equitable relief." 135 S. Ct. at 1385 (emphasis added); *see id*. (noting that limitation on remedies "might not, *by itself*, preclude the availability of equitable relief" (emphasis added)); *id*. at 1388 (Breyer, J., concurring) ("several characteristics" of the statute justify the

13

inference that Congress intended to preclude "this particular action for injunctive relief"). *Armstrong* cites *VOPA*, which held that a statute's provision of a specific administrative enforcement method, standing alone, "does not demonstrate that Congress has 'displayed an intent not to provide the 'more complete and more immediate relief' that would otherwise be available under *Ex parte Young*." *VOPA*, 563 U.S. at 256 n.3. Exelon argues that the administrative remedies in *VOPA* and *Armstrong* were not "adequate" or were "unlikely to be effective" for private plaintiffs, and suggests that more effective administrative remedies might foreclose equitable relief. EAB 18. That theory finds no support in either decision. *VOPA* focused not on the "adequacy" of the statutory remedies but their narrow scope compared to the "complete and more immediate relief" available under *Young*. 563 U.S. at 256 n.3. In concluding that the Medicaid Act *did* support such an inference, the *Armstrong* Court again emphasized its exclusive and specific nature, which, when "combined with" unadministrable standards, indicated an intent to limit relief. 136 S. Ct. at 1385.

*Available remedies*. In *Armstrong*, the "sole remedy Congress provided for a State's failure to comply with the Medicaid Act's requirements" was the "withholding of Medicaid funds by the Secretary of Health and Human Services." 135 S. Ct. at 1385. That is not true here: nothing in the FPA says that only FERC can enforce the law, or that it must do so in a single limited way; Section 825p

14

expressly envisions that private parties may sue under the FPA; and courts have consistently entertained preemption claims by private parties.  AOB 24-25 & n.7. If Congress were displeased with that exercise of equity jurisdiction, it would have said so in amending the FPA six times over the past 40 years.  *See id.*

None of Defendants' arguments rebuts these points.  Defendants, following the district court (SPA-12), contend that the FPA's remedial scheme is incompatible with an *Ex parte Young* action because it allows parties to bring administrative complaints before FERC.  EAB 16-21; NYAB 21-23.  But many federal statutes provide for administrative relief, and this has never been thought to preclude equitable actions to enjoin violations by state actors.  AOB 25-26; *see also East Hampton*, 841 F.3d at 144-47.  Defendants do not identify any particular aspect of the FPA's administrative scheme that is incompatible with private actions seeking equitable relief.  That FERC may "act on its own initiative," "solicit stakeholders' views," and "calibrate" its response accordingly (EAB 17) is irrelevant:  those are commonplace features of agency proceedings and are not undermined by lawsuits such as this one.

*Seminole Tribe of Florida v. Florida*, 517 U.S. 45 (1996) (cited at EAB 17-18, NYAB 21), by contrast, involved a remedial scheme that *was* incompatible with an *Ex parte Young* action.  The Indian Gaming Regulatory Act created a limited equitable remedy tailored to a unique situation:  a judicial order to

15

negotiate a tribal gaming compact for 60 days, followed by mediation and an administrative ruling. 517 U.S. at 73. A *Young* action would have "cast[] aside" the statute's limitations on equitable relief, since it would have made "complete and more immediate relief" available. *Id.* at 74-75. By contrast, there are no FPA remedial provisions that would be negated by allowing this action to proceed.

The implication of Defendants' arguments is that Plaintiffs were required to exhaust administrative remedies before proceeding in court. But Defendants do not use the term "exhaustion," and for good reason: that doctrine is inapplicable here. Where "Congress has not *required* exhaustion" of a plaintiff's claim, courts generally do not impose such a requirement unless the claim raises the sorts of concerns exhaustion is meant to address, such as allowing an agency to "correct its own mistakes" or where the agency has "special expertise." *McCarthy v. Madigan*, 503 U.S. 140, 145, 152 (1992), *superseded in part on other grounds by statute as recognized in Woodford v. Ngo*, 548 U.S. 81, 85 (2006).

None of those factors applies to this case. The FPA mandates exhaustion only for parties who have been "aggrieved by" a FERC order that they wish to challenge. 16 U.S.C. § 825*l*. Plaintiffs do not fall under this provision. For parties in Plaintiffs' position, the FPA "neither mentions exhaustion nor explicitly limits the jurisdiction of the courts." *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1248 (D.C. Cir. 2004). Nor are concerns about agency self-correction and

16

technical expertise implicated. Plaintiffs are not challenging FERC regulations or decisions, so there are no "mistakes" for FERC to correct. Nor is FERC's expertise needed to resolve Plaintiffs' preemption claims, a task familiar to the courts (as *Hughes* illustrates). *See McKart v. United States*, 395 U.S. 185, 197-98 (1969).

It does not matter that PURPA allows a right of action only to parties that first exhaust their claims before FERC. *See* EAB 20 (citing 16 U.S.C. § 824a-3(h)(2)(B)); NYAB 19-20 (citing two PURPA cases: *Allco Finance Ltd. v. Klee*, 805 F.3d 89, 95 (2d Cir. 2015), and *Niagara Mohawk Power Corp. v. FERC*, 306 F.3d 1264, 1269-70 (2d Cir. 2002)). This express exhaustion requirement—like PURPA's creation of the cause of action—in no way indicates that Congress intended to foreclose *Ex parte Young* actions based upon the preemptive force of *other* FPA provisions.[1] To the contrary, the inclusion of an exhaustion requirement limited to specific PURPA claims, but not others, indicates that exhaustion is *not* required in ordinary FPA preemption cases. AOB 24 & n.7; 27-29.

---

[1] PURPA establishes a narrow carve-out to FERC's exclusive jurisdiction over wholesale rates. It authorizes States initially to set the rates for certain environmentally-beneficial generators. If a generator believes a state-set wholesale rate is too low, it must seek FERC review before going to federal court. 16 U.S.C. § 824a-3(h)(2)(B).

17

Finally, Defendants note that other provisions of the FPA authorize the federal government to sue to enjoin FPA violations.  EAB 19-20.  But concurrent private and agency enforcement of statutes is routine, as *East Hampton* recognized:

> "The fact that Congress conferred such broad enforcement authority on [an agency], and not on private parties, does not imply its intent to bar such parties from invoking federal jurisdiction where, as here, they do so not to enforce the federal law themselves, but to preclude a municipal entity from subjecting them to local laws enacted in violation of federal requirements."

841 F.3d at 146; *see* AOB 25-26.

Defendants seize on the quoted language in *East Hampton* (*see also* SPA-11 n.9), arguing that Plaintiffs here "are suing to enforce federal law themselves." EAB 21.  But that is not what *East Hampton* means.  The court contrasted the *Ex parte Young* action there with a hypothetical lawsuit seeking to require a defendant to take affirmative steps to conform its conduct to federal law as enforced by federal agencies.  *See* 841 F.3d at 146.  Here, Plaintiffs seek only negative relief preventing New York's incursion into FERC's exclusive regulatory authority. Nothing in the FPA suggests that concurrent private and agency enforcement are incompatible here.

*Judicial administrability*.  As the district court correctly determined (SPA-12-13), concerns about judicial administrability do not counsel against allowing Plaintiffs' claim to proceed.  The *Armstrong* plaintiffs sought an affirmative injunction "increas[ing] their rates," which would have required the court to

18

determine (as might an administrative agency) whether the challenged rates were "consistent with efficiency, economy and quality of care." 135 S. Ct. at 1382, 1385. Here, by contrast, Plaintiffs seek to enjoin enforcement of a preempted state law, a traditional remedy that turns only on whether state regulation invades FERC's jurisdiction. *See* AOB 37. That is a question well-suited to judicial resolution. *See*, *e.g.*, *Hughes*, 136 S. Ct. at 1297; *FERC v. Elec. Power Supply Ass'n* ("*EPSA*"), 136 S. Ct. 760, 766 (2016) (noting the "steady flow of jurisdictional disputes" between states and FERC because of overlapping jurisdictions).

Defendants attempt to bring Plaintiffs' preemption claim within the scope of *Armstrong* by arguing that it requires the court to apply the FPA's "just and reasonable" standard for rate regulation. NYAB 24. The issue in this case, however, is not *what* wholesale electricity rates should be, but *who* should set them. Plaintiffs allege the ZEC program "contraven[es] the FPA's division of authority between state and federal regulators" by seeking to set "'rates and charges … received … for or in connection with' interstate wholesale sales." *Hughes*, 136 S. Ct. at 1297 (quoting 16 U.S.C. § 824d(a)). That is the same issue *Hughes* addressed.

Defendants offer no coherent theory of why the controlling preemption standard was administrable in *Hughes*, but not here. Defendants suggest that

19

arguments based upon the distortive effect of ZEC payments on the wholesale electricity market invite a judicially unadministrable inquiry into how much distortion is permissible. EAB 21-22; NYAB 24. This case, however, does not turn on the magnitude of the distortion, but the tethering of the subsidy to the wholesale market—precisely the issue addressed in *Hughes*.

## II.    THE ZEC PROGRAM IS FIELD-PREEMPTED

The FPA forecloses a State from setting "rates and charges … received by any public utility for or in connection with the … sale of electric energy" for resale. 16 U.S.C. § 824d(a), § 824(a). That is what the ZEC program does. It is preempted.

### A.    The ZEC Subsidy is Tethered to Wholesale Rates in the Same Manner as the Preempted Subsidy in *Hughes*

When Fitzpatrick, Ginna and Nine Mile Point sell electricity at wholesale, they receive the FERC-approved wholesale rate for each unit of electricity. Unlike other wholesale sellers, however, these plants *also* receive a state-mandated subsidy—a ZEC payment—for each unit. The amount of that subsidy is calculated based on wholesale auction rates. It varies inversely with those rates to ensure Exelon's revenues are sufficient to cover the costs of the three economically-inefficient plants. Exelon necessarily "receive[s]" ZEC payments "in connection with" sales of electricity at wholesale, *id.* § 824d(a), because the plants necessarily sell the electricity they generate on wholesale markets. The ZEC program

20

"guarantees [Exelon] a rate distinct from the clearing price for its interstate sales."
*Hughes*, 136 S. Ct. at 1297.

Defendants all but concede that the ZEC program possesses the
characteristics the Supreme Court found dispositive in *Hughes*:

- The favored plants sell the electricity they generate into wholesale
  markets and receive the subsidy for all sales into those markets.
  *Compare Hughes*, 136 S. Ct. at 1299, *with* NYAB 10.

- The subsidies are tethered to the wholesale auction rates by means of
  a statutory formula that calculates the subsidy based on those rates.
  *Compare Hughes*, 136 S. Ct. at 1295 (describing pricing mechanism),
  *with* NYAB 10.

- The subsidies vary inversely with auction rates, decreasing as rates
  rise and increasing as they fall, to ensure that Exelon receives
  wholesale revenues at state-preferred levels rather than the FERC-
  approved levels set at auction.  *Compare Hughes*, 136 S. Ct. at 1295
  & n.5 (describing inverse relationship), *with* NYAB 10.

- Load-serving entities ("LSEs") are required to pay Exelon to make up
  the difference between the FERC-approved auction rates and the
  compensation New York has dictated, and LSEs then pass that cost on

21

to retail customers. *Compare Hughes*, 136 S. Ct. at 1295 & n.5, 1299 (describing payment scheme), *with* NYAB 11.

Defendants seek to distinguish the Maryland program preempted in *Hughes* on the theory that New York's goal was to assign value to the environmental benefits of nuclear power generation (EAB 9), not to alter the wholesale rate for electricity. For this reason, Defendants contend, the ZEC program falls on the non-preempted side of a "bright line" that divides exclusive state authority over power generation from exclusive federal authority over wholesale rates. EAB 25-28.

As initial matter, that account of the ZEC program's purpose is dubious. The ZEC program was plainly reverse-engineered to keep Exelon's unprofitable plants in operation. Although the program is ostensibly open to any nuclear generator that has made a "historic contribution" to New York's clean energy mix (A-209), the program was enacted in response to Exelon's threat to close those three plants (A-61-63 (Compl. ¶¶ 54-58)), and was designed to ensure that only those plants will receive subsidies, excluding another nuclear plant (which also would generate power with similarly valuable environmental attributes) that does operate profitably at FERC-approved wholesale rates. (A-39-40, 61-63, 66 (Compl. ¶¶ 2-3, 54-58, 65).) If the ZEC truly represents compensation for environmental benefits, then all zero-emitting facilities (other nuclear plants, wind,

22

solar, etc.) should receive the same subsidy, and the subsidy paid to the favored plants should not fluctuate based on wholesale market prices.

Even if the ZEC program were aimed at the environmental benefits of the three favored plants, that would not distinguish this case from *Hughes*. Advancing a similar motive-based argument, Maryland contended that it aimed solely to ensure a reliable future supply of power generation, not to disrupt or alter FERC-approved mechanisms for setting wholesale rates. 136 S. Ct. at 1298. Indeed, Maryland argued that state regulation of energy generation is categorically exempt from preemption, *see id.*—just as Defendants argue here. NYAB 27; EAB 27-28.

The Supreme Court, however, was crystal clear that "States may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates," *Hughes*, 136 S. Ct. at 1298, and that is true "even when States exercise their traditional authority over … in-state generation," *id.* at 1298-99. The relevant dividing line is between state regulatory means that impermissibly intrude on FERC's exclusive rate-setting authority and regulatory means that do not. The analysis is functional, not formalistic. *See EPSA*, 136 S. Ct. at 780 ("The FPA 'leaves no room either for direct state regulation of the prices of interstate wholesales' or for regulation that 'would indirectly achieve the same result.'").

23

Whatever its objectives, the ZEC program "interfere[s] with FERC's authority" in precisely the same ways as did the Maryland program because New York has "disregard[ed] interstate wholesale rates FERC has deemed just and reasonable." *Hughes*, 136 S. Ct. at 1299-1300. Maryland sought to add new generation capacity by guaranteeing that a favored plant would receive subsidy payments in addition to FERC-approved rates for electricity sold at wholesale. It tethered those payments to the FERC-approved rate-setting mechanism. New York seeks to ensure that three nuclear plants can operate profitably by guaranteeing them subsidy payments for all of the electricity they sell at wholesale. The State tethers those payments to the FERC-approved rate-setting mechanism. So New York's ZEC program should meet the same fate as the Maryland program.

Nor can the ZEC program's displacement of FERC-mandated rates be saved, as Defendants suggest, by invoking a "presumption against preemption." EAB 27. That presumption has no application where, as here, the question is whether a state law invades a sphere of authority with a history of significant federal involvement. *See United States v. Locke*, 529 U.S. 89, 108 (2000); *Pub. Util. Dist. No. 1 of Grays Harbor County v. IDACORP Inc.*, 379 F.3d 641, 648 (9th Cir. 2004); *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 477 (4th Cir. 2014), *aff'd on other grounds sub nom. Hughes*, 136 S. Ct. 1288. In *Hughes*, the Supreme Court

24

decided a question like the one presented here without mentioning, much less applying, any such presumption.

Giving *Hughes* its proper controlling effect here will have none of the "staggering" consequences Defendants posit. EAB 41-43. Unlike the ZEC program, none of the regulatory means that Defendants identify—RECs, cap-and-trade, carbon taxes, and so on—possesses the characteristics that trigger preemption here. None of these regulatory options tethers subsidy amounts to FERC-approved wholesale rates (and they certainly do not set alternative wholesale rates), and none is designed to guarantee that generators will receive the subsidies in connection with their sales on wholesale markets. As a result, none of these regulatory alternatives would transgress the line drawn in *Hughes*, and there would be no need for a court evaluating them under *Hughes* to conduct the burdensome analysis that Exelon hypothesizes. EAB 41. But when State subsidies *are* tethered to wholesale market participation and wholesale rates as they were in *Hughes*, the program's intended operation and effect amounts to preempted rate-setting under *Hughes*.

### B. In Operation and Effect, the ZEC Program Cannot be Distinguished from the Maryland Program Preempted in *Hughes*

Straining to distinguish *Hughes*, Defendants describe two purported differences between the "regulatory means" held preempted in that case, 136 S. Ct. at 1298, and the regulatory means that New York employs here. First, Defendants

contend that the ZEC program is "untethered to a generator's wholesale market participation" because New York does not expressly require Exelon's three plants to participate in the New York Independent System Operator (NYISO) wholesale market to receive a subsidy. EAB 32-33 (quoting *Hughes*, 136 S. Ct. at 1299). Second, they contend that ZEC subsidies are not tethered to FERC-approved wholesale rates because they are based on projected rather than actual market prices, and therefore do not guarantee that the payments Exelon receives will precisely match the baseline market price index that the State has set. NYAB 39; EAB 45-46.

These are form-over-substance evasions. A "proper analysis requires consideration of what the state law in fact does, not how [a] litigant might choose to describe it." *Wos v. E.M.A.*, 568 U.S. 627, 637 (2013). A state law's "intended operation and effect" is what matters for preemption purposes. *Id.* at 636; *see also Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 462-64 (2012) (holding state law preempted based on its practical operation). In its intended operation and in its practical, real-world effect, the ZEC subsidy is tethered to the wholesale market in ways indistinguishable from *Hughes* because of the combination of two features: (1) its sole beneficiaries, Fitzpatrick, Ginna and Nine Mile Point, necessarily sell their output into the wholesale market, and (2) the ZEC subsidy is adjusted based on the wholesale prices set at auction.

26

***Participation in wholesale markets.*** Plaintiffs' complaint alleges that the nuclear plants eligible for ZEC payments have sold their output into the NYISO auctions (A-65-66 (Compl. ¶ 64)), because they "have no alternative" (A-51 (Compl. ¶ 34)), such that the ZEC subsidy "will not occur unless the nuclear generators sell their energy into the wholesale market" (A-66 (Compl. ¶ 65)).

Defendants dispute these allegations, asserting that they might be eligible to receive ZEC payments for selling some of their output in other ways that bypass the FERC-approved energy and capacity auctions. EAB 38-41; *see also* NYAB 35. But Defendants' factual assertions cannot justify dismissal on the pleadings because Plaintiffs' allegations must be taken as true. AOB 18. Whether the favored plants in fact sell any portion of their output other than by bidding it into the wholesale auctions, and whether such purported sales have any bearing on the preemption analysis, are issues for discovery and summary judgment or trial.

In all events, Plaintiffs would prove that Defendants' assertions are incorrect and immaterial. The PSC Order establishes ZEC eligibility based on, among other factors, "the degree to which energy, capacity and ancillary services revenues projected to be received by the facility are at a level that is insufficient" to keep the plant afloat. A-255. Such "energy, capacity and ancillary services revenues" are earned in wholesale markets. On its face, the ZEC program is tied to wholesale sales subject to FERC's exclusive jurisdiction.

27

Defendants' focus on the subsidized plants' alleged bilateral contracts to sell some output does not change the preemption analysis. Whether the favored plants sell all their output at auction, or instead adjust the auction price for some fraction of that output through bilateral contracts, they are engaged in wholesale transactions subject to FERC's exclusive jurisdiction. *See Allco*, 861 F.3d at 99 ("bilateral contracts … are subject to FERC review for justness and reasonableness"). Just as it has determined that the NYISO auctions produce just and reasonable rates, so too has FERC determined that the rates set in a bilateral contract voluntarily negotiated by parties that do not have market power are just and reasonable. *Morgan Stanley Capital Group Inc. v. Pub. Util. Dist. No. 1 of Snohomish County*, 554 U.S. 527, 546-48 (2008). The ZEC subsidy changes the just and reasonable rate, both by adjusting auction prices directly *and* by adjusting the price established in bilateral contracts that are negotiated in the shadow of auction prices. Either way, the State is supplanting the rate that FERC has determined to be just and reasonable by requiring that the favored plants receive an additional payment at a state-prescribed amount that varies based on wholesale prices.

As this case progresses through discovery, Plaintiffs expect to show that bilateral contracts apply to electricity that is bid into and clears the NYISO auctions (thereby affecting the auction prices); there is no other way for nuclear

28

plants to deliver power. The output of the Fitzpatrick, Ginna and Nine Mile Point plants is scheduled into NYISO energy auctions; the power is included in the auctions' supply stack; and the clearing price is determined after considering the output of those plants. In a typical bilateral contract, the plant is paid the clearing price, and the counterparty pays or receives the difference between the auction price and the contracted price. The alteration of the rate that FERC has deemed just and reasonable, and the interference with the NYISO auction, occur when the ZEC alters the wholesale rate, whether that rate is set by the auction or the contract.

In short, because the favored plants must sell their output through wholesale markets, the ZEC necessarily alters the price of wholesale transactions.

Exelon attempts to avoid this conclusion by suggesting that it might be able to sell its output directly at retail. EAB 37. That contention contradicts the allegations of the complaint and must be tested in discovery. Exelon does not assert that the Fitzpatrick, Ginna and Nine Mile Point plants are physically connected to any retail consumer in a way that would allow them to deliver power except via the wholesale markets.[2]

---

[2] Exelon suggests that Nine Mile Point 2 may receive ZEC subsidies for electricity sold at retail because the Long Island Power Authority (LIPA) owns a minority share of the plant and sells its share of electricity to retail customers. EOB 37. This assertion too must be tested in discovery, given its factual complexity. If, as

29

Finally, Exelon suggests that ZEC subsidies could theoretically be paid for energy consumed at an affiliated, off-site facility (EAB 37), but Exelon does not establish that such remote self-supply can bypass the wholesale market. On the contrary, the case Exelon cites, *Calpine Corp. v. FERC*, 702 F.3d 41, 42 (D.C. Cir. 2012), upheld FERC's conclusion that it could not regulate self-supply. This means that station power must be purchased at retail from an LSE, which in turn must purchase the electricity at wholesale. The plant that generates the power must sell it into the wholesale market, whether that power is consumed at an affiliated offsite facility or by any other retail customer.

Ultimately, the Maryland program at issue in *Hughes* was preempted because it "guarantees [a favored generator] a rate distinct from the clearing price for its interstate sales" at wholesale, not simply because Maryland required the favored generator to participate in the wholesale market. 136 S. Ct. at 1297. Maryland's participation requirement was merely the mechanism by which the

_____

NYISO's rules suggest, LIPA must bid its share of the energy from Nine Mile Point 2 to the auctions in upstate New York (where the plant is located), LIPA is selling at wholesale, regardless of its purchases of power from NYISO on Long Island to serve its retail customers. This would mean that LIPA receives ZEC subsidies in connection with wholesale sales, as the complaint alleges. Nor is it reasonable to suggest that New York's multi-billion dollar bailout of three nuclear plants can be saved because a fraction of one unit at one of those plants is owned by an entity that does not decide whether to keep the plant operating, regardless of how LIPA uses its share of the plant's energy.

State ensured that augmentation of FERC-approved auction rates would achieve the State's goal of incentivizing construction of new generation capacity. New York has adopted a different mechanism to guarantee the same kind of tethered per-unit subsidy for the sale of electricity on wholesale markets that the Supreme Court invalidated in *Hughes*. In New York, no clearing requirement is needed because (as the PSC knew when it adopted the ZEC program) Exelon's plants will in fact sell the electricity they generate at wholesale (A-51 (Compl. ¶ 34), A-61 (Compl. ¶ 53)) and therefore will necessarily "receive" the ZEC subsidy "in connection with" each wholesale sale. 16 U.S.C. § 824d(a). With or without an express participation requirement, the ZEC program's "intended operation and effect," *Wos*, 538 U.S. at 636, is indistinguishable from the Maryland program invalidated in *Hughes*. It guarantees Exelon's plants a higher rate than the FERC-approved auction clearing price.

*Calculation of the subsidy.* The second feature of the ZEC program that renders it preempted is that the Base Subsidy Amount (which Defendants call the "Social Cost of Carbon") is adjusted based on a formula that is tied to wholesale market prices. AOB 7-9. For the first two years of the program, the subsidy is fixed at a level sufficient to keep Exelon's plants afloat based on the State's projection of a wholesale index price of $39/MWh. (A-222.) Thereafter, the subsidy is adjusted every two years based on forecasts for prices in the wholesale

31

energy and capacity markets in certain regions of the State. As those prices rise above the $39/MWh benchmark, the ZEC subsidy falls in tandem. If prices decline after rising above $39/MWh, the subsidy rises to cover the difference up to the Base Subsidy Amount.

Defendants do not dispute that the ZEC subsidy was set and will be adjusted in these ways based on the level of, and fluctuations in, wholesale market prices. Instead, they point out that the market revenues Exelon receives may not precisely match the market price index. EAB 11-12; *see also* Independent Economists Amicus Br. 17; NRDC Amicus Br. 17; NEI Amicus Br. 30; States' Amicus Br. 9. That assertion is beside the point. The ZEC subsidy is preempted because it is tethered to wholesale market prices, and that is no less true if the subsidy does not invariably guarantee that Exelon will receive New York's exact target rate – and thus only insulates Exelon from most, but not quite *all*, market risk.

But Defendants' position is also incorrect. While the index may not represent the price at which the favored plants sell, there is every reason to expect that changes in the index from the $39/MWh benchmark will closely track, if not precisely equal, changes in market revenues earned by the favored plants. Nor does it matter that the market price index is calculated based on actually traded energy and capacity futures contracts, rather than historical prices. A-259-61 (ZEC Order App. E, at 6-8). Those futures prices represent traders' informed estimates

32

of what market prices will be. At a minimum, whether any deviations between futures and actual prices are material is a fact question that cannot be resolved on a motion to dismiss.

Exelon notes that future increases in the ZEC subsidy may be affected by future changes in the availability of renewable energy, a variable unrelated to the plants' wholesale revenues. EAB 46. But that potential adjustment is not available until 2023, and only if more than 50 million MWh of renewable energy is being consumed in New York. A-221 (ZEC Order 137). Even then, the mix of renewable and conventional resources affects only the Base Subsidy Amount, not the price adjustment formula that tethers the ZEC subsidy to wholesale markets. A-259 (ZEC Order App. E, at 6).

### C. FERC Has Never Approved Anything Resembling the ZEC Program

Defendants also claim that FERC has already determined that the ZEC program's structure does not impermissibly intrude on FERC's exclusive regulatory authority. EAB 29-32; NYAB 27. That contention is baseless.

Defendants purport to locate FERC's imprimatur in its *WSPP* decision, which approved, "based on available information," a standard contract that facilitated trading of three classes of RECs. *WSPP Inc.*, 139 FERC ¶ 61,061 at ¶¶ 5, 24 (2012). *WSPP* did not discuss—let alone approve—a program having the defining characteristics of the ZEC program, namely, a subsidy that varies

33

inversely with wholesale prices and is available only to generators selling in wholesale markets. In *WSPP*, FERC considered a structure that provided for competitive pricing of RECs, traded on markets. FERC explained that it was approving "a service schedule through which RECs can be transferred" in order to "increase efficiency and liquidity in RECs sales, which should benefit market participants." *Id.* at ¶ 14; *cf. Allco*, 861 F.3d at 92-93 (describing tradeable nature of RECs). In sharp contrast, ZECs are not traded on open markets at rates determined by supply and demand, and are not negotiated at arms' length. They are not traded at all. New York has simply required utilities to purchase ZECs from three favored generators at state-prescribed prices tethered to the rates set at wholesale auctions. Whereas REC prices fluctuate based on forces independent of wholesale production, ZEC prices fluctuate based solely on the movement of wholesale auction rates according to a formula that New York has dictated.

If ZECs were tradable commodities reflecting environmental attributes of nuclear power (as RECs are for renewable power), they would be awarded to the most efficient nuclear generators, who would compete to provide zero-emission power at the lowest possible price. This is the principle behind REC programs, and the reason why FERC's goal is to "increase efficiency and liquidity" in markets for RECs. *See, e.g.*, Felix Mormann, *Clean Energy Federalism*, 67 Fla. L. Rev. 1621, 1632 (2015) (distinguishing RECs, which "call on the market's

34

invisible hand to determine trading prices," from tariffs that "require[] local electric utilities to purchase the power output of [renewable] generators at above-market rates designed to cover the generator's cost and offer a reasonable return on investment"). But the ZEC program subverts the goals of market efficiency and liquidity: a generator's very *inability* to efficiently produce power with zero-emission attributes is a *criterion* for awarding ZECs. The ZEC amount is fixed administratively precisely to prevent these generators from being underbid by more efficient generators.

Exelon fares no better in selectively quoting *ISO New England, Inc.*, 158 FERC ¶ 61,138 (2017). *See* EAB 39. FERC's discussion of *Hughes* in that decision was dicta, and no party argued that the program there, which encouraged renewable energy generation, was outside FERC's jurisdiction (as New York argues here). Regardless, FERC's "interpretation" of *Hughes* supports preemption here: "a state program subsidizing development of generation that was required to bid into PJM in a manner that would effectively determine PJM's capacity price violated the FPA." 158 FERC ¶ 61,138, at ¶ 8 n.19. Such programs are preempted under both *Hughes* and FERC precedent because "[t]he Commission has acknowledged the right of states to pursue their own policy interests but must be mindful of state regulatory actions that impinge on FERC-jurisdictional market mechanisms to set price." *Id.* at ¶ 7.

35

If FERC had adopted the kind of definitive interpretation of the line between permissible and preempted state authority that Defendants claim, FERC would have said so in its brief to the Supreme Court in *Hughes*.  But FERC's brief never mentioned the *WSPP* decision.  The brief's discussion of RECs consisted of a single sentence tentatively venturing that permissible state programs "may include … the creation of renewable energy certificates," without elaboration of the circumstances under which FERC would find RECs permissible.  Even if FERC's jurisdiction-defining statutory provisions were sufficiently ambiguous to justify *Chevron* deference, *but see EPSA*, 136 S. Ct. at 773 n.5, *WSPP* cannot possibly be entitled to the "dispositive" deference that Exelon claims for it.  EAB 41.  *WSPP* did not address a state regulatory program with the distinctive jurisdiction-usurping features of the ZEC program; rather, it approved a contract to facilitate the trading of RECs.  139 FERC ¶ 61,061, at ¶ 21.  Additionally, FERC was careful to clarify the limited and tentative nature of its ruling.  *See id.* at ¶¶ 25-26.

## III.  THE ZEC PROGRAM CONFLICTS WITH FEDERALLY ESTABLISHED WHOLESALE RATES

Exelon's theory that the ZEC program survives conflict preemption because it is "plausibly" related to matters of state concern (EAB 53 (quoting *Nw. Central Pipeline Corp. v. State Corp. Comm'n*, 489 U.S. 493, 518 (1989)), gets the analysis backwards.  Under the Supremacy Clause, a state may not pass laws that conflict with federal law even when acting within areas of traditional state concern.  *See,*

36

*e.g.*, *IDACORP*, 379 F.3d at 650 (finding conflict preemption where plaintiff "invok[ed] a state rule (specifically, contract law) that would interfere with the method by which the federal statute was designed to reach it goals (specifically, FERC regulation of wholesale electricity rates)"). The very case Exelon cites shows that an improper purpose is a sufficient but not necessary condition of preemption; it holds that no analysis of the State's purpose is necessary "if state regulation prevents attainment of FERC's goals." *Nw. Central*, 489 U.S. at 516.

The ZEC program interferes with FERC's objective of setting competitive wholesale rates, and the express tethering to wholesale rates reveals New York's purpose is to adjust those rates. *See Nazarian*, 753 F.3d at 479 ("[T]he [contracts for differences] are structured to actually set the price received at wholesale. They therefore directly conflict with the auction rates approved by FERC."). Defendants stress that FERC has not found any conflict in accommodating RECs, but that is beside the point. As noted, these market-based subsidies in which firms compete to supply clean or renewable power at the lowest price are polar opposites of administratively determined ZEC payments, which reward the least efficient producers by enabling them to remain in business. None of these other subsidies uses a formula to make up the difference between the FERC-approved rate and the State's target rate.

37

Exelon is equally wrong to analogize its plants to vertically integrated utilities, which participate in wholesale auctions even though states allow them to recover their prudent costs through retail rates. EAB 47-48. FERC does not allow utilities to "cross-subsidize" wholesale transactions through retail charges imposed on their captive ratepayers. *See, e.g.*, *Golden Spread Elec. Coop., Inc. v. Sw. Pub. Serv. Co.*, 123 FERC ¶ 61,047 at ¶ 41 (2008) ("The Commission has clearly sought to prevent the subsidization of shareholders at the expense of captive customers."); *Consumers Energy Co.*, 94 FERC ¶ 61,180 at *3-4 (2001). A vertically integrated utility cannot sell power below its marginal cost in wholesale auctions and recover the difference from ratepayers. The ZEC program, by contrast, provides a make-whole payment from LSEs (and ultimately ratepayers) calibrated to auction prices.

Defendants suggest that FERC can address any rate conflicts caused by the ZECs (EAB 56-57), but "[t]he fact that FERC [is] forced to mitigate the … distorting effects … tends to confirm rather than refute the existence of a conflict." *Nazarian*, 753 F.3d at 479; *accord Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1168 (11th Cir. 2008) ("Federal law is not obliged to bend over backwards to accommodate contradictory state laws…."). States "cannot regulate in a domain Congress assigned to FERC and then require FERC to accommodate [the] intrusion." *Hughes*, 136 S. Ct. at 1298 n.11.

38

Further, Defendants do not explain *how* FERC could address the conflicting rate set by ZECs.  Exelon asserts that FERC can alter auction rules if they produce unjust or unreasonable rates (EAB 56), but the ZEC formula would offset any change to wholesale rates.  Exelon has fought against proposed measures to mitigate the effect of ZECs precisely because they are "intended to offset the receipt of any state subsidy."  *See, e.g.*, Exelon's Motion to Submit Reply, *Calpine Corp. v. PJM Interconnection, LLC*, FERC Docket No. EL16-49-000 at p.2 (Feb. 23, 2017).

Finally, Defendants suggest that there is no conflict because establishing wholesale rates through competitive markets is not FERC's sole goal.  To be sure, FERC has accommodated certain deviations from free markets—like renewable-energy subsidies awarded and priced based on free-market competition.  But FERC has never countenanced a state program that alters the rates FERC has deemed just and reasonable by tethering a subsidy to the outcome of the FERC-approved wholesale market process.

In sum, the ZEC program is preempted because it is "structured to actually set the price received at wholesale," and "therefore directly conflict[s] with the auction rates approved by FERC."  *Nazarian*, 753 F.3d at 479.

## IV. PLAINTIFFS HAVE STATED A CLAIM FOR VIOLATION OF THE COMMERCE CLAUSE

### A. Plaintiffs Have Standing to Pursue Their Dormant Commerce Clause Challenge

Plaintiffs challenge the PSC's Order under the Commerce Clause because the ZEC subsidy, by design, allows Exelon's favored in-state plants to dump energy into the interstate wholesale market at economically unsustainable prices while reaping above-market returns. As Plaintiffs have pleaded (A-60-68 (Compl. ¶¶ 52-68)), and as discovery will prove, propping up in-state businesses was the purpose and effect of the ZEC subsidy.

Exelon's plants cannot profitably sell on the interstate market. If the plants were to bid into the wholesale auctions at prices above their costs, customers would buy from out-of-state competitors like Plaintiffs, whose costs, and therefore bids, are lower. The protectionist ZEC subsidy enables favored in-state plants instead to underbid Plaintiffs, causing the kind of competitive injury the Commerce Clause recognizes. AOB 51-52; *see Alliance for Clean Coal v. Miller*, 44 F.3d 591, 594-95 (7th Cir. 1995). That injury is traceable to the ZEC subsidy and would be remedied by invalidating it. Plaintiffs' complaint establishes all three elements of standing.

Like the court below, Exelon asserts that Plaintiffs lack standing because the only injury supposedly would be to out-of-state nuclear generators that are

40

ineligible, as a practical matter, for the ZEC subsidy. *See* EAB 57-59. But the PSC would not have adopted the ZEC program if subsidies flowed to out-of-state nuclear plants, for its clear purpose was to protect local jobs. A-61-63 (Compl. ¶¶ 54-59), A-77 (Compl. ¶ 96). The appropriate "cure" for the PSC's protectionism is not the subsidy's expansion (*see* EAB 58), but its elimination. *See Wyoming v. Oklahoma*, 502 U.S. 437, 460 (1992) (declining to change the scope of a state energy regulation in order to save part of it from a Commerce Clause challenge).

Plaintiffs want to compete fairly against the favored in-state generators for *sales*, not for subsidies. Exelon claims that Plaintiffs have not alleged that "their out of-of-state plants compete in NYISO auctions" (EAB 59), but Plaintiffs operate out-of-state plants and sell energy to New York LSEs through NYISO. *See* A-43-45 (Compl. ¶¶ 10-15), A-49 (Compl. ¶ 28) ("The energy suppliers in NYISO's wholesale auctions include generators … located … outside New York."). Plaintiffs are interstate competitors in an interstate market, injured by local protectionism. That injury is traceable to the ZEC subsidy and would be redressed by striking it down.

### B. The PSC Is Regulating, Not Participating in, the Wholesale Energy Market

Where a state's action can "be analogized to the activity of a private purchaser," a state—like a private purchaser—is permitted to buy from whomever it prefers, including by preferring its own citizens. *See New Energy Co. of Ind. v.*

41

*Limbach*, 486 U.S. 269, 278 (1988). But the ZEC subsidy entails no purchasing by the State itself. Rather, the PSC directs *private third parties*, the LSEs, to make the ZEC subsidy payments to the favored Exelon plants, and the LSEs then pass along this increased cost to their customers. (*See* A-70-71 (Compl. ¶ 73).) Telling businesses from whom they must buy and what they must pay is quintessential market regulation, not participation.

Exelon invokes *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976), but that case turned on the inapposite market participant rule, and did not, as Exelon suggests, adopt some exemption for environmental subsidies (EAB 59-61). The law in *Alexandria Scrap* was constitutional because Maryland "entered into the market itself to bid up the[] price" of automobile hulks via "the payment of state funds in the form of bounties" for such hulks. 426 U.S. at 806, 809.

New York is not entering the market by using state funds to buy energy from Exelon at above-market prices; it is requiring third parties (LSEs and ratepayers) to do so with private funds, with NYSERDA simply acting as a conduit for those third-party payments. Exelon claims that it is not "'constitutionally significant' whether funds come from [state] revenues" (EAB 61), but the significance can hardly be overstated. When a state uses its own money to pay third parties for goods or services, its actions can "be analogized to the activity of a private purchaser." *New Energy*, 486 U.S. at 278. But when a state compels residents and

42

businesses to spend their own money, it "is not acting as a purchaser of …

electricity but *as a regulator* of utilities.  The fact that its regulatory action has the

purpose and effect of subsidizing a particular industry … does not transform it into

a form of state participation in the free market."  *Alliance for Clean Coal*, 44 F.3d

at 596 (internal quotation marks omitted).  *Wyoming v. Oklahoma*, 502 U.S. at

459-60, contrasted a state's direct purchasing of in-state fuel supplies through a

public utility, on the one hand, to its regulation of what private utilities must buy,

on the other.  While the former might be permissible market participation, the latter

"cannot be characterized as anything other than protectionist and discriminatory."

*Id.* at 455.  Exelon's reliance on *Alexandria Scrap* fails for the same reason.

### C.    Plaintiffs Have Alleged Discrimination and *Per Se* Invalidity

Plaintiffs have alleged that the ZEC program violates the Commerce Clause

both *per se* by discriminating on its face, and in effect by propping up favored in-

state plants to the disadvantage of out-of-state power generators.  AOB 51-52.

Defendants insist that there can be no *per se* violation because the ZEC program

has no express requirement that only in-state plants receive the subsidy.  NYAB

50-52; EAB 61-64.  That argument misreads both the Complaint and the law.

As the Complaint alleges, the selection criteria for the ZEC subsidy

expressly favor three New York nuclear plants.  A-62-63, 67-68 (Compl. ¶¶ 58-59,

67-68); AOB 51-52.  Defendants attempt to justify this favorable treatment—for

43

instance, by arguing that it "reflects trading patterns that pre-date the Order—not state-imposed geographic limits" (NYAB 50) and that New York simply "happens to have a single-state grid" (EAB 64). These rationalizations do not change the practical, well-pleaded, and *conceded* fact that the ZEC criteria are designed to "pick New York plants." EAB 64.

Regardless, the State's rationale cannot be accepted at this stage. The Complaint alleges that the PSC rigged the selection criteria for protectionist purposes in order to favor the three in-state plants—not that the three plants just happen to be the beneficiaries of neutral selection criteria adopted for permissible reasons. (A-62-63, 67-68 (Compl. ¶¶ 58-59, 67-68).) That distinguishes this case from *Allco*, where there were no such allegations. *See* 861 F.3d at 105-06; *contra* EAB 63-64. The ZEC subsidy might be "ingenious" insofar as it "does not facially compel the use of [in-state electricity] or forbid the use of out-of-state [electricity]," but it is no less "forbidden by the Commerce Clause" for its cleverness. *Alliance for Clean Coal*, 44 F.3d at 596.

Quoting *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981), Exelon argues that the Court must accept New York's proffered purpose as true (EAB 62), and all Defendants insist that because that purpose is environmental, the law must stand. EAB 61-62; NYAB 51-52. Both of these points are wrong. Exelon lops off from its quotation of *Clover Leaf* the caveat

44

"[i]n equal protection analysis…." *Compare* 449 U.S. at 463 n.7, *with* EAB 62.

For Commerce Clause analysis, "when considering the purpose of a challenged statute, this Court is not bound by the name, description or characterization given it by the legislature or the courts of the State, but will determine [matters] for itself." *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979) (internal quotation marks and alteration omitted). Otherwise, the dormant Commerce Clause would be limited to "the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods." *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951). Thus, the purpose of a law can inferred from "[t]he facts alleged in the complaint, the details set forth in plaintiffs' affidavits and the provisions of the act," even when the state proffers a neutral explanation. *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 10 (1928); *see also Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 422 (2d Cir. 2013) (after full analysis of proffered motive in preemption case, statute invalidated where an illegitimate purpose was the "primary," but not necessarily "sole" motive).

Moreover, "even if environmental preservation were the central purpose of [the Order], that would not be sufficient to uphold a discriminatory regulation." *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 205 n.20 (1994); *accord Clover Leaf Creamery*, 449 U.S. at 471. The ZEC program was designed to prevent the closure of the three in-state nuclear facilities receiving the ZEC subsidy. That

violated the Commerce Clause, even assuming, *arguendo*, that the protectionist purpose had long-term environmental motives.

### D. Plaintiffs Have Stated a *Pike* Claim

Even if a legitimate interest supported the PSC's protectionism (which it does not), the Complaint pleads facts showing that "the burden imposed on such [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). AOB 53-54. By driving out and deterring entry of more cost-efficient, environmentally sound out-of-state generators, the ZEC program may thwart, rather than advance, the putative local environmental benefits. (A-56-59 (Compl. ¶¶ 43-48).) Defendants may disagree, but their arguments to the contrary are premature. *See Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 95 (2d Cir. 2009) (plaintiffs stated *Pike* claim based on factual allegations in complaint).

Defendants argue there is no cognizable burden on interstate commerce because in-state generators other than Exelon also are subject to discrimination. EAB 64-65; NYAB 52-53. But that argument has been repeatedly rejected:

> For example, in *Bacchus Imports, Ltd. v. Dias*, [468 U.S. 263, 265 (1984)], we held unconstitutional under the Commerce Clause a special exemption from Hawaii's liquor tax for certain locally produced alcoholic beverages (okolehao and fruit wine), even though other locally produced alcoholic beverages were subject to the tax. …
> And in *Lewis v. BT Investment Managers, Inc.*, [447 U.S. 27 (1980)], we held unconstitutional a Florida statute that excluded from certain business activities in Florida not all out-of-state entities, but only out-

46

of-state bank holding companies, banks, or trust companies.  In neither of these cases did we consider the size or number of the in-state businesses favored or the out-of-state businesses disfavored relevant to our determination.  Varying the strength of the bar against economic protectionism according to the size and number of in-state and out-of-state firms affected would serve no purpose except the creation of new uncertainties in an already complex field.

*New Energy Co.*, 486 U.S. at 276-77.

Finally, Defendants argue that *Allco* forecloses Plaintiffs' *Pike* claim. (NYAB 57-58; EAB 64-65.)  But in *Allco*, the complaint presented only "conclusory allegations" that said nothing about whether the "burden" on interstate commerce was "excessive" in relation to the law's "putative local benefits."  861 F.3d at 103; *see also, e.g.*, *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 503 (7th Cir. 2017) (to state a *Pike* claim, plaintiff must "plead specific facts to support a plausible claim that the ordinance has a discriminatory effect on interstate commerce").

By contrast, Plaintiffs have alleged both elements in detail.  (A-56-71 (Compl. ¶¶ 43-75).)  Moreover, the REC program at issue in *Allco* was quite different from the ZEC subsidy here.  First, Connecticut's REC-purchasing requirement favored a broad, FERC-defined region—including multiple states— and did not present the same kind of in-state protectionism present here.  861 F.3d at 93.  Second, the program favored materially different state-law-created RECs with distinct "legal requirements," merely differentiating between "two types of

47

RECs [that] are different products," not between the underlying fungible energy sold through NYISO, as New York has done. *Id.* at 103, 105. Plaintiffs' Commerce Clause claim is supported by plausible allegations, and Defendants have not justified dismissal of the Complaint without discovery into the purposes and effects of the ZEC subsidy.

## CONCLUSION

This Court should reverse the district court's decision granting Defendants' motion to dismiss and remand the case with instructions to consider Plaintiffs' motion for preliminary injunction.

Dated:  December 1, 2017                    Respectfully submitted,


By:  */s/ Donald B. Verrilli, Jr.*
      Donald B. Verrilli, Jr.
      MUNGER, TOLLES & OLSON LLP
      1155 F Street, NW
      Washington, DC  20004
      Telephone:    (202) 220-1100

      Henry Weissmann
      Fred A. Rowley, Jr.
      Mark R. Yohalem
      MUNGER, TOLLES & OLSON LLP
      350 South Grand Ave., Ste. 5000
      Los Angeles, CA  90071
      Telephone:    (213) 683-9100

      Jonathan D. Schiller
      David A. Barrett
      BOIES SCHILLER FLEXNER LLP
      575 Lexington Ave.
      New York, NY  10022
      Telephone:    (212) 446-2300

      Stuart H. Singer
      BOIES SCHILLER FLEXNER LLP
      401 E. Las Olas Blvd., Ste. 1200
      Fort Lauderdale, FL  33301
      Telephone:    (954) 356-0011


      *Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the word limit set by this Court's order of November 30, 2017 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,967 words, as determined by Microsoft Word 2010.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)  and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

By:  */s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.
*Attorney for Plaintiffs-Appellants*

50